# Exhibit B

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION
 3  KADEN MCNAMARA on Behalf    )
    of Himself and Others       )
 4  Similarly Situated,         )
                                )
 5          Plaintiff,          ) CIVIL ACTION
                                )
 6  VS.                         ) NO.: 1:24-CV-869-DAE
                                )
 7  BOAT TOWN, INC., CLAYTON    )
    RAVEN, and CLAY RAVEN,      )
 8                              )
             Defendants.
 9
10       ---------------------------------
11        ORAL DEPOSITION OF KADEN MCNAMARA
12               AUGUST 13, 2025
13                 VOLUME 1
14       ---------------------------------
15        ORAL DEPOSITION OF KADEN MCNAMARA, produced as a
16  witness at the instance of the DEFENDANTS, and duly
17  sworn, was taken in the above-styled and numbered cause
18  on August 13, 2025, from 9:28 a.m. to 12:07 p.m., before
19  Marta M. Johnson, CSR No. 10743, in and for the State of
20  Texas, reported by machine shorthand, at the law offices
21  of Jackson Lewis P.C., 93 Red River Street, Suite 1150,
22  Austin, Texas 78701, pursuant to the Federal Rules of
23  Civil Procedure and the provisions stated on the record
24  or attached hereto.
25
```

**Page 3**

```
 1                   INDEX
 2
 3  KADEN MCNAMARA                         PAGE
 4    Appearances               2
 5    Examination By Mr. DePonte          4
 6    Reporter's Certificate          95
 7
 8            EXHIBITS
 9  NO.     DESCRIPTION                 PAGE
10  Exhibit 1    Resume              23
11  Exhibit 2    Resume              25
12  Exhibit 3    Resume              26
13  Exhibit 4    Resume              28
14  Exhibit 5    Boat Town, Inc., Employee Handbook    51
15  Exhibit 6    Emails              60
16  Exhibit 7    Boat Town Acknowledgement       61
17  Exhibit 8    Plaintiffs' Answers and Objections    86
                 to Defendants' First Set of
18               Interrogatories
19
20
21
22
23
24
25
```

**Page 2**

```
 1          APPEARANCES
 2  FOR THE PLAINTIFF KADEN MCNAMARA:
 3    MS. TANNER SCHEEF, ESQ.
      KAPLAN LAW FIRM, PLLC
 4    2901 Bee Cave Road
      Suite G
 5    Austin, Texas 78746
      Phone: (512) 814-8522
 6    Tscheef@kaplanlawatx.com
 7
    FOR THE DEFENDANTS BOAT TOWN, INC., CLAYTON RAVEN, and
 8  CLAY RAVEN:
 9    MR. MICHAEL J. DEPONTE, ESQ.
      JACKSON LEWIS P.C.
10    500 North Akard
      Suite 2500
11    Dallas, Texas 75201
      Phone: (214) 520-2400
12    Fax: (214) 520-2008
      Michael.deponte@jacksonlewis.com
13
14  ALSO PRESENT:
15    Bonnie Harrell
      Clayton Raven
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1            KADEN MCNAMARA,
 2  having been first duly sworn, testified as follows:
 3            EXAMINATION
 4  BY MR. DEPONTE:
 5    Q.  All right.  Will you state your name for the
 6  record?
 7    A.  Kaden McNamara.
 8    Q.  All right.  Kaden, my name is Mike DePonte.
 9  I'm with Jackson Lewis.  You understand I represent the
10  defendants in this matter that you brought against Boat
11  Town?
12    A.  Yes.
13    Q.  Okay.  And this isn't a marathon.  If you need
14  to take a break, just let me know.
15    A.  Okay.
16    Q.  The only thing I ask is, if there's a question
17  on the table, if you would answer the question before we
18  take a break.
19    A.  Okay.
20    Q.  And you understand that your testimony today is
21  expected to be truthful and accurate as if you were in a
22  court of law testifying?
23    A.  Yes.
24    Q.  Okay.  And if you don't understand something
25  or -- something I ask you, will you ask me to clarify
```

Page 5

1  the question?
2      A.  Absolutely.
3      Q.  And if you do answer the question, can we go
4  ahead and assume that you understood it?
5      A.  Yes.
6      Q.  Okay.  And you're doing great.  If you'll make
7  sure your answers are audible, like, "yes" or "no," that
8  will help out the court reporter.
9      A.  Absolutely.
10     Q.  Okay.  Instead of "uh-huh" or "huh-uh."  They
11  hate that.
12          Are you taking any drugs or medications
13  that would affect your ability to testify today?
14     A.  No.
15     Q.  I know it's early.  I assume you haven't had
16  any alcohol to drink today?
17     A.  No.
18     Q.  Okay.  And you understand that when I refer to
19  Boat Town I'm referring to your former employer?
20     A.  Yes.
21     Q.  Okay.  And where did you primarily work for
22  Boat Town?
23     A.  At the Southern Marlow location.
24     Q.  Okay.  And do you recall that address?
25     A.  I do not.

Page 6

1      Q.  Okay.  Fair enough.
2          Did you work at other locations?
3      A.  I worked with a, like, sister location in LBJ,
4  but I wasn't working for that comp- -- for that, you
5  know, part of it.
6      Q.  Okay.  And -- so what did you do to prepare for
7  your deposition today, besides talk to your attorney,
8  which I don't want to know about?
9      A.  I -- I think I just reviewed any documentation
10  that we had and that you sent over.
11     Q.  Okay.  Now, I know what I sent over.  What --
12  were there other documents than what y'all have produced
13  that you reviewed?
14     A.  No.
15     Q.  Okay.  And I saw some stuff was produced last
16  night.  I haven't even had a chance to look at it.  Did
17  you look for that stuff previously or did you...
18     A.  Yes.
19     Q.  Okay.  And you just found it, like, yesterday?
20     A.  I -- I believe it was already sent over, but I
21  just wanted to make sure.
22     Q.  Okay.  All right.  Did you talk to anybody
23  besides your attorney about your testimony today?
24     A.  No.
25     Q.  Did you -- you didn't talk to any former

Page 7

1  employees, current employees of Boat Town?
2      A.  No.
3      Q.  Okay.  And since your employment with Boat
4  Town, have you spoken with any Boat Town employees?
5      A.  Say again.
6      Q.  Sure.
7          Since you left Boat Town, which was in
8  September 2023?
9      A.  Yes.
10     Q.  Have you had any contact with any Boat Town
11  employees?
12     A.  Yes.
13     Q.  Okay.  Who?
14     A.  Daniel.
15     Q.  Daniel, what is Daniel's last name?
16     A.  Lopez.
17     Q.  And I'll ask you about him in a moment.  You're
18  doing great, but you -- as you can tell, we kind of get
19  into a conversation because you kind of know what my
20  question's going to be, and you already know what your
21  answer is.  If you could let me finish my question, I
22  promise I'll let you finish your answer, because she
23  can't take down what we're saying at the same time.
24     A.  Sorry about that.
25     Q.  That's okay.  It's not your fault.  It's

Page 8

1  natural.
2          All right.  What was Daniel Lopez's
3  position at Boat Town?
4      A.  He was a delivery captain.
5      Q.  And is he still employed by Boat Town?
6      A.  I believe so.
7      Q.  And how do you know Daniel?  Just --
8      A.  He was a co-worker.
9      Q.  Did you know him before working for Boat Town?
10     A.  No.
11     Q.  And when did you last meet with Daniel?
12     A.  I don't know.
13     Q.  In your time -- how often have you met with
14  Daniel since your employment with Boat Town?
15     A.  Maybe a handful of times.
16     Q.  Okay.  And have you discussed your lawsuit or
17  the claims in your lawsuit with Daniel?
18     A.  Briefly.
19     Q.  Okay.  What did y'all talk about?
20     A.  Specifically?
21     Q.  Yes.
22     A.  I think the general ideas of what happened, but
23  I don't think there were any specifics talked about.
24     Q.  When you say the general ideas of what
25  happened, what would that be?

Page 9

1    A. I guess more, like, a general overview of the
2  situation and what happened and why I was terminated.
3    Q. And did he -- he didn't supervise you; right?
4    A. No.
5    Q. So he was just a co-worker?
6    A. I believe so.
7    Q. Okay.
8    A. That was my understanding.
9    Q. So you don't know if he knows any reasons why
10 you were discharged; correct?
11   A. I believe he understands why to an extent.
12 Obviously, I -- I don't know what he knows in his own
13 head.
14   Q. Okay.  And you don't know where he got that
15 information from; correct?
16   A. It could have been anywhere, including myself.
17   Q. Okay.  So you don't know?
18   A. I don't know.
19   Q. Okay.  Understood.
20       Anybody else from Boat Town with whom
21 you've spoken?
22   A. Since?
23   Q. Since your employment with Boat Town.
24   A. I don't believe so.
25   Q. Okay.

Page 10

1    A. Actually, I think I've -- I've run into Geromi
2  since then, but I don't think he works at Boat Town
3  anymore.
4    Q. What is Geromi's last name?
5    A. Trudeau.
6    Q. And what was Geromi's position at Boat Town?
7    A. He was my supervisor.  He was a salesman.
8    Q. And just for the record, you were a boat
9  captain for -- at Boat Town?
10   A. Yes.
11   Q. And so sales people supervised boat captains?
12   A. He did specifically.  I don't know if the other
13 ones did.
14   Q. And so why do you say he was your supervisor?
15 Did he give you direction, discipline you?
16   A. Yeah.  He would -- he would give me directions
17 on what to do.  But also he would be the one who would,
18 I guess, correct any time card issues or, you know, I
19 guess, basically deal with whatever I needed.
20   Q. Okay.  Anyone else with whom you have spoken
21 from Boat Town since your employment ended with Boat
22 Town?
23   A. No.
24   Q. And aside from Boat Town employees -- or aside
25 from Daniel Lopez and your attorney, have you spoken to

Page 11

1  anybody else about your claims against Boat Town?
2    A. Say it again.
3    Q. Sure.
4       Aside from your attorney and Mr. Lopez,
5  have you spoken to anyone else about your claims against
6  Boat Town?
7    A. I suppose my girlfriend and my parents.
8    Q. Okay.  Do they leave -- excuse me.  Do they
9  live here in the Austin area?
10   A. My parents live in Canyon Lake and my
11 girlfriend lives with me.
12   Q. Okay.  And we'll get to them here in a moment.
13 Okay.  So I know you stated your name for the record
14 when we started, but do you go by any other names?
15   A. No.
16   Q. Any nicknames?
17   A. Not that I'm aware of.
18   Q. Okay.  And how old are you?
19   A. Right now I'm Redac
20   Q. Okay.  And what's your date of birth?
21   A. Redacted
22   Q. And where do you currently reside?
23   A. I'm currently in a duplex in Buda.
24   Q. What's the address there?
25   A. Redacted .

Page 12

1    Q. Southfield?
2    A. Suffield, S-u-f-f-i-e-l-d.
3    Q. And what's the ZIP code there?
4    A. 78610.
5    Q. And are you renting?
6    A. I am.
7    Q. And where did you reside -- how long have you
8  been there?
9    A. Since March, I believe.  Oh, sorry.  It was
10 just after December.
11   Q. So January?
12   A. Yeah.  The last week --
13   Q. Or December?
14   A. -- of December.
15   Q. Okay.  So December of 2024.
16       Where did you reside before that?
17   A. I was also in an apartment in Bee Cave.
18   Q. And what was the address there?
19   A. Redacted .
20   Q. Do you recall the ZIP code?
21   A. 787-- no, I don't.  I don't remember.
22   Q. Okay.  And I think you said you currently
23 reside with your girlfriend?
24   A. Yes.
25   Q. What is her name?

**Page 13**

1    A. Redacted .
2    Q. And I think you said your parents live off of
3 Canyon Lake; is that correct?
4    A. Yeah.
5    Q. Okay. What are their names?
6    A. Redacted .
7    Q. Redacted ?
8    A. Yeah. Redacted.
9    Q. And Redacted?
10   A. Redacted.
11   Q. McNamara?
12   A. Yes.
13   Q. Okay. Any other family in the area?
14   A. My sister.
15   Q. Where does she live?
16   A. She lives with my parents.
17   Q. How old is she?
18   A. She's Redacted.
19   Q. Okay. What's her name?
20   A. Redacted
21   Q. All right. Have you ever declared bankruptcy
22 before?
23   A. No.
24   Q. Have you ever been convicted of a crime?
25   A. No.

**Page 14**

1    Q. Have you ever pled guilty to a crime?
2    A. No.
3    Q. Have you ever been a witness to a trial or
4 another lawsuit?
5    A. I have not.
6    Q. Okay. Have you ever had your deposition taken
7 before?
8    A. I have -- also have not.
9    Q. Okay. And aside from your current attorneys,
10 what other attorneys -- or did you contact any other
11 attorneys about your lawsuit?
12   A. I reached out to multiple attorneys before
13 finding this one.
14   Q. When did you start looking for an attorney?
15   A. Right after my termination.
16   Q. And aside from this lawsuit, have you ever been
17 represented by an attorney?
18   A. I have not.
19   Q. Okay. Do you currently have health insurance?
20   A. Through my parents.
21   Q. Have you always had health insurance through
22 your parents?
23   A. I believe so.
24   Q. So you didn't get health insurance through Boat
25 Town; correct?

**Page 15**

1    A. I don't believe so. I think it was offered,
2 but I declined.
3    Q. So you haven't had any medical bills you
4 couldn't pay or anything like that; correct?
5    A. I don't believe so.
6    Q. Okay. Are you currently suffering from any
7 mental or emotional conditions?
8    A. Yes.
9    Q. Okay. Which one? Mental or emotional, or
10 both?
11   A. Both.
12   Q. Okay. What is your emotional condition?
13   A. Depression, anxiety.
14   Q. Anything else?
15   A. Not that I can recall at this time.
16   Q. Have you seen a professional regarding your
17 depression and anxiety?
18   A. I have, and I'm on medications.
19   Q. What's the name of your physician or counselor?
20   A. I would have to look at that.
21   Q. Ricardo Longarini?
22   A. Yes, that's correct. And then I believe I also
23 saw Stassen for a different issue.
24   Q. What was that issue?
25   A. GI issues.

**Page 16**

1    Q. Stassen, how do you -- is that a doctor?
2    A. Yes. It's his last name.
3    Q. Do you have a first name?
4    A. I don't. I would have to look back. It's been
5 a while.
6    Q. And when did you start having GI issues?
7    A. Right before the summer of '23.
8    Q. So you're not claiming that that is -- that was
9 caused by Boat Town, are you?
10   A. I believe it was exacerbated by it, the stress
11 of the issue.
12   Q. And your depression and anxiety, are you
13 alleging that was -- well, when did you first start
14 suffering from those?
15   A. That I don't recall.
16   Q. Well, when did you first start seeing
17 Dr. Longarini?
18   A. That was -- actually, I don't know that either.
19 I'm sure I can find a record of it, though.
20   Q. Do you remember when you first started taking
21 Wellbutrin?
22   A. That was recently, within the last year and a
23 half.
24   Q. And are you alleging that your depression and
25 anxiety were caused by Boat Town?

Page 17

1    A. I believe they were exacerbated and, yes,
2  continually -- now.
3    Q. So you had those conditions before you came to
4  work for Boat Town?
5    A. Maybe as a general idea, but not nearly as bad
6  as after.
7        MR. DEPONTE: Counselor, did y'all ever get
8  those records from the doctor, because your responses
9  said you would produce them?
10        MS. SCHEEF: We requested them. I can send
11  a follow-up request.
12        MR. DEPONTE: Okay.
13        MS. SCHEEF: I just noted that, and I'll
14  message our paralegal.
15    Q. (BY MR. DEPONTE) And so how often are you
16  depressed or feel anxiety?
17    A. A lot of the time.
18    Q. A lot, as in, how many days a week?
19    A. Well, all of them. I'm -- I mean, I don't
20  think depression really goes away when you think about
21  the situation all the time.
22    Q. Any other mental or emotional conditions that
23  we haven't discussed from which you're currently
24  suffering?
25    A. Not that I can recall.

Page 18

1    Q. And you don't recall when either your
2  depression, anxiety, or GI issues started; correct?
3    A. I believe the GI issues started in the summer
4  of '23, if -- beginning of summer 2023.
5    Q. And are you taking anything for those issues?
6    A. The GI issues?
7    Q. Uh-huh.
8    A. I'm not currently taking anything.
9    Q. Do you have any hobbies?
10    A. Hobbies?
11    Q. Yeah.
12        Like, what do you do in your free time?
13    A. Disk golf.
14    Q. Okay. Anything else?
15    A. Not really.
16    Q. Okay. When did you start playing disk golf?
17    A. Not too long ago.
18    Q. Okay. Do you belong to any civic groups or
19  churches?
20    A. I do not. I am not.
21    Q. So where did you attend high school?
22    A. I was homeschooled.
23    Q. So did you get a GED of equivalent or...
24    A. Yes.
25    Q. And when was that?

Page 19

1    A. 2016 or 2017.
2    Q. And what did you do after high school?
3    A. I went on to my associate's degree in
4  San Antonio.
5    Q. At where?
6    A. San Antonio Community.
7    Q. And did you get your associate's degree?
8    A. I did.
9    Q. And when did you get that?
10    A. 2019.
11    Q. Did you work while you were at San Antonio
12  Community?
13    A. I did lawn maintenance for the neighborhood.
14    Q. So what did you do after attending -- is it
15  San Antonio Community College?
16    A. Yes.
17    Q. Okay. What did you do after San Antonio
18  Community College?
19    A. I enrolled in Texas State University and then
20  withdrew.
21    Q. So you would have enrolled when, fall of...
22    A. 2019.
23    Q. Okay. And then when did you withdraw?
24    A. To the best of my recollection, it was
25  somewhere in that fall semester.

Page 20

1    Q. Okay. Why did you withdraw?
2    A. I guess a bunch of different reasons.
3    Q. Okay. What were some of those?
4    A. One of them was relationship issues, the
5  apartment that I was in, and then some COVID-related
6  issues during that time.
7    Q. Was --
8    A. That was, like, right at the beginning of the
9  COVID era.
10    Q. What were the apartment issues?
11    A. The apartment was not adequate.
12    Q. And what were the relation issues --
13  relationship issues?
14    A. Those were more personal, I think, than I'd
15  rather talk about.
16    Q. Well, did they cause you to be depressed?
17    A. I -- no, I don't think so.
18    Q. Cause you any anxiety?
19    A. As relationships do, give you a little anxiety.
20    Q. So the answer to that is, yes, you suffered
21  anxiety as a result of your relationship issues in 2019;
22  correct?
23        MS. SCHEEF: Objection, form.
24    Q. (BY MR. DEPONTE) Am I correct? Is that a
25  correct statement?

Page 21

1    A. I don't believe so.
2    Q. So you didn't have any anxiety as a result of
3  your relationship issues?
4    A. I don't think that's true either.
5    Q. Well, which is it?  Did you or did you not have
6  anxiety as a result of your relationship issues?
7    A. I don't think it's a result of and as a
8  continuing basis.  I think I had anxiety while I was in
9  the situation, but not to the extent that I have it now.
10   Q. And how was the apartment inadequate?
11   A. It was student housing, so the relationship
12 issues, along with the apartment style definitely made
13 an impact.
14   Q. Were you living with somebody in the --
15   A. Yes.
16   Q. -- student housing?
17   A. My girlfriend.
18   Q. And what was the girlfriend's name?
19   A. Stephanie.
20   Q. What's her last name?
21   A. That I don't remember.
22   Q. So did you ever go back to school after leaving
23 in the fall of 2019?
24   A. I did not.
25   Q. Did you get COVID in the fall of 2019?

Page 22

1    A. In the winter of 2019.
2    Q. You did get COVID, then?
3    A. (Witness nods affirmatively.)
4    Q. So what did you do after the winter of 2019?
5    A. Winter of 2019?
6    Q. After you dropped out of Texas State, what did
7  you do?
8    A. I moved back to my parents' house and then I
9  got a job at Canyon Lake Adventures.
10   Q. And what does Canyon Lake Adventures do?
11   A. They're a -- a boat rental place in Canyon Lake
12 that does tours on Canyon Lake.
13   Q. Did you take any other classes or trainings or
14 certifications since you dropped out of college?
15   A. Since I dropped out of college?
16   Q. Yes.
17   A. Yes, I have.
18   Q. Okay.  What have you done?
19   A. Can you repeat that?
20   Q. Sure.
21      What trainings have you done for which
22 you've, like, received a certification since you dropped
23 out of college in the winter of 2019?
24   A. I believe I have quite a few.  But one of them
25 is a drone operator license, Part 107, for remote

Page 23

1  pilots.  I also got my real estate license.
2         MR. DEPONTE:  That's just really obnoxious.
3    Q. (BY MR. DEPONTE)  When did you get your real
4  estate license?
5    A. Ooh.  I want to say it was 2021.  I might be
6  wrong about that.
7    Q. And when did you get your drone operator
8  license?
9    A. That I don't remember.
10   Q. Any other licenses or certifications that you
11 have?
12   A. I might.  I -- not that I can recall right now.
13      (Exhibit 1 was marked for identification.)
14   Q. (BY MR. DEPONTE)  Let me hand you what I'm
15 going to mark as Deposition Exhibit 1.  Do you recognize
16 this document?
17   A. I do.
18   Q. And this is your resume; correct?
19   A. Yes.  One of them.
20   Q. And so this indicates that you were a licensed
21 Realtor from 2021 to 2023; correct?
22   A. Yes.
23   Q. And were you actively using that license during
24 that time frame?
25   A. Yes.

Page 24

1    Q. And was that through EXP Realty?
2    A. Yes, it was.
3    Q. Okay.  So what were you doing for EXP Realty?
4    A. I was a real estate agent.  I didn't use the
5  license for the entire duration.  I held onto the
6  license until 2023, but I was only active, I believe,
7  until maybe the start of 2022.
8    Q. And have you let your license lapse?
9    A. It is expired now.
10   Q. When did it expire?
11   A. In 2023.
12   Q. And was that all commission based?
13   A. It was.
14   Q. How'd you do?
15   A. Not well.
16   Q. And then the next thing on the -- your resume
17 indicates you were drone services and repair, I guess,
18 and owner operator.  Was that the name of the business?
19   A. It's a general idea of what the business is.  I
20 guess it -- it was never really a business, it was more
21 of a side gig.
22   Q. Okay.  Did you make much money from that?
23   A. Not a lot of money from that.
24   Q. And it also says you were doing sales and
25 delivery for MasterCraft, Cobalt, and Barletta

Page 25

1 dealership?
2     A. That's for Boat Town.
3     Q. Okay. So this is after Boat Town, this resume?
4     A. Sorry?
5     Q. Sure.
6         When did you draft this resume?
7     A. Oh, I believe earlier this year.
8     Q. So the first job that's listed here, though, is
9 that you're a licensed Realtor for EXP Realty through
10 2023?
11     A. I had my license through then.
12     Q. Are you -- were you licensed -- you had your
13 license through EXP Realty?
14     A. Yes.
15     Q. But you're saying you weren't really doing
16 anything for them --
17     A. Correct.
18     Q. -- since 2022?
19         (Exhibit 2 was marked for identification.)
20     Q. (BY MR. DEPONTE) Let me hand to you what I've
21 marked as Deposition Exhibit 2. Do you recognize this
22 document?
23     A. I do.
24     Q. And is this a similar resume?
25     A. I suppose so.

Page 26

1     Q. Well, I don't know. I mean, I didn't create
2 them, so I'm trying to understand why you -- you have
3 these two different resumes, and I'm just trying to
4 understand the difference between the two.
5     A. One was created before the other. And there's
6 different information on both of them.
7     Q. Well, which one was created first?
8     A. I believe the Exhibit 2. Now, these were both
9 modified at different times, and I -- I don't recall
10 when that was.
11     Q. And so you have some different dates here, too.
12 Because you have owner/operator of drone services
13 starting in 2018 to present, but you have 2016 to
14 current on your other resume. Which one is correct?
15     A. I believe the -- I believe this one is -- is --
16 the Exhibit 2 is a typo.
17     Q. Okay. So would you say Exhibit 2 is more
18 accurate or Exhibit 1?
19     A. That I'm unsure about just looking at these.
20 As far as I can tell right now, Exhibit 1 is more
21 accurate.
22         (Exhibit 3 was marked for identification.)
23     Q. (BY MR. DEPONTE) Well, let me hand you what
24 I'm going to mark as Deposition Exhibit Number 3. Do
25 you recognize this document?

Page 27

1     A. I do.
2     Q. Okay. And what is this?
3     A. Another resume.
4     Q. Okay. Where does this fall in the timeline of
5 resumes?
6     A. That I couldn't tell you. I made quite a few
7 versions of resumes trying to figure out how to do it
8 and do it well to find a job.
9     Q. Well, and this indicates that you were working
10 as an associate tech -- test technician for Icon through
11 March of 2025; correct?
12     A. Yes.
13     Q. So you would agree with me, then, that this has
14 to be after your employment with Boat Town?
15     A. Yes.
16     Q. And prior to that, you have listed -- listed
17 Lynx Contractors; correct?
18     A. Yes.
19     Q. So from May 2024 to August 2024?
20     A. Yes.
21     Q. So it has to be after that, too; correct?
22     A. Correct.
23     Q. Okay. So am I correct in saying that
24 Deposition Exhibit 3 you prepared in 2025?
25     A. Yes.

Page 28

1     Q. Okay. But you just don't know when?
2     A. Correct.
3         (Exhibit 4 was marked for identification.)
4     Q. (BY MR. DEPONTE) I'm going to hand you what
5 I'm going to mark as Deposition Exhibit Number 4. I
6 think this is another version of your resume. Do you
7 know when this one was created?
8     A. No. I believe also 2025.
9     Q. So this one, Deposition Exhibit 4, has pickup
10 and delivery driver for Boat Town from February 2022 to
11 September 2023; correct?
12     A. Yes.
13     Q. And then it has associate test technician for
14 Icon from August 2024 to March 2025; correct?
15     A. Yes.
16     Q. Where's your work for Lynx Contractors?
17     A. I guess it was omitted for some reason.
18     Q. You don't know why you omitted it?
19     A. No. Probably just a mistake.
20     Q. So what did you do for Lynx Contractors?
21     A. I drove a boat in Lady Bird Lake carrying
22 people and supplies to -- for an abatement company.
23 They were working on the underside of the bridge.
24     Q. And how did you find that job?
25     A. They contacted me through Work in Texas.

Page 29

1  Q. Through whom? I'm sorry.
2  A. Work in Texas. It's a website.
3  Q. Is that a website you went to to -- or --
4  A. It's a website that you -- you are supposed to
5  sign up for when you receive unemployment.
6  Q. And when did they call you? Or when did they
7  reach out to you?
8  A. That's quite a while ago. Obviously, I -- I
9  assume before I started, but I don't know how long
10 before.
11 Q. Well, this indicates you're -- at least
12 Deposition Exhibit 3 indicates you worked for them from
13 May 2024 to August 2024. So would you agree with me
14 that it had to be before May 2024?
15 A. Correct.
16 Q. And if you were getting them through your
17 unemployment benefits, you would agree with me it had to
18 be after September 2023?
19 A. Correct.
20 Q. Okay. So we kind of have this six-month --
21 six-, seven-month window when I guess they reached out
22 to you?
23 A. If I recall correctly, I only had a few weeks
24 to prepare for that position, if that.
25 Q. And what kind of preparations did you do for

Page 30

1  that position?
2  A. Well, at first we thought it was going to be an
3  overnight position, so I started switching my schedule
4  for that.
5  Q. What were you switching your schedule from?
6  A. From waking up at 8:00 or 9:00 in the morning
7  and going to bed at 9:00 or 10:00 at night.
8  Q. So changing your sleep schedule?
9  A. Yes.
10 Q. And you indicate that your employment there
11 ended in August of 2024; correct?
12 A. Yes.
13 Q. Why did it end?
14 A. The contract was up. The job was completed.
15 Q. Did they have any other contracts?
16 A. That I don't know.
17 Q. Did you seek any other work with them?
18 A. Yes.
19 Q. But you weren't hired?
20 A. Correct.
21 Q. Do you know why?
22 A. I believe they don't -- they didn't need a boat
23 driver anymore. I think the rest of their stuff was on
24 land.
25 Q. And did you have any disciplinary issues with

Page 31

1  Lynx?
2  A. No.
3  Q. Who was your supervisor?
4  A. I don't recall his name at the moment.
5  Q. Do you remember who hired you?
6  A. Kelly.
7  Q. What is Kelly's last name?
8  A. That I don't know.
9  Q. And how much did you make at Lynx Contractors?
10 A. It was $2,000 a week.
11 Q. Was that -- was that wages or as an independent
12 contractor?
13 A. As an independent.
14 Q. So unless my math is wrong, you were making
15 about $104,000 a year with them during the four months
16 you worked there for them?
17 A. For a very short amount of time.
18 Q. Well, May through August of 2024; correct?
19 A. Correct. And it was the end of May to the
20 beginning of August.
21 Q. So basically three months?
22 A. I believe so.
23 Q. Do you recall how much a week you were making
24 at Boat Town?
25 A. That I don't remember.

Page 32

1  Q. Do you remember how many -- how much you were
2  paid per hour at Boat Town?
3  A. It was different throughout the entire thing.
4  I think I started at $18 and ended up at $24 an hour.
5  $22 an hour.
6  Q. So at 40 hours a week, $24 an hour, that's
7  about $960 a week; correct?
8  A. Yes. That sounds right.
9  Q. So you kind of doubled what you were making
10 working for Lynx than what you were making at Boat Town?
11 A. Yes. But it was a contract position and I
12 needed to deal with my own taxes.
13 Q. And then you -- you immediately got a job at
14 Icon as an associate test technician?
15 A. Yes.
16 Q. In August of 2024?
17 A. Pretty -- pretty close after that, yeah.
18 Q. How did you come across that job?
19 A. I got referred into that position by McKenna's
20 brother.
21 Q. And what did you do for Icon?
22 A. I was a test technician, so...
23 Q. What does a test technician do?
24 A. Basically I was working on their machines,
25 getting them ready for field, also testing new

Page 33

1 improvements, and I guess many other things, but that
2 was the main goal.
3    Q. When you say "working on their machines," what
4 type of machines do they have?
5    A. They -- they are 3-D printing machines for
6 homes, making homes out of concrete.
7    Q. And how much did you make at Icon?
8    A. $24 an hour, I believe.
9    Q. And were you working 40 hours a week?
10    A. I believe so.
11    Q. Did you work more than 40 hours a week?
12    A. I believe sometimes, yes.
13    Q. So some overtime?
14    A. Some overtime.
15    Q. And your resume indicates that you worked there
16 from August of 2024 to March 2025?
17    A. Yes.
18    Q. Why did your employment there end?
19    A. They did a company layoff of about 37 -- 33 to
20 37 percent of their workforce.
21    Q. How large was their workforce?
22    A. Large. At least a couple hundred employees.
23    Q. Before the layoff?
24    A. Yes. And that's as far as I know. I wouldn't
25 know specifics.

Page 34

1    Q. And do you know how it was that you were
2 selected for the layoff?
3    A. I do not.
4    Q. And so what did you do after Icon?
5    A. We get into, I guess, current now. I've been
6 looking for jobs consistently since then, reaching out
7 to anybody I could.
8    Q. So did you file again for unemployment after
9 your work with Icon?
10    A. I did. I was denied the first time just
11 because of how much money I made in the last year. That
12 was acceptable to them. And then I filed again in July
13 and was accepted.
14    Q. And how much in unemployment benefits do you
15 receive?
16    A. Currently?
17    Q. Yes, sir.
18    A. None.
19    Q. How much did you receive in July?
20    A. None. Currently it's not accepted yet.
21    Q. Oh. So you've refiled but you're still not
22 receiving benefits yet?
23    A. Correct.
24    Q. How much did you make in unemployment benefits
25 after your employment with Boat Town?

Page 35

1    A. I would have to look back at the paperwork.
2    Q. And aside from your Department of Labor
3 complaint that you identified in the petition, have you
4 filed any complaints with any other state or federal
5 commissions or entities?
6    A. I don't believe so.
7    Q. Did you -- after your employment with Boat
8 Town, did you apply for any positions that you did not
9 receive?
10    A. Many.
11    Q. Okay. Then did you receive -- did you apply
12 for any positions after your employment with Boat Town
13 that you received but declined?
14    A. Not that I recall at the moment.
15    Q. So since September 2023, you haven't declined
16 any jobs?
17    A. I believe there was -- there might have been
18 one that I declined due to liability.
19    Q. I'm sorry. I don't understand.
20       What do you mean "due to liability"?
21    A. I believe, if I'm thinking about this
22 correctly, I think it was a -- another boat rental
23 place, but they wanted to hire me as an independent
24 contractor, which would mean that I needed my own
25 insurance. And I wasn't comfortable with driving their

Page 36

1 boats under that risk.
2    Q. How much were they willing to pay?
3    A. Oh, that I don't remember.
4    Q. And what was the name of the company?
5    A. I would have to look back and see.
6    Q. And so how soon after your employment with Boat
7 Town did you receive that offer?
8    A. I believe that was more recent. Like, within
9 the last six months.
10    Q. Oh, I'm sorry. I thought you said it was in
11 2023 that you declined it?
12    A. No. I did not say that.
13    Q. And so what types of jobs did you look for
14 following your employment with Boat Town?
15    A. Anything that I was qualified for.
16    Q. And I'm sorry. Let me take a step back.
17       When you say that this unknown boat rental
18 company wanted you to have your own insurance and hire
19 you as an independent contractor, was there an issue
20 with getting insurance as an independent contractor?
21    A. I called around to see if I could, and I had
22 issues trying to find a company that would supply that.
23    Q. Why did you have issues?
24    A. I think it was a timing thing as well. They
25 wanted me to start work almost immediately before I

Page 37

1 could take the time to find that kind of insurance.
2    Q. Did you talk to a broker about getting that
3 type of insurance?
4    A. A broker?
5    Q. Yeah.
6        Somebody who sells insurance?
7    A. Yes. I made a few calls.
8    Q. Not just insurance companies, but somebody who
9 specifically deals with insurance for independent
10 contractors or boats or those things?
11    A. I don't remember exactly who I talked to at
12 that point. This was a while ago.
13    Q. So you don't even know how much that would have
14 cost?
15    A. I don't.
16    Q. Did you go through any employment agencies for
17 work?
18    A. I did reach out to a few. One in North Austin.
19    Q. Did you get any placements through those
20 employment agencies?
21    A. I did not.
22    Q. And did you keep a list of the employers to
23 which you applied?
24    A. I'm keeping one currently. And I tried to make
25 one of my past applications from the data from Indeed

Page 38

1 and other sites.
2    Q. When did you try to make that?
3    A. I requested the information maybe a few weeks
4 ago. And I believe we sent it over last night.
5        MS. SCHEEF: Counselor, that's the
6 documents we produced yesterday.
7        MR. DEPONTE: Oh. All right. I'll have to
8 take a look at those.
9        MS. SCHEEF: Apologies for that.
10    Q. (BY MR. DEPONTE) All right. And did you limit
11 your search, your job search, at all by geography?
12    A. I did.
13    Q. Okay. What was the geography to which you
14 limited it?
15    A. I limited it to a -- a range where it would be
16 okay to drive. I believe it was -- it was 90 miles.
17    Q. So did you look for jobs in San Antonio?
18    A. I did.
19    Q. But you didn't look for jobs in Waco?
20    A. I don't know. I don't think so.
21    Q. Do you know how far Waco is from Austin?
22    A. I don't.
23    Q. Okay. If I told you it was a hundred miles,
24 would you agree with me that you didn't look in Waco?
25    A. Probably.

Page 39

1    Q. Okay. Did you limit your job search by wage?
2    A. Not really. I was open to work for basically
3 any pay.
4    Q. So aside from the two jobs that we've discussed
5 where you're making over a hundred thousand as a
6 contractor in one, and then the other one you were
7 making about $24 an hour in the other, you didn't -- you
8 couldn't find a job that even paid minimum wage?
9        MS. SCHEEF: Objection, form.
10        THE WITNESS: I -- I don't know if I agree
11 with that entire statement.
12    Q. (BY MR. DEPONTE) Okay. Well, did you apply
13 for any jobs that paid minimum wage?
14    A. Yes.
15    Q. And you didn't -- couldn't get any of them?
16    A. No.
17    Q. And is that in the record that you provided me
18 last night?
19    A. I believe so. I even applied to Home Depot and
20 Lowe's.
21    Q. Are there any jobs that you interviewed for
22 that you did not get?
23    A. Yes.
24    Q. Is that in that list that you provided?
25    A. I don't believe that, like, I marked which ones

Page 40

1 I went on interviews for. I think I've had less than 15
2 interviews over the past couple of years.
3    Q. So did you interview for the job at Icon?
4    A. I did.
5    Q. And did you interview for the job at Lynx?
6    A. Technically. I think it was a phone call and
7 interview.
8    Q. And so in the less than 15 that you -- that you
9 just described, did those include phone interviews?
10    A. Yes. Along with Zoom calls and in person. And
11 that's a rough guess. I -- I haven't totaled that
12 together.
13    Q. Was there any period of time after your
14 employment with Boat Town that you could not work?
15    A. No. I was able to work the entire time.
16    Q. So aside from these two jobs at Lynx and Icon,
17 did you have any other sources of income since your
18 employment with Boat Town?
19    A. I don't believe so.
20    Q. Do your parents support you?
21    A. Yes.
22    Q. They send you money?
23    A. Yes, to an extent.
24    Q. How much did they send you?
25    A. That I don't know. I know they helped with

Page 41

1  groceries and food sometimes.
2       Q. Does your girlfriend work?
3       A. She does.
4       Q. Where does she work?
5       A. She works at Lakeway Resort & Spa.
6       Q. So does she help support you during your
7  unemployment?
8       A. She does.
9       Q. So aside from your parents, who I assume
10  they're not loaning you the money; right?  They're
11  giving it to you; correct?
12       A. As far as I know.
13       Q. Okay.  And your girlfriend, who I assume is
14  giving you the money and not loaning it to you?
15       A. I believe her support is other than financial,
16  other than groceries and helping with rent.
17       Q. What would that other support be?
18       A. Emotional, physical.
19       Q. Okay.  But my question is, she's not loaning
20  you the money; correct?
21       A. Money, no.
22       Q. Yeah.
23          Okay.  Any other sources of income since
24  your employment with Boat Town?
25       A. Any other sources of income?  Say again.

Page 42

1       Q. Sure.
2          Any other sources of income since your
3  employment with Boat Town ended?
4       A. Other than my two jobs?
5       Q. Other than your two jobs and the support you
6  receive from your parents and the support you receive
7  from your girlfriend.
8       A. That's it as far as I know.
9       Q. And unemployment benefits --
10       A. There -- yeah.
11       Q. -- previously.
12          Did you work for any other entity while you
13  were working with -- for Boat Town?
14       A. I'm sorry.  Say again.
15       Q. Sure.
16          Did you work for any other entity while you
17  were working for Boat Town?
18       A. While I was working for Boat Town?
19       Q. Yes.
20       A. No.  I...
21       Q. Okay.
22       MR. DEPONTE:  Tell you what, we've been
23  almost -- going for about an hour, why don't we go ahead
24  and take a break and go off the record.
25          (Recess taken from 10:23 a.m. to 10:34 a.m.)

Page 43

1       Q. (BY MR. DEPONTE)  All right.  Mr. McNamara,
2  we're back on the record, and you understand that you're
3  still under oath?
4       A. Yes.
5       Q. So -- and I'm sorry.  I need to go back on a
6  couple of questions.
7          When did you first start seeing someone for
8  your depression?
9       A. That I'm not sure about.  I would have to go
10  and look back at the records.
11       Q. And did you take anything when you first --
12  like, take any medications for your depression when you
13  first started?
14       A. I believe so.
15       Q. What did you take?
16       A. That I don't know.  I know what I'm on
17  currently, but not the past.
18       Q. Well, what are you currently taking?
19       A. Wellbutrin.
20       Q. But you don't remember when you first started
21  taking that?
22       A. I -- I don't recall.
23       Q. And when did you -- and I'm sorry.  You might
24  have answered this.  When did you start suffering from
25  depression?

Page 44

1       A. That I don't recall.
2       Q. Was it before September 2023?
3       A. I would have to go and look and see if there's
4  any documentation.
5       Q. Well, I'm not asking if there's documentation.
6  I'm asking you when you first started suffering from
7  depression.
8       A. Right.  And I don't remember.
9       Q. When did your sister pass?  Did your sister
10  die?
11       A. A foster sister.
12       Q. A foster sister.
13          When did she die?
14       A. She died -- man.  Two years ago.
15       Q. Would that have been in 2023?
16       A. I believe so.  It would be sometime in the
17  beginning of 2023.
18       Q. Were you depressed after her passing?
19       A. I -- I was sad.  I don't think I was depressed.
20       Q. So is it possible that her passing caused your
21  depression?
22       A. I don't believe so.
23       Q. Did you ever sell any real estate?
24       A. I did not sell.  I tried to.  But I -- I
25  believe I did a few leases but never sold any homes.

Page 45

1   Q. Did you ever offer to sell or lease to anyone
2   at Boat Town while you worked for Boat Town?
3   A. I believe I mentioned that I had my real estate
4   license, but I don't think anybody took me up on any
5   offer.
6   Q. Okay. But my question is, did you ever try to
7   sell or lease realty while you worked for Boat Town?
8   A. No. Not -- not that I'm aware of.
9   Q. Not to anyone at Boat Town?
10  A. I believe we've had conversations about that I
11  had the license, but I don't -- I don't believe we ever
12  talked about anything specific.
13  Q. And I should have asked you this earlier. How
14  much did you make as a drone operator?
15  A. That's, like, my own side business.
16  Q. Uh-huh.
17  A. So it kind of depends on what kind of job I was
18  doing or...
19  Q. Well, how about yearly?
20  A. No idea.
21  Q. Well, did you report it to the IRS?
22  A. I don't -- I don't know.
23  Q. Well, it's a business; right?
24  A. It's -- I don't really think it's a business.
25  I think it's something I used to do on the side or still

Page 46

1   do on the side. I haven't done it in a long time.
2   Q. But it was income. Yes?
3   A. To an extent.
4   Q. You made money from it?
5   A. Some.
6   Q. Okay.
7   A. Very, very little.
8   Q. But it's nothing you reported as income to the
9   IRS?
10  A. That I don't know. I'd have to look back.
11  Q. So how did you come to hear about the job at
12  Boat Town?
13  A. I believe it was a posting that they had listed
14  somewhere that -- I -- I don't remember if it was Indeed
15  or somewhere else, but I know I found it online.
16  Q. And did you interview with somebody at Boat
17  Town?
18  A. I did.
19  Q. Who did you interview with?
20  A. To the best of my knowledge, I believe it was
21  Geromi and Clay.
22  Q. And when was that interview? Do you recall?
23  A. I don't.
24  Q. How soon after that interview were you hired?
25  A. I recall it being pretty quickly.

Page 47

1   Q. And I'm sorry. I just noticed something on
2   your resume. You have that you were a professional
3   wakeboard driver and instructor, Central Texas --
4   Central Texas lakes, from January '19 to September 2023.
5   Is that a job?
6   A. It's a combination of different jobs, but,
7   yeah. It was Canyon Lake Adventures and Boat Town.
8   Q. But you have that on your work history on your
9   resume on Exhibit 3; correct?
10  A. Yeah.
11  Q. All right. So when did you start working for
12  Boat Town?
13  A. February of 2022. I believe it was the 15th.
14  Q. So did you interview for the job at Boat Town
15  before or after the first of 2022?
16  A. First of 2022?
17  Q. January 1, 20-- I'm trying to figure out when
18  you interviewed, and you said you didn't know.
19  A. Right.
20  Q. And so my question is, was it after the first
21  of the year in 2022?
22  A. I imagine it was.
23  Q. Okay. So somewhere between January 1st, 2022,
24  and February 15, 2022, you were hired; correct?
25  A. I believe so.

Page 48

1   Q. Would you have any reason to disagree with me?
2   A. About when I was hired?
3   Q. Yes.
4   A. I don't think so.
5   Q. Okay. And who called you to tell you you got
6   the job?
7   A. That was a long time ago. I -- I don't
8   remember.
9   Q. Do you remember how much your rate of pay was
10  when you were first hired?
11  A. I believe it was $18 as a temporary rate.
12  Q. $18 an hour?
13  A. Yes.
14  Q. And when did that go up?
15  A. If I recall correctly, it was after three
16  months.
17  Q. And what was your job title then?
18  A. I believe it was the same throughout my career
19  there.
20  Q. Boat captain?
21  A. Yeah. Boat captain, delivery driver.
22  Q. And when did you -- after -- I'm sorry. You
23  said after three months your pay went up. To what did
24  it go up to?
25  A. I believe it was $21.

Page 49

1  Q. And did it change after it went to $21 at some
2  point in time?
3  A. Yes. I believe it went up a dollar after
4  December.
5  Q. December 2022?
6  A. If I recall correctly, yes.
7  Q. So if you started February 15, 2022, when did
8  you have the accident with the dock at Boat Town?
9  A. That I don't remember. I know it was well
10  before the summer of 2023.
11  Q. Was it in 2022?
12  A. It was a long time ago. I -- I really don't
13  remember.
14  Q. Would March 2023 -- or 2022 sound about right?
15  A. March of 2022?
16  A. Uh-huh. Yes.
17  A. So just --
18  Q. Or May?
19  A. -- a few months after I was hired?
20  Q. Yes.
21  A. It could be.
22  Q. Okay. And the company didn't fire you then;
23  correct?
24  A. Correct.
25  Q. Do you remember how much damage you caused?

Page 50

1  A. No, I don't. Did you say boat dock?
2  Q. Yeah.
3  Did you hit a dock with a boat?
4  A. I don't believe so.
5  Q. Did you ever have an accident in a boat?
6  A. In a boat, no, I have not.
7  Q. Did you ever have any part of your job duties
8  where you caused property damage --
9  A. Yes.
10  Q. -- while working for Boat Town?
11  A. Yes.
12  Q. What was it?
13  A. It was a guard shack.
14  Q. Okay. What is a guard shack?
15  A. It was an entryway to a private community and
16  it had an awning that I drove underneath and it hit the
17  bimini of the boat.
18  Q. And when was that?
19  A. That I don't recall.
20  Q. And how much damage did you cause then?
21  A. That, also, I don't know.
22  Q. Did it damage the boat?
23  A. It did damage the boat.
24  Q. Did it damage the shack?
25  A. It did damage the shack.

Page 51

1  Q. Was that in 2022?
2  A. That I don't know.
3  Q. So whether it was a guard shack or a dock that
4  you hit, you weren't fired after that, were you, for
5  hitting it?
6  A. It definitely wasn't a dock, but...
7  Q. Mr. McNamara, it doesn't matter what it was.
8  You hit something with a boat?
9  A. Correct.
10  Q. Did Boat Town fire you after you had the
11  accident?
12  A. No.
13  Q. Okay. When you first started working for Boat
14  Town, do you remember receiving a handbook?
15  A. Yes, I do.
16  MR. DEPONTE: I think I'm on 5; right?
17  THE COURT REPORTER: Yes.
18  (Exhibit 5 was marked for identification.)
19  Q. (BY MR. DEPONTE) Let me hand to you what I've
20  marked as Deposition Exhibit 5. Do you recognize this
21  document?
22  A. I think so.
23  Q. Did you read through it?
24  A. I believe so.
25  Q. If you look with me at Boat Town, which is

Page 52

1  BT000005, so basically page 5. If you look with me
2  under the "Hourly Procedures." Boat Town's policies
3  state you will be paid overtime if you work more than 40
4  hours between Wednesday and Tuesday. Hours for paid
5  vacation -- holidays, vacation, or sick time do not
6  count towards the 40 hours worked; correct?
7  A. That is what it says.
8  Q. And so the policy states that if you worked
9  more than 40 hours during a week, you would be paid
10  overtime; correct?
11  A. That is what I'm understanding from this.
12  Q. Okay. So would you agree with me, then, that
13  Boat Town had a policy to pay you overtime for all hours
14  worked over 40 as calculated from week to week?
15  A. That's what this says.
16  Q. Well, it's a policy; correct?
17  A. As far as I know.
18  Q. So would you agree with me that if it's policy,
19  that it has a policy that says you will be paid for
20  overtime if you work more than 40 hours in a week?
21  MS. SCHEEF: Objection, form.
22  THE WITNESS: Yeah.
23  Q. (BY MR. DEPONTE) I -- I'm just trying to get a
24  straight answer.
25  A. I'm not understanding.

Page 53

1  Q. Do you understand that this is a policy?
2  A. The handbook?
3  Q. Yes.
4  A. Yes.
5  Q. Okay. And the policy says that you will be
6  paid overtime if you work more than 40 hours between
7  Wednesday and Tuesday; correct?
8  A. That's what I'm reading.
9  Q. Okay. So would you agree with me that the
10 company has a policy that says you will be paid overtime
11 if you work more than 40 hours between Wednesday and
12 Tuesday?
13 A. I suppose so. That's what I'm looking at.
14 Q. Well, is there any doubt in your mind?
15 A. From what I'm seeing, no, not -- not at this
16 moment.
17 Q. So you would agree with -- well, it's okay.
18 Strike that.
19       And did you read through this handbook when
20 you received it?
21 A. I believe so.
22 Q. So since we're talking about overtime, when was
23 the first time you believed that you were not being paid
24 correctly?
25 A. I believe it was right before the summer of

Page 54

1  2023.
2  Q. And how did it come to your attention that you
3  might not have been paid correctly?
4  A. I'm not sure of the specifics, but I believe
5  that I had noticed a discrepancy from when I worked
6  overtime one week and then had less than 40 hours on the
7  next week.
8  Q. So to be clear, you were getting paid overtime.
9  Yes?
10 A. Incorrectly, yes.
11 Q. But you were being paid overtime. Yes?
12 A. I was receiving some overtime, yes.
13 Q. Okay. But your concern was that it was being
14 calculated incorrectly?
15 A. That was my issue, yeah.
16 Q. Okay. And the policy actually told you it
17 should be paid on a weekly basis; correct?
18 A. I mean, it says paid overtime if you work more
19 than 40 hours between Wednesday and Tuesday.
20 Q. Yes.
21 A. That's what I understand from that.
22 Q. You don't understand anything else from that?
23 A. I -- I don't know what I'm supposed to
24 understand from that.
25 Q. Fair enough.

Page 55

1          Did you ever ask anybody to clarify the
2  company's policies to you?
3  A. I did not.
4  Q. Okay. So when you realized that you may not
5  have been paid correctly for your overtime, to whom did
6  you speak?
7  A. At first I spoke with Geromi on the 6th of
8  June. And then almost immediately he brought me to
9  Patti and all three of us spoke about it.
10 Q. Had you spoken with Patti before?
11 A. I have.
12 Q. What were some of the things you had spoken
13 with Patti about before June 6, 2023?
14 A. Primarily it was payroll.
15 Q. So why did you go to Geromi first?
16 A. Because he's my immediate supervisor.
17 Q. Would it surprise you to know that Geromi is
18 not your supervisor?
19 A. It would.
20 Q. So tell me about your conversation with Patti.
21 What did you tell her?
22 A. Well, at first it was a question asking about,
23 you know, why this was the way it was, and showing her
24 the research that I had found. And the conversation was
25 not pleasant. She made a few comments that I wrote

Page 56

1  down, after the fact, that it would -- that it's the way
2  that it's been done for a long time. And that -- that
3  it saves the company money the way that it is and that
4  it was being done, or is.
5  Q. And what was your response to her alleged
6  comment?
7  A. It -- I wasn't there to argue, so I -- you
8  know, I gave her the information that I have and then I
9  left.
10 Q. Did you talk with her again after that
11 conversation?
12 A. Later on after she looked -- looked it up and
13 did some more research on her end, she did ask to have
14 another conversation with Geromi and myself.
15 Q. Okay. And when was that?
16 A. I believe it was the same day.
17 Q. Okay. Tell me about that second conversation.
18 A. The second conversation -- let me think back.
19 The second conversation she -- we were in Geromi's
20 office. She understood that they were doing it a
21 different way than it should have been. But the issue
22 was trying to figure out how to fix the situation or how
23 they were going to go forward with it. She was
24 mentioning that she wanted to -- to just fix it, you
25 know, now and going forward. But I mentioned that both

Page 57

1  myself and everyone else should be paid back pay for the
2  incorrect hours that were logged.
3      Q.  Well, so to be clear, though, you had logged
4  the correct hours.  The company just didn't pay it
5  correctly?
6      A.  As far as I understand.
7      Q.  Okay.
8      A.  Yes.
9      Q.  So it wasn't a discrepancy about the hours you
10  told the company you had worked?
11      A.  Right.
12      Q.  Okay.  It was just an error -- and you were
13  paid some overtime?
14      A.  Yes.
15      Q.  So it was an error in how the overtime was
16  calculated; correct?
17      A.  Yes, it was.
18      Q.  And what was Patti's response?
19      A.  She was frustrated at the situation.  And I
20  think -- I think she -- she didn't want to do the work
21  that it would take to go back that far and pay
22  everybody.
23      Q.  Well, to be honest, you don't know what she
24  wanted to do or didn't want to do, do you?
25      A.  I'm not inside her mind.

Page 58

1      Q.  Okay.  And when you say she was frustrated, you
2  don't really know that either?
3      A.  That was a physical response that I could see.
4      Q.  What was the physical response that you saw?
5      A.  Just the -- the way that she spoke to me and
6  the word choices she used.
7      Q.  But you don't know why she was frustrated, do
8  you?
9      A.  Correct.  I...
10      Q.  Did y'all talk further during that second
11  conversation?
12      A.  This was a long time ago, so I'm -- obviously,
13  I'm not going to remember exactly what was said.  I can
14  refer -- you know, reference back to the notes that I
15  took immediately after the -- the meeting, but I'm not
16  going to remember specifically what was said.
17          MR. DEPONTE:  Are the -- is the -- I'm
18  sorry.  Are those the notes y'all provided yesterday?
19          MS. SCHEEF:  Yeah.  Sorry about that.
20          MR. DEPONTE:  Okay.  We're going to -- I'll
21  get through this deposition.  I'm not going to pass him
22  because I haven't had time to even look at those notes,
23  but we'll -- let's go ahead and get through this.
24      Q.  (BY MR. DEPONTE)  When you say you took those
25  notes immediately after, how soon after?

Page 59

1      A.  Within 20 minutes.
2      Q.  Okay.  When was the next time you spoke with
3  her?
4      A.  That I don't recall.  I don't believe we spoke
5  again that day.
6      Q.  So that would have been June 6th.  What -- when
7  was the next time you spoke with her?
8      A.  I -- I believe on that next Monday on the 9th
9  is the next time that I talked with any Boat Town
10  management about the issue.
11      Q.  And when you say "Boat Town management," to
12  whom are you referring?
13      A.  To Clay, Clayton, or Geromi, or Patti.
14      Q.  Well, which one did you speak to?
15      A.  I spoke to Clayton on -- or -- I spoke to the
16  store manager on the 6th at the end of the day.  And he
17  requested me to put all of the hours together and the
18  money that I might have been owed together over the
19  weekend.
20      Q.  What's the store manager's name, for the
21  record?
22      A.  I believe it's Clay.
23      Q.  And just so we have a clear record, what's
24  Clay's last name?
25      A.  Raven.

Page 60

1      Q.  Okay.  And did you put the records together?
2      A.  I did not that weekend.  I was busy.
3      Q.  Well, when did you put the records together?
4      A.  I don't know specifically.  I may have a record
5  of when I did that based on emails to Patti.
6      Q.  But you determined how much you were owed?
7      A.  I did, along with Patti's numbers that she came
8  up with.
9      Q.  And you agreed with her numbers; correct?
10      A.  Yeah.  I mean, we -- we did come to some
11  agreement.  Now, I'm not an attorney, so I don't know
12  exactly what I was owed, but we did come to an
13  agreement.
14          (Exhibit 6 was marked for identification.)
15      Q.  (BY MR. DEPONTE)  Let me hand to you what I've
16  marked as Deposition Exhibit 6.  Do you recognize this
17  number -- or I'm sorry -- this exhibit?
18      A.  Yes.
19      Q.  And these are emails between you and Patti;
20  correct?
21      A.  I believe so.
22      Q.  Well, do you have any reason to disagree that
23  they are emails between you and Patti Shook?
24      A.  No.
25      Q.  Okay.  And if you look with me through these

Page 61

1  emails, she provides the calculations based on your rate
2  and hours; correct?
3     A. Yes.
4     Q. And you agreed with those calculations between
5  your rate and hours. Yes?
6     A. Yes.
7        (Exhibit 7 was marked for identification.)
8     Q. (BY MR. DEPONTE) Let me hand to you what I've
9  marked as Deposition Exhibit 7. Do you recognize this
10  document?
11     A. I do.
12     Q. And this indicates that on June 27, 2023, you
13  were paid the $851.04 less taxes that you believe you
14  were owed; correct?
15     A. Correct.
16     Q. And, in fact, you stated "I understand and
17  agree that upon my receipt of the amounts above, I will
18  have been paid and/or have received all compensation,
19  wages, and other amounts to which I am entitled to the
20  past two years, and no other compensation, wages, or
21  amounts are due to me"; correct?
22     A. That is what it says.
23     Q. And you agreed to it; right?
24     A. I did sign it.
25     Q. Well, yes, I see that you signed it. Did you

Page 62

1  sign it and agree to it?
2     A. Yeah.
3     Q. Okay. And so is it your contention now that
4  you were owed something more before Boat Town fixed the
5  issue with the pay?
6     A. I mean, I'm not an attorney, so I -- did my
7  best to calculate what I was owed.
8     Q. Well, that's not my question. My question is,
9  is it your contention now that you were owed something
10  more from Boat Town that you were not paid?
11     A. For the specific overtime here, I don't believe
12  so.
13     Q. For this lawsuit?
14     A. Oh.
15     Q. From the time that you worked for Boat Town to
16  the time of your termination, were you paid for all --
17  everything that you were due?
18     A. Until the termination?
19     Q. Yes.
20     A. I believe so.
21     Q. So would you agree with me, then, that once you
22  brought the issue to Boat Town's attention, it fixed the
23  issue; correct?
24     A. To an extent.
25     Q. What do you mean "to an extent"?

Page 63

1     A. I -- I believe that the issue was taken care of
2  with me.
3     Q. Okay. You don't know about anybody else, do
4  you?
5     A. I don't.
6     Q. Okay.
7     A. I don't know about anyone else. I heard
8  rumors, but --
9     Q. Heard rumors --
10     A. -- that was all.
11     Q. -- from whom?
12     A. From Daniel and Colton and Gabe.
13     Q. Colton, what's Colton's last name?
14     A. I don't know.
15     Q. What was Colton's position?
16     A. He was a service writer, I believe.
17     Q. And who else did you say? Was it Daniel,
18  Colton and --
19     A. Gabe.
20     Q. -- Gabe?
21        What's Gabe's last name?
22     A. I think it was Platt.
23     Q. And what was Gabe's position?
24     A. He was also a delivery captain.
25     Q. So what did Daniel tell you?

Page 64

1     A. I believe I was asking around to see if anybody
2  else had been paid. And I was hearing the same thing
3  from all three that they had not.
4     Q. When were you asking?
5     A. That I don't know.
6     Q. Well, it had to be after June 2020 -- June 27,
7  2023; correct?
8     A. I -- I believe so.
9     Q. So would you agree with me, then, it was
10  sometime between June 27, 2023, and the end of your
11  employment in September of 2023?
12     A. Yes, I believe so.
13     Q. And what about Colton, what did you talk to
14  Colton about?
15     A. I believe the same thing.
16     Q. And what did Colton tell you?
17     A. That he was not paid any back pay for the
18  overtime discrepancy.
19     Q. So did you tell them that you had been paid?
20     A. I told them about the issue that I had.
21     Q. Not my question. My question is, did you tell
22  them you had been paid?
23     A. I told them that -- that I had been paid, yes.
24     Q. Okay. Same thing with Gabe?
25     A. I believe so.

Page 65

1    Q. And what was their reaction when you told them
2  that you had been paid, or discussed this issue?
3    A. I think it was mixed between all three of them.
4  I wasn't very close with Colton or Gabe, so I don't
5  think they -- they cared very much whether or not they
6  got paid or not, but...
7    Q. So between June 6th, 2023, and June 27, 2023,
8  you came to the company, you said you'd been paid
9  incorrectly and the company fixed it; correct?
10   A. They -- they fixed it with me, I believe.
11   Q. I -- I'm talking about you. This is your
12  lawsuit.
13       MS. SCHEEF: Objection, form.
14   Q. (BY MR. DEPONTE) They fixed it with you;
15  correct?
16   A. I -- I'm not understanding.
17   Q. Well, you complained about your pay; correct?
18   A. I did complain about the -- the way that
19  overtime was paid.
20   Q. And that was June 6, 2023?
21   A. Yes.
22   Q. And on June 27, 2023, you received a payment;
23  correct?
24   A. Correct. I did receive a payment.
25   Q. Which corrected the errors; correct? Yes?

Page 66

1    A. It did correct my errors, yes.
2    Q. Okay. And it was correct moving forward, too.
3  Yes?
4    A. As far as I know.
5    Q. Are you alleging that it wasn't?
6    A. I -- I -- I have not looked at the records
7  after that, but I believe that it was -- it was
8  addressed and -- and fixed on the payroll going forward.
9    Q. So you would agree with me that that's not part
10  of your lawsuit?
11   A. I -- I don't understand.
12   Q. Sure.
13       I mean, after 20 --
14   A. I -- I believe --
15   Q. -- after June 2027 -- June 27, 2023, were you
16  paid correctly by Boat Town?
17   A. As far as I know.
18   Q. Okay. Do you have any reason to think you were
19  not?
20   A. I -- yes. Because they didn't -- they didn't
21  do it correctly the first time.
22   Q. So is that part of your lawsuit? I mean, do
23  you know what you're alleging in this lawsuit?
24   A. I'm -- I'm alleging that they broke the law,
25  then fired me because I made a report to the DOL.

Page 67

1    Q. Okay. So you're not really -- that's okay.
2  Strike that.
3       So within three weeks the company paid you
4  correctly; right? It's three weeks from June 6th to
5  June 27, 2023.
6    A. I'm sorry. Say it again.
7    Q. Sure.
8       It is three weeks between June 6th and
9  June 27, 2023; correct?
10   A. I don't know.
11   Q. Can you do math?
12   A. Not --
13   Q. I'm sorry. Strike that.
14       Twenty-seven minus six is what?
15   A. Do I need to?
16   Q. I -- I think you do.
17   A. Say it again.
18   Q. Twenty-seven minus six.
19   A. Is 21.
20   Q. Okay. So those -- that's the number of days
21  between the 27th of June going back to the 6th.
22   A. If you say so.
23   Q. Do you have any reason to disagree?
24   A. No.
25   Q. Then why are you telling me that I'm -- if --

Page 68

1  if I think so or if I say so?
2       MS. SCHEEF: Objection, form.
3       MR. DEPONTE: You know what, let's just
4  take a break. Go off the record.
5       (Recess taken from 11:09 a.m. to 11:17 a.m.)
6    Q. (BY MR. DEPONTE) Okay. Mr. McNamara, you
7  understand you're back on the record and under oath?
8    A. Yes.
9    Q. You mentioned complaining to the Department of
10  Labor. When did you do that?
11   A. I filed that on the 6th of June, the same day
12  that I brought it up to the company.
13   Q. And how did you file that with the Department
14  of Labor?
15   A. Through their website.
16   Q. Did you tell anybody that you had complained to
17  the Department of Labor?
18   A. Only my parents.
19   Q. And what did you tell the Department of Labor?
20   A. I told them about the situation and how the
21  overtime was being calculated, and that I thought I was
22  being unfairly paid.
23   Q. And did you speak to anyone at the Department
24  of Labor?
25   A. I did not. Not at that point.

Page 69

1    Q. When did you, or did you ever speak to anyone
2  from the Department of Labor?
3    A. I believe they reached out. I don't know the
4  specific date that they did. I know that they had also
5  told me when they had made contact with Boat Town, and I
6  believe that was in August.
7    Q. Did you have any emails with the Department of
8  Labor?
9    A. As far as I know, I -- I think we did talk over
10 email briefly, or they had sent something to me. I
11 don't remember exactly what was on there.
12   Q. And you said the Department of Labor came out
13 in August. Would that be August 2023?
14   A. The Department of Labor came to Boat Town on
15 the 7th of September, about eight days before my
16 termination.
17   Q. Do you know -- so you weren't, like, on any of
18 the correspondence between the Department of Labor and
19 Boat Town; correct?
20   A. Not that I know of.
21   Q. So you don't know what was discussed between
22 Boat Town and the Department of Labor?
23   A. Not -- no.
24   Q. So you said the Department of Labor came out on
25 September 7th. You were -- were you working that day?

Page 70

1    A. I was. Although, I didn't know who they were.
2  I think I saw them pull up, but then I had other duties
3  elsewhere and couldn't stay at the shop.
4    Q. So how long were you at the shop?
5    A. That I don't remember. I don't think it was
6  very long in the morning.
7    Q. Did you come back to the shop?
8    A. Near -- yes, after a few hours.
9    Q. Was -- I think you said a car or whatever
10 pulled up that you didn't recognize. Was that still
11 there when you got back?
12   A. It was not.
13   Q. Do you know if the Department of Labor came out
14 again after that September 7th?
15   A. I do not know.
16   Q. Do you know if the Department of Labor spoke to
17 any employees?
18   A. I heard rumors that they had done interviews.
19   Q. But you don't know?
20   A. I was not present.
21   Q. So you don't know?
22   A. I -- I -- correct. I -- I don't know. I only
23 heard it from Daniel and others.
24   Q. So when you allege in your petition that Boat
25 Town would not allow you to speak to the Department of

Page 71

1  Labor, you were only there for a short while in the
2  morning and then you were offsite. And when you came
3  back on site, the Department of Labor was gone; correct?
4    A. Correct.
5    Q. So how is it that Boat Town didn't allow you to
6  speak to the Department of Labor?
7    A. Where did I allege that?
8    Q. Well, let's see. And this is my copy, but take
9  a look at -- Paragraph 31 says "McNamara was not allowed
10 to be involved in these meetings when the Department of
11 Labor came out."
12   A. That's true.
13   Q. So how is it that Boat Town did not allow you
14 to meet with the Department of Labor?
15   A. I don't think it's not that they didn't allow
16 me, it's that I wasn't privy to the information.
17   Q. Well, it says "not allowed." I mean, that's
18 your allegation.
19   A. Can I see it again?
20   Q. Sure. That's your allegation in the lawsuit.
21 You're saying you were not allowed.
22   A. I -- I wasn't a part of the meetings. I
23 wasn't -- you know, I was -- I was busy doing other
24 things.
25   Q. But would you agree that there is a difference

Page 72

1  between doing your job and Boat Town affirmatively not
2  allowing you to talk to the Department of Labor?
3    A. Yes.
4    Q. Okay. And are you aware that Boat Town never
5  even knew why the Department of Labor came out?
6    A. I find that hard to believe.
7    Q. Why do you find that hard to believe?
8    A. Because of my allegation -- or my -- my
9  discussions with them about the issue.
10   Q. The discussions with them about the issue?
11   A. About -- about the overtime being paid
12 incorrectly.
13   Q. So you're saying them being your discussions
14 with the company about the overtime issue --
15   A. Yes.
16   Q. -- back in June; correct?
17   A. Yes.
18   Q. Do you know the reasons why the Department of
19 Labor does audits or visits employers?
20   A. Specifically?
21   Q. Yes.
22   A. No.
23   Q. Okay. And are you aware that the Department of
24 Labor, if they receive a complaint, does not tell the
25 employer why they are there?

Page 73

1    A. I did not know that.
2    Q. And are you aware that even if it's the result
3 of a complaint, the Department of Labor will not tell
4 the employer who made the complaint?
5    A. That was made aware to me.
6    Q. Okay. And so it's just your guess that Boat
7 Town knew that you went to the Department of Labor and
8 that the Department of Labor came out in September?
9    A. Well, I was the only one who brought this to
10 Boat Town's attention and the only one that continually
11 talked with them about the issue.
12    Q. How do you know you're the only person that
13 brought it to Boat Town's attention?
14    A. As far as I -- I know, I was the only one who
15 brought it up.
16    Q. How do you know?
17    A. Based on conversations with other employees
18 during that time.
19    Q. Well, would you agree with me that you don't
20 know if any other employee spoke to Boat Town about the
21 same issues?
22    A. I suppose I don't know, but I did talk with
23 other people to make sure that -- you know, to see if
24 they were interested in talking about it.
25    Q. And you just assume they told you the truth?

Page 74

1    A. That -- that's fair.
2    Q. And do you know if any of them went to the
3 Department of Labor?
4    A. That I do not know.
5    Q. So it is your guess that Boat Town knew that
6 you went to the Department of Labor --
7    MS. SCHEEF: Objection, form.
8    Q. (BY MR. DEPONTE) -- is that correct?
9    You're -- you're just speculating, aren't
10 you?
11    A. It would be a strange coincidence if that were
12 to happen.
13    Q. That's speculation, isn't it?
14    MS. SCHEEF: Objection, form.
15    THE WITNESS: I don't understand what
16 you're trying...
17    Q. (BY MR. DEPONTE) Sure.
18    What evidence do you have that Boat Town
19 knew that you had complained to the Department of Labor?
20    A. The timing.
21    Q. So timing. That's it?
22    A. The -- it -- when -- I'm having a hard time
23 understanding what you're trying to say.
24    Q. Sure.
25    What evidence do you have that Boat Town

Page 75

1 knew you had complained to the Department of Labor?
2    A. I suppose I don't have specific evidence.
3    Q. Okay. Did you tell anyone else that you had
4 gone to the Department of Labor?
5    A. I did.
6    Q. Who did you tell?
7    A. Daniel, my parents, my girlfriend, and I
8 believe Cesar.
9    Q. Who is Cesar?
10    A. Cesar was a -- actually, I don't know his role,
11 but he worked at Boat Town.
12    Q. What did you tell Cesar?
13    A. I told him basically what I had -- had reported
14 to the Department of Labor and the issue that -- of
15 overtime being paid incorrectly.
16    Q. So would you agree with me, then, that your
17 sole complaint is that you were terminated after you
18 complained to the Department of Labor; is that correct?
19    A. Among not being paid exactly what I was owed.
20    Q. But we've already discussed that; right?
21    You -- you have now been paid everything
22 that you were owed because Boat Town fixed the overtime
23 issue?
24    A. I believe under the law that I was entitled to
25 more than that, but I'm not an attorney.

Page 76

1    Q. Well, when you say "under the law," what law?
2    A. I'm not an attorney. I --
3    Q. Well, I mean, you said "under the law."
4    A. -- I'm in -- I -- according to my research, I was
5 supposed to be paid double based on them breaking the
6 law.
7    Q. Well, do you know if the Department of
8 Corrections -- Department of Corrections -- labor --
9 Department of Labor calculated out what you were owed?
10    A. Say again.
11    Q. Sure.
12    Do you know if the Department of Labor
13 calculated what you were allegedly owed?
14    A. Do I know?
15    Q. Yes.
16    A. No, I do not know.
17    Q. Okay. Did you receive any other payments or
18 checks from Boat Town after your employment with Boat
19 Town?
20    A. Say it one more time.
21    Q. Sure.
22    Did you receive any other payments from
23 Boat Town after your employment with Boat Town?
24    A. After I was terminated on --
25    Q. Yes.

Page 77

1    A. -- the 15th?
2         I believe I received a -- another check for
3    the weeks that I had worked.  And then I believe I
4    received a check in the mail at -- maybe the next year
5    for a small amount.  And I wasn't sure what that was
6    for, so I never cashed it.
7    Q. And I'm sorry.  What was your last day of
8    employment?  I think you just said it.  September --
9    A. 15th.
10   Q. -- 15th, 2023?
11   A. Yes.
12   Q. How did you learn that would be your last day
13   of employment?
14   A. I had a meeting with management in the upstairs
15   office and they told me that -- that day was going to be
16   my last and that I was free to go from that point on.
17   Q. And when you say "management," to whom are you
18   referring?
19   A. I believe in the room it was Clay, Clayton,
20   Colton, I believe Geromi and the -- Clay's brother.  I
21   don't remember his name.
22   Q. Was anything else said in that meeting?
23   A. Yes.
24   Q. What else was said?
25   A. They gave me multiple reasons of why they were

Page 78

1    firing -- or terminating me.
2    Q. Okay.  What were the reasons you were given?
3    A. They -- they told me that they were getting rid
4    of multiple people and that -- that I was one of the
5    youngest.  But, obviously, I wasn't the youngest there.
6    I'm -- not in term, nor age, so that didn't make sense.
7    But then also they mentioned that I was also being
8    let -- let go because of the damage that I caused well
9    before that.  And that didn't make sense to me either,
10   because that had happened so long ago.
11   Q. I'm sorry.  I thought earlier you testified
12   that you couldn't remember when that happened?
13   A. I -- I knew that it happened more than months
14   before my termination.  But, no, I don't remember the
15   specific dates that it was -- that it happened.
16   Q. So it could have been in June 2023?
17   A. I suppose so, but I don't believe so.
18   Q. What about May 2023?
19   A. Again, I -- I don't know the specific date of
20   when that happened.
21   Q. Okay.  So when you say you found that hard to
22   believe that it was so long ago, you don't even
23   remember when it was?
24   A. I -- I don't remember when it was.  I -- I
25   remember it being quite a while before my...

Page 79

1    Q. Well, would you agree with me that that
2    accident was poor performance?
3    A. Poor performance?
4    Q. Sure.
5    A. I was never told that.
6    Q. That's not my question.
7    If you are a boat driver and you hit
8    something, would you agree that that is poor
9    performance?
10   A. I suppose so.
11   Q. And to this day, you don't know how much damage
12   was caused?
13   A. No.
14   Q. Would you agree with me that having a boat
15   accident is a reason to be fired?
16   A. If it were fireable, they should have fired
17   me --
18   Q. That's not my question.
19   A. -- at that time.
20   Q. Let me restate my question.
21        Would you agree with me that having a boat
22   accident when you're a boat driver is a reason to be
23   fired?
24   A. If it were a fireable offense, they would have
25   fired me.

Page 80

1    Q. That's not my question.  We -- we can go ask
2    this question again.
3         MR. DEPONTE:  Can you read that back for
4    us, my question?
5         (Record read.)
6         THE WITNESS:  I -- I mean, again, if -- if
7    it was a fireable offense, I would have been fired.
8    Q. (BY MR. DEPONTE)  So you have no understanding
9    that that was a fireable offense, in your mind, as you
10   sit here today?
11   A. If it were, I would have been fired.
12   Q. Well, you were fired; right?
13   A. Eventually.
14   Q. In fact, there were other folks that were let
15   go, too, at that same time, weren't there?
16   A. That I don't know.  I was told that.
17   Q. So you don't know who else was let go that same
18   day as you?
19   A. Not that I can recall, no.
20   Q. Do you know if there were any other boat
21   drivers let go that day?
22   A. Not that I can recall.
23   Q. What were the -- some of the other reasons
24   given for your layoff?
25   A. I believe they had mentioned that it was also

Page 81

1  becoming a slow season and they needed to get rid of
2  captains. But that also didn't make sense to me because
3  they didn't release any captains the year before and
4  they tried to refill my position the same day.
5      Q. With whom did they try to refill your position?
6      A. They were asking around seeing if anybody knew
7  someone who could replace my position.
8      Q. How do you know that?
9      A. Daniel told me.
10     Q. And I'm sorry, what was Daniel's title?
11     A. He was the same as me, I believe.
12     Q. So if Daniel's already a boat captain, why --
13  how would he know that they were asking around to fill
14  the boat captain -- a boat captain position?
15     A. Because they asked him if he had friends who
16  would or could come in to fill that position.
17     Q. Do you know if that would have been at a
18  cheaper rate of pay?
19     A. No idea.
20     Q. Do you know if maybe that would be somebody who
21  hadn't had a collision in a boat?
22     A. That I also don't know.
23     Q. And aside from your conversation with the
24  Department of Labor and Patti, did you make any other
25  complaints about your pay to anyone at Boat Town?

Page 82

1      A. I'm sure I talked about it with other people, I
2  just don't remember exactly what was said.
3      Q. That would have been co-workers, though;
4  correct?
5      A. Yes.
6      Q. And you spoke to Patti in June of 2023, but you
7  weren't let go until September of 2023; correct?
8      A. Correct. I was let go eight days after the
9  Department of Labor showed up.
10     Q. So if the company was upset that you were
11  complaining about your wages, wouldn't it have just
12  fired you in June of 2023?
13     A. I don't believe they realized that I had made
14  that complaint until -- until after they showed up --
15     Q. Well --
16     A. -- and realized the severity of their mistake.
17     Q. And even then, you don't know if they realized
18  that you had made the complaint; correct?
19     A. I -- yes. Correct. I don't believe it was
20  coincidence.
21     Q. That's just your subjective belief?
22     A. Understood. Yes.
23     Q. Yes?
24         MR. DEPONTE: Okay. Tell you what, let's
25  go off the record for, like, five minutes and then I'll

Page 83

1  try to wrap up here shortly.
2         MS. SCHEEF: Sounds good.
3         THE COURT REPORTER: Do you want to
4  purchase a copy of the transcript?
5         MS. SCHEEF: Can we just have an E-copy?
6         THE COURT REPORTER: Yes.
7         MS. SCHEEF: We don't need a physical one.
8      (Recess taken from 11:39 a.m. to 11:51 a.m.)
9      Q. (BY MR. DEPONTE) All right. Mr. McNamara, you
10 understand you're still under oath?
11     A. Yes.
12     Q. Okay.
13     (Discussion off the record.)
14        MR. DEPONTE: Okay. Now we're back on the
15 record?
16        THE COURT REPORTER: Yes.
17        MR. DEPONTE: All right. Sorry about that.
18     Q. (BY MR. DEPONTE) So, Mr. McNamara, do you know
19 how people were selected for the reduction in force?
20     A. The reduction in force?
21     Q. Yes.
22     A. No.
23     Q. Okay. Because you weren't the only one that
24 was laid off on -- on or about September 15, 2023;
25 correct?

Page 84

1      A. I don't know.
2      Q. Okay. So you have no idea what criteria the
3  company used to lay off folks?
4      A. Not that I know of.
5      Q. And --
6      A. Only what was told to me.
7      Q. Okay. And so if the company thought you were a
8  low performer, that's a reason to let you go; correct?
9      A. They told me that?
10     Q. No.
11        My question is, if the company thought you
12 were a low performer, that would be a reason to let you
13 go; correct?
14     A. I suppose.
15     Q. Do you know how many other people were let
16 go --
17     A. I don't know.
18     Q. -- at that time?
19        I'm sorry. I should have finished my
20 question.
21        You don't know?
22     A. I don't know.
23     Q. And you mentioned Daniel. I'm sorry. What was
24 Daniel's last name again?
25     A. Lopez.

Page 85

1    Q. And he still works for Boat Town; correct?
2    A. As far as I know.
3    Q. You don't keep in contact with him at all
4  anymore?
5    A. Not much.
6    Q. When you say "not much," how often?
7    A. One -- I might check in with him, like, once
8  every couple months.
9    Q. Y'all discuss your lawsuit at all?
10    A. No, not really.
11    Q. And if the company let go of -- well, strike
12  that.
13         Do you know -- you don't know if anybody
14  else complained to the Department of Labor; correct?
15    A. No. I -- I don't know if someone else
16  complained.
17    Q. So if -- okay. Are there any other facts or
18  circumstances about your claims in this lawsuit that we
19  haven't discussed?
20    A. I -- potentially. I -- I --
21    Q. Well, this is --
22    A. -- I'm not sure if we went over absolutely
23  everything.
24    Q. Well, this is your opportunity.
25    A. But as far as I -- I know, I think that's the

Page 86

1  main points of it.
2    Q. Well, what haven't we discussed?
3    A. That's a good question. I -- I think we've --
4  we've gone over the majority of -- of everything that I,
5  you know, have to say.
6    Q. Okay. Well, what's in the minority of what you
7  have to say?
8    A. That -- not -- not that I can recall right now.
9    Q. And we've discussed the complaints you made to
10  the company and to the Department of Labor; correct?
11    A. We have.
12    Q. And those are the only two complaints you made;
13  correct?
14    A. Like, complaints?
15    Q. Regarding your wages.
16    A. I believe so.
17    Q. And are you aware that if you lose this lawsuit
18  you could owe Boat Town their costs?
19    A. I do.
20    Q. Okay. Let me hand to you what I've marked
21  as --
22         MR. DEPONTE: Eight?
23         THE COURT REPORTER: Yes.
24         (Exhibit 8 was marked for identification.)
25    Q. (BY MR. DEPONTE) -- Deposition Exhibit 8. Do

Page 87

1  you recognize this document?
2    A. Yes. From what I'm seeing.
3    Q. Sure.
4         These are your interrogatory responses to
5  the discovery sent to you from Boat Town; correct?
6    A. I believe so, yeah.
7    Q. So under Interrogatory 1, which is on page 4 of
8  the document you have in front of you --
9    A. I'm sorry, page what?
10    Q. Four.
11    A. Four.
12    Q. It asks you what damages you are seeking. And
13  under A you have "Economic Damages"; correct?
14    A. I do.
15    Q. And I guess at the time that you responded to
16  this you said was approximately $50,000 -- $49,930?
17    A. That's what it says.
18    Q. And that is after you take out the wages that
19  you made with your other employers, or is that before?
20    A. That calculation, I'm not sure of.
21    Q. Well, you were making about $960 a week with
22  Boat Town, ish, times 52. That's about $46,000 or so.
23  $46,000 a year. So you don't know if that $49,000 is
24  before or after the other pay you received from your
25  other positions?

Page 88

1    A. Of that, I don't know.
2    Q. Okay.
3    A. That's -- I would refer to my -- my lawyer.
4    Q. And then under -- well, to be clear, you
5  verified that these were correct. Yes?
6    A. I did, yes.
7    Q. Okay. So you just assumed that number was
8  correct from your attorneys?
9    A. I -- I put trust in them.
10    Q. Well, under B you also seek reimbursement for
11  replacement health care coverage and other benefits to
12  an amount to be determined after discovery is exchanged;
13  correct?
14    A. Correct.
15    Q. But you didn't receive health care benefits
16  from Boat Town?
17    A. I did not.
18    Q. So why are you seeking a reimbursement for
19  health care coverage from Boat Town that you never got?
20    A. Replacement of health care coverage. That I'm
21  not sure.
22    Q. And then if you look with me on page 5,
23  Interrogatory 5, it asks you to identify all the
24  positions that you've held after your work with Boat
25  Town. And you list Lynx Contractors and Icon

Page 89

1 Technology; correct?
2      A.  Yeah.  It says Lynx Contractors and Icon, yeah.
3      Q.  Okay.  And those were, in fact, the only two;
4 correct?
5      A.  Yes.
6          MR. DEPONTE:  And you're going to get me
7 the documents from the doctors?
8          MS. SCHEEF:  Yeah.  Just -- I already
9 messaged our paralegal to follow up with them.
10          MR. DEPONTE:  Okay.  And I guess there's
11 two doctors, not just Longarini?
12          MS. SCHEEF:  Yeah.  We've requested from --
13          MR. DEPONTE:  Longarini.
14          MS. SCHEEF:  -- Longarini and Stassen.
15      Q.  (BY MR. DEPONTE)  Okay.  And then if you look
16 with me at Interrogatory 10, you list a number of
17 individuals who you identify as witnesses.  And I think
18 the only one that we haven't talked about was Rusty.
19 Who is Rusty Kutzur?
20      A.  Rusty is another sales agent.  He's a salesman
21 for Boat Town, or was.  I don't know if he's still
22 there.
23      Q.  Have you spoken with any of those individuals
24 in Interrogatory 10 since your employment with Boat
25 Town?  Obviously, we've -- you've spoken with Daniel,

Page 90

1 but anyone else that you've spoken with?
2      A.  I guess I -- like I said, I ran into Geromi
3 after that.
4      Q.  But you didn't discuss your lawsuit; correct?
5      A.  Correct.
6      Q.  Anyone else with knowledge of your claims that
7 you did not list there?
8      A.  From Boat Town or...
9      Q.  Correct.
10      A.  From Boat Town, no.  I think that's everybody.
11      Q.  Well, and anyone else who would have knowledge
12 of your claims would be -- their knowledge would be
13 based on what you told them; correct?
14      A.  I believe so, yes.
15      Q.  Okay.
16          (Discussion off the record.)
17          MR. DEPONTE:  Let's go off the record real
18 quick.  I just want to make sure I'm done, at least for
19 now.
20          (Recess taken from 12:04 p.m. to 12:05 p.m.)
21          MR. DEPONTE:  We can go back on the record.
22      Q.  (BY MR. DEPONTE)  Okay.  Just real quick,
23 Mr. McNamara.  Boat Town didn't ask you to pay back the
24 damages that you caused in that guard house accident,
25 did it?

Page 91

1      A.  I was not asked to -- to pay anything for the
2 damages.
3      Q.  And it -- but you don't know how much they
4 were?
5      A.  I do not.  I was never told.
6      Q.  And are you aware that Boat Town can still try
7 to seek damages from you for that damage you caused?
8      A.  I was not under that -- I was not aware of
9 that.
10      Q.  Okay.  And you don't even know how much that
11 was, do you?
12      A.  I -- I don't believe that I was ever told
13 what...
14      Q.  Okay.  So if I said maybe $54,000, you wouldn't
15 have any reason to dispute that?
16      A.  I -- I don't know how much it cost.
17      Q.  Okay.  Have you understood all my questions
18 today?
19      A.  Yes.
20      Q.  Have you asked me to clarify any questions you
21 didn't understand?
22      A.  I -- I did.
23      Q.  And have all your answers been truthful?
24      A.  They have.
25      Q.  Okay.

Page 92

1          MR. DEPONTE:  I'm not going to pass the
2 witness.  We'll reconvene by Zoom once I get a chance to
3 look at those records, but it won't be long.
4          MS. SCHEEF:  Yeah.  Just let me know.
5          MR. DEPONTE:  Okay.  That's it.
6          (Proceedings adjourned at 12:07 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1   CHANGES AND SIGNATURE TO THE ORAL DEPOSITION OF
2            KADEN MCNAMARA
3            AUGUST 13, 2025
4   PAGE    LINE    CHANGE    REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 94

1        I, KADEN MCNAMARA, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5            _____
             KADEN MCNAMARA
6
7
8
9   THE STATE OF _____)
10  COUNTY OF _____)
11
12      Before me, _____, on
13  this day personally appeared KADEN MCNAMARA, known to me
14  (or proved to me under oath or through
15  _____) (description of identity
16  card or other document)) to be the person whose name is
17  subscribed to the foregoing instrument and acknowledged
18  to me that they executed the same for the purposes and
19  consideration therein expressed.
20      Given under my hand and seal of office this
21  _____ day of _____, _____.
22
23
24  _____
            NOTARY PUBLIC IN AND FOR
25          THE STATE OF _____
            COMMISSION EXPIRES: _____

Page 95

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION
3   KADEN MCNAMARA on Behalf    )
    of Himself and Others       )
4   Similarly Situated,         )
            Plaintiff,          )
5   VS.              ) CIVIL ACTION
    BOAT TOWN, INC., CLAYTON    )
6   RAVEN, and CLAY RAVEN,      ) NO.: 1:24-CV-869-DAE
            Defendants.         )
7
         REPORTER'S CERTIFICATION
8        DEPOSITION OF KADEN MCNAMARA
            AUGUST 13, 2025
9        I, Marta M. Johnson, Certified Shorthand Reporter
10  No. 10743, in and for the State of Texas, hereby certify
11  to the following:
12      That the witness, KADEN MCNAMARA, was duly sworn by
13  the officer and that the transcript of the oral and
14  videotaped deposition is a true record of the testimony
15  given by the witness;
16      That the original deposition transcript was
17  delivered to _____.
18      That a copy of this certificate was served on all
19  parties and/or the witness shown herein on
20  _____.
21      That the amount of time used by each party at the
22  deposition is as follows:
23      MR. MICHAEL J. DEPONTE, ESQ. - 02 HOURS:05
    MINUTE(S)
24      MS. TANNER SCHEEF, ESQ. - 00 HOURS:00 MINUTE(S)
25      I further certify that pursuant to FRCP Rule

Page 96

1   30(f)(1) that the signature of the deponent:
2       _____ was requested by the deponent or a party
3   before the completion of the deposition and that the
4   signature is to be before any notary public and returned
5   within 30 days from date of receipt of the transcript.
6   If returned, the attached Changes and Signature Page
7   contains any changes and the reasons therefore.
8       _____ was not requested by the deponent or a
9   party before the completion of the deposition.
10      I further certify that I am neither counsel for,
11  related to, nor employed by any of the parties or
12  attorneys in the action in which this proceeding was
13  taken, and further that I am not financially or
14  otherwise interested in the outcome of the action.
15      Certified to by me this 29th day of August, 2025.
16
17
18  _____
    Marta M. Johnson, Texas CSR 10743
19  Expiration Date:  10/31/26
    Deposition Resources, Inc.
20  Firm Registration No. CRF-409
    515 North Church Street
21  Palestine, Texas 75801
    efile@depositionresources.com
22  (800) 295-4109
23
24
25

Page 97

1  COUNTY OF BEXAR   )
              )
2  STATE OF TEXAS    )

3

4        I hereby certify that the witness was notified
5  on _____ that the witness has 30 days or
6  (_____ days per agreement of counsel) after being
7  notified by the officer that the transcript is available
8  for review by the witness and if there are changes in
9  the form or substance to be made, then the witness shall
10  sign a statement reciting such changes and the reasons
11  given by the witness for making them:
12        That the witness' signature was/was not
13  returned as of _____.
14        Subscribed and sworn to on this, the _____ day
15  of _____, 2025.

16

17

18

19        _____
        Marta M. Johnson, Texas CSR 10743
20        Expiration Date:  10/31/26
        Deposition Resources, Inc.
21        Firm Registration No. CRF-409
        515 North Church Street
22        Palestine, Texas 75801
        efile@depositionresources.com
23        (800) 295-4109

24

25