# Exhibit C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

KADEN McNAMARA on Behalf of  )
Himself and Others Similarly )
Situated,                    )
                             )
          Plaintiff,         )
                             )
vs.                          ) CASE NO. 1:24-cv-869-DII
                             )
BOAT TOWN, INC., CLAYTON     )
RAVEN and CLAY RAVEN,        )
                             )
          Defendants.        )

-----------------------------------------------------------

ORAL DEPOSITION

PATRICIA LYNN SHOOK

SEPTEMBER 17, 2025

(Reported Remotely)

-----------------------------------------------------------

     ORAL DEPOSITION OF PATRICIA LYNN SHOOK, produced as

a witness at the instance of the Plaintiff and duly

sworn, was taken in the above-styled and numbered cause

on the 17th day of September, 2025, from 10:02 a.m. to

11:35 a.m., before Jean Thomas Fraunhofer, Certified

Shorthand Reporter in and for the State of Texas,

reported by computerized stenotype machine in Port

Mansfield, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Patricia Lynn Shook 9-17-2025

**2**

APPEARANCES

FOR PLAINTIFF:
      TANNER SCHEEF
      KAPLAN LAW FIRM, PLLC
      2901 Bee Cave Road, Suite G
      Austin, Texas 78746
      Telephone: (512)814-8522
      E-mail: tscheef@kaplanlawatx.com

FOR DEFENDANT:
      MICHAEL J. DePONTE
      JACKSON LEWIS, PC
      500 North Akard, Suite 2500
      Dallas, Texas 75201
      Telephone: (214)520-2400
      E-mail: michael.deponte@jacksonlewis.com

ALSO PRESENT: Gabriel Loya
                        Kaden McNamara

**3**

INDEX

                                                    PAGE
PATRICIA LYNN SHOOK
Examination by Ms. Scheef ........................5

Signature Page . . . . . . . . . . . . . . . . . 75

Court Reporter's Certificate . . . . . . . . . 76


                        EXHIBITS
EXHIBIT            DESCRIPTION            PAGE
Exhibit 1    Defendant Objections and      18
                  Answers to Plaintiff's First
                  Set of Interrogatories }
Exhibit 2    Handwritten notes of Kaden    32
                  McNamara

Exhibit 3    Audio recording               41

**4**

PROCEEDINGS

THE REPORTER: Today's date is September 17, 2025. The time is 10:02 a.m. This is the deposition of Patti Shook and is being conducted remotely, the witness being located in Port Mansfield, Texas.

My name is Jean Fraunhofer, Texas CSR 7990. I am reporting the deposition by stenographic means from New Braunfels, Texas.

Would counsel please state their appearances for the record beginning with the Plaintiff?

MS. SCHEEF: My name is Tanner Scheef. I represent the Plaintiff, Kaden McNamara. With me is our law clerk, Gabriel Loya.

MR. DePONTE: Hi. My name is Michael DePonte with Jackson Lewis, and I represent the Defendants in this matter.

THE REPORTER: Because we are conducting this deposition remotely, it is very important to speak one at a time, clearly and slowly to produce a good record.

Ms. Shook, would you please raise your right hand to be sworn?

(Witness sworn remotely.)

THE REPORTER: Counsel, you may begin.

**5**

PATRICIA LYNN SHOOK,
having been first duly sworn, testified as follows:

EXAMINATION

BY MS. SCHEEF

Q.   Okay. Going to make sure I've got everything pinned for the Zoom. Okay. Perfect. Well, good morning, Ms. Shook. It's nice --

A.   Good morning.

Q.   -- to virtually meet you. I really appreciate you taking the time today, and hopefully I will get it done fast. I anticipate I will, but I will not make promises because I'll inevitably break it if I do. Can you just --

A.   That would be good.

Q.   -- state your name for the record?

A.   Patricia Lynn Shook.

Q.   And what's your current address?

A.   Current address is 6125 Wegner Road, New Braunfels, Texas.

Q.   And what is your current occupation?

A.   I am retired.

Q.   And sorry, just finalizing the tech issues. Congratulations on the retirement.

A.   Thank you, yes.

Q.   I apologize for having to have you log on to a

6

1 Zoom call during your retirement. I'm sorry about that.
2   A.  It's fine.  I'm just not real techknowledged.
3   Q.  Apparently I'm not either given how my
4 morning's been going.  So you and I are in the same
5 boat --
6   A.  I was happy I could get logged in at all.
7   Q.  Took me a while to do it, too.
8       So have you ever given a deposition under
9 oath before?
10   A.  No, ma'am.
11   Q.  And --
12   A.  Never.
13   Q.  Are you currently taking any medications that
14 might affect your ability to give truthful testimony
15 today?
16   A.  No.
17   Q.  Are you -- have you had any alcohol in the last
18 several --
19   A.  No.
20   Q.  -- that you can --
21   A.  No.  Even though I can, but no, no.
22   Q.  5 o'clock somewhere, I'll tell you, especially
23 in retirement.
24   A.  Exactly.
25   Q.  So do you understand that you are under oath

7

1 today the same way you would be if you were testifying
2 in front of a judge?
3   A.  Yes, ma'am.
4   Q.  And do you understand the difference between
5 answering something I don't know versus I don't recall?
6   A.  No.
7   Q.  For example, if -- if you say I don't know, it
8 just means you have no knowledge of it.  I don't recall
9 means, I might have known, but I don't remember.  Do you
10 understand kind of --
11   A.  Okay.
12   Q.  -- the difference between those two?
13   A.  Yes, fair.
14   Q.  Okay.  And at some point, I know myself, I'm
15 going to ask a question that's confusing.  Maybe my last
16 one was.  So if at any point I ask a confusing question,
17 will you just ask me to rephrase it so I can make sure
18 my question's clear?
19   A.  I will.
20   Q.  Okay.  Perfect.  And will you agree to answer
21 my questions to the best of your ability?
22   A.  Yes, ma'am.
23   Q.  And if at any point you need to take a break
24 during this deposition, just let me know, but I just ask
25 that you answer the pending question before going on

8

1 break.  All right?
2   A.  Yes.
3   Q.  And do you have any documents with you right
4 now?
5   A.  No, ma'am.
6   Q.  Is there anyone else in the room with you?
7   A.  No, ma'am.
8   Q.  And are you communicating with anyone while
9 you're giving this testimony?
10   A.  No, ma'am.
11   Q.  And do you agree to let me know if that
12 changes?
13   A.  Sure.
14   Q.  And do you agree while we're in this deposition
15 not to review anything other than, you know, what I pull
16 up on screen for you?
17   A.  Yes, ma'am.
18   Q.  And are you using a cell phone, tablet or
19 computer to do this deposition?
20   A.  No, ma'am, I have a computer.  I'm on my
21 computer.  My home computer.
22   Q.  Perfect.  And if you have any type issues, just
23 let me know, and we can take some time for you to sort
24 it out.
25   A.  I appreciate that.

9

1   Q.  I'm sure I'll need it, too.
2       Will you also agree -- do you have your
3 cell phone with you there today?
4   A.  I do.  It's on silent, and it's in the other
5 room.
6   Q.  Okay.  I appreciate that.  Will you let me know
7 if that changes?
8   A.  Yes, ma'am.
9   Q.  And did you review any documents to prepare for
10 today?
11   A.  No, ma'am.
12   Q.  And are you repre -- represented by counsel
13 today?
14   A.  Mike is here.
15   Q.  Okay.  And so --
16   A.  DePonte.
17   Q.  Does Mike represent you in this case?
18   A.  Yes, I would think so.  I mean --
19   Q.  Have you --
20   A.  -- to my knowledge, yes.
21   Q.  Have you signed any agreements with Mike?
22   A.  No.
23   Q.  Are you paying Mike in any way?
24   A.  No.
25   Q.  So is he representing you because he represents

10

1  Boat Town?
2    A.  Yes, that's my knowledge is he's representing
3  me because he represents Boat Town.
4    Q.  But you're no longer --
5    A.  That's --
6    Q.  -- employed by Boat Town?
7    A.  That's correct.  But I no longer -- I'm --
8  employed, and he hasn't personally represented me.
9    Q.  Okay.  Well, at some point, I know it's all
10  very confusing.  I totally understand.  Well, just for
11  deposition logistics, I know Jean already told us.  But
12  just to make Jean's life a little bit easier, I just ask
13  that you wait until I finish answering [sic] my
14  question, and in turn, I'll wait until you finish your
15  answer to get -- you know, before we start talking.  Is
16  that all right?
17    A.  I'll do my best.
18    Q.  I'll do my best, too.  I -- I'll slip up
19  sometimes I'm sure.
20       And I know it feels counterintuitive, and
21  a lot of times we answer questions with nods or uh-huhs,
22  but can you keep your answers to verbal yeses and noes
23  just to make Jean's life easier too?
24    A.  Yes, ma'am.
25    Q.  And then at some point during this deposition,

11

1  you might hear Mike object.  You can still answer the
2  questions.  Those objections will be handled later on by
3  the Judge, and it doesn't mean you don't answer.
4    A.  Okay.
5    Q.  I know it's a little bit confusing because when
6  you watch, you know, trials --
7       (Simultaneous conversations.)
8    A.  Trying to (indecipherable) --
9    Q.  -- (indecipherable) but in depositions, it's a
10  little bit different.
11    A.  Okay.
12    Q.  Okay.  Any other questions about the deposition
13  process?
14    A.  No, ma'am.
15    Q.  Okay.  Let me check my notes and make sure I'm
16  not missing any questions here.
17    A.  Okay.
18    Q.  Okay.  Okay.  Let's get into Boat Town.
19    A.  Okay.
20    Q.  When did you first start working there?
21    A.  April 10th.  Well, 15 years ago, 2010.
22    Q.  Okay.  And when did your employment end?
23    A.  I don't know the exact date.  I think, like,
24  July 27th, 2025.  Somewhere around there.  25th, 26th.
25  I don't know the exact date.

12

1    Q.  Okay.
2    A.  I was on vacation, and then I decided to retire
3  earlier than I had told them originally.
4    Q.  When were you originally going to retire?
5    A.  The end of the year.
6    Q.  Okay.  And you were the controller, right?
7    A.  Yes -- yes, ma'am.
8    Q.  Was that always your title?
9    A.  Yes, ma'am.
10    Q.  And who did you report to?
11    A.  Clayton Raven --
12    Q.  And that's --
13    A.  -- Sr.
14    Q.  -- Clayton Sr.  Okay.
15    A.  Yes, ma'am.
16    Q.  It's always a little bit confusing.  I'm sure
17  it was for you, too.
18       So what were your primary duties as
19  controller?
20    A.  When I first started, it was to do all the
21  accounting, not -- well, not all of it.  I didn't do
22  payables, and I did not do payroll.  I did all of the
23  accounting and bookkeeping and financials.
24    Q.  When did you start taking control of the
25  payroll?

13

1    A.  I honestly don't recall.  Our prior payroll
2  clerk retired, and it was just kind of, you know, passed
3  down to me.
4    Q.  And do you remember the name of your prior
5  payroll clerk?
6    A.  Yes, Jan Sprayberry.
7    Q.  Am I correct in assuming that's Sprayberry,
8  S-P-R-A-Y-B-E-R-R-Y?
9    A.  That's correct.
10    Q.  And so before you took on payroll duties, was
11  it Jan's job to set up how overtime was calculated?
12    A.  To my knowledge.
13    Q.  Okay.
14    A.  Yes.
15    Q.  And then, so were you responsible for
16  accounting matters?
17    A.  Accounting matters?  Just the --
18    Q.  General accounting for the company?
19    A.  Sure.
20    Q.  Okay.
21    A.  Yes.
22    Q.  And do -- if you could give me an estimate on
23  when Jan left.  I -- if you don't have exact dates,
24  that's fine.  Just so I can get a general idea of when
25  you took over payroll.

14

1    A.  I wouldn't even try to guess.  Like I say, she
2  retired, and I know she was there at least 4 or 5 years,
3  but to give you a es -- I can't even remember.
4    **Q.  That's totally fine --**
5    A.  I just --
6    **Q.  -- it's been a long time.**
7    A.  I know she was -- right, yeah.  Yeah.  I -- I
8  can't remember, honestly.  But I know she was there 4 or
9  5 years with me when I first started.  She'd been there
10  before me, so...
11    **Q.  And so if she was -- if you were there, started
12  in 2010, it's fair --**
13    A.  Right.
14    **Q.  -- to say that she left around 2015ish?**
15    A.  Yes, that's fair, but I don't know for exact.
16  And I'm not --
17    **Q.  I won't hold you to that --**
18    A.  -- I'm not -- I'm not going to say.  I -- I
19  don't know, honestly.
20    **Q.  So when you took over payroll, what authority
21  did you have on making payroll decisions?  Was it kind
22  of you were the final say, or did you go up to Clayton?**
23    A.  I always -- I took any questions or concerns to
24  Clayton Raven, Sr.
25    **Q.  Okay.  And that includes on overtime?**

15

1    A.  Yes, ma'am.
2    **Q.  Okay.  And then did anyone review what you had
3  for payroll before it was processed?**
4    A.  The only time it got reviewed was when I did a
5  salesman's commission payroll.  Not regular payroll
6  didn't.  Not --
7    **Q.  Okay.**
8    A.  -- not once I figured it, no, ma'am.
9    **Q.  And, you know, I know you said that you kind of
10  reported to Clayton, Sr.**
11    A.  Yes, ma'am.
12    **Q.  Did you supervise anyone?**
13    A.  I -- I don't know if you would call it
14  supervising.  I mean, Jan and I worked together.
15    **Q.  Okay.**
16    A.  But afterwards, I supervised a part-time person
17  we pulled in to do payables and a couple other people
18  that when she retired, another payables.  There was
19  always an extra person in the office.
20    **Q.  Do you remember who that extra person was
21  around the time --**
22    A.  One was Deb -- around the time of what?
23    **Q.  Around the time that Mr. McNamara brought up
24  the wage issues.**
25    A.  It probably had to be Debbie.

16

1    **Q.  And what was Debbie's last name?**
2    A.  Davis.
3    **Q.  Debbie Davis.  Okay.**
4        And then you -- I know you resigned a
5  little bit earlier, and do you --
6    A.  Retired.
7    **Q.  Retired.  Sorry, wrong word.  You retired a
8  little bit earlier than expected.  Why was that?**
9    A.  Personal and family issues.
10    **Q.  I'm sorry to hear about that.  Hopefully I hope
11  everything is okay.**
12    A.  It's working.  We're getting it.
13    **Q.  That's -- I'm glad to hear that.**
14    A.  I appreciate -- I appreciate it.
15    **Q.  And were you at any point supposed to represent
16  the company as corporate representative to your
17  knowledge?**
18    A.  No, ma'am.
19    **Q.  Okay.  And given that it's person -- personal
20  reasons, you know, I got to ask, did the pending
21  litigation have any reason in why you resigned -- or why
22  you retired, or was it --**
23    A.  No, ma'am.
24    **Q.  -- just the family?  Okay.  That makes total
25  sense.**

17

1    A.  It was family.  I had prob -- issues with my
2  daughter.  And I had already reached full retirement, so
3  I was, like, well, she needed me more.
4    **Q.  Sometimes it's the time.  I completely
5  understand.  We have someone from our own firm
6  retiring --**
7    A.  Retire --
8    **Q.  -- so --**
9    A.  -- it is different.
10    **Q.  Yes, it is.  I don't know.  It's the employment
11  lawyer in me that has the other word in my head.**
12        But you were aware of this lawsuit before
13  **you resigned?  Resign --**
14    A.  Yes.
15    **Q.  -- retired.  I am so sorry.  Retired.**
16    A.  You're fine.  You're fine.
17    **Q.  Were you aware --**
18    A.  Yes, I was.
19    **Q.  -- of this lawsuit before you retired?**
20    A.  Yes, I was.
21    **Q.  And bringing this up, I just want to discuss
22  something.  Let me see.  I'm going to screen share it,
23  and you can just let me know if you can see what I am
24  screen sharing.  I'll mark it as Exhibit 1 for the
25  deposition.**

18

1    (Exhibit 1 marked.)
2    Q.  Do you -- can you see what I'm sharing?
3    A.  Yes.
4    Q.  Do you see where it says Defendant Boat Town,
5  Inc.'s Objections and Answers to Plaintiff's First Set
6  of Interrogatories?
7    A.  Yes.
8    Q.  Do you remember helping make these?
9    A.  I don't understand.  Make them.
10    Q.  So here at Interrogatory 1, when it says,
11  Please identify each person from whom information or
12  documents were obtained to answer these interrogatories
13  and respond to Plaintiff's First Request for Production
14  to Defendant and who assisted in the preparing --
15  preparing the responses and objections to said discovery
16  requests and identifying the interrogatory or requests
17  for production each person helped answer.
18        And it says Patti Shook.
19    A.  Okay.
20    Q.  Do you see that?
21    A.  Yes, I see that.
22    Q.  So did you review these interrogatories and the
23  answers that were given to --
24    A.  No, I -- no, I did not.
25    Q.  So if we received a verification of these

19

1  interrogatories with your signature, you didn't actually
2  review these?
3    A.  Correct.
4    Q.  Okay.  Were you asked at all about these
5  questions and your memory whatsoever?
6    A.  No, not --
7        MR. DePONTE:  Objection to the --
8        Wait, wait, Patti.
9        Objection to the extent you're seeking
10  attorney-client communications.  And I'll instruct the
11  witness not to answer that question.
12    Q.  Did you review this document, Patti?
13    A.  Not really.
14    Q.  Okay.  Moving on into kind of the questions
15  regarding the nitty-gritty of overtime.  And trust me,
16  doing employment law, I know it is a confusing world.
17        So before you went to Boat Town, how long
18  had you been doing kind of roles similar to the
19  controller position at Boat Town?
20    A.  The same role is the question?
21    Q.  I guess roles of adjacent duties.
22    A.  Well, the thing is because I've been in the
23  automotive and -- and dealership business for 40 years,
24  but not always in a controller position.
25    Q.  In --

20

1    A.  I started in the boat and -- well, automotive
2  business when I was 16.
3    Q.  I guess my question is, how many years have you
4  been dealing with things like running payroll, doing
5  overtime?
6    A.  Just at Boat Town.
7    Q.  Just at Boat Town.  Okay.
8    A.  Yes, ma'am.
9    Q.  And when Mr. McNamara came to you, Boat Town
10  had been calculating overtime at a 2-week basis?
11    A.  Can you -- can you re-question that?  I mean,
12  how were we paid biweekly?
13    Q.  Yes.  So you were -- but you were calculating
14  overtime based on whether or not someone was working
15  over 80 hours every 2 weeks, right?
16    A.  That is correct.
17    Q.  How long had Boat Town been doing that?
18    A.  I have no idea.
19    Q.  Was that the --
20    A.  I know how long I did it.  You know, from the
21  time I started doing payroll.  I have no idea of prior.
22    Q.  Did Jan have it that way?
23    A.  Yes.
24    Q.  Sorry, I think your audio might have gone out.
25  Can you repeat your answer?

21

1    A.  I don't -- I don't -- I don't remember because
2  I never checked her payroll.
3    Q.  Okay.  How did you take over the system from
4  her?
5    A.  She had a couple of spreadsheets, and she
6  showed me how to pull the time sheets off the computer
7  and showed me how her spreadsheets worked.  And it was
8  kind of you manually fill them in, and that was pretty
9  much it.  So I really -- she did train me, but not to
10  massive extent I guess is a good way to put it.
11    Q.  Did she -- did you change her spreadsheets or
12  her method in any way?
13    A.  No, not at all because I'm not a spreadsheet
14  queen.
15    Q.  Neither am I, trust me.  Had a class in
16  undergrad where they wanted me to learn how to code and
17  use Excel, and I was like, I'd rather not do this.
18    A.  Jan was -- Jan was very good at it.
19    Q.  I -- I guess going on to -- I guess I want some
20  clarification on what the process was.  I understand
21  there was Lightspeed and then ADP.  How did the process
22  work from what -- what you remember?
23    A.  For payroll, to run payroll or process payroll?
24    Q.  To run payroll --
25    A.  Is that --

22

1    Q.  -- and calculate --
2    A.  -- is that the question.
3    Q.  Yes.
4    A.  Okay.  In Lightspeed, I would print out all of
5  the time clock sheets where they've clocked in and out.
6  Lightspeed had a log-in and, you know, kept track of all
7  their log-ins and outs.  So I'd run those.  And I would,
8  yes, add up all their time.  And then I -- of course
9  there was flag sheets involved from the technicians.
10  And once I put them into the spreadsheets, then I would
11  log in to ADP and enter it all manually into ADP, and
12  that -- that really is what processed it.  I did all the
13  additions and all that manually and entered it into
14  Lightspeed -- I mean, into ADP.  I'm sorry.
15    Q.  Okay.  So where does the over 80 hours come in?
16  Was that something you got from Lightspeed, from the
17  spreadsheet or from ADP?
18    A.  I don't understand your question.
19    Q.  Sure.  So --
20    A.  Where -- I mean, I don't understand what you're
21  saying, where did the 80 hours come into play.
22    Q.  So where did you calculate overtime over
23  80 hours a week --
24    A.  On the --
25    Q.  -- or over 80 hours every 2 weeks?

23

1    A.  On their individual time sheet.  In other
2  words, it -- it would have a list of 2 weeks, total
3  2 weeks on the time sheet.  And then at the bottom, it'd
4  have a total hours for the 2 weeks.  And if it said
5  81 hours, it was 80 regular and an hour overtime is how
6  it was calculated.
7    Q.  Okay.  And was Lightspeed, the Lightspeed
8  spreadsheet, ADP process, that was in place with Jan?
9    A.  Yes.
10    Q.  Okay.
11    A.  Yes.
12    Q.  And then were you aware that calculating
13  overtime on a 2-week basis was incorrect?
14    A.  I was not.
15    Q.  And when did you first learn that this was
16  incorrect?
17    A.  When Mr. McNamara came to me and told me.
18    Q.  And we'll get into that a little bit, but did
19  you ever, I guess, on your own look up guidance into how
20  it was correctly done?
21    A.  No, not until after Mr. McNamara came to me.
22  And then, yeah, WW Google search, you know.  What are
23  the FSLA whatever overtime rules in Texas.
24    Q.  It's the best --
25    A.  But not --

24

1    Q.  -- place to start off, I'll tell you that.
2    A.  Yeah.  Not until then.
3    Q.  Okay.  And then let me pull this up real quick.
4  So you mentioned that you used the, I believe,
5  Lightspeed, right?
6    A.  Yes, ma'am.
7    Q.  Do you know how long Boat Town had been using
8  Lightspeed?
9    A.  Since I was there.  I don't know prior to my
10  arrival how long.
11    Q.  And did you just use Lightspeed for time
12  tracking?
13    A.  No, Lightspeed was our accounting system.
14    Q.  Okay.
15    A.  ADP was just our payroll.
16    Q.  Okay.  And can you explain to me how Lightspeed
17  tracks time?
18    A.  Well, you go in the computer, you log in with
19  your log-in, and you hit F whatever it is, 12, and it
20  asks to you log in.  You put in your time, you log in,
21  and then you go about your business.  And when you leave
22  the end of the day, you go in and hit F12 again, and it
23  clocks your time.  And it saves it in the file, and you
24  run a report on, okay.  This 2-week period, I clocked in
25  this many hours or whatever.

25

1    Q.  A lot simpler than having to do the physical
2  card.
3    A.  Oh, I -- I've done those.  I've added those up.
4    Q.  I did too, I did too.
5        So was there -- on Lightspeed, would it
6  tell you how many hours someone worked a week?
7    A.  You could put it like that.  It's just how you
8  put it in the system.  You would ask it, I want from
9  this date to this date.  Or you would say, you know, the
10  one week or the two weeks.  I just always pulled the
11  two weeks since we were on a biweekly payroll.
12    Q.  Okay.  So I'm going to pull up, I guess this
13  won't really be an exhibit because it's a Web site, but
14  I just have some questions on -- I'm pulling up
15  Lightspeed's Web site on their labor and tracking and
16  overtime settings.  Do you see that?
17    A.  Yes.
18    Q.  Okay.  And you see here it says, Set up
19  overtime settings.
20    A.  Uh-huh.
21    Q.  Did you ever set up any overtime settings in
22  Lightspeed?
23    A.  No, ma'am.
24        MR. DePONTE:  Let me object to this line
25  of questioning because there's no indication that this

**26**

1 is what was active at the time Boat Town was using
2 Lightspeed. I assume this is not an archived page.
3 This is a current page. So I don't know that this is
4 really accurate. I mean, what -- Ms. Shook answered to
5 the extent she can, but it's not necessarily a
6 representation of what's in Lightspeed.
7 **Q. Okay. Well, here it does say, Set up Overtime**
8 **Settings. Right, Ms. Shook?**
9 A. It says that, but I don't recall anything in my
10 setup saying that, so...
11 **Q. Okay. I'm scrolling down a little bit here.**
12 **Do you recall ever seeing a page like this on**
13 **Lightspeed?**
14 A. No, ma'am.
15 **Q. Do you see where it says, Set your overtime and**
16 **double time rules to enable us to populate your report**
17 **correctly --**
18 A. Yes --
19 MR. DePONTE: Objection, form.
20 A. No, ma'am. I never saw that. I see that, but
21 I never saw it.
22 **Q. Do you --**
23 A. In our setup.
24 **Q. Do you see here where it says, Please verify**
25 **that your state's overtime and double time rules of the**

**27**

1 **US Department of Labor and enter any rules that apply**
2 **for your business in the appropriate row below.**
3 A. I see that, yes.
4 MR. DePONTE: Can we agree to just a
5 running objection to any questions related to this Web
6 site?
7 MS. SCHEEF: Yeah, I'm fine with that.
8 MR. DePONTE: Thank you.
9 **Q. You see here it has kind of three options. One**
10 **saying, Employees begin earning overtime after**
11 **zero hours per week. Employees begin earning overtime**
12 **after zero hours per day. Employees begin earning**
13 **double time after zero hours per day.**
14 **Does that sound -- does that look correct**
15 **from what you see on this screen?**
16 A. From what I see on the screen, yes, ma'am.
17 **Q. And there's no option here that says per every**
18 **2 weeks?**
19 A. No, ma'am.
20 **Q. Okay. But you don't recall ever going into the**
21 **Lightspeed settings to see how --**
22 A. Never.
23 **Q. -- overtime?**
24 A. Never.
25 **Q. Okay.**

**28**

1 A. I didn't know that existed to be honest.
2 **Q. And so what would you download from or print**
3 **from Lightspeed when you were doing payroll?**
4 A. It would be what's called a time card report.
5 **Q. And you would do that on a 2-week basis for**
6 **each employee?**
7 A. That's correct.
8 **Q. -- that you had at the time?**
9 A. That's correct.
10 **Q. And those would be physically printed?**
11 A. Correct.
12 **Q. And then you would manually enter that into**
13 **Excel?**
14 A. Correct.
15 **Q. And then would you upload the Excel to ADP or**
16 **input the data manually into ADP?**
17 A. Manually input it.
18 **Q. And so you had to input each employee's**
19 **individually?**
20 A. Correct.
21 **Q. Must have been very time consuming?**
22 A. Yes, ma'am.
23 **Q. And just double-checking this.**
24 **When you would enter it into ADP, and this**
25 **is kind of my ignorance on how ADP works, would you put**

**29**

1 **in hours worked and overtime hours separately, and it**
2 **would calculate the overtime?**
3 A. No, I would manually put in 80 hours and then
4 the overtime over 80 into -- there's an overtime column.
5 **Q. Okay. And then --**
6 A. So I would separately put them in.
7 **Q. And then ADP would calculate the time and a**
8 **half, right, I'm guessing?**
9 A. Correct. Based on what they were already put
10 in the system at.
11 **Q. Okay. And do you know whose decision it was to**
12 **do the 2-week basis for the overtime calculation?**
13 A. I don't recall. I don't know, honestly. Like
14 I said, it was just passed over to me when Jan retired
15 and, you know, kind of like monkey see monkey do.
16 **Q. You inherited it from them?**
17 A. Exactly and, you know, went with that.
18 **Q. Okay. And I guess getting into Mr. McNamara.**
19 **Did you --**
20 A. Yes, ma'am.
21 **Q. -- you worked -- you worked with Mr. McNamara?**
22 A. I did.
23 **Q. How often would you interact with him?**
24 A. Hardly never.
25 **Q. Was he in a separate part of the shop, or were**

30

1  you in a different location?
2    A.  Yes, he was.
3    Q.  And are you aware of what the duties are for a
4  boat captain?
5    A.  No, I don't -- that's not my job to know that.
6  That's Mr. Raven's.
7    Q.  Makes sense.
8        Are you aware, I guess, what -- was it
9  part of the job duties for boat captains or other roles
10  to assist members of the Raven family with their
11  personal errands?
12        MR. DePONTE:  Objection, form.
13    A.  I have no -- I have no idea.
14    Q.  Were you ever asked to do personal errands for
15  the Ravens?
16    A.  No, ma'am.
17    Q.  If we heard from Mr. Raven that part of the
18  boat captain's duties was to do personal errands for the
19  Raven family, is that accurate from your experience?
20        MR. DePONTE:  Objection, form.
21    A.  If -- I'm sorry.  Can you rephrase that or ask
22  it again?
23    Q.  Sure.  If we heard from Mr. Raven, Sr. that --
24    A.  Yes.
25    Q.  -- part of the boat captain's duties was to

31

1  assist members of the family with their personal
2  errands, was that accurate from your experience?
3        MR. DePONTE:  Objection, form.
4        You can answer if you can, Patti.
5    A.  I have no idea because I don't -- I'm never
6  aware of what they asked them to do.  That's -- you
7  know, I wasn't ever aware.
8    Q.  In your role --
9    A.  So --
10    Q.  -- go ahead.
11    A.  I can't answer that because I don't know.
12    Q.  And that's a perfectly fine answer.  If you
13  don't know, feel free to say it.
14    A.  Okay.
15    Q.  I always say that's -- that's the most common
16  deposition answer.  You hear it more than yes and no.
17        I guess my question is, you know, you have
18  decades of experience.  Was it normal for -- in your
19  other companies for people to have to do personal
20  errands for the owners of the company?
21        MR. DePONTE:  Objection, form.
22    A.  Yes.
23    Q.  So you saw that in --
24    A.  Yes.
25    Q.  -- other employees doing personal errands?

32

1    A.  Yes, ma'am.
2    Q.  Okay.  Do you know if doing those personal
3  errands was counted towards someone's hours for working?
4    A.  I have -- I have no idea.
5    Q.  Okay.  And so you're not sure if the Ravens
6  allowed people to count those personal errands towards
7  their working hours?
8    A.  That is correct.
9    Q.  Okay.
10    A.  I was not sure.
11    Q.  So I want to hop into your -- whenever
12  Mr. McNamara came and first talked to you, that was
13  around June 6, 2023, correct?
14    A.  I can't re -- I can't recall the dates.
15    Q.  That make sense.  What I'm going to do is I'm
16  going to pull up what we'll mark as Exhibit 2.
17        (Exhibit 2 marked.)
18    A.  And I don't have any stuff here to go off of
19  and to look at, so...
20    Q.  And what I'm going to show you, I'll pull it up
21  now, it is notes that Mr. McNamara was taking during
22  these conversations.  I just want to reference it for
23  the dates.
24        MR. DePONTE:  Let me object because these
25  have not been proven up.  These are allegedly notes he

33

1  took during meetings.
2        MS. SCHEEF:  I appreciate the objection.
3  I think it's verging a little close towards instructing
4  the witness, but --
5        MR. DePONTE:  I --
6        MS. SCHEEF:  -- I will note the objection.
7    Q.  Patti, I'm just asking you, does the date
8  June 6, 2023 sound correct?
9    A.  I -- I have no idea, honest.
10    Q.  Do you remember at all when he came to
11  complain?
12    A.  No, I don't recall.
13    Q.  Do you have any reason to dispute that this is
14  accurate?
15    A.  No reason to dispute it.  I just don't recall
16  the date.
17    Q.  Okay.  That makes sense.  Well --
18    A.  And the time I don't -- I do know -- the only
19  thing I can agree on on this that you're showing me is
20  it was Geromi and me and Kaden.  That's the only thing
21  for sure I do know.
22    Q.  That's -- that's helpful for me.  So Geromi was
23  there as well.  Geromi Trudeau, right?
24    A.  Correct.
25    Q.  And do you remember where this meeting would

34

1  have taken place?
2    A.  In Geromi's office.
3    Q.  And what was Geromi's role?
4    A.  You know, we really didn't like roles, but he
5  was -- I would say he's a salesman, but sometimes he was
6  over the captains, but --
7    Q.  And --
8    A.  -- he was the salesperson.
9    Q.  Do you remember Mr. McNamara raising the issue
10  to you that overtime was being calculated improperly?
11    A.  Yes, I do.
12    Q.  And do you recall saying, This is how it has
13  always been done.
14    A.  I don't recall that at all.
15    Q.  Do you recall saying, It saves the company
16  money.
17    A.  No.
18    Q.  Okay.  And whenever -- what was your reaction
19  when Mr. McNamara came in?
20    A.  I was surprised.  But, you know, I listened,
21  and of course right away, I'm like, Okay.  Well, I got
22  to find out if I'm doing it wrong.
23        Like I said, I just -- well, assume.  You
24  should never assume, but I thought the 80 hours and then
25  anything over 80 was correct.  So I told him I would

35

1  check into it and, you know, let him know.
2    Q.  When he came to you, did he explain what he
3  thought the correct method was?
4    A.  I don't recall.  He might have.  I don't
5  recall.
6    Q.  Did he specifically mention the Fair Labor
7  Standards Act or FSLA?
8    A.  I don't recall.  Perhaps, but I don't recall.
9    Q.  Okay.  And that day when you spoke with
10  Mr. McNamara, did you bring it up to Mr. Raven?
11    A.  I don't think I did, no, no until I went and
12  looked up.  Like I said, I Googled, you know, overtime
13  laws in Texas.  I don't think I did, no, no.
14    Q.  Do you recall speaking to Geromi and Kaden a
15  second time that day a couple hours later?
16    A.  I don't recall.
17    Q.  Did you meet -- did you call Mr. McNamara back
18  in after you did your research?
19    A.  I don't recall.  I don't remember.
20    Q.  And that makes sense.  I know it was several
21  years ago, so I don't -- I probably wouldn't remember
22  something that far back either.  So no worries about
23  that.
24        I guess, what do you do remember about
25  those conversations with Geromi and Mr. McNamara?

36

1    A.  I just remember him bringing it up to me, and
2  I -- like I said, I went and researched it, and I found
3  out and realized yes, I was in fact figuring it wrong.
4  And so that's when I think I went to Mr. Raven and told
5  him, Look, you know, we've been doing this wrong.  I
6  need -- we need to fix this.
7        I did, too, at the time and part of my
8  research, I called our ADP company.  And I asked them,
9  you know, how they figured overtime on a biweekly
10  payroll.  And I asked -- and I cannot remember the
11  lady's name, but I asked her, I said, Do you figure, you
12  know, anything over 80 hours was my question, or is it,
13  you know, over 40?
14        She said, Well, I get paid biweekly, and
15  that's how they pay me anything over 80.
16        So to me, you know, she said I was doing
17  it right, but I did look it up, and I wasn't.  So I
18  didn't take her word for it.
19    Q.  Well, if ADP is doing it wrong, I don't know
20  how any of us is doing it right.
21    A.  I mean, well, I didn't -- I didn't take her
22  word for it.  Like I said, I did do whatever Google
23  search and stuff.
24    Q.  Okay.  And then when Mr. McNamara came to you,
25  did you understand that he was alleging that, you know,

37

1  potentially the overtime process was violating federal
2  law?
3        MR. DePONTE:  Objection, form.
4    A.  He did.  He did.
5    Q.  And going over the notes of this conversation,
6  do you recall talking about the process being difficult
7  to fix and offering to give 2 hours -- overtime hours
8  going forward to fix the issue?
9    A.  No.
10    Q.  Okay.  And do you recall an option being, don't
11  backpay it but fix it going forward?  Do you recall --
12    A.  No.  No.
13    Q.  Okay.  Sharing just for a second.
14        So you said you kind of did your research,
15  and you had been talking to Mr. McNamara.  What was Clay
16  Sr.'s reaction to you bringing up this issue?
17    A.  You know, I -- I really don't remember.  I do
18  remember bringing it up to him and telling him, you
19  know, it was something that we needed to fix.
20    Q.  Did he have any knowledge about who had
21  implemented this in the first place?
22    A.  No.  Well, did I tell him that it was
23  Mr. McNamara that came to me?
24    Q.  I guess --
25    A.  Is that the question?

38

1    Q.  -- that question, yes.
2    A.  I don't recall.  Probably, but I don't -- I
3 won't testify definite, but probably.
4    Q.  I guess another question is, did he give you
5 any indication of who started this overtime calculation
6 process?
7    A.  No.  Clayton, no.
8    Q.  Did anyone else at Boat Town say who might have
9 started that overtime calculation process?
10    A.  No.
11    Q.  And what was Mr. Raven's reaction to you
12 wanting to solve the issue?
13    A.  Oh, he was totally agreed.  You know, we -- the
14 company is like that.  You know, they're going to make
15 it right.  And just like, you know, I said, Well, if his
16 is wrong, I've been doing everybody's wrong.
17         And so, you know, it was -- it was a
18 consensus that we were going to go back and fix
19 everyone.  So --
20    Q.  And --
21    A.  And of course, naturally fix it going forward,
22 yes.
23    Q.  Do you recall, going back here.  Let me make
24 sure I have my -- let me scroll down a little bit.
25 Okay.  Pulling this back up, Exhibit 2.  Here on where

39

1 it says McNamara 143, it says, Meeting for Clayton,
2 Patti, 6/9/23.
3         Do you recall having a meeting with
4 Clayton and Mr. McNamara?
5    A.  No.
6    Q.  Do you re -- recall approaching him in front of
7 the office while he was waiting on service managers to
8 prepare paperwork?
9    A.  No.
10    Q.  What conversations -- do you recall Mr. Raven
11 asking Mr. McNamara why he hadn't done the calculations
12 yet?
13    A.  No.
14    Q.  Do you recall Mr. Raven telling him that he was
15 not allowed to do it during work hours?  That might have
16 been my audio.  Can you answer the question again?  I'm
17 having audio skip in and out.
18    A.  No.  I sent the paperwork and all that to
19 Kaden.  But as far as Clayton, no.
20    Q.  Okay.
21    A.  I gave all the paperwork for Mr. McNamara to go
22 over and look at on his time.
23    Q.  Okay.  And stop sharing that.  Also, I noticed
24 your shirt.  Thank you for your service.  I just saw
25 it --

40

1    A.  Thank you.
2    Q.  -- in reading that.
3    A.  Well, you know, they always thank all the guys.
4 And I'm like, hello.
5    Q.  No, you got to thank the girls, too.  I --
6    A.  Me -- me too.
7    Q.  -- you and I are on the same page about that.
8         Okay.  So I'm going to pull up, hopefully,
9 the sound shares.  I have difficulty doing that
10 sometimes.  This is a recording of a conversation that
11 Mr. McNamara had.  I'm just going to go through -- we're
12 not going to listen all 9 minutes.  Don't worry about
13 that.  I just want help identifying some of the voices
14 and some of the things that are said.  I'm going to play
15 a little snippet.  Let me know if you can hear it.
16 Okay?
17    A.  Okay.
18    Q.  This is my first tech hurdle of this to try and
19 get it to work.  So let me know.
20         (Audio played.)
21    Q.  Can you hear that?
22    A.  Yes, I can hear it.
23    Q.  Okay.  I'm going to go back a little bit and
24 just play around 20 seconds starting at 4 seconds.
25         MS. SCHEEF:  And this is going to be

41

1 Exhibit 3 by the way.  Should have said that.  It's
2 McNamara Bates No. 0000133.
3         (Exhibit 3 marked.)
4         (Audio played.)
5    Q.  And so I'm guessing that was your voice and
6 Mr. McNamara's?
7    A.  Sounds like me, and I don't know who the other
8 voice was.
9    Q.  Okay.
10    A.  But it sounds like me.
11    Q.  And at the beginning of that clip, we hear what
12 you believe to be your voice saying, We misinterpreted
13 that 80-hour work week wrong.  Right?  Correct?
14    A.  Correct.
15    Q.  And I guess, what did you mean by
16 misinterpreted?
17    A.  I guess because I wasn't splitting out each
18 week individually.
19    Q.  And kind of moving forward.
20         (Audio played.)
21    Q.  Do you -- can you tell whose voice that was?
22 Is that Clay, Sr.?
23    A.  Sounded like Clay -- sounded like Clay, Sr.
24    Q.  Okay.
25         (Audio played.)

42

1    Q.  So that's, what we hear there you believe to be
2  Clay, Sr. talking to Mr. McNamara asking him how much he
3  thinks he's owed?
4    A.  That's what it sounds like to me, yes, ma'am.
5    Q.  And he's specifically asking Mr. McNamara what
6  he has calculated?
7    A.  That's what it sounds like.
8    Q.  And then at some point you try and say that you
9  had calculated it, but he asks -- Mr. Raven says, I want
10  to hear what he says.
11    A.  I didn't hear that, I'm sorry.
12    Q.  Okay.  I'll go back a couple seconds.
13    A.  Yeah, I didn't hear that.
14        (Audio played)
15    Q.  You say -- Kaden says, Individual calculations
16  like I assume that you did.
17        And then you say, Yeah, I did.
18        And then Mr. Raven says --
19    A.  Those are -- those are the calculations that
20  I'd given him to go over.
21    Q.  And then Mr. Mc -- Mr. Raven says, I want to
22  hear what he says.
23    A.  That's what it said on --
24    Q.  Okay.
25    A.  -- that recording.

43

1    Q.  And then going forward a little bit if I have
2  my timestamps right.  So we're at 1:23 in that audio
3  clip.
4        (Audio played.)
5    Q.  So I want to kind of talk about what we hear
6  near the end of that.  You mention that the other
7  employees, that the payroll security issue.  What did
8  you mean by that?
9    A.  I don't have no idea.  I don't recall.  I have
10  no idea what I meant.  Unless I meant, you know, you
11  don't need to be a part of what I'm going to figure or
12  do for them.  Maybe that's what I meant.  I don't know.
13    Q.  And then Mr. Raven --
14    A.  Because his payroll -- his payroll's his, and
15  his time's his, but he doesn't need to know how or what
16  we're going to fix the others.  Maybe that's what I
17  meant.
18    Q.  Uh-huh.
19        Are you aware of the fact that employees
20  do have the right to talk about wage issues with other
21  employees?
22        MR. DePONTE:  Objection --
23    A.  No.  No, I wasn't aware.  I'm not aware.
24    Q.  And do you hear, I guess, near the end of this
25  clip, let's see.

44

1        (Audio played.)
2    Q.  So Mr. Raven says something along the lines, It
3  doesn't concern you legally or personally, Mr. McNamara.
4    A.  I heard that.
5    Q.  Was it your understanding that Mr. Raven was
6  instructing Mr. McNamara not to talk to other employees
7  about this issue?
8        MR. DePONTE:  Objection, form.
9        You can answer if you can.
10    A.  Was that my understanding is the question?
11    Q.  Yes.
12    A.  That's what it sounded like.
13    Q.  Okay.  So would Mr. McNamara have gotten in
14  trouble if he had talked to other employees about this
15  issue?
16        MR. DePONTE:  Objection, form.
17    A.  I have no idea.
18    Q.  Okay.  And then, so to your knowledge,
19  Mr. McNamara made an internal complaint to Boat Town
20  about not being paid properly for his overtime hours,
21  right?
22    A.  Correct.
23    Q.  He specifically claimed that Boat Town's
24  policies violated overtime law?
25    A.  I don't recall if that's how he said it, but...

45

1    Q.  The understanding is that he was saying that it
2  violated the law?
3    A.  Correct.
4    Q.  Okay.  And did you take any notes from your
5  meetings with Mr. McNamara?
6    A.  No.
7    Q.  Were there any e-mails back and forth with
8  anyone from Boat Town about the issue?
9    A.  With Boat Town, just probably with Clayton, Sr.
10    Q.  And so do you recall e-mailing with Clayton,
11  Sr. about it?
12    A.  I -- I don't other than, you know, I probably
13  talked to him in person.  I don't recall e-mailing him
14  about it.
15    Q.  Okay.
16    A.  I normally would call him on the phone.  I
17  don't, you know.
18    Q.  I understand.  I'm a phone call person, too.
19  My friends get very annoyed by it.  They're like, You
20  can text me.  And I'm like, I want to call.  So I
21  understand.
22        I guess, are there any written records
23  that you are aware of specifically regarding
24  Mr. McNamara's complaint?
25    A.  Written complaints?  The only written that

46

1  him -- Mr. McNamara and myself had was when I was
2  sending him his numbers and trying to get him to approve
3  and say yes, this is -- looks good to me.  Those are the
4  only e-mails back and forth he and I had.
5      Q.  Okay.  Anyone else at Boat Town?
6      A.  No.
7      Q.  Okay.
8      A.  No.
9      Q.  And then --
10      A.  I feel it's a very private issue, and that's
11  why it was just Mr. Raven and myself and...
12      Q.  But it did -- you know, it wasn't private
13  because it applied to every single employee who was
14  entitled to overtime, right?
15         MR. DePONTE:  Objection, form.
16      Q.  You can answer.
17      A.  Correct.  But like I said, the whole situation
18  I didn't feel needed to be publicized within the
19  organization.  It was just Mr. Raven and I and McNamara
20  at that time.
21      Q.  Okay.  I -- if you want to, this is a good
22  break point if you would like to take a break, or we can
23  keep pushing forward.  Whatever you prefer here.
24      A.  I'm okay.
25      Q.  Let's keep pushing forward then.

47

1      A.  Let's go.
2      Q.  I appreciate it.
3         MS. SCHEEF:  And Mike, unless you or Jean
4  need a break.
5         MR. DePONTE:  No, let's push on.
6         MS. SCHEEF:  Perfect.
7      Q.  Okay.  I want to get into the Department of
8  Labor.  So were you aware that Mr. McNamara contacted
9  the Department of Labor?
10      A.  No, I wasn't.  I don't know who did.
11      Q.  Did you contact the Department of Labor?
12      A.  No, I did not.
13      Q.  Okay.  So if we heard Mr. Raven say that you
14  contacted the Department of Labor, that would be false?
15      A.  That's correct, he's -- I did not.
16      Q.  Okay.
17      A.  I contacted ADP.
18      Q.  Okay.  And so you never contacted the
19  Department of Labor reporting Boat Town?
20      A.  No, no.
21      Q.  Had anyone other than Mr. McNamara raised the
22  overtime issue?
23      A.  No.
24      Q.  And so did the Department of Labor contact you
25  first before showing up?

48

1      A.  Not me personally.  But it was me, and I don't
2  recall if it was Cody, Clayton and Clay on an e-mail.  I
3  was copied on an e-mail stating they wanted to do an
4  investigation at that time.  It's the first time I'd
5  heard about it, knew about it or whatever.
6      Q.  Okay.  So --
7      A.  And I don't recall when that was.  It was an
8  e-mail, though.  And I assume, of course, as soon as I
9  got that I got with Mr. Raven, and I was like, Hey, so
10  they want to do this.
11         And I think if I'm not mistaken, I could
12  be wrong, that's when we contacted our attorney --
13      Q.  Okay.
14      A.  -- or found an attorney.
15      Q.  So going back a little bit.  Mr. McNamara makes
16  a complaint.  Department of Labor contacts y'all?
17      A.  Later.
18      Q.  Do you recall how much later?
19      A.  I don't.  A month or two.  I know I had already
20  been in the process deep and heavy of recalculating
21  everybody's overtime.  And I had already paid
22  Mr. McNamara his that he had signed off on and approved
23  and signed that waiver.  And I was already in the
24  process of calculating all the other overtimes when we
25  got the notice.

49

1      Q.  Okay.  I guess my question is, if McNamara was
2  the only one who had reported wage issues, and then the
3  Department of Labor shows up, no one thought it was
4  Mr. McNamara that reported y'all to the Department of
5  Labor?
6         MR. DePONTE:  Objection, form.
7         You can answer if you can, Patti.
8      A.  I didn't.  I had no idea.  If anybody else did,
9  I didn't.
10      Q.  No one put two and two together and thought
11  that it might have been Mr. McNamara given that he was
12  the only one to raise the issue, and y'all told him not
13  to talk to anyone about it?
14         MR. DePONTE:  Objection, form.
15         You can answer if you can, Patti.
16      A.  Well, I have no idea, honestly.
17      Q.  Whenever you were dealing with the Department
18  of Labor, you know, getting that e-mail from them, did
19  Mr. Raven make any comments about Mr. McNamara?
20      A.  Not to my knowledge, no.
21      Q.  Did anyone bring up --
22      A.  Not -- not to me -- not to me.  So if he did, I
23  am not aware of it.
24      Q.  Okay.  So you said it was an e-mail that you
25  got from the Department of Labor that Boat Town got?

50

1    A.  Correct.  Boat Town, and I was copied on it.  I
2  don't recall who else was, but yes, correct.
3    **Q.  Okay.  So that would be a part of Boat Town's**
4  **e-mail records?**
5    A.  Should be, yes, ma'am.
6    **Q.  Okay.  Don't know if we've necessarily received**
7  **that, but I know that's -- you're no longer there, so**
8  **that's why I'll let --**
9    A.  Yeah.
10   **Q.  -- stop right now.**
11       **So we heard from Mr. Raven that Boat Town**
12  **hired someone to help comply with Department of Labor.**
13  **Is that the attorney you were talking about?**
14   A.  Yes, ma'am.
15   **Q.  And I'm not going to ask you about, you know,**
16  **the details and nitty-gritty of what you talked about**
17  **with the attorney because that's not my business.**
18   A.  No, yeah.
19   **Q.  Was that -- I guess just timing-wise, was that**
20  **before or after they showed up in person?**
21   A.  Before.
22   **Q.  Okay.  And how many times did the Department of**
23  **Labor come in person?**
24   A.  Twice.
25   **Q.  Okay.**

51

1    A.  In person, yes.
2    **Q.  And I'm guessing it was kind of a -- a lengthy**
3  **correspondence beyond those, you know, two --**
4    A.  In and out, yes.  Yes, ma'am.
5    **Q.  Okay.  And you don't recall the exact dates of**
6  **these visits?**
7    A.  I don't.
8    **Q.  Were you present at the meetings with the**
9  **Department of Labor?**
10   A.  I was.
11   **Q.  Do you recall the name of the person at the**
12  **Department of Labor you worked with?**
13   A.  I don't recall.  I know he was -- I know, don't
14  take this bad, but I know he was Hispanic, but I don't
15  remember his name.
16   **Q.  Going back to those rogs just because I can't**
17  **remember his last name off the top of my head.  Let me**
18  **pull it up.  Does the name Michael Ramirez ring a bell?**
19   A.  Correct, yes, that sounds -- Ramirez does.  I
20  don't know if it was Michael or whatever, but Ramirez
21  sounds good.
22   **Q.  And is he the only person with the Department**
23  **of Labor that you worked with?**
24   A.  Yes, ma'am.
25   **Q.  And what did you discuss with the Department of**

52

1  **Labor?**
2    A.  He had e-mailed us, like, how far back and
3  dates we had to go back to figure the overtime and
4  everything to give them lists of who all it would
5  entail, the employees, and gave us a date frame to
6  gather the information for them.
7    **Q.  And what was --**
8    A.  And because it was 2 years, but not the same
9  2 years I thought it would be.  I thought it was 2 years
10  from whenever we first found out Mr. McNamara.  So I had
11  already -- like I said, I'd already gone back figuring
12  it on 2 years because that was my -- you know, I was
13  told 2 years was a good period.  I don't remember who
14  told me if you ask, but so I was already going back
15  2 years figuring it.
16       And so when they gave me the time frame
17  that they wanted my records and to figure it from there,
18  it was off a couple of months, you know, because wasn't
19  a full -- it was a full 2 years, but it wasn't the same
20  2-year month I was pulling.  So I -- you know, I went
21  back to my spreadsheets and started figuring again.  And
22  then, you know, came up with my totals that I owed
23  everyone, so.
24       And all of that, once I got it all
25  together of course, yes, everything I did or -- or got

53

1  ready went through the attorney to the Department of
2  Labor.  I'd send it my attorney, and then he would
3  forward it on to the Department of Labor.
4    **Q.  Okay.**
5    A.  And vice versa.  They would send it to him and
6  back to me.
7    **Q.  Okay.  And I'm sure it was a real pain to have**
8  **to redo all those calculations, so...**
9    A.  No, not really.  Not really, no.  Because, you
10  know, ultimately in the end, I knew whatever the
11  Department of Labor told me I needed to pay is what I
12  was going to pay.  I mean --
13   **Q.  That's a good --**
14   A.  -- it's...
15   **Q.  And so did you go back only for current**
16  **employees or for every single person --**
17   A.  No.
18   **Q.  -- who worked there?**
19   A.  Ev -- every single person, I just put the time
20  frame of who worked there.  And I did it on both
21  computers.  I -- well, I say computers.  ADP and
22  Lightspeed, I pulled both reports.  And if they were in
23  that time frame an hourly employee, they got issued
24  whatever, or they were figured.
25   **Q.  Okay.  Perfect.  That kind of --**

Patricia Lynn Shook 9-17-2025

---

**Page 54**

1    A.  And you know some -- some of them of the
2  employees are seasonal people, and they were -- when I
3  say seasonal, too, part-time.  So they were in the
4  report, but they didn't necessarily qualify because when
5  I did all my calculations and all, they didn't have
6  overtime doing it the correct way.
7    Q.  Makes sense if they're part-time.
8    A.  Okay.  Yeah, so.  But yes, everybody that was
9  in the system for that time period they gave me.
10    Q.  And so going to -- and how did you make these
11  calculations?  Did you just go through the spreadsheets
12  and do it at, you know, 40 hours rather than 80?
13    A.  I had a very tremendous, yes, Excel spreadsheet
14  where I would download all of their time from that
15  period into it.  And then I'd go through it and separate
16  each week.  And this is what I paid them on the 80.
17  This is what I should have.  Here was 42 hours.  Okay.
18  Well, I missed 2 hours because it was 79 total.  Okay.
19  So I had the two different columns of, this is what I
20  did pay them.  Oh, well, I missed because I should have
21  paid them this.
22    Q.  Okay.
23    A.  It was all Excel spreadsheets that I downloaded
24  all of their time into.  Each individual.
25    Q.  That must have been a Herculean effort.  So I

---

**Page 55**

1  do not envy you in having to do that.
2    A.  That's my job.
3    Q.  That is fair.
4        So y'all corrected the issue going
5  forward --
6    A.  Yes, ma'am.  Oh, that moment when Mr. McNamara
7  brought it to me, we didn't wait to hear anything from
8  labor board, we just fixed it right then.
9    Q.  Uh-huh.
10        MS. SCHEEF:  I just broke my own rule.  I
11  said uh-huh.  Apologies for that, Jean.
12    A.  No problem.
13    Q.  So some of my questions here are a little
14  redundant, so I'm just scrolling past them.
15        So you did -- you went back 2 years, not
16  3 years, right?
17    A.  Two.
18    Q.  But that was based on --
19    A.  Well --
20    Q.  -- what the Department of Labor told you?
21    A.  I -- well, I went 2 years, and then I went and
22  redid everything with the time frame they told me.  But
23  me personally, I did 2 years.
24    Q.  Okay.  And was it -- I guess, maybe a little
25  confused about the time frame that they told you.  Was

---

**Page 56**

1  it still two years, or it was going back three?
2    A.  No, two.
3    Q.  Okay.  It was just a different --
4    A.  I --
5    Q.  -- 2 years starting point?
6    A.  Correct, correct.  It might have been, like,
7  June to September or whatever where mine I did it from,
8  I don't know, the current year.  Like, January through
9  December.  I don't recall, but it was different than
10  mine.
11    Q.  Okay.
12    A.  But it was 2 years.
13    Q.  Did y'all also calculate interest on the
14  backpay amounts?
15    A.  No, I did not.
16        MR. DePONTE:  Objection, form.
17    Q.  Could you repeat your answer?
18    A.  No, I did not.
19    Q.  Okay.
20    A.  I didn't know how to do that.  I just figured
21  what I owed them, the difference between the 80 hour
22  2 weeks and 40 each week.  And I did pay them at their
23  current rate.  I didn't go back, and if they were making
24  18 two years ago, I paid them at their current rate
25  or --

---

**Page 57**

1    Q.  Okay.
2    A.  -- when they -- if they were with the company
3  and left.
4    Q.  And then, so y'all did the backpay for all of
5  those employees who had worked there in that 2-year
6  period?
7    A.  If they had it coming.
8    Q.  If --
9    A.  In other words, if they --
10    Q.  -- worked overtime?
11    A.  Correct, correct.
12    Q.  And did you also pay double that?
13    A.  Well, I must have.  That's what, you know, I
14  calculated.  Let's say I paid them this, but I should
15  have paid them three or four, I paid them at their
16  current rate.  Which I'd already -- I don't know exactly
17  how that worked out, time and a half.  And then I paid
18  them again.  So it really kind of was, I basically
19  ultimately paid them what the labor board told me I owed
20  them.
21    Q.  Okay.
22    A.  You know, I had -- I had prior checks written
23  and ready to go off my calculations, but I didn't
24  release them until I got back my calculations from the
25  DOL.  And when I got those calculations, oh, I owe him

---

58

1  this, oh, okay.  So I did another check, separate check
2  for the difference and paid them what the DOL told me I
3  owed them.
4      Q.  Okay.  Did you ever at any point pay them --
5  you know, you have your unpaid overtime amount.  Did you
6  ever pay them double that unpaid overtime amount?
7      A.  I don't understand the question.  I guess I'm
8  not -- I mean.
9      Q.  It's getting into potential, you know, it's
10  a -- it's a -- not a legal question, but it's about a
11  legal concept.  Was -- did they ever receive not only
12  the unpaid overtime, but double that unpaid overtime, or
13  was it just --
14      A.  They re --
15      Q.   -- overtime?
16      A.  They received what the DOL told me to pay them.
17      Q.  And was that the unpaid --
18      A.  I don't know how -- I have no idea how they
19  calculate it.
20      Q.  Okay.
21      A.  But I did get a calculation worksheet from
22  them, and that's what I went by.
23      Q.  Okay.  So you got a calculation worksheet from
24  the DOL?
25      A.  Yes, ma'am.

59

1      Q.  Okay.  And then did y'all make the employee or
2  the people you sent the checks to sign waivers?
3      A.  Yes, ma'am.  Well, I assume they did because I
4  didn't hand them out, Clayton and Clay did.  And they
5  gave me their waivers.  So I assume that's what
6  happened.
7      Q.  Did you get one from every single person?
8      A.  Yes.
9      Q.  Even the past employees?
10      A.  I don't recall, honestly, to be honest because
11  I don't recall if there were a lot of past employees
12  that qualified.  I don't recall.
13      Q.  That makes sense.
14          Okay.  So this is the date I have.  If
15  it's accurate, let me know, but I have that the
16  Department of Labor visited on September 8th, 2023.  Is
17  that around accurate from what you remember?
18      A.  Around that I remember.
19      Q.  And were you aware that Mr. McNamara was
20  terminated on September 15th, 2023?
21      A.  I was not aware at the time.  I was out on
22  vacation.  And when I got back from vacation, they told
23  me.  And honestly, you know, like I said, I didn't know
24  that was even going to happen.  I'm not usually thought
25  about or considered in hiring or firing, so.  And nine

60

1  times out of ten, I never would find out if anyone was
2  let go until I got ready to do a payroll.  And then
3  they're like, Oh, they're not here no more.
4          I'm like, Oh, okay.
5      Q.  That makes sense.  You answered some of my
6  other questions in that answer.  So that's helpful.
7          I guess, you know, September 8th is when
8  the Department of Labor comes in, and he's terminated
9  September 15th.  That's just a week difference?
10      A.  That's true.
11      Q.  So Mr. McNamara was terminated a week after the
12  Department of Labor came into Boat Town?
13      A.  If that's the correct dates, that's right.
14      Q.  Okay.
15      A.  To my -- you know, like I said, I don't know
16  when he was terminated.  I can only go off of what I was
17  told.
18      Q.  Okay.
19      A.  Because I wasn't there.
20      Q.  Why were you told he was terminated?
21      A.  Because I'm doing payroll?  Oh --
22      Q.  Oh, no I mean, like, what was the reason given
23  for his termination.  Sorry.
24      A.  I was -- I wasn't given.
25      Q.  They didn't tell you it was a layoff or for

61

1  cause?
2      A.  No, ma'am.
3      Q.  Had you ever heard of any performance concerns
4  with Mr. McNamara?
5      A.  Not to my knowledge.  Not performance, no,
6  ma'am.  They don't come to me normally anyway about
7  that.
8      Q.  It's outside of your -- your scope of your job.
9  You don't have to deal with that.
10      A.  Thank goodness.
11      Q.  I -- I -- I agree with that, certainly.
12          So who told you about his termination?
13      A.  Clay.
14      Q.  And that's Clay, Jr.?
15      A.  Jr., Jr., yes.
16      Q.  Okay.  And for -- this is for Tanner personally
17  and making this case a little bit easier for everyone.
18  Clay is Jr., Clayton is Sr.?
19      A.  That's correct, for me anyway.  That's how I --
20  yeah.  Yes, ma'am.
21      Q.  Perfect.
22          I guess, do you know if anyone was
23  terminated alongside Mr. McNamara?
24      A.  The only one I'm aware of at the same time was
25  Dylan Shafer (phonetic).

62

1    Q.  And are you aware of whether or not Dylan
2  (phonetic) was offered Mr. McNamara's role after he was
3  terminated?
4    A.  No, ma'am, I'm not aware of that.
5    Q.  Do you know if Boat Town hired any more boat
6  captains after terminating Mr. McNamara?
7    A.  I can't recall.  I don't know.
8    Q.  Okay.  And --
9    A.  I'm not going to say yes, I'm not going to say
10  no because I don't recall.
11    Q.  That's perfect.  I'd rather you do that.
12    And I guess, was it normal for Boat Town
13  to do a layoff around Labor Day?
14    A.  Yes, ma'am.  Not so much layoffs.  I guess
15  layoffs, but also a lot of our seasonal people would get
16  ready to go back to school.  And it was our slow time.
17  We'd start slowing down and, you know, just help out
18  with economy, I guess, is a good reason.  But slow.  We
19  slowed down come September through the end of the year.
20    Q.  But Mr. McNamara wasn't seasonal?
21    A.  No, ma'am.
22    Q.  And so usually would you -- would there be some
23  sort of layoff of nonseasonal people?
24    A.  I really can't say.  I don't know.  You know,
25  other than seasonal, I don't know.  I don't remember

63

1  who, when, where they come from and where they go.  So I
2  can't say.  I don't know.
3    Q.  That's totally fine.  I guess, you know,
4  understanding that it's, you know, busy season's ending,
5  you're going into fall and winter, had you previously
6  when running payroll noticed an influx of nonseasonal
7  workers being terminated?
8    A.  Terminated.  I wouldn't call it terminated.
9  They would -- they would, like -- well, I put them in
10  leave of absence because they'd be coming back the next
11  summer.  Most of the seasonal people would come back the
12  next summer.  So they didn't really per se terminate.
13  Some they did; some they didn't.  But some that
14  requested to come back the next season definitely would
15  come back.  But, you know, half the time I didn't know
16  who wasn't coming or going, honestly.  I was --
17    Q.  When you --
18    A.  -- the only time -- every time I'd find out is
19  when I'd run payroll.
20    Q.  And so with -- with Mr. McNamara.
21    A.  Yes, ma'am.
22    Q.  You don't know why he was selected to be laid
23  over?
24    A.  No, ma'am.
25    Q.  You just know that it was approximately a week

64

1  after the Department of Labor came in?
2    A.  I know it was when I was on vacation.  And
3  the 15th is when I was on vacation.
4    Q.  So a week after the Department of Labor came
5  in?
6    A.  I have no idea if that date is when they came
7  in, the Department of Labor.  I don't know that.  I
8  can't -- I mean, around that time, maybe.  I don't
9  recall.
10    Q.  Okay.  But you don't know who made the decision
11  to terminate Mr. McNamara?
12    A.  It's my understanding, but I don't know who did
13  it, but it's my understanding Clay, Jr. did.  But I
14  don't know that for a fact.  Clay is the one who told me
15  he was no longer with us, and that Dylan (phonetic) was
16  no longer with us.
17    Q.  Okay.  But you never got told that, I guess,
18  Shelby and Leo were no longer with y'all?
19    A.  No, I knew Leo had got let go.  I don't know
20  when.  I knew Leo had been released.  And I don't --
21  honestly, I can't remember even what Shelby did or who
22  she was, to be honest.  I can't remember what she did.
23  But I -- I knew Leo was terminated.
24    Q.  Okay.  And then do you recall being a part of a
25  conversation where Boat Town, I guess Mr. Raven was told

65

1  that he needed to terminate someone alongside
2  Mr. McNamara to make it look like they were not
3  targeting Mr. McNamara?
4    A.  No, I don't recall that.
5    Q.  Okay.
6    A.  I don't -- you know, I'm not privy to their
7  conversations when it comes to that.
8    Q.  Okay.  Was there ever anything regarding his
9  termination that gave you pause especially since it was
10  so soon after the Department of Labor came in?
11    A.  What do you mean give me pause?
12    Q.  Just make you wonder if the two things were
13  connected.
14    A.  Sure, everybody thinks that.  I'm sure he did,
15  too --
16    Q.  Okay.
17    A.  -- but I don't know that.
18    Q.  Okay.  But it certainly, like you said,
19  everybody thinks it?
20    A.  That's the way it looks, but, you know --
21    Q.  So that's the way it looked --
22    A.  -- I don't know that.
23    Q.  -- to the people at Boat Town is that he got
24  terminated because the Department of Labor came in?
25    A.  No, I'm not saying that --

66

1       MR. DePONTE: Objection, form.

2       Patti --

3  A. I'm not saying that.

4       MR. DePONTE: -- and Patti, please give me

5  a moment to object for the record. You can answer if

6  you can.

7  A. I, that's just my thoughts. I don't -- I can't

8  answer for Boat Town. I just know, you know, what I

9  thought.

10  Q. And you thought that it was because he had

11  reported it to the Department of Labor that he was

12  terminated?

13       MR. DePONTE: Objection, form.

14  A. I don't know that.

15  Q. I'm asking what you think, not what you know.

16  Do you -- did you think that's why that happened?

17  A. No.

18  Q. You didn't think it was because he reported to

19  the Department of Labor?

20  A. Well, no, because he had other problems with

21  the company, and I know, you know, they weren't happy

22  with some of the things he had done. I know he had had

23  an accident and wrecked the boat and caused the company

24  money. So no, I had no idea.

25  Q. Well, earlier when I asked you if he had any

67

1  performance issues, you said you didn't know about any.

2  A. Well, not performance. I would say when he had

3  that wreck. I know about that incident, but I don't

4  know about performance per se.

5  Q. And that wreck was around May of 2022?

6  A. I don't know when.

7  Q. If it was in May of 2022, that would have been

8  almost a year and a half before his termination?

9  A. Yeah, they don't do a lot to people who do

10  stuff like that. Boat Town doesn't.

11  Q. Was it the sentiment around Boat Town people

12  thought he got terminated because he reported to the

13  Department of Labor to your understanding?

14  A. I don't know -- to my understanding, I have no

15  idea because I didn't talk to anybody else about it.

16  Q. Okay.

17  A. I didn't.

18  Q. And then, so just to clarify some things. You

19  only ever made a report to the -- to ADP, not the

20  Department of Labor?

21  A. I didn't make a report, I just questioned.

22  Q. Yeah. So you -- you -- but you never made a

23  report to the Department of Labor?

24  A. No, ma'am.

25  Q. Okay. And then you don't recall any

68

1  conversations where people thought it might have been

2  Mr. McNamara who reported it to the Department of Labor?

3  A. No, ma'am.

4  Q. Okay. Did you think it could have been --

5  A. No, I had no idea, honestly. I had no idea.

6  Yes, he came to me, but I had no idea. Maybe it was one

7  of the other employees. I don't know. I don't know who

8  all Mc -- Mr. McNamara talked to, so I -- I had no idea.

9  Q. But he had been instructed by Mr. Raven not to

10  talk to anyone about it, right?

11  A. Well, that doesn't mean he didn't.

12  Q. Is -- but is that a yes to my question is that

13  Mr. Raven had instructed him not to talk to anyone about

14  it?

15  A. In that recording he had, that's correct.

16  Q. Okay. And then your replacement, if I'm

17  correct, is Tom Lang (phonetic); is that correct?

18  A. That's correct, yes.

19  Q. Did you provide him any training on how to do

20  the overtime process?

21  A. Yes, I did.

22  Q. And what'd you train him?

23  A. The new way, the right way. Anything over

24  40 hours a week.

25  Q. Perfect.

69

1     And then did -- and this is based on your

2  perspective of what you saw. Did Mr. Raven seem

3  surprised that y'all had been doing the overtime wrong?

4  A. Sure, yes.

5  Q. Okay.

6  A. Yes, very much so. I was.

7  Q. And then -- okay. What I'm going to do is I'm

8  going to have us take a 10-minute break. I want to make

9  sure --

10  A. Okay.

11  Q. -- that I asked everything that I wanted to

12  because I was kind of hopping all over my outline.

13  And --

14  A. That's fine.

15  Q. -- if that's it, then I can get you out of here

16  before lunch which would be --

17  A. That would be good. Then I can go get lunch.

18  Q. Okay. I'm going to pause the recording.

19  Jean'll take us off the record, and then we'll be back.

20  Let's make it 8 minutes and come back at 11:30 so we can

21  have a nice pretty even number.

22  A. Okay. Fair enough.

23       MR. DePONTE: Thank you.

24       THE REPORTER: Okay. We're off the record

25  at 11:22 a.m.

70

1      (Recess from 11:22 a.m. to 11:31 a.m.)
2      THE REPORTER:  We're back on the record at
3  11:31 a.m.
4      Q   (BY MS. SCHEEF) Okay.  Patti, do you have
5  anything that you would like to change from the
6  testimony you gave earlier today?
7      A.  I don't think so.
8      Q.  Okay.  Going back just to get some clarifying
9  questions as we, you know, prepare to go to trial
10  regarding your relationship with Mr. DePonte.  Just
11  clarifying, you do not have a -- a representation
12  agreement with Mr. DePonte?
13     A.  That's correct.
14     Q.  To your knowledge, he has -- he represents Boat
15  Town and --
16     A.  Correct.
17     Q.  -- the Ravens?
18     A.  Yes, ma'am, correct.
19     Q.  You don't know who's paying his fees for
20  representing you?
21     A.  I have no idea.  He's not representing me, I
22  guess.  He's representing Boat Town.
23     Q.  Okay.  And so do you know if he will be
24  representing you at trial?
25     A.  I have no idea.  I didn't know that was, like,

71

1  a thing, honestly.
2      Q.  It's totally fine.  It's -- first time for
3  everything, and being in the trial litigation world, I
4  know it's very confusing.
5      THE WITNESS:  Mike, can you help out?  I
6  have -- I have no --
7      MR. DePONTE:  Well, we'll -- we'll talk
8  after this, Patti.
9      THE WITNESS:  Okay.  I'm, like, I have no
10  idea what she's talking about.
11     Q.  I guess my question logistically.
12     MS. SCHEEF:  And Mike, you and I can talk
13  about this.
14     Q.  But when we need to do a subpoena for trial, do
15  you know if we will be sending it to Mr. DePonte, or
16  should we send it to your address?
17     A.  I guess Mr. DePonte and that way he could get
18  ahold of me.  I don't know.
19     Q.  Just in case, do you mind giving me your most
20  recent address so I can have that if we --
21     A.  Oh.
22     Q.  -- need to send a subpoena?
23     A.  No, you have it on file.  That's my address
24  that I said this morning.  61 --
25     Q.  Okay.  Perfect.

72

1      A.  I'm just down here fishing.
2      Q.  I'm jealous.  I am very jealous of that.
3      A.  Fishing.
4      Q.  My -- my fianc  recently went fly-fishing.  He
5  caught a 17-inch rainbow trout, and that is his pride
6  and joy right now, so...
7      A.  Nice.  We have -- my mom had a cabin down here
8  at Port Mansfield with a pier that my brother bought
9  when she passed.  And so we come down here a lot to do
10  that same fishing.  But ours is red --
11     Q.  Very jealous of that fact.
12     A.  Ours is red fishing trout.
13     Q.  I -- red fish is one of my favorite fish.
14         Well, getting back into the matter at
15  hand.  So when you were at Boat Town based on that
16  knowledge, obviously you haven't been there in a couple
17  of months, were there records of the correspondence
18  between Boat Town and Department of Labor?
19     A.  Yes, ma'am.
20     Q.  And Boat Town had access to those records?
21     A.  Yes, ma'am.
22     Q.  Okay.  Do you know what kind of records those
23  were?
24     A.  They are big ole files in the office there --
25     Q.  Okay.

73

1      A.  -- of everything.  Every canceled check, every
2  copy of anything from calculations, everything.  Two big
3  ole files.
4      Q.  Perfect.
5         And then this is my end of depo question.
6  Is there anything that we've talked about today or
7  anything that we haven't talked about today that you
8  feel like we should discuss during this deposition?
9         MR. DePONTE:  Objection, form.
10        You can answer if you can, Patti.
11     A.  I don't think so, you know.
12     Q.  And I won't hold you to it.  I just want to
13  make sure I hit everything.  And I understand if --
14     A.  If you're -- if you're happy, I'm happy.  I
15  mean --
16     Q.  And then, I guess, final question.  And you'll
17  have the opportunity to review your deposition, see if
18  there are things you want to change, but anything right
19  now that you can think of?
20     A.  No, ma'am.
21     Q.  Okay.  Well, I really appreciate your time.  If
22  you have, you know, any questions, and you need
23  anything, obviously you'll be working with Mr. DePonte,
24  but I appreciate you taking the time especially out of
25  your retirement.  If there's anything you need from me,

74

1 **let me know, but that concludes my questioning.**
2          MS. SCHEEF:  And I pass the witness.
3          THE WITNESS:  Will do.  Thank you so much.
4          MR. DePONTE:  Thanks, Patti.  I'll --
5          THE WITNESS:  It was a new experience.
6          MR. DePONTE:  I'll reserve my questions
7 for the time of trial.
8          That's it.  You're good to go.
9          THE REPORTER:  Okay.  Does the witness
10 want to read and sign?
11          MR. DePONTE:  Yes.
12          THE REPORTER:  Okay.  Send it to you,
13 Mr. DePonte?
14          MR. DePONTE:  Please.
15          THE REPORTER:  Okay.  And would you like
16 to purchase a copy as well?
17          MR. DePONTE:  Yes, please.
18          THE REPORTER:  Okay.  Thank you.
19          We're off the record at 11:35 a.m.
20          (Deposition concluded at 11:35 a.m.)
21
22
23
24
25

75

1                  CHANGES AND SIGNATURE
2 WITNESS:  PATRICIA LYNN SHOOK  DATE:  SEPTEMBER 17, 2025
3 Reason Codes:  (1) to clarify the record; (2) to conform
  to the facts; (3) to correct a transcription error; (4)
4 other (please explain).
5 PAGE  LINE  CHANGE                      REASON CODE
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

76

1     I, PATRICIA LYNN SHOOK, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5          _____
6                  PATRICIA LYNN SHOOK
7 THE STATE OF _____)
8 COUNTY OF _____)
9
10     Before me, _____, on this day
11 personally appeared PATRICIA LYNN SHOOK, known to me or
12 proved to me on the oath of _____ or through
13 _____ (description of identity card
14 or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that he/she executed the same for the purpose and
17 consideration therein expressed.
18     Given under my hand and seal of office on this _____
19 day of _____, _____.
20          _____
21          NOTARY PUBLIC IN AND FOR
22          THE STATE OF _____
23 My Commission Expires: _____
24
25

77

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION
3 KADEN McNAMARA on Behalf of  )
  Himself and Others Similarly )
  Situated,                    )
4                              )
5          Plaintiff,          )
                               )
6 vs.                          ) CASE NO. 1:24-cv-869-DII
                               )
7 BOAT TOWN, INC., CLAYTON     )
  RAVEN and CLAY RAVEN,        )
8                              )
          Defendants.          )
9
10          REPORTER'S CERTIFICATE
11     ORAL DEPOSITION OF PATRICIA LYNN SHOOK
12               SEPTEMBER 17, 2025
13     I, Jean Thomas Fraunhofer, Certified Shorthand
14 Reporter in and for the State of Texas, hereby certify
15 to the following:
16     That the witness, PATRICIA LYNN SHOOK, was duly
17 sworn and that the transcript of the deposition is a
18 true record of the testimony given by the witness;
19     I further certify that pursuant to FRCP Rule
20 30(f)(1) that the signature of the deponent was
21 requested by the deponent or a party before the
22 completion of the deposition and is to be returned
23 within 30 days from date of receipt of the transcript.
24 If returned, the attached Changes and Signature Pages
25 contain any changes and the reasons therefor;

Patricia Lynn Shook 9-17-2025

78

1    That pursuant to information given to the deposition
2  officer at the time said testimony was taken, the
3  following includes all parties of record and the amount
4  of time used by each party at the time of the
5  deposition:
6     TANNER SCHEEF (1 Hour, 23 Minutes)
         Attorney for Plaintiff
7
     MICHAEL J. DePONTE (0 Hours, 0 Minutes)
8         Attorney for Defendant
9    That $_____ is the deposition officer's charges
10  to the Plaintiff for preparing the original deposition
11  and any copies of exhibits.
12    I further certify that I am neither counsel for,
13  related to, nor employed by any of the parties in the
14  action in which this proceeding was taken, and further
15  that I am not financially or otherwise interested in the
16  outcome of this action.
17    Certified to by me on this 30th day of September,
18  2025.
19
20  _____
     Jean Thomas Fraunhofer, CSR
21     Texas CSR 7990
     Expiration:  01/31/2027
22     THE LEGAL CONNECTION
     8656 West Highway 71
23     Building F, Suite 200
     Austin, Texas 78735
24     CRCB Firm No. 656
     P 512.892.5700 F 512.892.5703
25