# Exhibit D

1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF TEXAS
2           AUSTIN DIVISION

3  KADEN MCNAMARA on Behalf    )
   of Himself and Others       )
4  Similarly Situated,         )
                               )
5          Plaintiff,    ) CIVIL ACTION
                               )
6  VS.                  ) NO.: 1:24-CV-869-DII
                               )
7  BOAT TOWN, INC., CLAYTON    )
   RAVEN, and CLAY RAVEN,      )
8          )
           Defendants.   )
9

10     ----------------------------------

11            ORAL DEPOSITION OF

12          RULE 30(b)6 WITNESSES

13     ROBERT CLAYTON RAVEN and BONNIE HARRELL

14            AUGUST 14, 2025

15          (Reported Remotely)

16     ----------------------------------

17    ORAL DEPOSITION OF ROBERT CLAYTON RAVEN and BONNIE

18  HARRELL, produced as a witness at the instance of the

19  PLAINTIFF, and duly sworn, were taken in the

20  above-styled and numbered cause on August 14, 2025, from

21  10:07 a.m. to 1:22 p.m., via Zoom, before Claudia White,

22  CSR in and for the State of Texas, reported by machine

23  shorthand, with all parties and the witnesses appearing

24  remotely, and with the witnesses located in Marble

25  Falls, Texas, and Austin, Texas, respectively, pursuant

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

**2**

1 to the Federal Rules of Civil Procedure and the
2 provisions stated on the record or attached hereto.
3
4
5           A P P E A R A N C E S
              (Via Zoom)
6
7 FOR THE PLAINTIFF:
8   Ms. Tanner Scheef
    KAPLAN LAW FIRM, PLLC
9   2901 Bee Cave Road
    Suite G
10  Austin, Texas 78746
    (512) 553-9390
11  tscheef@kaplanlawatx.com
12
   FOR THE DEFENDANTS BOAT TOWN, INC., CLAYTON RAVEN, and
13 CLAY RAVEN:
14   Mr. Michael J. DePonte
     JACKSON LEWIS
15   500 North Akard
     Suite 2500
16   Dallas, Texas 75201
     (214) 520-2400
17   michael.deponte@jacksonlewis.com
18
   ALSO PRESENT:
19
     Mr. Kaden McNamara
20   Mr. Gabriel Loya
   Mr. Ryan Estes
21
22
23
24
25

**3**

1                    INDEX
2 Appearances........................................ 2
3
4
5 ROBERT CLAYTON RAVEN
    EXAMINATION BY MS. SCHEEF...................... 4
6
  BONNIE HARRELL
7    EXAMINATION BY MS. SCHEEF....................119
8
  Signatures and Changes.............................. 148
9 Reporter's Certificate.............................. 152
10                  EXHIBITS
  Exhibit 1  Notice of Rule 30(b)(6) Deposition...... 10
11  Exhibit 2  Defendants' Answers.................... 26
  Exhibit 3  Employee handbook for Boat Town........ 94
12  Exhibit 4  Defendants' initial disclosures........ 89
13
               REQUESTED DOCUMENTS/INFORMATION
14
  NO.  DESCRIPTION                          PAGE
15
      NONE  ........................................
16
17
18
19
20
21
22
23
24
25

**4**

1         THE REPORTER:  I need you to raise your
2 right hands to be sworn.
3         (Oaths administered remotely.)
4      ROBERT CLAYTON RAVEN and BONNIE HARRELL,
5 having been first duly sworn, testified as follows:
6              DIRECT EXAMINATION
7         OF ROBERT CLAYTON RAVEN
8 BY MS. SCHEEF:
9      **Q. Okay.  So, Mr. Raven, I'm going to start with**
10 **you.**
11         **Good morning.  Would you rather we call you**
12 **Mr. Raven, or Clayton, what do you prefer?**
13    A.  Mr. Raven is fine.
14    **Q. Okay.  Perfect.**
15         **Could you please state your full name for**
16 **the record.**
17    A.  Robert Clayton Raven.
18    **Q. And what is your current address?**
19    A.  310 Chaparral.
20    **Q. Okay.  And what is your current occupation and**
21 **job title?**
22    A.  I am a boat dealer.  I'm really not big on
23 titles, but I guess my title would be president and CEO.
24    **Q. And is that at Boat Town, Inc.?**
25    A.  Yes, it is.

**5**

1      **Q. Okay.  And how long have you been there?**
2    A.  Fifty-one years.
3    **Q. Congratulations.**
4         **What are your, I guess, current duties and**
5 **responsibilities?**
6         **I know that may be a lot, since you wear a**
7 **lot of hats.**
8    A.  There are a great deal.  It's, you know, at the
9 end of the day, I'm responsible for the company.  I wear
10 the hats, but I got a lot of great people underneath me
11 that run the bulk of day-to-day operations.  I'm sort of
12 keeper of culture.  I try to touch every client, I talk
13 to our managers every day, oversee some boat ordering.
14 Just wear many hats.
15    **Q. Yeah, I can -- I'll help you narrow it down a**
16 **little bit.**
17         **Do you, you know, hire and fire people?**
18    A.  That's typically done at the level below me.
19    **Q. Do you supervise any of the other employees?**
20    A.  Yes.  If we're hiring managers or somebody at
21 that level, yes, I am absolutely a part of that level of
22 hiring.
23    **Q. Do you have some say in -- oh, apologies.**
24 **Sorry about that.**
25    A.  Nothing.  Go ahead.

6

1 Q. Do you have a say in what the rate of pay
2 people get is?
3 A. Yes, I do.
4 Q. And do you kind of have control over how
5 records are maintained?
6 A. Just relying on key members to maintain them.
7 Q. Okay. And have you ever been deposed before?
8 A. Yes.
9 Q. How many times have you been deposed before?
10 A. Multiple. Probably in a half dozen lawsuits.
11 Q. Were they related to personal events or related
12 to your time with Boat Town?
13 A. I would say probably 50/50, in different
14 ventures, other than Boat Town, and some with Boat Town.
15 Q. Okay. We may get back to that a little bit
16 later.
17 Now, pretty sure the answer is going to be
18 yes, but have you met with an attorney to prepare for
19 today's deposition?
20 A. Yes.
21 Q. Okay. And do you understand that for this
22 deposition you're under oath and that your testimony has
23 the same force as if it was given in court?
24 A. Absolutely.
25 Q. And do you understand, you know, the difference

7

1 between "I don't know" and "I don't recall"?
2 A. Yes -- well, no. What is the difference
3 between that?
4 Why don't you explain it.
5 Q. Sure. Would you agree that "I don't know"
6 means I don't have knowledge of this topic, versus, "I
7 don't recall" is just, I may have had knowledge in the
8 past, but I don't remember.
9 A. Okay.
10 Q. And do you agree that -- you know, at some
11 point I under -- understand I may ask a confusing
12 question. Do you agree if you don't understand, you'll
13 just ask me to clarify it?
14 A. Yes.
15 Q. And will you agree to answer my questions to
16 the best of your ability?
17 A. Yes.
18 Q. Do you have any physical or mental condition
19 that would prevent you from giving accurate testimony
20 today?
21 A. No.
22 Q. Are you on any medication that might prevent
23 you from -- your ability to testify today?
24 A. No.
25 Q. And have you had any alcohol this morning that

8

1 would pre -- affect your ability to testify?
2 A. No.
3 Q. And is there anything that would prevent you
4 from giving complete and full testimony today?
5 A. No.
6 Q. Okay. And you agree that if you need a break
7 at any point during this deposition, just to let me
8 know, but just to answer the question that I've asked
9 before asking for a break?
10 A. I agree.
11 Q. Is there anyone in the room with you where --
12 where you are physically located?
13 A. No.
14 Q. Are you communicating with anyone, whether over
15 the computer or over the phone, while you're giving
16 testimony?
17 A. No.
18 Q. If that changes, do you agree to let me know?
19 A. Yes.
20 Q. And if you're looking at any documents during
21 the deposition, will you agree to let me know what
22 you're looking at?
23 A. I'm not sure what the hell they are, but, yes.
24 Q. Okay. Sounds good.
25 And do you have any cell phone or tablet

9

1 with you there today?
2 A. Yes.
3 Q. Will you just agree to put that away and have
4 it turned -- notifications turned off during this
5 deposition?
6 A. I have it on silent.
7 Q. Okay. Perfect.
8 And will you agree just, you know, at
9 certain times -- strike that.
10 During this deposition, when you're giving
11 answers, you would agree to give verbal answers rather
12 than uh-huhs or head nodding? It just makes the court
13 reporter's life a little bit easier.
14 A. Yes.
15 Q. And I promise to do this, too, to make Ms.
16 White's life a little bit easier, do you agree to wait
17 until I finish my question until giving your answer?
18 A. Yes.
19 Q. I promise I'll do the same and wait until
20 you're finished with your answer to give my question.
21 Now, you -- do you understand that you're
22 here today as the designated corporate representative of
23 Boat Town, correct?
24 A. Yes.
25 Let me -- let me interrupt. I may stand up

10

1 some, during this deposition. I've got a very bad back,
2 so --
3    Q. Completely understand.
4        If you ever need a second to stand up or
5 anything like that, just let me know, or if you need a
6 break, it's totally fine. I know Mr. Dupont said this
7 yesterday, but it is a bit of a marathon to do this, so
8 don't hesitate to ask for a break if you need it, all
9 right?
10   A. All right.
11       (Exhibit 1 marked.)
12   Q. (BY MS. SCHEEF) Okay. So I'm going to pull up
13 what we've marked as Exhibit 1.
14       I'm going to screen share that. Let me
15 know if you can see what I'm screen sharing and if you
16 need me to zoom in at all.
17       Can you see what I'm screen sharing?
18   A. Yes.
19   Q. And I can zoom in here, too.
20       It's titled "Notice of Rule 30(b)(6)
21 Deposition."
22       Do you see that?
23   A. Yes.
24   Q. And have you reviewed this notice of the
25 deposition and what topics you were designated?

11

1    A. Yes. I've glanced over it and I have it in
2 front of me.
3    Q. Do you understand that you're testifying on
4 behalf of Boat Town, Inc. and not in your individual
5 capacity?
6    A. I do.
7    Q. And what did you do to prepare for this
8 deposition?
9    A. Not a great deal.
10   Q. Tell me about it.
11   A. I just glanced over this, tried to --
12 understood what I could, and will sit down and talk
13 about it.
14   Q. Okay. Did you go look at any of Boat Town's
15 records?
16   A. No, I have not. I had people produce, you
17 know, some key dates.
18   Q. Did you look at any -- did you speak with any
19 employees with relevant knowledge?
20   A. Yes, I did.
21   Q. Who did you speak to?
22   A. I talked to Tom, Hannah, Juliet, all on our
23 accounting teams. Then as we got closer to the
24 deposition, you know, and to fully understand what Kaden
25 is charging us with, I went and talked to multiple

12

1 employees when I was down at the Boat Town store, just
2 to see if they remembered Mr. McNamara and what their
3 thoughts were.
4    Q. Which employees did you speak to?
5    A. There was countless employees. I'll just be
6 going by record. I talked to Rusty in sales, Bonnie,
7 Kirt, Abraham, Eric. I talked to Chuck Embree, the
8 service manager, when he was there, talked to Mike, the
9 parts manager. I talked to Morgan, our marketing
10 director. I talked to several of the gentlemen out in
11 detail, Ricardo and Luis.
12   Q. Anyone else?
13   A. I'm sure I did, I just don't have a complete
14 list of all in front of me right now.
15   Q. Okay. You gave me a lot of names. I'm just
16 going to hop through them one by one.
17       What's Tom's last name?
18   A. Tom Lang.
19   Q. Lang, L-A-N-G?
20   A. Uh-huh.
21   Q. And Hannah something?
22   A. McRee.
23   Q. And can you spell that for me?
24   A. No.
25   Q. Is it like McRay or Mc --

13

1    A. McRee, McRee.
2    Q. Okay. Juliet's last name?
3    A. Ellis.
4    Q. Ellis. Okay.
5        I think we have Rusty and Bonnie's last
6 names already.
7        What is Kirt's last name?
8    A. Divine.
9    Q. Divine.
10       Abraham's last name?
11   A. Rodriguez.
12   Q. Eric's last name?
13   A. I believe it is Rodriguez, also. I would have
14 to just confirm that.
15   Q. Okay. And then you gave me Chuck Embree, so
16 that's good.
17       You said you spoke with someone named Mike?
18   A. Mike, yes. He's in parts.
19   Q. Do you know his last name?
20   A. I think I just call him Big Mike. I'll get
21 that for you here in a second, it will come to me.
22   Q. That's totally fine. I'll write down Big Mike
23 for now.
24       You said you spoke with the marketing
25 director. What's the name of the marketing director?

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

14

1    A. Morgan Burchell.
2    Q. How do you spell that last name?
3    A. B-U-R-C-H-E-L-L, I believe.
4    Q. Okay. And then the last two were Ricardo and
5  Luis. What are their last names?
6    A. Luis Samarina, Samarya.
7    Q. Okay.
8    A. And I don't recall Ricardo's last name.
9    Q. Okay. And then I guess walking through one by
10  one, what did you talk to Tom Lang about?
11    A. Just asking him to pull up any of the files we
12  had on this.
13        Bonnie Harrell, the former control -- not
14  Bonnie Harrell, but Patti Shook, the former controller,
15  resigned unexpectedly right before these depositions.
16    Q. Did she say why she was resigning?
17    A. Pardon?
18    Q. Did she tell you why she was resigning?
19    A. Well, we had been working towards her
20  resignation for six months, and her date was the end of
21  the year, when she was going to resign. But she has a
22  lot of personal issues going on and just suddenly
23  resigned. She was the one most involved in this.
24    Q. Okay. And then -- so is Tom Lang the new
25  controller?

15

1    A. Yes.
2    Q. Okay. And then Hannah McRee, what did you talk
3  to Hannah about?
4    A. She was just assisting Tom, pulling up payroll
5  records, anything we may have to, you know, just show
6  documentation in this case.
7    Q. Okay. And then Juliet, same thing, or did you
8  talk to her about something different?
9    A. No, Juliet was just assisting with Tom.
10    Q. Okay. And then what did you talk to Rusty
11  about?
12    A. Just my recollection -- recollections,
13  everything I had heard, and what he remembered about
14  working with Kaden.
15    Q. What did he tell you?
16    A. What did Rusty tell me?
17        Just that, you know, basically he would sit
18  in boats on the showroom floor, for hours on end, just
19  playing on his phone.
20    Q. Was Mr. McNamara ever written up for that?
21    A. No.
22    Q. Okay. What did you talk to Kirt Divine about?
23    A. You know, that he would repeatedly say that it
24  wasn't in his job description, and refused to do things,
25  that he would repeatedly sit at the service counter, up

16

1  in the air-conditioning, with his head down on the
2  counter, playing on his phone, continually. Just his
3  poor job performance. You know, he would continually
4  leave company trucks filthy, coffee cups, fast food
5  wrappers, things of that nature, in the trucks.
6    Q. Was Mr. McNamara ever written up for the things
7  Kirt talked about?
8    A. No.
9    Q. Okay. Never put on probation or anything?
10    A. He was talked to, but we really don't write
11  people up at our dealership. We're family owned. We
12  always try to give people the benefit of the doubt.
13    Q. I totally get that. That -- that wasn't really
14  my question.
15        My question was whether or not he was put
16  on probation for the things that Kirt mentioned. And he
17  wasn't?
18    A. No, he wasn't.
19    Q. Okay. Any record of him being talked to about
20  that?
21    A. I believe these people will all testify to it.
22  I know there's record.
23        I can testify to the fact that I talked to
24  him, multiple times, about him sitting in a front
25  office, refusing to get up and do work, about the

17

1  company trucks being dirty, that the company trucks
2  weren't clean. That, you know, we checked the service
3  records on the truck, did we need new tires, did we need
4  to have the oil changed so the company trucks represent
5  the company in a proper fashion and/or they're ready to
6  go when it's time? And he would just say, it's not in
7  my job description.
8    Q. Okay. Was he ever written up for that?
9    A. Well, after Mr. McNamara's -- I believe it's
10  his foster daughter, adopted sister passed away, you
11  know, we're a pretty compassionate company, we cut him a
12  great deal of slack.
13    Q. Okay. That wasn't my question, though.
14        You didn't write him up?
15    A. No.
16    Q. Okay.
17    A. You can ask it nine times, the answer is going
18  to be the same. No, we did not write him up.
19    Q. Okay. Next question, what did you talk to
20  Abraham Rodriguez about?
21    A. Just Abraham remembering working with him and
22  what he remembered. The technicians always have to walk
23  up to the front counter to pull parts, to get the parts
24  department and pull it, and he voluntarily brought up
25  that he was continuously sitting at the parts counter

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

18

1 with his head down; sitting in the sales offices.
2        The one that seemed to get under his craw
3 the most, was we have a five-acre trailer lot back
4 behind the dealership, and Abraham just was very adamant
5 and went off that, countless times, Abraham would go
6 back to get a trailer for a boat that came in, and
7 Abraham [sic] is sitting in a company truck underneath
8 the tree, with the AC running, looking on his phone.
9 And then he'd go take that trailer back and get another
10 trailer, 30 or 45 minutes later, he's still sitting
11 underneath the tree, playing on his phone.
12        Just overall character of the young man and
13 the job performance of the young man.
14    Q. The accusations that Abraham brought up, Mr.
15 McNamara was never written up about that, yes?
16    A. No.
17    Q. Okay.
18    A. We can make this real simple.  I don't think
19 Mr. McNamara was ever written up, even after he damaged
20 the guard shack.  We talked to him about it.
21    Q. Okay.  What did you talk to Eric Rodriguez
22 about?
23    A. Same thing, do you remember Kaden being
24 employed here, what are your recollections of him.
25    Q. Okay.  And what did you talk to Chuck Embree

19

1 about?
2    A. The same thing.  Chuck probably worked with him
3 more than any employee at the dealership.
4    Q. And same deal as what the other people said?
5    A. His list is much longer.
6    Q. All right.  And what about Mike who was in
7 parts, what did he say?
8    A. Most of what he just, you know, witnessed, him
9 sitting in boats, witnessed the counter with his head
10 down.
11    Q. What about Morgan, Morgan Burchell, the
12 marketing director, what did she say?
13    A. Well, when we would talk to Kaden -- the one
14 thing I found really compassionate about talking to all
15 these people, because I spent seven hours at the store,
16 is the amount of disdain they had for this young man and
17 his work ethic, it's --
18        You know, after his family member passed
19 away, I believe we paid him for that, what he was off,
20 and then it just intensified, his lack of character and
21 lack of work ethic, and it just -- I hadn't talked to
22 them about this since his dismissal, and when I brought
23 it up, it seemed to be like opening an old wound, and
24 they were pretty adamant about a bunch of the stuff.
25    Q. Okay.  What did you talk to Luis about?

20

1    A. Same thing, just, I remember Kaden, what did he
2 observe, and I've got some of their notes here.  Well, a
3 lot of the people in the shop, in the fiberglass shop,
4 in the detail shop.
5        Mr. McNamara had a one-wheeled skateboard
6 that was motorized, and he continuously just rode it
7 around the back parking lot during office hours, while
8 he was on the clock.  And we're not talking about one,
9 two, three, six times, a dozen times, this was
10 continually.  And that really seemed to stick underneath
11 the skin of all of our employees, while they're working,
12 working their butts off, and he's riding around on a
13 skateboard, refusing to do stuff.
14    Q. Tell me about those notes that you got there
15 with you.  Are those notes from your conversation with
16 them?
17    A. Yes.  Just things that I've jotted down.
18    Q. All right.  And did you make those yourself?
19    A. I wrote everything down, then I got with
20 Hannah, and she went with me, and then she documented
21 all of them.
22        MS. SCHEEF:  Okay.  And I don't think I've
23 seen those notes, but I'd like to get a copy of those,
24 once we're done with this.
25        MR. DEPONTE:  We'll look at them and then

21

1 we'll determine whether or not they should be produced.
2        THE WITNESS:  Do what?  Do what, Mike?
3        MR. DEPONTE:  Clayton, if you'll send them
4 to me so I can take a look at them, and then we can
5 assess producing them.
6        THE WITNESS:  Okay.
7    Q. (BY MS. SCHEEF)  You didn't create those --
8 those notes with an attorney, did you?  No?
9        Okay.  You just created them yourself,
10 speaking to people who had relevant knowledge?
11    A. Yes.
12    Q. Okay.
13    A. I wanted to see who remembered what.
14    Q. And you're using that today to rely on your
15 testimony?
16    A. Yes.
17    Q. Okay.
18    A. Because it -- when I started talking to these
19 people, it was very enlightening, what they remembered,
20 with absolutely no coaching, because I didn't know
21 two-thirds of this stuff.  And that they were adamant
22 about it and would be happy to talk about it and testify
23 to it.
24    Q. Okay.  Moving on.  So we know you spoke to
25 these people.  Anything else you did to prepare for this

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

22

1 deposition today?
2    A. I just wanted to know, you know, what this was
3 all about. You know, in my opinion, this is the biggest
4 shakedown I've seen, or one of the biggest I've seen in
5 a while.
6    But, no, I really haven't prepared. I just
7 had people pull up, you know, some basic dates, you
8 know, the date he was hired, the date of the boat
9 incident where he tore up the guard shack and did
10 considerable damage to one of our boats; that cost us
11 over 50 grand. You know, the date of his family
12 member's death, you know, or somewhere real close to
13 that. And then the date of his termination, which was,
14 you know, during a layoff, where multiple people were
15 let go. And they weren't let go at random, they were
16 let go because they were the poorest people performing
17 at our company at that time.
18    Q. Well, we'll get into all that.
19    My question was pretty simple. Did you do
20 anything to prepare for this --
21    A. No. I had people pull up some key dates that I
22 knew I would be asked. I went and talked to probably
23 half of our employees there. You know, I didn't focus
24 on people in sales, or service, or management, I talked
25 to people on the detail shift, fiberglass shift, the

23

1 shop service members, people who had been there, the
2 longest tenure. A lot of our employees have been there
3 25, 30 years, who I thought would have a good
4 recollection of Mr. McNamara, and it was very
5 enlightening.
6    Q. Okay. And you didn't look over the records
7 yourself?
8    A. Yeah, most of the records that I believe you're
9 requesting, it's all stuff that has been provided to you
10 and provided to the Department of Labor.
11    Q. That wasn't my question.
12    My question is whether you looked over the
13 records to prepare for today, and you didn't?
14    A. No, I -- no, I did not.
15    Q. Okay. So getting more into Boat Town here --
16 well, first, just as corporate representative, you
17 already talked -- you're -- you're speaking about as the
18 corporation on these topics.
19    You understand that you were required to
20 prepare for today, right?
21    A. Prepare in what way?
22    Q. You were required to be prepared to be asked
23 about all of these topics that you've been designated
24 for.
25    A. I did so. We already talked about them.

24

1    Q. Did you review the documents that we asked you
2 to talk about?
3    A. Are you talking about all the payroll records
4 and things of that nature?
5    Q. Among other records.
6    MR. DEPONTE: Objection, form.
7    Q. (BY MS. SCHEEF) Did you look at -- you know,
8 let's go, topic number one.
9    I'm scrolling down here. Sorry. It's
10 going to take a second.
11    Did you read over the defendants' answer?
12    A. What's that say, the facts and affirmative
13 defenses asserted by defendants' answers?
14    Q. Yeah. Did you look at the defendants' answer
15 before you came in here today?
16    A. No.
17    Q. Did you look at the plaintiff's first set of
18 interrogatories or first requests for productions, did
19 you look at those?
20    A. I glanced over some stuff, but I hate to read.
21    Q. Did you look over the actual answers that y'all
22 gave to those interrogatories?
23    A. Not really.
24    Q. Did you look over the documents that you
25 produced in response to our requests for production?

25

1    A. I went over everything with Mike as this
2 lawsuit was proceeding. You know, we talked through --
3    Q. Did you look over that to prepare for today?
4    A. No.
5    Q. Okay. So do you still feel prepared to talk
6 about the topics that are listed for you?
7    A. I believe so.
8    Q. Okay. Let's go for it, then.
9    Are you familiar with what claims are being
10 made in this lawsuit?
11    A. It's my understanding that I'm being sued for
12 wrongful termination.
13    Q. Okay. And have you reviewed the actual
14 petition in this case that Mr. McNamara filed?
15    A. I may have looked over it.
16    Q. You're not sure, though?
17    A. I'm pretty sure I've looked over it, but I
18 really don't get a real good grasp of all you all's
19 legal knowledge.
20    Q. Totally get that. Went to too much school to
21 be able to do that, so I understand that.
22    But did you take a chance to look over
23 either, you know, the complaint or your answer to the
24 complaint?
25    A. Yes.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

26

1    Q. Okay. Was that in preparation for today, or
2  was that a while back?
3    A. I couldn't tell you. I'm sure I've scanned
4  over it in the last 12 hours, but I've looked at it in
5  the past.
6    Q. Okay. Okay. So first topic is -- I just want
7  to discuss the facts and affirmative defenses asserted
8  in the defendants' answer. I'm not going to ask you for
9  any legal conclusions or anything like that, I just want
10 to talk about the facts that y'all are asserting in you
11 all's case, all right?
12   A. Fine.
13   Q. Okay. So when we pull up -- I'm going to pull
14 up what's marked as Exhibit 2.
15       (Exhibit 2 marked.)
16   Q. (BY MS. SCHEEF) And just give me a second.
17       So Exhibit 2, that I'm pulling up, is the
18 defendants' answer, so that's the answer that y'all made
19 in this case today.
20       Can you see that? And I can zoom in if you
21 need me to.
22   A. Is that, Plaintiffs are precluded from
23 recovering any amounts from defendants, where defendant
24 has paid plaintiffs and/or members of punitive class.
25 Will also --

27

1    Q. Well, I'm just --
2    A. -- include --
3    Q. -- I'm starting with right here. It says -- do
4  you see where it says: Defendants deny each and every,
5  all and singular, allegations contained in plaintiff's
6  original petition and demand strict proof thereof by a
7  preponderance of the evidence.
8        Do you see where it says that?
9    A. Yes.
10   Q. So Boat Town denied every single allegation in
11 Mr. McNamara's petition?
12       MR. DEPONTE: Objection.
13       Tanner, this is not one of the topics you
14 listed. You listed the affirmative defenses and
15 defenses of defendant, not the general denial pleadings
16 filed by defendant. If you want to ask questions,
17 actual questions, about the affirmative defenses, please
18 do so.
19       MS. SCHEEF: Well, the facts -- this
20 inherently has to do with the facts, you're denying all
21 of the facts in the petition.
22       MR. DEPONTE: It's called a general denial.
23 You're well aware of how that works in Texas.
24   Q. (BY MS. SCHEEF) Okay. Do you deny that Mr.
25 McNamara worked for you?

28

1    A. No.
2    Q. Do you deny that Mr. McNamara worked for you
3  from February of 2022 until September 15th, 2023?
4    A. No.
5    Q. What --
6    A. Let me -- let me rephrase this. He was
7  employed there.
8    Q. Okay. He was employed --
9    A. But I do -- yeah, he was employed there;
10 whether he actually worked is up for discussion.
11       But go ahead.
12   Q. Okay. Mr. Raven, was he employed by you?
13   A. Yes. He was employed.
14   Q. Okay. I just ask that you let me finish my
15 question.
16   A. I answered it, the one before.
17   Q. I just ask that you not interrupt me, because
18 it makes Ms. White's life harder when she's trying to
19 transcribe this, all right?
20   A. All right.
21   Q. Okay. My question simply was whether or not
22 you think he worked -- you employed him from February
23 of 2022 to September 15th, 2023?
24   A. Yes. He was --
25   Q. Okay.

29

1    A. -- employed there during those dates.
2    Q. Okay. Now, who at Boat Town was involved in
3  the creation of this answer?
4    A. Who factually produced the dates or who created
5  the answer?
6    Q. Who worked on the facts that are in here?
7        MR. DEPONTE: Sorry. Is there -- which
8  facts, Tanner? I -- I don't see which ones you're
9  referring to.
10       MS. SCHEEF: Let me --
11       MR. DEPONTE: I don't -- I don't understand
12 your question.
13   Q. (BY MS. SCHEEF) Did no -- did no one work with
14 the attorneys on creating this document?
15       MR. DEPONTE: Clayton, you can answer, if
16 you know.
17   A. I don't know.
18   Q. (BY MS. SCHEEF) You don't know who worked with
19 the attorneys on creating this document?
20   A. I'm not sure.
21   Q. Okay.
22   A. I don't know.
23   Q. Now, does Boat Town contend that there's any
24 time that Mr. McNamara worked, that he was doing such
25 small duties, that it shouldn't have been compensated?

30

1    A.  No.  Mr. McNamara was compensated for every
2  minute he was on the clock, or told us that he was on
3  the clock.
4    Q.  Okay.  But you're not alleging that there were
5  times that he should not have been paid?
6    A.  I didn't acknowledge that.  All I simply stated
7  is he spent a great deal of time sitting -- sitting in
8  offices, sitting in boats, sitting in trucks, doing
9  nothing, that he was repeatedly talked to, that he got
10  paid for.
11    Q.  Mr. Raven, that wasn't my question.
12        My question was, are you contending that,
13  under the law, there are times that he was paid for,
14  that he shouldn't have been paid for?
15    A.  Under the law?
16    Q.  Yes.
17    A.  I would have to ask Mr. McNamara to give me an
18  opinion on that.  But, no, we are not questioning --
19    Q.  Okay.
20    A.  -- that.
21    Q.  Is there any company policy as to what kind of
22  time is not payable at all?
23    A.  Let me see if I can get that for you.  Review
24  our handbook.
25    Q.  We can look at the handbook later, but I'm just

31

1  asking, you know, if you're waiting to bring a truck or
2  you're waiting to pick up a boat, is there a policy that
3  that wait time isn't compensable?
4    A.  No.
5    Q.  Okay.  And here -- I'm not going to ask you
6  specifically about the Portal-to-Portal Act, but it does
7  say that there's some activities that were preliminary
8  or post preliminary to their principal activities.
9        Are you alleging that there was time that
10  Mr. McNamara worked, before or after his main duties,
11  that he should not have been compensated for?
12        MR. DEPONTE:  We're withdrawing that
13  affirmative defense.
14        MS. SCHEEF:  Okay.
15    Q.  (BY MS. SCHEEF)  And then, finally -- let me
16  find it in here.
17        Okay.  So here, it says that all actions or
18  omission of defendants, if any, with regards to
19  plaintiff's employment and the method of payment of
20  plaintiffs, were in good faith and based on good cause,
21  and on reasonable grounds, for believing that the
22  defendant was complying with the FLSA.
23        Do you see where I said that -- or where it
24  says that?
25    A.  Let me see if I can figure out which --

32

1    Q.  And I can highlight it here.  It's on page 2 of
2  the defendants' answer to plaintiff's original petition.
3    A.  All I can say is, you know, we tried to pay
4  them right.
5    Q.  Who set up the method of the original form of
6  payment?
7    A.  Well, that would be accounting and us.
8        They're supposed to clock in and out on the
9  computer, but there were multiple dates that an employee
10  would work after hours on the lake, when the store would
11  be locked, and they would just simply come in and tell
12  service management, or accounting, and we would make the
13  adjustment, not question it, and pay them for the hours
14  they say they worked.
15    Q.  So just to go back to my question.  Who set up
16  that policy?
17    A.  That would be service management, and Patti, in
18  accounting.
19    Q.  Okay.
20    A.  And myself.
21    Q.  Before any of the stuff with Mr. McNamara, did
22  Boat Town ever consult with attorneys about how to
23  comply with the FLSA?
24    A.  Not that I'm aware of.
25    Q.  Did you ever look up any, you know, guidance on

33

1  how to properly pay employees according to the FLSA?
2    A.  We just tried to pay people right, ma'am, and
3  do what was fair.
4    Q.  I understand that, but that wasn't quite my
5  question.
6        What did you do in order to understand the
7  FLSA and follow the law?  Did you look up guidance, did
8  you look at the law?
9    A.  What did I personally do?
10    Q.  Or your staff.
11    A.  I cannot testify to what they did, but I'm not
12  aware that we looked up.
13    Q.  So -- and I'm asking you this as the corporate
14  representative.
15        Did anyone at Boat Town, as far as you
16  know, the accountants, yourself, anyone, look up how to
17  correctly do overtime before instituting the overtime
18  policy?
19    A.  I'll look into that and try to get you the
20  answer.
21    Q.  So you don't know?
22    A.  I don't know.
23        MR. DEPONTE:  Back to that question.  It is
24  outside of the scope of the topics, and you can read the
25  affirmative defense.  It is what it is.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

34

1         MS. SCHEEF:  Good faith has to be based on
2  something, that's just what I'm trying to see, what it's
3  based on.
4      Q. (BY MS. SCHEEF)  We'll get into this a little
5  bit more later.
6         Had -- did any other employee bring up
7  issues with the FLSA, before Mr. McNamara?
8      A. Not that I'm aware of.
9      Q. Had anyone, other than Mr. McNamara, brought up
10 overtime issues, in the history of Boat Town, as far as
11 you're aware?
12     A. Not that I'm aware of.
13     Q. Okay.  Okay.  Going to number two, the factual
14 basis for responses to interrogatories.
15        You know, my question is just going to be
16 pretty simple.  Did you or anyone from Boat Town assist
17 the attorneys in creating the answers for the
18 interrogatories?
19     A. I'm sure Mike and I discussed it.
20     Q. Now, it's listed on the -- on some of your
21 answers, that Patti Shook was the person who provided
22 information.
23        Do you know if Patti provided information?
24     A. I'm sure she did.
25     Q. Okay.  And what were Ms. Shook's title and

35

1  responsibilities?
2      A. She was the controller.  She handled all
3  accounting responsibilities, payroll responsibilities,
4  at that time.
5      Q. Okay.  Did anyone else, aside from Ms. Shook,
6  assist in preparing these responses?
7      A. Not that I'm aware of.
8      Q. Do you know what, if anything, Ms. Shook did,
9  to confirm that the answers provided, were accurate?
10     A. No.
11     Q. Okay.  In regards to the documents y'all
12 produced, what steps did Boat Town take to search for
13 responsive documents?
14     A. Define a responsive document.
15     Q. A document that responds to the requests that
16 we made.
17     A. Is this regarding payroll records, employee
18 files?
19     Q. This is regarding all of the documents that we
20 requested to produce, including payroll documents,
21 employee files, relevant documents that Boat Town may
22 have in its own records.
23        MR. DEPONTE: Hey, I'm sorry, objection,
24 form.
25        Is there a specific document you're looking

36

1  for, Tanner?
2      Q. (BY MS. SCHEEF)  All I'm asking is, what did
3  y'all do to search for relevant documents in this case?
4         MR. DEPONTE:  You may answer, if you can,
5  Clayton.
6      A. It's from you all, or the Department of Labor,
7  or --
8      Q. (BY MS. SCHEEF)  I'm asking about documents
9  that Boat Town has --
10     A. Yes.
11     Q. -- what did y'all do to search that you got all
12 of the relevant documents and not just some of them?
13     A. It's, Patti dug into it, provided the
14 Department of Labor with everything they needed and
15 wanted, they were totally satisfied, and we have
16 provided you with anything that we have.
17     Q. Okay.  And you said Patti conducted the
18 document searches, right?
19     A. That is correct.
20     Q. Do you know where she looked for documents?
21     A. I was not physically there when she was looking
22 for them.
23     Q. Did you look over her work?
24     A. No.
25     Q. Has anyone checked to make sure she actually

37

1  gave everything?
2      A. I would have to look into that and get back to
3  you.
4      Q. Certainly you haven't looked to make sure she
5  actually gave everything, right?
6      A. No.
7      Q. Okay.  You don't -- as far as you know, Clay
8  Raven, Karen Raven, you know, the new accounting staff,
9  they haven't double-checked to make sure all the
10 documents were given?
11        MR. DEPONTE:  Objection.
12        You can answer, if you can, Clayton.
13     A. I don't know.
14     Q. (BY MS. SCHEEF)  Okay.  Are there any documents
15 that exist, that are relevant, that Boat Town has not
16 produced?
17     A. No.
18     Q. So as far as you know, everything's been given?
19     A. As far as I know.
20     Q. Were there any emails between Boat Town staff
21 about this case?
22     A. Not that I'm aware of.
23     Q. Any text messages between Boat Town ownership
24 and management about this case?
25     A. Not that I'm aware of.

38

1    Q.  You haven't texted Clay Raven about this case?
2    A.  Not that I'm aware of.
3    Q.  You haven't texted Karen Raven about this case?
4    A.  No.
5    Q.  You haven't texted or emailed any Boat Town
6  staff about this case?
7    A.  No.
8    Q.  As far as you know, no Boat Town email records
9  or phone records discussed this case at all?
10    A.  As far as I know --
11    Q.  Okay.
12    A.  -- that's correct.
13    Q.  Okay.  Moving on here, to topic three.
14        I'm just trying to get an idea of what kind
15  of a structure is at Boat Town.
16        Now, you're president and CEO.
17        What role does Clay Raven play?
18    A.  Clay Raven is the -- everything has been
19  transitioning over the years.  If you go back, when I
20  got out of college, Boat Town had probably six
21  employees, was losing money.  It's turned into a decent
22  little company now.  As the boys have grown and matured,
23  Clay, over the last several years, has transitioned from
24  a sales position to now being the general manager of the
25  Austin store.

39

1    Q.  Okay.  And then what is Karen Raven's role?
2    A.  She is vice president of the company.
3    Q.  Is she also a co-owner?
4    A.  No.
5    Q.  Okay.  And who else is -- is it just you at the
6  ownership level?
7    A.  It's just me.
8    Q.  And then what about the director level, is
9  there any directors?
10    A.  It is -- we do not have a formal board of
11  directors.  There's myself, the three Raven members,
12  they have the right to make any decision they feel they
13  can and want to make, and from there it drops to Bonnie
14  Harrell, director of operations.  If no member of the
15  Raven family is available, Bonnie also has the sole
16  discretion to make any decision that she feels she needs
17  to make.
18    Q.  Okay.  And then what about managers, who are
19  the managers at Boat Town?
20    A.  We have parts managers and service managers at
21  both stores.  Cody Raven's the general manager at the
22  LBJ store, Clay's the GM at the Austin store, and then
23  Bonnie oversees all of them, with the help of the boys.
24    Q.  Okay.  And then I know we talked about these
25  questions as to you, but just go into a little bit more

40

1  detail, and I'll try and make these quick.
2        So you, yourself, Clayton Raven, Senior, do
3  you have the power to hire and fire employees at Boat
4  Town?
5    A.  Do I have the power?
6    Q.  Yes.
7    A.  Yes.
8    Q.  Okay.  Do you have the power to supervise or
9  control employee work schedules and conditions of
10  employment?
11    A.  I guess I would have that power.
12    Q.  And do you have the power to determine the rate
13  or method of payment that workers at Boat Town receive?
14    A.  I have the power, but most of that's done at a
15  lower level.
16    Q.  And do you have the power to maintain employee
17  records or decide how they are maintained?
18    A.  I'll say yes, I have that power.
19    Q.  Okay.  We're going to go through these
20  questions again for Clayton Raven, Junior.
21        Does he also have the power to hire and
22  fire employees?
23    A.  To a certain extent.
24    Q.  I remember you said earlier that the three
25  Ravens can make any and all decisions?

41

1    A.  Yes.
2    Q.  Does that include power to hire and fire?
3    A.  Except me.
4    Q.  Except you.  Yeah, can't -- can't fire the
5  boss, but, other than that, you know, Clayton Junior and
6  Karen have the power to hire and fire?
7    A.  Yes.
8    Q.  Does Clayton Raven, Junior, have the power to
9  supervise or control employees' work schedules or
10  conditions of employment?
11    A.  Yes.
12    Q.  Does the same go for Karen Raven?
13    A.  Yes.
14    Q.  Does Clayton Junior have the power to determine
15  the rate or method of payment for employees at Boat
16  Town?
17    A.  Before somebody's salaries or hourly wage has
18  stiffly changed, it typically comes to me.  But, yes, he
19  has the ability to do that.
20    Q.  Does the same go for Karen?
21    A.  Yes.
22    Q.  Okay.  And then what about determining -- or
23  maintenance of employee records, do Clayton and Karen --
24  or Clayton Junior and Karen both have the ability to
25  either maintain employee records or decide how they're

42

1 maintained?
2     A.  Well, it's all been done in the accounting
3 office.
4     Q.  Do all three of y'all have access to those
5 records?
6     A.  Yes.
7     Q.  Okay.  And you can decide, if you don't like
8 how they're being maintained, and change the way that
9 the records are maintained?
10     A.  We have never done that.
11     Q.  But you could if you wanted to?
12     A.  We'd have to be able to find them, first.
13     Q.  If you wanted to, if the three of y'all wanted
14 to, y'all could decide to change the way that employee
15 records are maintained, correct?
16     A.  Correct.
17     Q.  Okay.  And then pulling this up.
18          So just getting more into the generalities
19 of Boat Town so I know a little bit more about it.
20          Can you describe, kind of, the primary
21 operations of Boat Town.
22     A.  We're a full-service boat dealership.  I guess
23 to put it in layman's terms, we're nothing more than a
24 car dealership that sells boats.  We have new and used
25 sales.  We have parts, service, finance.  We take care

43

1 of boats, where car dealers take care of cars.
2     Q.  Okay.  And then how many locations do boat --
3 does Boat Town operate?
4     A.  Two.
5     Q.  And what is Boat Town's annual gross sales
6 volume?
7          THE WITNESS:  Is this relevant, Mike?
8          MR. DEPONTE:  It is, to an extent, but we
9 can mark this as confidential.
10          THE WITNESS:  Okay.
11     A.  It's currently 30 -- 30 million, give or take.
12     Q.  (BY MS. SCHEEF)  Okay.  And nowadays,
13 approximately how many employees does Boat Town have?
14     A.  You know, it varies seasonally.  I would say we
15 run from 23 to 24 in the off season, per dealership, and
16 it may go to 27, 28-ish, but that number varies.
17     Q.  So off season, versus, you know, your main
18 season, which, hazarding a guess, your main season is
19 summer?
20     A.  Yes, spring and summer.
21     Q.  All right.  You're -- you have around three to
22 four less employees between winter and spring and
23 summer?
24     A.  Per store, at least.
25     Q.  Okay.  And I'm going to skip over topic four,

44

1 because I think I'm talking to Bonnie about that, so
2 I'll skip over four, five, and six.
3          MS. SCHEEF:  Let me know if I'm wrong about
4 that, Mike.
5          MR. DEPONTE:  That's correct.
6          MS. SCHEEF:  Okay.
7     Q.  (BY MS. SCHEEF)  Let's get into number seven,
8 Mr. Raven.
9          So when was Mr. McNamara hired by Boat
10 Town?
11     A.  I believe it was February 15th of '22.
12     Q.  And when was he -- when he was hired -- when he
13 was hired, what was his title?
14     A.  He was boat delivery captain, but that title
15 comes with many hats.
16     Q.  And what were the duties of a boat delivery
17 captain?
18     A.  Boat delivery captains assist the sales team
19 with demos, driving to and from the lake, picking up
20 boats on the water, teaching clients to drive boats,
21 helping the service department, if they needed boats
22 picked up and brought in.
23          When there was none of that going on, it
24 was their responsibility to help keep the company trucks
25 maintained, clean, serviced regularly, you know, report

45

1 it if the tires were getting worn, brakes were getting
2 worn.  So when the need arised, and it arose on short
3 notice very often, you know, that the vehicles needed to
4 perform the job, were ready.  If there was an issue with
5 a trailer, we needed to get it pointed out so we could
6 get it into service and get it fixed.
7          They, you know, assisted family members
8 with personal errands, running and picking up things.
9          If they needed to run and pick up a part
10 from another dealership, from the parts department,
11 things like that.
12     Q.  Were all of those listed on the job posting for
13 the boat delivery captain?
14     A.  No.
15     Q.  Okay.  So, like, picking -- doing errands for
16 the family, that's not one of the official job duties?
17     A.  It is one of the official job duties, and I
18 think we very seldom, if ever, post for these positions,
19 because employees normally have friends that want to
20 come in, clients normally have sons or daughters that
21 wish to come in.  We have two family members right now
22 that have three sons, and we're on their third son right
23 now.
24          We do have a core philosophy at Boat Town,
25 it's when you come to work for our company, it's who do

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

46

1 you work for? And they all say me, and I tell them
2 they're wrong.
3        When you come to work for Boat Town,
4 anybody I've ever hired, I have this core decision --
5 core conversation with them, when you come to work for
6 Boat Town, you work for Boat Town. My two sons work for
7 Boat Town, my wife works for Boat Town, I work for Boat
8 Town, and it is a core philosophy.
9    Q. I appreciate that.
10       But if there was a job posting -- but as
11 far -- as far as you know, Mr. McNamara found this job
12 through a job posting, right?
13    A. No. I do not know that.
14    Q. How did Mr. McNamara find this job?
15    A. I have no knowledge.
16    Q. How did he apply?
17    A. I have no knowledge.
18    Q. Well, you know how he was hired, right?
19    A. I'm not sure if my son hired him, the service
20 manager hired him. I'm not sure who actually hired him.
21    Q. Did y'all receive a job application from Mr.
22 McNamara?
23    A. I have not seen one. I'm not saying one
24 doesn't exist.
25    Q. Okay. Well, you're not sure if it doesn't

47

1 exist --
2    A. That's correct.
3    Q. -- you just haven't seen one?
4    A. That's correct.
5    Q. Okay. So when he was hired, what was his
6 hourly rate of pay?
7    A. I believe it was $18 an hour, but I would have
8 to go back and check that.
9    Q. And when did that change?
10    A. Let me see.
11       I do not have that information in front of
12 me.
13    Q. Fine.
14       Do you know what it was changed to?
15    A. I believe it was changed to $22 an hour.
16    Q. Okay. Who were his supervisors?
17    A. At this time, they would have been Chuck Embree
18 and Clay Raven.
19    Q. Okay. What were their respective roles at Boat
20 Town?
21       We already talked about Clay, but what was
22 Chuck Embree's title?
23    A. Chuck was service manager.
24    Q. Okay. And who was Geromi Trudeau?
25    A. Geromi Trudeau was just a salesman.

48

1    Q. Okay. He wasn't in management?
2    A. No.
3    Q. And is he still employed with Boat Town?
4    A. No.
5    Q. Okay. And what hours were the typical schedule
6 for a boat delivery captain?
7    A. Our typical hours are, we work from 9:00 to
8 5:00 in the off season; i.e., October, November,
9 December, January, February, five days a week, and 9:00
10 to 2:00 in the off season. And then we go from 9:00 to
11 6:00, four days a week, and then 9:00 to 5:00 on
12 Saturdays, during the full season.
13       But the sales team, along with the delivery
14 captains and the service team, once again, they all work
15 for Boat Town, we work for Boat Town's clients, many
16 times we work much longer hours in season.
17    Q. On average, how long were people working in
18 that main season?
19    A. I do not have an average number.
20    Q. Do you know what Mr. McNamara's average weekly
21 hours were, more than 40 hours per week, during the busy
22 season?
23    A. I do not have that information in front of me,
24 no.
25    Q. Do you know how Mr. McNamara's hours were

49

1 tracked and recorded?
2    A. Yes.
3    Q. How?
4    A. They were just tracked on a 40 hour -- every
5 week, the number of hours that he worked that week were
6 tracked and we paid biweekly.
7    Q. How did you track them? Did you have a system?
8    A. Yes. Once again, we've spoken about this
9 earlier. Everybody is supposed to clock in and out on
10 Lightspeed, which is our computer system.
11    Q. Okay. Tell me a little bit about Lightspeed.
12    A. Lightspeed is the industry standard. It's
13 fully integrated to parts, service, accounting.
14 Employee walks in, they jump on a computer, they log in,
15 clock in.
16    Q. I think I used that when I was a hostess, so I
17 have a little bit of a memory of that from a long time
18 ago.
19       Now, has that always been you all's system?
20    A. Yes.
21    Q. Okay. Hasn't changed at all?
22    A. No.
23    Q. Going into the next issue, and I know you have
24 a lot of opinions on Mr. McNamara's work ethic, and a
25 lot of opinions on that. I'm asking you about

50

1 specifically his record.
2          Did he ever receive any performance
3 evaluations?
4     A. Not that I'm aware of.  I know he's had
5 multiple verbal evaluations from multiple people.
6     Q. Are there any records of these supposed verbal
7 conversations?
8     A. Not that I'm aware of.
9     Q. Was Mr. McNamara ever disciplined for anything
10 that happened during his tenure?
11    A. Not that I'm aware of.
12    Q. Mr. McNamara was never written up?
13    A. Not that I'm aware of.
14    Q. Never given a Performance Improvement Plan?
15    A. No.
16    Q. Never put on probation?
17    A. No.
18    Q. Never had his pay docked?
19    A. No.
20    Q. Never had his hours docked?
21    A. No.
22          MS. SCHEEF: Okay.  I think I'm hitting a
23 good breaking point, and I need to grab more water.
24 Would y'all be cool with breaking until 11:15?
25          Is that all right with you, Mr. Raven?

51

1          THE WITNESS: Sounds good to me.
2          MS. SCHEEF: Okay.  Be back at 11:15.  Let
3 me let Claudia take us off the record.
4          THE REPORTER: Off the record at 11:08 a.m.
5          (Break taken from 11:08 a.m. to 11:15 a.m.)
6          THE REPORTER: Back on the record at
7 11:15 a.m.
8     Q. (BY MS. SCHEEF) Okay, Mr. Raven.  Now, is
9 there anything that you would like to change about your
10 testimony that -- from before the break?
11    A. No.
12          MS. SCHEEF: Okay.  And tell me if I'm
13 wrong, Mike, but I think our next section, relevant to
14 Mr. Raven, is topic 10?
15          MR. DEPONTE: I believe that is correct.
16 Let me just check.  Yeah, that's 10.
17          MS. SCHEEF: Okay.  Perfect.
18    Q. (BY MS. SCHEEF) Okay.  So, Mr. Raven, Mr.
19 McNamara complained to Boat Town management about not
20 receiving proper overtime pay on June 6, 2023, right?
21    A. I'll take your word that that's the correct
22 date.
23    Q. Well, do you not know what the correct date is?
24    A. I do not have it in front of me, no.
25    Q. Did you review anything that had the dates?

52

1     A. I don't recall.
2          MR. DEPONTE: We'll stipulate that that's
3 the correct date.
4          MS. SCHEEF: Okay.
5     Q. (BY MS. SCHEEF) Mr. McNamara made this -- he
6 first brought this up to Geromi Trudeau, correct?
7          MR. DEPONTE: Objection.
8     A. I believe --
9          MR. DEPONTE: Go ahead, Clayton.  You can
10 answer, if you can.
11    A. I believe so.  My son is the one that called
12 me.
13    Q. (BY MS. SCHEEF) Okay.  Do you have any records
14 of Mr. McNamara meeting with Patti Shook on June 6,
15 2023?
16    A. I do not have any records, no.
17    Q. You're aware that Mr. McNamara specifically
18 complained that he wasn't being paid for his time worked
19 over 40 hours in a week, correct?
20    A. Correct.
21    Q. And Mr. McNamara told management, Ms. Shook,
22 that at the time, Boat Town was illegally calculating
23 overtime on a two-week basis instead of weekly?
24    A. That is correct.  That's what was brought to my
25 attention.

53

1     Q. Okay.  And Boat Town's management knew that Mr.
2 McNamara was raising a complaint of a violation of
3 federal law, right?
4     A. As soon as we learned, that day that Mr.
5 McNamara brought this to our attention, and he came in
6 like he was bringing down the Capone crime family, you
7 know, Patti was crying.  So she dug into it, immediately
8 called the Department of Labor, confirmed that she had
9 been paying it wrong.  It was strictly by accident.
10          And as soon as it was brought to our
11 attention, we started working immediately to create --
12 you know, correct the problem.  You know, we're
13 apologetic, we got the Department of Labor, we
14 immediately started digging back in.  Since it was June,
15 our high season, we had to hire somebody else, you know,
16 to really dig in, in a short period of time, to run all
17 of the calculations the Department of Labor wanted.  And
18 we corrected it immediately and provided DOL with
19 everything they requested.
20          Matter of fact, we already had it done
21 before they even showed up at the dealership, if memory
22 serves me correct.
23    Q. Well, I appreciate all that, but that wasn't
24 really my question.
25          My question is, Boat Town knew that Mr.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

54

1 McNamara was claiming that Boat Town was violating
2 federal law?
3    A. We did not know it. We knew it when he brought
4 it to our attention. We did not question it when he
5 brought it to our attention, we immediately looked into
6 it.
7    Q. So that's a yes to my question, you know that
8 he was complaining that you violated federal law?
9    A. Yes. It was brought to my attention that he
10 was complaining that we were paying overtime
11 incorrectly.
12    Q. Okay. Now, Mr. McNamara met with Ms. Shook
13 multiple times?
14    A. I'll take your word for that.
15    Q. You're not aware of when Mr. McNamara met with
16 Ms. Shook?
17    A. Ma'am, I office out of Lake LBJ, 60 miles away,
18 so I do not see everything that goes on in that store.
19    Q. That wasn't exactly my question.
20        You were asked to review all of Boat Town's
21 records relevant to this case to prepare for today's
22 deposition, right?
23        MR. DEPONTE: I'm sorry, objection, form.
24        How is how many times Mr. McNamara met with
25 Ms. Shook one of the topics?

55

1        MS. SCHEEF: We're specifically talking
2 about the protected -- any complaints he made. This is
3 specifically going to the facts of Mr. McNamara alleging
4 the violation of the law.
5        MR. DEPONTE: And there's no dispute that
6 he went to Ms. Shook and made a complaint.
7    Q. (BY MS. SCHEEF) Are there no records of how
8 many times Mr. McNamara met with Ms. Shook, Mr. Raven?
9        MR. DEPONTE: You can answer, if you can,
10 Clayton.
11    A. Not that I'm aware of. He could have gone in
12 there 27 times, he could have gone in there 2. I don't
13 know, I wasn't there.
14    Q. (BY MS. SCHEEF) Okay. Ms. -- Ms. Shook didn't
15 take any notes, as far as you know?
16    A. I don't know. She's not with me anymore. Her
17 daughter tried to commit suicide. She's got a lot going
18 on in her personal life. Maybe you can call her.
19    Q. We'll do that. But I'm asking you, according
20 to Boat Town's records, there are no records of when Mr.
21 McNamara met with Patti Shook?
22    A. I'm taking your word that it was June 6th.
23 We're not IBM, we're not Dell computer. When it was
24 brought to our attention, we have roughly 50 employees,
25 she went to the front of her lane, we dug into it

56

1 immediately that day. So I don't think there was many
2 corporate meetings and board meetings. As soon as it
3 was brought to our attention, we immediately dug into
4 it, confirmed what he was saying was correct, and
5 started taking corrective action.
6    Q. Mr. Raven, my question is simply, were there
7 any records, even just personal notes or an email, that
8 said --
9    A. For the third time, I do not know.
10    Q. Okay. As far as you know, there's no records?
11    A. Fourth time --
12        MR. DEPONTE: Objection, form.
13    A. -- yes, that is correct.
14        MS. SCHEEF: Mike, he's not answering the
15 question.
16        MR. DEPONTE: Yeah, he did.
17    A. I just said yes.
18    Q. (BY MS. SCHEEF) Okay.
19    A. That is correct, for the fourth time.
20    Q. Okay. So it was true -- well, are you aware
21 that Ms. Shook said that Boat Town had been using the
22 2-week time calculation for over 20 years?
23        MR. DEPONTE: Objection, form.
24        You can answer.
25    A. I believe we've been using it ever since she'd

57

1 been there, and probably before.
2    Q. (BY MS. SCHEEF) How long had Patti been there?
3    A. Roughly, 15 years. I don't have the exact
4 dates.
5    Q. So it's true, that had been the way y'all had
6 always done it, is that calculating by if you worked
7 over 80 hours in 2 weeks?
8    A. I don't know if Patti changed it that way when
9 she came on board. She was highly recommended. She was
10 a controller in the automotive world. But it would be,
11 my understanding, that we had been doing it at least
12 since Ms Shook had been there.
13    Q. Okay. Are you aware that at another meeting,
14 Ms. Shook told Mr. McNamara that this practice saved the
15 company money?
16        MR. DEPONTE: Objection, form.
17    A. Yeah. Somebody told me that. I immediately
18 confronted Patti; she denied the hell out of it.
19    I heard it once, confronted Patti, and
20 nobody else can confirm. And it's just flat ridiculous.
21 We would not do anything to short an employee.
22    Q. (BY MS. SCHEEF) Have you listened to the audio
23 recordings that we provided y'all in discovery?
24    A. No.
25    Q. So if something similar was said in those audio

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

58

1 recordings, that would be contradictory, is what you're
2 saying now?
3    A. It would be (audio issue.)
4        THE REPORTER: I'm sorry, did you -- I'm
5 sorry, I think -- did you say something, Michael?
6        MR. DEPONTE: I did. I said, objection,
7 form.
8        THE REPORTER: Okay. And then repeat your
9 answer, Mr. Raven.
10        THE WITNESS: Yes, that would be new to me.
11    Q. (BY MS. SCHEEF) Okay. So you haven't listened
12 to any of those recordings?
13    A. No.
14    Q. Okay. So you're not aware if Ms. Shook said,
15 What if we can't or don't back pay anyone, and just fix
16 it going forward? You're not aware if she said that?
17    A. I'm not aware if she said that.
18    Q. Okay. Are you aware that Mr. McNamara also met
19 with Clay Raven?
20    A. Yes. I know those two did meet.
21    Q. Are you aware that Mr. Raven asked Mr. McNamara
22 what money he wanted, for it to all go away?
23    A. No. I'm not aware of that.
24    Q. Okay. When Mr. -- when Boat Town paid back Mr.
25 McNamara, was it intending to also back pay everyone who

59

1 had worked for Boat Town in the past three years,
2 leading up to that?
3        MR. DEPONTE: Objection, form.
4        That's totally irrelevant to this case.
5        But answer, if you can, Clay.
6    A. We were more than willing, never disputed that
7 we would go back and pay every employee at Boat Town.
8    Q. (BY MS. SCHEEF) I'm not asking just about at
9 Boat Town. I'm asking about the employees who had
10 previously worked at Boat Town, who no longer did.
11        Did you go back and pay these people?
12    A. Once again, we looked into it, figured out we
13 had been paying incorrectly, contacted the Department of
14 Labor. They told us we needed to go back, figure the
15 calculations, and repay everybody for two years. And
16 that's what we immediately did.
17    Q. By everybody, did you include people who were
18 no longer at Boat Town?
19    A. I believe -- we'd have to look into that, but I
20 believe so.
21    Q. Okay. You're not sure, though?
22    A. Not positive, no.
23    Q. Okay. Boat Town eventually did make a payment
24 to Mr. McNamara for unpaid overtime, right?
25    A. At the time, we made a payment to every

60

1 employee at Boat Town.
2    Q. Well, you paid Mr. McNamara before you paid the
3 other employees, correct?
4    A. I don't know. I don't believe so. I know we
5 immediately went back and did everybody.
6    Q. So are you contending that you paid every
7 single employee, past and present, on June 27th, when
8 you paid Mr. McNamara?
9        MR. DEPONTE: Objection, form.
10        That is not what he stated at all.
11    A. I would have to look into the exact date
12 everybody was paid.
13    Q. (BY MS. SCHEEF) Okay. Do y'all have records
14 of the exact date everyone was paid?
15    A. I would believe we do.
16    Q. Okay.
17    A. Or the Department of Labor. I'm sure you have
18 it, I'm sure the Department of Labor has it.
19    Q. I unfortunately don't have it right now, but we
20 can certainly request it.
21        MR. DEPONTE: And as I said, Counselor, we
22 requested the Department of Labor's records. I
23 suggested postponing this until you had them. And as
24 soon as we have those records, we will produce them.
25        MS. SCHEEF: Okay.

61

1    Q. (BY MS. SCHEEF) Now, when Boat Town paid Mr.
2 McNamara, did it calculate interest on what he was owed?
3    A. I do not know.
4    Q. Okay. And did it calculate interest on the
5 other people it paid?
6    A. I do not know.
7    Q. Okay. And --
8    A. The only thing I know for a fact is, we asked
9 the Department of Labor what we needed to do, they told
10 us, and we did it.
11    Q. Okay. Just to be clear, you have knowledge
12 that Boat Town was violating the FLSA in how it was
13 previously paying its employees, correct?
14        MR. DEPONTE: Objection -- whoa, whoa.
15 Objection, form.
16        You cannot ask him a legal conclusion about
17 whether or not Boat Town was violating the FLSA.
18        So I would instruct the witness not to
19 answer the question, because it calls for a legal
20 conclusion.
21        MS. SCHEEF: Okay. I'll rephrase it.
22    Q. (BY MS. SCHEEF) If you were confident you
23 weren't breaking the law, you wouldn't have paid these
24 people, right?
25        MR. DEPONTE: You can answer, if you can,

62

1 Clayton.
2    A. If I was confident I wasn't breaking the law, I
3 wouldn't pay these people?
4    Q. (BY MS. SCHEEF) Yeah. If you thought, hey, we
5 are paying you entirely correct, we're not going to pay
6 you back pay because we paid you correctly, you wouldn't
7 have paid them -- scratch that. I'll ask it in a
8 clearer way. That was confusing on my behalf.
9        If you were confident that you were not
10 violating the FLSA in how you paid your employees, you
11 would not have paid them that back pay?
12    A. I am confident Boat Town never has and never
13 will intentionally short an employee any penny.
14    Q. Wasn't my question.
15        Intentionally or unintentionally, you
16 wouldn't have paid them the unpaid overtime if you
17 didn't think they were owed the unpaid overtime?
18        MR. DEPONTE: Objection, form.
19    Q. (BY MS. SCHEEF) You can still answer.
20        MR. DEPONTE: If you can, Mr. Raven.
21    A. I would pay them anything I think they were
22 owed.
23    Q. (BY MS. SCHEEF) So you thought they were owed
24 the unpaid overtime, correct?
25    A. I did not know until I got a ruling from the

63

1 Department of Labor.
2    Q. Okay. So you paid them what they were owed?
3    A. Yes. As soon as it -- everything was brought
4 to my attention, and it's -- you and Mr. McNamara act
5 like you're bringing down the Capone crime family, when
6 this whole sum of money, for this way we paid people
7 wrong, is much smaller than the damage Mr. McNamara did
8 tearing up Boat Town property, hitting the guard shack,
9 and rendering a boat unusable.
10    Q. Look, I get that you're frustrated about that.
11        (Crosstalk.)
12    A. -- perspective.
13    Q. That wasn't my question.
14    A. I'm a little more than frustrated about it.
15    Q. I --
16    A. Go ahead.
17    Q. I -- I completely understand, and you can get
18 mad at me all you want, after this.
19    A. I'm not mad at you.
20    Q. That's totally fine.
21        My question is very simple.
22        The Department of Labor did a verdict, and
23 that verdict made you pay unpaid overtime, like you
24 said?
25        MR. DEPONTE: Objection, form.

64

1        There's no verdict from the Department of
2 Labor.
3    Q. (BY MS. SCHEEF) Or guidance decision.
4        You paid the unpaid overtime that people
5 were owed, yes?
6    A. Before the Department of Labor even told it,
7 asked us to, they told us how it should have been
8 calculated. And we immediately went back and had all of
9 the calculations done before they even asked for them.
10 When we handed them to them, they signed off on them,
11 and then we paid our people.
12    Q. That wasn't my question. My question is a very
13 simple yes or no question.
14        You paid the workers the unpaid overtime
15 that they were owed, yes?
16    A. Yes.
17    Q. Okay. Perfect.
18        MR. DEPONTE: Much better question. Thank
19 you, Counselor.
20        MS. SCHEEF: Thank you. Doing my best
21 here.
22    Q. (BY MS. SCHEEF) Okay. My next topic actually
23 does go into that Department of Labor investigation a
24 little bit.
25        So you mentioned earlier that Patti Shook

65

1 said she contacted the Department of Labor?
2    A. I believe that's how it happened.
3    Q. Is there a record of that?
4    A. I don't know if it's on a phone record or not.
5    Q. Did she tell you that she did?
6    A. I don't recall.
7    Q. So how do we -- where does Patti Shook
8 contacting the Department of Labor come from?
9    A. Because I'm pretty sure that's how it happened.
10    Q. But you don't know how you know?
11    A. You can subpoena Patti.
12    Q. Okay. You don't know how you know?
13        MR. DEPONTE: Objection, form.
14        MS. SCHEEF: He didn't answer the question.
15 He told me to subpoena a witness.
16    Q. (BY MS. SCHEEF) You don't know how you know
17 that Ms. Shook contacted the Department of Labor?
18    A. No. I did not contact --
19        (Crosstalk.)
20        MR. DEPONTE: Hang on. Hey, Clayton.
21 Clayton. Wait a moment.
22        My objection is to the form of the
23 question.
24        You can answer, if you can, Mr. Raven.
25        THE WITNESS: I'm not even sure what her

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

66

1 question is.
2    Q. (BY MS. SCHEEF) How do you know Ms. Shook
3 contacted the Department of Labor?
4    A. She did not send me something in writing
5 that she conducted -- and so I do not know that she
6 conducted the Department of Labor -- or contacted them.
7    Q. Okay. Do you know who it was, the first person
8 at Boat Town, to have, I guess, a conversation with the
9 Department of Labor?
10    A. I don't know for a fact. If you want to run
11 down this same realm of questioning, it would probably
12 be Patti, but I don't know.
13    Q. Okay. Do you know when the Department of Labor
14 first contacted you?
15    A. I believe we contacted them first, but, no.
16    Q. Who at Boat Town was involved in the Department
17 of Labor investigations?
18    A. That would have been Patti, to the best of my
19 knowledge.
20    Q. Did anyone else speak with the Department of
21 Labor?
22    A. Not that I know of.
23    Q. You, yourself, never spoke with the Department
24 of Labor?
25    A. I did speak with them, yes.

67

1    Q. Okay. So you were one of the people who spoke
2 with the Department of Labor.
3         Anyone else?
4    A. I do not recall whether my son was there.
5 Debbie could have been there, another lady that helped
6 us, in accounting.
7    Q. Okay. And what was Debbie's role?
8    A. Debbie just helped us with storage, payables,
9 things of that nature.
10    Q. Okay. What was the scope of the Department of
11 Labor investigation, as far as you know?
12    A. Very limited. They came in, asked us for
13 documents, instructed us how it should have been done,
14 how far we needed to go back, to the best of my
15 recollection. Because I wanted to be there when they
16 got there, to understand what we were dealing with.
17         They were just very direct; here's what you
18 have been doing, here's what you should have been doing.
19 This is what we need, and here's what needs to be done
20 to correct it.
21    Q. Okay. Now, before the Department of Labor
22 investigation, to your knowledge, no other employee had
23 raised the issue of unpaid overtime to Boat Town?
24    A. No.
25    Q. He was the only one who raised the issue?

68

1    A. Yes.
2    Q. Even after the Department of Labor investigate
3 -- or the Department of Labor contacted you all, Mr.
4 McNamara was the only person who had brought up this
5 unpaid overtime issue?
6    A. I can't testify to that.
7    Q. As far as you know, no one else was reporting
8 that there was unpaid overtime?
9    A. As far as I know, that's correct.
10    Q. Okay. And you're here as the corporate
11 representative on behalf of the company, right?
12         MR. DEPONTE: Objection, form.
13         We've already established he's here as a
14 corporate representative.
15         MS. SCHEEF: Okay.
16    Q. (BY MS. SCHEEF) So as far as you know, Mr.
17 McNamara was the only person to have made a report to
18 the -- made a report of unpaid overtime?
19         MR. DEPONTE: Objection, form.
20         You can answer again, if you can, Mr.
21 Raven.
22    A. Yes.
23    Q. (BY MS. SCHEEF) Okay. Now, the Department of
24 Labor investigators came to Boat Town on September 8,
25 2023, right?

69

1    A. I can't testify to that date.
2    Q. Well, you were there, right?
3    A. I can't testify to the date, whether that's the
4 first day they were there and I -- or I was there the
5 first day.
6    Q. Did they come in multiple times?
7    A. I believe they did.
8    Q. Okay. Do you know the time --
9    A. I wouldn't say multiple -- no, I do not know
10 the exact times.
11    Q. Okay. If the investigators came on
12 September 8th and Mr. McNamara was fired on
13 September 15th, that's about an eight-day difference --
14 or seven days?
15         MR. DEPONTE: Okay. Thank you.
16    Q. (BY MS. SCHEEF) Right?
17    A. If those are the correct dates.
18    Q. So if the Department of Labor came in on
19 September 8th and terminated Mr. McNamara on
20 September 15th, that is a week?
21         MR. DEPONTE: I'm sorry, is the question if
22 that's a week, seven days is a week?
23         MS. SCHEEF: Yes.
24    Q. (BY MS. SCHEEF) Is seven days -- is seven days
25 a week?

70

1    A. Yeah, seven days is a week.
2    Q. Okay. Perfect. It's a running theme.
3    A. It's a good one.
4    Q. Yeah. Now, we already hit on some of the
5 topics I was going to ask, so I'm just going to kind of
6 scroll through this.
7        Do you know what documents Boat Town
8 provided to the Department of Labor?
9    A. No.
10   Q. Okay. So do you know if they provided time
11 sheets, payroll records?
12   A. Once again, we provided everything they asked
13 for. As soon as we get those documents back, we will be
14 more than happy to show them to you, I believe is what
15 Mr. DePonte said.
16   Q. Perfect.
17       Did you invite Mr. McNamara to the meetings
18 with the Department of Labor, since he was the one who
19 raised the issue?
20       MR. DEPONTE: Objection, form.
21       You -- you can answer, if you can, Clay.
22   A. I don't recall whether Mr. DePonte was there or
23 not.
24   Q. (BY MS. SCHEEF) I said Mr. McNamara.
25       MR. DEPONTE: Same objection.

71

1    A. I said I don't recall.
2    Q. (BY MS. SCHEEF) Did you invite Mr. McNamara to
3 meet with the Department of Labor?
4    A. I don't believe we did.
5    Q. Okay. Who was Boat Town's primary contact with
6 the Department of Labor?
7    A. That would have been Patti Shook.
8    Q. Regarding the Department of Labor staff, y'all
9 have identified Michael Ramirez as the Department of
10 Labor investigator that was assigned to Boat Town.
11       Did you speak with Michael Ramirez?
12   A. I spoke with whoever they sent to the office,
13 ma'am.
14   Q. How many people did they send?
15   A. One.
16   Q. Okay. Was it a man?
17   A. Yes.
18   Q. Okay. Other than when they came in person,
19 what communications do you recall Boat Town having with
20 the Department of Labor?
21   A. Once again, that would have all been done
22 through Patti, and I'm not sure whether Mr. DePonte was
23 involved in any of that or not.
24   Q. Okay. Were there any findings or
25 determinations made by the Department of Labor?

72

1    A. They determined that we'd been paying
2 incorrectly. They told us how we should have been
3 paying. We immediately went back the full time they
4 told us we should, produced all the calculations,
5 provided it to the Department of Labor, of which they
6 took and reviewed.
7        And when they signed off on it, said it was
8 correct and appropriate, and that is what we needed to
9 do, that's when we paid the people.
10   Q. Okay. You're unaware if Boat Town paid back
11 employees who were not currently employed at Boat Town?
12       MR. DEPONTE: Objection, form.
13   Q. (BY MS. SCHEEF) You can answer the question.
14   A. I'll have to get back with you on that.
15   Q. Okay. What corrective actions has Boat Town
16 taken since the Department of Labor came in?
17   A. The only thing that I know that we were doing
18 wrong, or had ever done wrong, was immediately
19 correct -- corrected.
20       THE REPORTER: Immediately corrected what?
21   Q. (BY MS. SCHEEF) Let me --
22       THE REPORTER: I'm sorry, I didn't
23 understand the last word you said, Mr. Raven.
24       THE WITNESS: I said, the only thing that
25 has ever been brought to our attention that we done

73

1 wrong, or were doing wrong, we corrected immediately.
2    Q. (BY MS. SCHEEF) Okay. So you corrected the --
3    A. The way in which -- the way in which overtime
4 is calculated and paid out on a biweekly basis.
5    Q. Okay. Now, kind of going down to topic 12, and
6 I think these next few are going to pop through pretty
7 quickly.
8        Has Boat Town ever been sued for wage and
9 hour violations, before this case?
10   A. No.
11   Q. Has Boat Town been subject to any grievances
12 regarding wage and hour policies, before this case?
13   A. No.
14   Q. Are you aware of any other complaints about
15 Boat Town's overtime practices?
16   A. No.
17   Q. No employees, other than Mr. McNamara, brought
18 up the issue of unpaid overtime?
19   A. No.
20   Q. Besides this lawsuit, are there any other
21 pending lawsuits against Boat Town?
22   A. No.
23   Q. Are there any lawsuits that have been settled
24 against or have been -- scratch the question.
25       Are there any -- in the last decade, have

74

1 there been any cases that Boat Town has had brought
2 against it?
3           MR. DEPONTE: Objection, form.
4           And I'm going to instruct the witness not
5 to answer that until you can limit the scope of the
6 question. The last decade is relevant -- irrelevant,
7 and if it's not wage and hour, it's irrelevant. So if
8 you want to limit the question to that, I will have Mr.
9 Raven testify. Otherwise, I'm going to instruct the
10 witness not to testify to that.
11      Q. (BY MS. SCHEEF) So nowhere in the -- the 51
12 years of Boat Town has there ever been a complaint about
13 unpaid overtime or unpaid wages?
14      A. No.
15      Q. Okay. And I'm going through this, because some
16 of these are, kind of, topics I've already hit on.
17           Okay. I may hop back to these later, but
18 just going back to topic 14.
19           Does Boat Town have policies regarding
20 retaining written documents?
21      A. It's our typical policy, we retain stuff for
22 seven years.
23      Q. Okay. And how long has that been the policy?
24      A. For as far back as I can remember.
25      Q. Okay. And who is enforcing these document

75

1 retention policies?
2           MR. DEPONTE: Objection, form.
3           You can answer, if you can, Clayton.
4      A. We just bought extra buildings to store them
5 in. We did not audit or check that.
6      Q. (BY MS. SCHEEF) What type of documents are
7 covered by this retention policy?
8      A. That would be employee records, anything
9 pertaining to, you know, sales tax, IRS.
10      Q. Does this document retention policy cover email
11 correspondences between employees?
12      A. I don't think it specifically addressed that.
13 I don't know that we've ever deleted any emails.
14      Q. Okay. So you don't have any policy on not
15 deleting any emails that may be relevant to anything?
16 That was -- I'll scratch that question. I'll make it
17 more specific.
18           In this case, you received a notice not to
19 destroy any evidence, right?
20      A. Yes.
21      Q. Did you make sure that no one -- that -- that
22 everyone with relevant knowledge was not -- was
23 instructed not to delete anything relevant?
24      A. Anybody that I spoke to, my sons, yes.
25      Q. Did you tell Patti not to delete any relevant

76

1 emails or documents?
2      A. I don't recall.
3      Q. Was --
4      A. I can 100 percent testify I damn sure didn't
5 ask her to delete anything; never had, never will.
6      Q. That's not my question.
7           My question is, did you instruct people
8 with relevant knowledge not to destroy any evidence?
9      A. No, ma'am.
10      Q. Okay.
11      A. Once again, this isn't the Capone crime family.
12      Q. I understand that, but --
13      A. I'm sure you do.
14      Q. Do you remember receiving a request from us to
15 instruct employees not to do that?
16           MR. DEPONTE: Objection, form.
17           You can answer again, Mr. Raven.
18           THE WITNESS: I don't even know what the
19 hell her question was.
20      Q. (BY MS. SCHEEF) Okay. We can move on.
21      A. You're not rattling me, ma'am. I'm just
22 getting bored with you.
23      Q. I'll try to be more understanding.
24           So how does Boat Town retain its wage and
25 hour records? Same way -- same way as everything else?

77

1      A. Once again, they're filed into boxes, they're
2 held in the main accounting office for probably two
3 years, where they're moved externally to a separate
4 building.
5      Q. But no steps were taken to preserve any email
6 records regarding this case?
7           MR. DEPONTE: Objection, form.
8           You can answer.
9      Q. (BY MS. SCHEEF) You can -- you can answer the
10 question.
11      A. No.
12      Q. Okay. Has Boat Town spoken to its employees
13 about this lawsuit?
14      A. Yes.
15      Q. What has been communicated to the employees
16 regarding this lawsuit?
17      A. Well, the basic, after the Department of Labor
18 settled everything, or instructed us what we needed to
19 pay, we went back and generated the checks with the
20 documentation.
21           And Clay and I personally went to every
22 employee that was due -- not all employees were due.
23 Some of them were very, very, very small sums of money,
24 none of them great big. But we went to the employees,
25 handed them the envelope, explained what had happened,

78

1 personally apologized. And I found it amusing that
2 several of them apologized to us and said, don't worry
3 about it, we don't want the money.
4        And we said, take it, it's -- we're sorry
5 it happened.
6        And anybody that was due a check, we went
7 to, with the exception of Mr. McNamara, because he
8 wouldn't communicate, so his was dropped in the mail.
9    Q. Did you attempt to contact his attorneys?
10    A. No, I did not.
11    Q. Okay. Did you have every single person you
12 gave those checks to, sign a waiver?
13    A. Yes. We asked them to, and I believe all of
14 them did, without reservation.
15    Q. Okay. And that includes past employees?
16    A. I will have to double-check in the past
17 employees.
18    Q. Okay. Have there been any meetings with
19 employees regarding this case?
20    A. No.
21    Q. Have you instructed any employees regarding
22 this case?
23    A. No.
24    Q. Have any employees been instructed not to
25 discuss this case?

79

1    A. No.
2    Q. Are there any restrictions on employee
3 communications about wage and hour issues?
4        MR. DEPONTE: Objection, form.
5        I'm not sure where that is in the topics,
6 but if you want to find one for me, that would be great.
7        Otherwise, Mr. Raven, you can answer, if
8 you can.
9    A. It's -- when we employ people, we instruct them
10 that it's no -- nobody's business what they make and
11 it's not their business what anybody else makes.
12        But, no, we do not have ongoing discussions
13 about it.
14    Q. (BY MS. SCHEEF) Okay. After Mr. McNamara's
15 termination, did anyone attempt to contact him from Boat
16 Town?
17    A. Not that I'm aware of.
18    Q. Okay. Have -- has Boat Town interviewed any
19 witnesses for this case, other than the conversations
20 you have from your notes?
21        MR. DEPONTE: Objection, form.
22        Are you asking for attorney/client work
23 product, or are you asking about internally?
24        MS. SCHEEF: I'm talking about internal
25 communications.

80

1    A. No.
2    Q. (BY MS. SCHEEF) Okay. I think 18, we've
3 discussed already a little bit, and I'm sure we'll get
4 in more with Bonnie.
5        MS. SCHEEF: Why don't we take -- our next
6 topic is topic 19. How about we take a little break and
7 meet back at noon. Would that work for y'all?
8        Once we hit topic 19, I'm kind of rolling,
9 and I think we can get us done within the next hour or
10 so.
11        MR. DEPONTE: That will work.
12        MS. SCHEEF: Okay. Sounds good, y'all.
13        You want to take us off the record,
14 Claudia?
15        THE REPORTER: Yes.
16        Off the record at 11:52 a.m.
17        (Break taken from 11:52 a.m. to 12:00 p.m.)
18        THE REPORTER: Back on the record at
19 12:00 p.m.
20    Q. (BY MS. SCHEEF) Okay. Mr. Raven, anything you
21 would like to change, that you said before the break?
22    A. No.
23    Q. Okay. I'm going to get into, kind of, the --
24 the meat and potatoes here. So we're going to get up to
25 topic 19.

81

1        Now, you would agree that -- I mean, Boat
2 Town agrees that companies must not fire employees
3 because they reported FLSA violations?
4    A. Yes.
5    Q. While working at Boat Town in June of 2023, Mr.
6 McNamara reported FLSA violations to Boat Town, correct?
7    A. I know he did at some point.
8    Q. You would agree that Mr. McNamara reported FLSA
9 violations, right?
10    A. Yes.
11    Q. Mr. McNamara also reported these FLSA
12 violations to the Department of Labor?
13    A. I'll take your word for that.
14    Q. In September of 2023, Boat Town separated Mr.
15 McNamara's employment after nearly a year and a half of
16 working at Boat Town?
17    A. I know he was terminated -- what did you say,
18 what date?
19    Q. September 8 -- or September 15th is when he was
20 terminated.
21    A. I'll take your word for that.
22    Q. And like we discussed earlier, September 8th is
23 when the Department of Labor came in?
24    A. I believe we had been notified long before
25 that, by Mr. McNamara.

82

1    Q. I'm asking about when the Department of Labor
2 came in.
3            They came in on September 8th, correct?
4    A. I can't testify to that.
5    Q. You haven't looked over Boat Town's notes on
6 when the Department of Labor came in?
7            MR. DEPONTE: Objection, form.
8            You can answer, Mr. Raven.
9    A. I believe all of this started months prior to
10 this.
11    Q. (BY MS. SCHEEF) That wasn't my question.
12        I'm asking when the Department of Labor
13 came into the physical location of Boat Town.
14    A. I don't know. Can't testify to that.
15    Q. Okay. When was the decision made to terminate
16 Mr. McNamara?
17    A. It -- we always have downsizing at the end of
18 the summer, because we're a highly seasonable business,
19 but this was magnified. We -- we were just coming
20 through COVID.
21        In the 12 months prior to Mr. McNamara,
22 there was four people that were terminated; Shelby in
23 marketing; Dylan in sales; and Leo in makeready; all
24 within about a 2- or 3-day period.
25        In addition to the season -- season, not

83

1 only did we need to downgrade or downsize our
2 employment, Boat Town -- and since this is all --
3            THE WITNESS: Numbers are confidentiality,
4 is that correct, Mr. DePonte?
5            MR. DEPONTE: We can designate them as
6 confidential.
7            Right, Counselor?
8            MS. SCHEEF: Okay.
9    A. Yeah, in the prior 12 months, we had gone from
10 a $50 million company to a $30 million company, on the
11 downside of COVID and with the economy slowing, so
12 revenues were off 40 percent, income was off 70 percent.
13        So, yes, we took the four weakest
14 performing employees we had, in the different
15 departments, and released them from employment.
16    Q. (BY MS. SCHEEF) When was that decision made?
17    A. Just in the prior week when -- you know, the
18 harsh reality, when you see revenue off $20 million and
19 you see income, net profit off, 70 percent, as a
20 business owner, you look at the numbers and you look at
21 the reality, that's when the decision was made.
22    Q. Okay. So you said in the week prior. So in
23 the week prior to your -- to his termination, that's
24 when you made the decision to terminate him?
25    A. Yes.

84

1    Q. Okay. So between September 8th and
2 September 15th?
3    A. Somewhere right in there. We're just watching
4 our season come to an end, the business model has fallen
5 off the planet. And since his sister passed away, if
6 you want to get real personal, he thought he had
7 immunity, that he could get away with murder. And we
8 did give him a lot of leeway, because we are a
9 family-owned company.
10    Q. Okay.
11    A. He should have been fired long before that,
12 after he hit the guard shack, and then many times
13 before, due to his work ethic.
14    Q. We'll get -- we'll get into that in just a
15 minute.
16        But do you have records of the termination
17 of Shelby, Leo, and Dylan?
18    A. I'm sure we do.
19    Q. Okay. And so you have documents to prove that
20 you actually did terminate those three people around the
21 same time as Mr. McNamara?
22    A. It would be four people. I think you missed
23 Leo; he was out in detail.
24    Q. Well, it was Shelby -- am I missing a person?
25        Shelby, Leo, and Dylan were terminated

85

1 alongside Mr. McNamara.
2    A. Yeah, four total.
3    Q. Okay. So three other people were terminated
4 alongside him?
5    A. Yes.
6    Q. And you have records supporting that those
7 three people were terminated alongside him?
8    A. Yes. I'm sure we do.
9    Q. Okay. And --
10    A. We can also back up our revenue and income
11 figures falling off the planet.
12    Q. Okay. So -- and this might be a little bit of
13 a monologue, but I'm giving you the stage here.
14        What were all the reasons Boat Town had for
15 separating Mr. McNamara from his employment?
16    A. What were all the reasons?
17    Q. Yes. At the time, that you knew of.
18    A. Just with --
19    Q. First, let me clarify. You spoke with all
20 these people about Mr. McNamara, in the notes that you
21 got, you spoke with them recently, right?
22    A. Yes.
23    Q. Those notes that you have, did you know the
24 substance of all of those notes when you made the
25 decision to terminate Mr. McNamara?

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

86

1    A. No. What this is based on is internal people,
2  other employees at Boat Town complaining to Clay and
3  myself when I was there.
4        I witnessed multiple times seeing Mr.
5  McNamara just sit in a boat in the showroom, tapping on
6  his phone. I witnessed multiple times, and addressed it
7  three or four times, when he's sitting in an unoccupied
8  sales office by the front door, talking on his phone.
9  And I would just stop and I said, We working hard? And
10 he would just look at me like he was unfireable.
11       So I would ask him, I said, Are all of our
12 company trucks cleaned and ready -- ready to go? Do
13 they have current oil changes? And he would just look
14 at me with total disdain and dismissiveness.
15   **Q. Okay. I appreciate that, but that wasn't**
16 **really my question.**
17       **My question was, this pile of documents**
18 **that you have of speaking with people, the complaints**
19 **that those people had --**
20   A. Yes.
21   **Q. -- you were not aware of those particular**
22 **complaints when you made the decision to terminate Mr.**
23 **McNamara?**
24   A. I was aware of a bunch of them.
25   **Q. Okay.**

87

1    A. These, the things that I just went -- in the
2  last couple of weeks, when it became evident that this
3  shakedown was going to trial, because it is going to
4  trial, I just thought it would be best, I went, just
5  started picking out employees in every department. I
6  asked them if they remembered Mr. McNamara, and they
7  did. And that's when they brought up, Is this thing
8  going to trial? They can't believe it.
9        And I said, Do you remember what kind of
10 employee he was, or would you have any input on that?
11 And they just started flowing, they did not --
12       (Crosstalk.)
13   **Q. You didn't have these --**
14   A. Pardon?
15   **Q. You didn't have these conversations before you**
16 **terminated Mr. McNamara, correct?**
17   A. We had some conversations before Mr. McNamara
18 was terminated. I had multiple conversations with --
19 with people about Shelby, I had multiple conversations
20 with people about Leo and Dylan.
21   **Q. Who did you speak to about Mr. McNamara, before**
22 **his termination?**
23   A. That would be my son, probably be Bonnie, it
24 would be Chuck Embree, all the people in the service
25 department up there.

88

1        You know, Chuck Embree complained nonstop
2  about him.
3    **Q. Do we have written complaints about Mr.**
4  **McNamara from Chuck Embree?**
5    A. No, we do not.
6    **Q. Okay. So going back to where you were on the**
7  **day the decision was made to terminate Mr. McNamara,**
8  **what were the reasons for termination?**
9        MR. DEPONTE: Objection, form.
10   **Q. (BY MS. SCHEEF) You can answer the question.**
11   A. Basically complete refusal, continuously
12 stating it wasn't his job to do something, riding his
13 skateboard, just, he was an anchor to the company.
14       THE REPORTER: He was a what to the
15 company? I'm sorry.
16       THE WITNESS: An anchor.
17       THE REPORTER: As in something you drop in
18 the water?
19       THE WITNESS: Something that holds you
20 down.
21   **Q. (BY MS. SCHEEF) An apt boating metaphor, I am**
22 **sure.**
23       **Were finances a reason?**
24       **That wasn't in the list you just gave.**
25   A. Yes. They were a reason for the downsize, not

89

1  him, in particular.
2    **Q. Okay. Who were all of the people who were**
3  **involved in the decision to terminate Mr. McNamara?**
4    A. Basically, Chuck Embree, my son, Clay Raven,
5  and myself.
6    **Q. Okay. Now, initially, you have described this**
7  **termination as a layoff?**
8    A. Yes. Once again, we're a family business, and
9  we try to be as noninvasive as we can or as soft as we
10 can.
11   **Q. What do you mean by that?**
12   A. Well, rather than fire them where they can't,
13 you know, compile unemployment, yes, we know we could
14 have gone back on each and every one of these and
15 written them up multiple times in the couple of weeks
16 prior to this, if we wanted to do it, but we try to be a
17 compassionate company.
18   **Q. Now, if we go to -- and let me pull this up.**
19 **And give me a sec. What I've marked as Exhibit 4.**
20       MS. SCHEEF: I know I'm going out of order.
21 Sorry there, Claudia. I thought I was going to hit
22 Exhibit 3 a little bit earlier.
23       THE REPORTER: No worries.
24       (Exhibit 4 marked.)
25   **Q. (BY MS. SCHEEF) So if I pull up Exhibit 4,**

90

1 this is the defendants' initial disclosures.  If we go
2 to initial disclosures, scroll down here to this, it
3 says that there are limited Boat Town financial records
4 related to its reduction in force and plaintiff's
5 discharge.
6        What documents are there that are related
7 to the reduction in force and plaintiff's discharge?
8    A.  We can just show you a P&L.
9    Q.  Okay.  Anything else?
10    A.  No.  It will clearly state the reduction in
11 revenue and re -- reduction in net.
12    Q.  Okay.  And then --
13        MS. SCHEEF:  Mike, this could be in the
14 documents y'all produced, but do y'all have those
15 documents available so we can verify whether the
16 financial state was such that a reduction in force was
17 needed?
18        MR. DEPONTE:  Yeah, I think we offered to
19 produce those, subject to an agreed protective order.  I
20 don't know that we've entered an agreed protective order
21 in this case.
22        MS. SCHEEF:  I mean, I think we can talk
23 about that after, I'll put it on my list of things we
24 can probably --
25        MR. DEPONTE:  That works.

91

1        MS. SCHEEF:  -- have a conference about.
2    Q.  (BY MS. SCHEEF)  Were you also aware that when
3 Mr. McNamara was being terminated, one of the reasons he
4 was told he was selected was because he was the
5 youngest?
6    A.  I can't testify to that.
7    Q.  And you have --
8    A.  I mean, we do -- we do give seniority
9 consideration.
10    Q.  And you haven't listened to the -- the call
11 that we provided you -- or the -- sorry, the recording
12 we provided you that records the entire termination
13 phone call or termination conversation?
14    A.  No, I have not.
15    Q.  Okay.  So you're unsure of what the substance
16 of that recording is?
17    A.  That would be correct.
18    Q.  Okay.  Was Mr. McNamara the youngest?
19    A.  I don't know.
20    Q.  Had he been there longer than other boat
21 delivery captains?
22    A.  I don't know.
23    Q.  So you're unsure if he actually was laid off
24 because he was the youngest, because -- correct?
25        MR. DEPONTE:  Objection, form.

92

1        You can answer, if you can.
2    A.  I'm not positive of that, one way or the other.
3    Q.  (BY MS. SCHEEF)  Okay.  And you also claim that
4 this is a layoff because you terminated Mr. McNamara at
5 the same time as three individuals named Shelby, Dylan,
6 and Leo?
7    A.  That is correct.
8    Q.  Are you aware that there were conversations
9 heard that you had been advised to terminate someone
10 along with McNamara so it appeared that you were not
11 targeting him?
12        MR. DEPONTE:  Objection, form.
13    A.  I'm unaware of that.
14    Q.  (BY MS. SCHEEF)  Did you have such
15 conversation?
16    A.  No.
17    Q.  Okay.  Another reason that you give for
18 termination was an accident that happened, where a boat
19 hit a guard gate, correct?
20    A.  Yes.
21    Q.  When did that happen?
22    A.  I believe it was 5/31/22.
23    Q.  Okay.  5/31/22.  '22.
24        So that's around three months after Mr.
25 McNamara -- three or four -- yeah, three months after

93

1 Mr. McNamara started at Boat Town?
2    A.  Correct.
3    Q.  Was he written up for that?
4    A.  I don't believe so.
5    Q.  Was he demoted for that?
6    A.  There was nowhere to demote him to.
7    Q.  Well, he wasn't fired?
8    A.  No, ma'am.
9    Q.  Okay.
10    A.  Once again, back in '22, we are in the throws
11 of COVID, we're running 19 ways from Sunday.  Yes, he
12 should have been fired, but we needed people.
13    Q.  Well, wouldn't it save more money to terminate
14 an employee who had caused damage?
15    A.  Well, we didn't know that he was going to do it
16 again.
17    Q.  Did he do it again?
18    A.  He did not hit another guard shack, no.
19    Q.  Did he do damage again?
20    A.  I have not been able to determine that yet.
21    Q.  So you don't know if he's done any more damage
22 than that one incident on May 31st, 2022?
23    A.  No, I do not.
24    Q.  Okay.  And you certainly didn't do a write-up,
25 PIP, demotion, termination, in response to that incident

94

1 on May 31st, 2022?
2    A. Not that I'm aware of.
3    Q. Okay. Now, I'm going to pull up what's marked
4 as Exhibit 3, if my screen share thing wants to get out
5 of the way. Okay.
6        (Exhibit 3 marked.)
7    Q. (BY MS. SCHEEF) Okay. Can you see this
8 document right here?
9        THE REPORTER:  And that -- it didn't
10 change, Dear.
11        MS. SCHEEF:  Oh. Hold on. Let me unpause
12 it.
13    Q. (BY MS. SCHEEF) Can you see what I'm sharing
14 now?
15        THE REPORTER:  Yes.
16    A. Okay. Yes.
17    Q. (BY MS. SCHEEF) I do Zoom for work every day,
18 and I still find a way to mess it up sometimes.
19        Okay. This is the employee handbook for
20 Boat Town, right?
21    A. It appears to be.
22    Q. Do you see here where it says BT 00001?
23    A. Yes.
24    Q. I'll represent to you that that just means that
25 Boat Town produced this document.

95

1        Do you have any reason to believe that this
2 is not accurate?
3    A. No, I do not.
4    Q. Okay. So I'm going to go to page 9.
5        So page 9 talks about probation, right?
6    A. Yes.
7    Q. It says, a regular employee may be placed on a
8 formal probation if his supervisor determines that the
9 employee is not meeting performance standards or is in
10 violation of company policy or procedure.
11        Any violation on part of the employee, of
12 the conditions of probation, company policy or procedure
13 during this time period will be grounds for termin --
14 immediate termination.
15        Noticeable improvement during the
16 probationary period must be evidenced for continued
17 employment. Probation period will be determined on a
18 case-by-case basis.
19        I read that correctly, right?
20    A. Yes.
21    Q. Mr. McNamara was never put on probation?
22    A. No.
23    Q. Not for the May -- May 31st, 2022 incident,
24 correct?
25    A. I don't believe so, no.

96

1    Q. He was never, in his entire tenure, put on
2 probation?
3    A. I don't believe anybody at the company was.
4    Q. But certainly Mr. McNamara was not put on
5 probation during the entirety of his tenure?
6    A. No. I think we just stated that.
7    Q. Okay. Going here to the bottom of page 9,
8 y'all kind of lay out the different terminations y'all
9 do.
10        Obviously we don't really have a voluntary
11 termination situation here.
12        The next one it says is, at the bottom of
13 page 9, involuntary termination may result from an
14 employee's inability to meet performance expectations.
15        Also, actions and performance levels
16 determined by your supervisor to be of extraordinarily
17 adverse nature will be grounds for termination without
18 notice or probationary period.
19        I read that correctly, right?
20    A. Yes.
21    Q. Was there -- I guess, what does it mean by
22 actions of performance levels?
23    A. That would mean it would just -- as it reads.
24 That their actions, refusing to do work, their
25 performance level, refusing to do things. It was also

97

1 multiple people pointed out to me that if we needed two
2 delivery captains to go pick up a boat, Mr. McNamara
3 would find a way for the other two people to do it and
4 he would stay at the shop.
5    Q. Okay. But he was never written up for that?
6    A. I've stated we really don't write up employees.
7 We're a family-owned business. I can't recall that
8 we've written anybody up in the last years.
9    Q. Well, I mean, y'all are a $33 million dollar
10 business --
11    A. Yes.
12    Q. -- so, you know, highly successful business, if
13 someone is not performing well, you want to tell them
14 that they're not performing well, right?
15    A. Yes, and we do.
16    Q. Okay. But you don't have any records of
17 admonishing Mr. McNamara during that time?
18    A. I can personally testify that I had multiple
19 conversations with him, and I believe multiple other
20 people will, too.
21    Q. That's not my question.
22        My question is if you have written
23 documentation --
24    A. No. We -- we have no written documents.
25    Q. Okay. So we're relying on the memory of

98

1 yourself and other witnesses?
2       MR. DEPONTE: Objection, form.
3       You can answer, if you can.
4    A. Yes.
5    Q. (BY MS. SCHEEF) Okay. And it seems like, from
6 what you're telling me, the problems you were having
7 with Mr. McNamara, they were endemic, you know, issues?
8    A. Endemic?
9    Q. It just means expansive.
10   A. Yes.
11   Q. But you never terminated him until the week
12 after the Department of Labor came in?
13   A. We terminated him at the end of the season. I
14 believe this labor issue had been going on for a long
15 while, prior to this.
16   Q. Is there a set date for end of the season?
17   A. Typically, Labor Day is the end of our season.
18   Q. Okay. Did you terminate him Labor Day weekend?
19   A. I believe we terminated him just prior to that.
20   Q. Okay. Now, I know the time frame, you're
21 unsure of. But if the Department of Labor came in on
22 September 18th, and then Mr. McNamara was terminated
23 September 15th, like we discussed, that's a week
24 difference?
25       MR. DEPONTE: I'm sorry, I don't think --

99

1 Mr. Raven -- I'm sorry, Counselor, could you restate
2 that question?
3       MS. SCHEEF: Yeah.
4    Q. (BY MS. SCHEEF) If -- if the Department of
5 Labor came in on September 8th, and Mr. McNamara was
6 terminated on September 15th, that is a week's
7 difference?
8       MR. DEPONTE: Okay. Objection, form.
9    Q. (BY MS. SCHEEF) You can answer the question.
10       MR. DEPONTE: You can answer it again, Mr.
11 Raven.
12   A. I'll take your word for it.
13   Q. (BY MS. SCHEEF) I'm not asking you to take my
14 word for -- I'm just asking -- I'm asking you, that
15 is -- those two days are a week apart, right?
16   A. Yes.
17   Q. Okay. Sorry. Give me one second.
18   A. What date did Mr. McNamara make his first
19 complaint to accounting?
20       MR. DEPONTE: Mr. Raven, you don't get to
21 ask questions. Just let her ask her questions, and when
22 we finish up, we can discuss.
23   Q. (BY MS. SCHEEF) And then you didn't categorize
24 Mr. McNamara's termination as a -- as a discharge, did
25 you?

100

1    A. I was not the one to terminate him. I believe
2 Clay was.
3    Q. Well, Boat Town didn't categorize his
4 termination as a discharge, did you?
5    A. I believe it was categorized as a layoff, but
6 I'll have to check into that.
7    Q. Well, certainly if you thought he was being
8 terminated for cause, you would have said he was
9 terminated for cause?
10       MR. DEPONTE: Objection, form.
11   Q. (BY MS. SCHEEF) You can answer.
12   A. I was not there. I was not there when Shelby,
13 Dylan, Leo, or Mr. McNamara, were terminated.
14   Q. But you were there when the decision was made?
15   A. I was consulted, absolutely, on all of them.
16   Q. And you didn't make the decision to discharge
17 him?
18       MR. DEPONTE: Objection.
19   A. I don't know what your legal opinion, exactly
20 how they were categor -- categorized as being let go.
21 They were all just let go for very poor performance
22 reasons, each and every one of them.
23   Q. (BY MS. SCHEEF) Okay. So I know you have some
24 unsure -- you're -- you're kind of unsure about when the
25 Department of Labor specifically came in, but Boat Town

101

1 knew that Mr. McNamara reported this to the Department
2 of Labor?
3    A. Yes.
4       MR. DEPONTE: Objection, form.
5    Q. (BY MS. SCHEEF) What did you say?
6    A. I said yes.
7    Q. So --
8    A. I don't know -- well, no, let me rephrase that.
9       I don't know that he reported it to the
10 Department of Labor. I just know that he's the one that
11 brought it to Patti's attention, our accounting people's
12 attention, that, in his mind, we were paying overtime
13 incorrectly.
14   Q. But like we discussed earlier, Mr. McNamara was
15 the only employee, as far as you know, to bring up wage
16 issues, right?
17   A. That's to the best of my knowledge.
18   Q. And then the Department of Labor contacts you
19 regarding wage issues?
20   A. I believe we may have reached out to the
21 Department of Labor long before they contacted us.
22   Q. But you're not sure about that?
23   A. I'm not sure. I'd have to get Patti back in on
24 that.
25   Q. Okay. Whenever you talked to the Department of

102

1 Labor, did you talk about -- talk about Mr. McNamara?
2    A. Patti was the one talking to the Department of
3 Labor, so I can't answer that. I have a feeling we were
4 talking about every employee at Boat Town as a whole.
5    Q. But just to be clear, the Department of Labor
6 comes in after an employee reports unpaid wages, that's
7 what happened, right?
8    A. The Department of Labor came in after we
9 contacted them to let us know exactly what we're doing
10 wrong and what we needed to do to correct it.
11    Q. But you're not sure if y'all actually contacted
12 the Department of Labor, you just said that?
13    A. I will look into it, but I'm nearly positive we
14 contacted the Department of Labor.
15    Q. You do not know whether or not Boat Town
16 contacted the Department of Labor?
17    A. No, I do not.
18    Q. Okay. So from what you do know, you do know
19 for certain that an employee reported, to Boat Town,
20 unpaid wages, and then the Department of Labor came in
21 after, correct?
22    A. Yes.
23    Q. And are you saying that Boat Town never put two
24 and two together, that Mr. McNamara was the one who
25 reported this to the Department of Labor?

104

1 after that, or whatever your deal is.
2    Q. (BY MS. SCHEEF) Okay. Now, you called Mr.
3 McNamara's termination a layoff, right?
4    A. Once again, I was not there when we did that.
5 I believe that's the way Clay and the people in Austin
6 did it, out of respect for the employees.
7    Q. And a layoff means that you're not going to
8 hire someone to fill that position, right?
9       MR. DEPONTE: Objection, form.
10       Are you asking him a legal conclusion about
11 what a layoff means, Counselor?
12       MS. SCHEEF: I'm asking him what his
13 interpretation of a layoff is.
14    Q. (BY MS. SCHEEF) In your understanding, a
15 layoff means you're not hiring someone in that position?
16    A. I don't think it necessarily means anything.
17 We can --
18    Q. Is it -- is it --
19    A. -- terminate somebody --
20    Q. -- true that Boat Town went around asking
21 employees if they knew someone who could fill Mr.
22 McNamara's position the day Mr. McNamara was terminated?
23    A. I do not know that.
24    Q. Did -- did -- was Mr. McNamara's job position
25 filled soon after his termination?

103

1       MR. DEPONTE: Objection, form.
2    Q. (BY MS. SCHEEF) You can answer the question.
3       MR. DEPONTE: You can answer, if you can.
4    A. It appears it was a long time after. I have no
5 idea if any employee ever reported it to the Department
6 of Labor.
7    Q. (BY MS. SCHEEF) That wasn't my question.
8       All I'm asking is, you -- your argument is
9 that no one at Boat Town put two and two together that
10 the Department of Labor was coming in because Mr.
11 McNamara reported it?
12    A. No. I did not put that together.
13       MR. DEPONTE: Objection, form.
14       You can answer, if you can.
15    Q. (BY MS. SCHEEF) And then you just so happened
16 to terminate him a week after they come in?
17       MR. DEPONTE: Objection, form.
18    Q. (BY MS. SCHEEF) You can answer the question.
19       MR. DEPONTE: You can answer it again, Mr.
20 Raven.
21    A. I think I've answered it 27 times.
22    Q. (BY MS. SCHEEF) That's fine.
23       MR. DEPONTE: Answer it again, please.
24    A. If your date's correct when the Department of
25 Labor actually came in, yes, we terminated him a week

105

1    A. I don't believe so.
2    Q. Did y'all ever hire another boat cap -- boat
3 delivery captain?
4    A. Hell, yeah, when we get around to next spring
5 we bring on multiple people.
6    Q. So if we take a look at your record --
7    A. It's seasonal.
8    Q. If we take a look at your records, there's
9 going to be no record of you hiring a boat delivery
10 captain in the fall -- fall or winter of 2023?
11    A. I would have to check our records, but I would
12 not think so.
13    Q. Okay. And do you have records of who you hired
14 in that time?
15    A. I would surely think we do.
16    Q. Okay. I'll jot that down.
17       Okay. Isn't it true, on the very same day
18 that Mr. McNamara was terminated, Boat Town assigned a
19 sales representative to perform his duties while he was
20 gone?
21    A. Yes, once again, when you work for Boat Town,
22 you work for Boat Town. So if you're referring to
23 Dylan, somebody who's been relieved from a sales
24 position, he may have been given the opportunity to
25 pitch in and help as a delivery captain at a lot lower

**106**

1 pay grade and then over -- do overflow sales.
2    Q. Okay. So you terminate Dylan and then you
3 offer him Mr. McNamara's role?
4    A. No. We -- I have a feeling you would need to
5 ask Clay this, that there may be an opportunity to him
6 to sort of wear two hats, if that would work, at a
7 reduced pay rate.
8    Q. Did he do that?
9    A. No.
10    Q. Okay. But was it offered to him?
11    A. I don't know.
12    Q. Okay. I'm looking through my questions here.
13       I just want to close the loop on this.
14       All of the complaints that you, yourself,
15 and others, have about Mr. McNamara, he wasn't
16 terminated, but for those, when those complaints were
17 made?
18    A. Those were all reasons he was at the top of the
19 list when we needed to downsize. Yes, they were all a
20 factor, very much so.
21    Q. That wasn't my question.
22       You didn't terminate him when you received
23 those complaints?
24    A. I didn't go talk to the people till a year,
25 year and a half after he was. I did, continuously would

**107**

1 hear bits and pieces, because I'm not at that store.
2    Q. So when you were continuously hearing these
3 bits and pieces, say you hear -- hear something on -- on
4 May 1st, you didn't terminate him May 1st?
5    A. No.
6    Q. If someone tells you something else on
7 June 5th, you don't terminate him June 5th, right?
8    A. Ma'am, I probably need to draw you a picture.
9       We do 50 percent of our business -- you can
10 smile if you want to. It's a simple concept. We're a
11 seasonal business. We do 50 percent of our business in
12 a 4-month period, all of the months that you're just
13 talking about.
14    Q. Did you --
15    A. The four people -- the four people that got let
16 go at the end of August, beginning of September,
17 whatever the exact day was, were all, by far, the
18 poorest performing people, bar none.
19    Q. Going back to my question, he was not
20 terminated for any of those accusations until
21 September 15th?
22    A. That is correct.
23    Q. Okay. Now, for other than Mr. McNamara, what
24 metrics were you using to determine whether or not
25 someone was a low performer?

**108**

1    A. Leo, detail, whole lot like Kaden, would just
2 sit in his chair, behind a boat, talk on his phone.
3 Hell, he would sleep. You walk in, he wouldn't be doing
4 a damn thing. He would clean boats for me.
5       Shelby was continually given tasks she
6 would not do, she would not perform them. Poor
7 performance, laziness, lack of effort, lack of
8 character.
9       Dylan, we can look at his commission sheets
10 versus the other salespeople. He was touching more
11 clients than anybody else and selling right at 25
12 percent of the boats, which means he was costing the
13 company a great deal of money that we need to pay the,
14 roughly, other 45, 50 people at the dealership.
15       So poor performance is poor performance.
16 We can go through and list for every one of the people,
17 but your boy is at the top of the list.
18    Q. I'd appreciate it if you didn't refer to my
19 client in that way.
20       But going back to previous years, in
21 September of 2022, around Labor Day, did you terminate
22 anyone?
23    A. Of 2022?
24    Q. Yes.
25    A. I would have to check our labor deal, but we

**109**

1 were wrapping up very hard in 2022.
2    Q. What about September --
3    A. Oh, excuse me, are you talking September?
4    Q. I'm talking about September 2023 -- 2, Labor
5 Day weekend, whenever that was that you're saying is the
6 end of the summer quarter, in 2022 --
7    A. Our staff downsizes every year.
8    Q. So you have records of your staff downsizing?
9    A. Late August, September.
10       THE REPORTER: You guys, don't talk over
11 each other. We're getting a little -- little busy
12 there.
13       MS. SCHEEF: Apologies, Ms. White. Sorry
14 about that.
15       THE REPORTER: No worries.
16    Q. (BY MS. SCHEEF) Do you have records of
17 terminating employees in September of 2022?
18    A. We will have multiple records of the staff
19 being downsized in September of 2022.
20    Q. What about September of 2024?
21    A. 2024?
22    Q. Yes. How many people did you terminate then?
23    A. We don't always terminate them. A lot of them
24 are seasonal employees that roll back out.
25       Once again, it just went back to revenue

110

1 being off $20 million and, bottom line, lost 70 percent.
2 So in addition to our seasonal layoffs, we had
3 poor-performing people that year, and there very well
4 could have been people in the years prior and after as
5 well.
6     Q.   Okay.  But Mr. McNamara wasn't a seasonal
7 employee, right?
8     A.   No.
9     Q.   Okay.
10    A.   And neither was Shelby, Leo, or Dylan.
11    Q.   Did you terminate any seasonal employees at
12 that time -- or, not terminate, but kind of close them
13 up?
14    A.   Yes.  There was multiple seasonal employees
15 coming off at that time as well.
16    Q.   Okay.  How many?
17    A.   I don't know, ma'am.  If I wanted to do
18 accounting, I wouldn't need to hire accountants.
19    Q.   Okay.  Has there been any financial impact on
20 Boat Town in changing the way that y'all calculate
21 overtime?
22    A.   None that I can discern.
23    Q.   Okay.
24    A.   Like I said, the entire number was not a great
25 big number.

111

1     Q.   Does Boat Town have any ongoing obligations to
2 the Department of Labor?
3     A.   Ongoing obligations?
4     Q.   Yes.
5     A.   No.  It's -- we had the calculations done
6 before they got there.  We gave them to them, they
7 signed off on them.  We -- the employees that were owed
8 money, which wasn't all of them, we paid.  I believe the
9 Department of Labor came in and reviewed that, signed
10 off on everything, and we were good to go.
11        And it's my recollection that the
12 Department of Labor said we needed to pay one and a half
13 times what the calculation was, but they said, you know,
14 if somebody wanted to take this to court, we would need
15 to pay double.
16        So we're a family-owned company, once
17 again, it wasn't a great deal of money, we went ahead
18 and paid everybody double.
19    Q.   Were any penalties assessed by the Department
20 of Labor, onto Boat Town?
21    A.   The only penalty that I'm aware of is that we
22 needed to pay double -- I mean, excuse me, one and a
23 half times.
24    Q.   Do you know how much, in total, Boat Town paid
25 to resolve the issues of the Department of Labor?

112

1     A.   I would have to pull that up.
2     Q.   Okay.  And you're still not certain whether or
3 not you paid employees who used to work for Boat Town,
4 who weren't current employees?
5     A.   Once again, I would have to look that up.
6     Q.   Okay.  Does Boat Town have any policies
7 prohibiting retaliation against employees?
8     A.   Does it have any policies prohibiting
9 retaliation?  From us retaliating against employees,
10 or --
11    Q.   Yes.
12    A.   We don't retaliate against employees.
13    Q.   That wasn't my question.
14        My question is if you have a policy against
15 it.
16    A.   If it's not in the handbook, then I don't
17 believe we have a policy.
18    Q.   Okay.  Is there any training given to
19 leadership at Boat Town regarding how to follow wage and
20 hour laws?
21    A.   Not that I'm aware of.  I just -- our
22 accountants do it, and our software does the bulk of it,
23 and I was very surprised that the software didn't catch
24 what was going on.
25    Q.   Is there any training provided, about

113

1 anti-retaliation laws, to leadership at Boat Town?
2     A.   No.
3     Q.   If someone makes a complaint of retaliation,
4 how are investigations of that handled within Boat Town?
5     A.   I don't believe we've ever had a complaint
6 against retaliation, unless it's Mr. McNamara in this
7 case.
8     Q.   Well, if someone makes a report to leadership
9 that they are facing retaliation, what would -- what
10 steps would be taken?
11    A.   We would damn sure --
12        MR. DEPONTE:  You can answer, if you can.
13    A.   We would damn sure look into it.
14    Q.   (BY MS. SCHEEF)  Okay.  How would you look into
15 it?
16    A.   I'm sure they would contact me.
17    Q.   And how would you look into it?
18    A.   I would just get with accounting or sales, try
19 to figure out the appropriate people who were involved,
20 who would be accused of retaliating, and for what, and
21 look into it.
22    Q.   Okay.  I'm going to hop back to our notice,
23 kind of just do a last glance.
24        I'm almost done with you, Clayton.  Don't
25 worry about it.

114

1        Looking at topic one, is there anything
2 else you would like to say, or relevant knowledge you
3 feel that you can say, about topic one?
4        MR. DEPONTE: Objection, form.
5        If you have a specific question, ask it,
6 Counselor, but we're not going to have him give a
7 dissertation on every topic you could have asked -- or
8 every question you could have asked him.
9    Q. (BY MS. SCHEEF) Is there anything you feel
10 like you would like to say about topic one?
11    A. Not at this time.
12    Q. What about topic two?
13        MR. DEPONTE: Same objection.
14    A. Not at this time.
15    Q. (BY MS. SCHEEF) What about topic three?
16        MR. DEPONTE: Same objection for all the
17 topics, if we're going to go through them.
18        MS. SCHEEF: Okay. We can just have a
19 running objection to the question.
20    Q. (BY MS. SCHEEF) So topic three?
21    A. Not at all, not at this time.
22    Q. We didn't talk about four, or -- let me go back
23 to my notes, just don't want to -- we didn't talk about
24 four, five, or six.
25        What about topic seven, anything else you'd

115

1 like to add?
2    A. Not at this time.
3    Q. Okay. Going down to topic 10. Anything you'd
4 like to add here?
5    A. Not at this time.
6    Q. Topic 11?
7    A. Not at this time.
8    Q. Topic 12?
9    A. Not at this time.
10    Q. Topic 13?
11    A. Not at this time.
12    Q. Topic 14?
13    A. Not at this time.
14    Q. Topic 15?
15    A. Not at this time.
16    Q. Topic 16?
17    A. Not at this time.
18    Q. Topic 17?
19    A. Not at this time.
20    Q. Almost done.
21        Topic 18?
22    A. Not at this time.
23    Q. Topic 19?
24    A. Not at this time.
25    Q. Topic 20?

116

1    A. Not at this time.
2    Q. Topic 21?
3    A. Not at this time.
4    Q. And topic 22?
5    A. Not at this time.
6        MS. SCHEEF: Okay. I'm going to propose
7 maybe just like a quick break, just to make sure -- let
8 me look over my notes, make sure I'm not missing
9 anything with Mr. Raven, and then I can switch over to
10 Bonnie.
11        Are you cool with me taking two minutes,
12 Mike?
13        MR. DEPONTE: Yeah, that's fine.
14        MS. SCHEEF: Okay.
15        Go off the record.
16        THE REPORTER: Off the record at 12:45 p.m.
17        (Break taken from 12:45 p.m. to 12:49 p.m.)
18        THE REPORTER: Back on the record at
19 12:49 p.m.
20    Q. (BY MS. SCHEEF) Okay. Mr. Raven, I'm about to
21 cure you of your boredom and have you be done here.
22        Is there anything else that you believe is
23 relevant, that we haven't discussed today?
24    A. Not that I recall.
25    Q. Are there any documents that you're aware of

117

1 that haven't been produced to us, other than the ones
2 that we discussed today?
3        MR. DEPONTE: Objection.
4        You can answer, if you can.
5    A. Not that I recall.
6    Q. (BY MS. SCHEEF) Okay. Are there any witnesses
7 with relevant knowledge, that we haven't identified
8 today?
9        MR. DEPONTE: Objection, form.
10        You can answer, if you can.
11        THE WITNESS: Have you submitted the list
12 of witnesses that we've added?
13        MR. DEPONTE: Yes, we supplemented our --
14 I'll refer counsel to that list.
15        THE WITNESS: Okay.
16        MS. SCHEEF: Okay.
17    Q. (BY MS. SCHEEF) Is there anything you'd like
18 to clarify about your testimony today or change about
19 it?
20        MR. DEPONTE: Objection, form.
21        We will read and sign in accordance with
22 the Rules.
23    Q. (BY MS. SCHEEF) Just asking, is there anything
24 you'd like to change about your testimony today?
25    A. I'll read it and let you know then.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

118

1          MS. SCHEEF: All right. Okay. Well, I'm
2 done with my questions for Mr. Raven, I --
3          Claudia, what is the logistics for you
4 about switching witnesses?
5          THE REPORTER: Well, we have them both
6 sworn in, so you want the transcript all to show on
7 there that Mr. Raven is complete and we'll begin with
8 Bonnie.
9          (This suspends the Examination of Robert
10 Clayton Raven.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

119

1          DIRECT EXAMINATION
2          OF BONNIE HARRELL
3 BY MS. SCHEEF:
4     Q. Okay. And I know I've called you Bonnie a
5 couple times during that. Do you prefer that or Ms.
6 Harrell?
7     A. That's fine.
8     Q. Okay. And you can just call me Tanner if the
9 time ever comes to refer to me by name, I don't think it
10 will.
11          So I have to quickly run through those kind
12 of early on questions that I ran through with Mr. Raven,
13 but I'll try to do them quick.
14          So can you please state your full name for
15 the record.
16     A. Bonnie Harrell.
17     Q. What is your current address?
18     A. 367 Hoffman Road in Bastrop, Texas.
19     Q. What is your current occupation and job title?
20     A. I'm the director of operations and business
21 manager for Boat Town.
22     Q. How long have you been employed by Boat Town?
23     A. This will be my eighth year.
24     Q. And what are your current duties and
25 responsibilities as the director of operations?

120

1     A. As director of operations, I am the liaison
2 between service, sales, and the accounting department,
3 and the management staff, just the day-to-day operations
4 with employees and clients.
5     Q. Okay. And have you ever been deposed before?
6     A. I have.
7     Q. Was it related to your employment at Boat Town
8 or for personal matters?
9     A. A previous employment.
10     Q. Okay. Have you had the opportunity to meet
11 with counsel to kind of prepare for deposition today?
12     A. We spoke, yes.
13     Q. And do you understand that you're under oath
14 and your testimony has the same force and effect as if
15 it was given in court?
16     A. I do.
17     Q. You understand the difference between "I don't
18 know" and "I don't recall"?
19     A. I do.
20     Q. And as I'm sure you've already seen, sometimes
21 I ask confusing questions. Do you agree that if I ask a
22 confusing question, you'll just ask me to rephrase it?
23     A. I will.
24     Q. And will you answer my questions to the best of
25 your ability?

121

1     A. I will.
2     Q. And do you have any physical or mental
3 condition that would prevent you from giving accurate
4 testimony today?
5     A. I do not.
6     Q. Are you taking any medication that might affect
7 your ability to testify accurately?
8     A. I am not.
9     Q. Have you had any alcohol today that might
10 prevent your ability to testify?
11     A. I have not.
12     Q. Is there anything whatsoever that you think
13 would prevent you from giving complete and truthful
14 testimony today?
15     A. There is not.
16     Q. Is there anyone else in the room with you where
17 you are physically located?
18     A. There is not.
19     Q. And are you communing with -- communicating
20 with anyone remotely regarding this?
21     A. I'm not.
22     Q. Do you have any documents with you?
23     A. I do.
24     Q. And what documents do you have?
25     A. I have a Boat Town employee handbook, which

122

1 you've got, I've just got a physical copy, and then I
2 have the list of questions that you issued.
3     Q.  Okay.  And do you agree that if you start
4 reviewing something else, you'll just let me know what
5 it is?
6     A.  I will.
7     Q.  And you got your cell phone or tablet there
8 with you?
9     A.  My cell phone is in the office, but it's shut
10 off and upside down.
11     Q.  Perfect.
12         If that changes, will you agree to let me
13 know?
14     A.  I will.
15     Q.  And you already got that turned off, but I know
16 you're on your computer.
17         Will you just agree not to communicate with
18 anyone while you're on that commuter -- computer, while
19 I'm talking with you?
20     A.  I will.
21     Q.  Okay.  And then -- now, you understand that
22 you're here as a designated corporate representative for
23 Boat Town, correct?
24     A.  I do.
25     Q.  And I know you have one in front of you, so

123

1 that notice of deposition with topics, you've had the
2 chance to review that?
3     A.  I did.
4     Q.  And you specifically are talking about topics
5 four, five, six, eight, and nine?
6     A.  Correct.
7     Q.  And you understand that you're -- you're
8 testifying on behalf of Boat Town, not in your
9 individual capacity as Bonnie?
10     A.  I do.
11     Q.  And what did you do to prepare for this
12 deposition?
13     A.  I spoke with Tom Lang, which is our accountant
14 and comptroller.
15     Q.  Okay.  Did you review any documents to prepare
16 for this deposition?
17     A.  The only things that I looked at were items
18 that you requested regarding hours worked and pay steps
19 for the client.
20     Q.  Okay.  And other than Mr. Lang, did you speak
21 with anyone else to prepare for today?
22     A.  Hannah McRee.
23     Q.  And that's the other person that we talked
24 about in accounting?
25     A.  Correct.

124

1     Q.  Okay.  And I'm making sure I'm not asking you
2 redundant questions here.
3         Are you prepared to testify on behalf of
4 Boat Town for the topics that you have been designated
5 for?
6     A.  I am.
7     Q.  Okay.  Let me scroll down to those topics,
8 then, and I can -- you know, you have that in front of
9 you, but I'll also screen share it to make it a little
10 bit easier for you as well.
11         So I'll go down to topic four and screen
12 share that, and just let me know when you can see it.
13     A.  I can see it.
14     Q.  (BY MS. SCHEEF) Okay.  Perfect.
15         And so starting on topic four, your -- you
16 have a copy with you of the employee handbook for -- for
17 Boat Town?
18     A.  I do.
19     Q.  Do you know when that was written?
20     A.  This particular version was written -- well,
21 it's -- they call it the 2022.  I think it was in -- in
22 2021, is when it was implemented.
23     Q.  Okay.  And I'm just going to pull up that
24 handbook.  I'm going to be on page 5, if you also want
25 to take a look on page 5, but I'll also screen share it.

125

1     A.  Okay.
2     Q.  Page 5 here talks about the hourly procedures
3 for Boat Town, right?
4     A.  Correct.
5     Q.  And this was the policy in place when Mr.
6 McNamara was employed?
7     A.  It was, is.
8     Q.  And here, it says, in the second paragraph, you
9 will be paid overtime if you work more than 40 hours
10 between Wednesday and Tuesday, right?
11     A.  Correct.
12     Q.  Is that kind of what y'all considered your work
13 week, is Wednesday to Tuesday?
14     A.  That's how payroll falls, yes.
15     Q.  Okay.  And how were y'all doing payroll?
16         Was it being paid on -- we know a biweekly
17 basis, but was it on certain days of the week?
18     A.  As to when it was figured or when they were
19 paid?
20     Q.  When they were paid.
21     A.  They were paid on Fridays.
22     Q.  Okay.  And when --
23     A.  Or I guess they were Wednesdays, actually.  The
24 hourly employees were paid on Wednesdays, so --
25     Q.  Okay.  So hourly employees paid on Wednesdays,

126

1 that's -- that's helpful for me.
2          When -- if it was paid on Wednesdays, when
3 was it calculated?
4    A. Tuesdays.
5    Q. Okay. And that makes sense for the Tuesday to
6 Wednesday time frame.
7          And so hours for paid holidays, vacation,
8 or sick time, do not count towards the 40 hours worked,
9 was that the policy of Boat Town?
10   A. It is.
11   Q. Was there ever a time that employees had to
12 work federal holidays?
13   A. I think most federal holidays fall on Mondays,
14 and we're closed.
15   Q. Okay. But, for example, the 4th of July, would
16 employees work the 4th of July?
17   A. Generally, we're closed. That's a case-by-case
18 situation.
19   Q. Would an employee's pay change if they worked
20 on a federal holiday?
21   A. Yes.
22   Q. Okay. And it says, the department supervisor
23 must approve all overtime in advance.
24          How was that handled logistically?
25   A. When we're during the busy season, we expect

127

1 that there will be some overtime, and -- and so we know
2 that they're out on the lake.
3          And if they're out on the lake, then they
4 just let us know when they -- the hours are completed,
5 the next day they'll let us know, or let the accounting
6 department know, and it's -- we just believe what they
7 say.
8    Q. Hard to verify when they're out on the lake to
9 --
10   A. Right. Right.
11   Q. Makes sense.
12          So it wasn't always in advance that the
13 overtime hours were approved just because it wasn't
14 always possible to do that logistically?
15   A. Correct. And probably the approval time would
16 be during the winter hours, that's when overtime would
17 most likely be approved by a supervisor.
18   Q. Was there any policy that if, you know, let's
19 say you're in the busy season, but it's a slow day, you
20 got downtime, are you required to clock out during that
21 time?
22   A. You are not.
23   Q. Okay. If you don't have tasks to do, you're
24 not required to clock out and clock in only when you're
25 doing tasks?

128

1    A. There's always tasks to do. When -- if -- if
2 there's downtime, then there's something else to do,
3 then there's property that needs cleaned up, then
4 there's boats that need washed, and there's trucks that
5 need serviced. So there's really no downtime,
6 especially during our busy season.
7    Q. In the, you know --
8          (Zoom connection dropped for the reporter.)
9          THE REPORTER: You lost me. I'm so sorry,
10 I don't know what happened.
11         MS. SCHEEF: No worries.
12         What was the last question we have?
13         THE REPORTER: The last -- she was
14 answering that there was always tasks to do. She gave a
15 pretty long answer. Boats need washed, trucks need
16 serviced. And then you said, in the, you know -- and
17 that's all I had.
18         MS. SCHEEF: You missed a pretty dumb
19 question, on my part, at that point.
20         THE REPORTER: Go ahead.
21         MS. SCHEEF: I'll ask my -- my dumb
22 question again.
23         THE REPORTER: Okay.
24   Q. (BY MS. SCHEEF) In the magical situation where
25 there are no tasks to do, you aren't required to clock

129

1 out if there's downtime?
2    A. You are not.
3    Q. And we were kind of going into this before we
4 noticed that we had lost Claudia.
5          When it comes to tasks, there's no
6 formalized process of, if you have nothing to do, who
7 you reach out to to get another task?
8    A. And this is where I said that everyone that
9 works here, the Raven's have said, act as if you're a
10 Raven, treat this place as if you own it, and take
11 toilet paper to the bathroom, clean, you know, pick up
12 trash, do whatever needs to be done.
13   Q. I get that. I used to work for a family
14 business, so I completely understand.
15         I guess my question is, other than that
16 kind of core value, there's no actual formalized policy
17 of who you reach out to to get additional tasks, or
18 there's no list of tasks that need to be done?
19   A. I think they expect people to think on their
20 own and do what's best for the company.
21   Q. But there's no formalized process?
22   A. When you say formalized --
23   Q. I guess, no checklist that says, here are the
24 tasks that need to be done if you're not doing anything?
25   A. We don't hand out checklists, no, we don't.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

130

1    Q. Okay. Moving on.
2        So before Mr. McNamara made his report,
3  Boat Town was calculating overtime by if you worked over
4  80 hours in 2 weeks, rather than 40 hours in 1 week,
5  right?
6    A. I believe that's how Patti was calculating,
7  yes.
8    Q. And that can cause some problems, because you
9  could work 45 hours one week, and 35 the next week, and
10 have 80 hours?
11   A. When it was brought to the attention of the
12 owners and to Boat Town, realized that the error had
13 been made, and the corrections have been made since
14 then.
15   Q. But that -- that wasn't my -- really my
16 question.
17       My question was, the problem would be if
18 you worked 45 hours 1 week and 35 hours the next week,
19 you would have 80, and you wouldn't get paid overtime
20 for that 45 hours?
21   A. Understood. And that's why the correction was
22 made.
23   Q. Okay. And I know it seems like maybe we need
24 to have a conversation with Ms. Shook about this, but
25 what was the -- do you know the reasoning behind why

131

1  that was used as the calculation method?
2    A. You'd have to speak with Patti.
3    Q. Okay. And she never told y'all why she used
4  that as a calculation method?
5    A. I believe that was the form that they used at
6  her previous employer.
7    Q. And -- but now y'all are calculating it the
8  correct way?
9    A. Correct.
10   Q. Okay. And you made this change after Mr.
11 McNamara's report and after the Department of Labor came
12 in?
13   A. Correct.
14   Q. Okay. Have y'all changed, I guess, your
15 handbook in any way to reflect the change in the way you
16 calculate overtime?
17   A. The handbook actually says the correct way to
18 figure overtime.
19   Q. Okay. So it was just the system, that it was
20 calculating it wrong?
21   A. Correct.
22   Q. And we heard a little bit about it earlier, but
23 what was the system you used for hourly employees to
24 track time?
25   A. Lightspeed is the accounting software that we

132

1  use for them to clock in and out.
2    Q. Okay. And did Lightspeed just have the
3  settings set a certain way where it was done on a
4  biweekly basis?
5    A. It's actually figured each day.
6    Q. It's done each day?
7    A. Uh-huh, correct.
8    Q. And then --
9    A. It's hours each worked each day.
10   Q. And then did Ms. Shook manually go in and do
11 the two weeks?
12   A. The -- that information is manually put into
13 the third-party company. We use ADP.
14   Q. Okay. So it goes from the original one to ADP?
15   A. Correct.
16   Q. And you said y'all manually do that?
17   A. Correct.
18   Q. Okay. And is that the same process y'all
19 utilize now?
20   A. It is.
21   Q. Okay. And then payroll is just run through
22 ADP?
23   A. Correct.
24   Q. Okay. Was there automated calculations of the
25 time and a half or overtime done through ADP, or did

133

1  y'all do that yourself?
2    A. That's manually input.
3    Q. Okay. So it was someone, I'm guessing Patti at
4  the time, manually calculating time and a half for
5  people's -- well, hours worked over 80 hours a week, at
6  the time?
7    A. She doesn't manually -- they don't compute the
8  overtime, they input the hours, so --
9    Q. Okay. That makes sense.
10       And then -- so all hours were tracked
11 through that software we discussed while Mr. McNamara
12 was employed there?
13   A. Correct.
14   Q. And I know we discussed a little bit earlier,
15 where it says that there must be approval for overtime,
16 and obviously sometimes that doesn't happen, but if you
17 needed to request approval, how would you do it?
18   A. As far as overtime, the approval is probably
19 made, especially for your client's position, by the
20 person that sends him out to deliver the boat, pick up
21 the boat. They know he's going to be working overtime.
22   Q. Okay.
23   A. So that's preemptive, approving the overtime.
24   Q. And would that be for Mr. McNamara, Clay, and
25 Chuck?

134

1    A. Clay -- Clay and Chuck, whoever -- or someone
2 from the other dealership, whoever sent him out on the
3 task.
4    Q. Okay. And would you just verbally request it,
5 or would it be a written request?
6    A. Typically, they're right here and you just send
7 them out with a boat.
8    Q. Okay. And would someone go through the time
9 sheets before any payroll to ensure all of it was
10 accurate?
11    A. Employees had the option to look at what was
12 turned in, and that was just, then, handed off. If
13 there were any errors, they would get with their
14 supervisor or with Patti, they -- they forgot to clock
15 in, forgot to clock out, worked after hours, and then
16 adjustments were made at that time, and Patti would make
17 the final adjustments.
18    Q. Okay. And who is responsible for payroll now?
19 Is it Tom?
20    A. Tom.
21    Q. And are y'all still paying on a biweekly basis,
22 but just calculating differently?
23    A. Correct.
24    Q. Okay. What information is included on the pay
25 stubs?

135

1    A. I've provided you his pay stub so you could
2 look at that, but it's a general pay stub, as far as
3 withholding.
4    Q. Have they changed since the ones Mr. McNamara
5 received?
6    A. No.
7    Q. Okay. And in the past, it was Ms. Shook who
8 reviewed payroll before it's processed, now it's Mr.
9 Lang?
10    A. Correct.
11    Q. Okay. Has Mr. Lang received any training
12 regarding following the FLSA?
13    A. He came from extensive background prior and is
14 using that information with the new company.
15    Q. Okay. But you just -- I guess my question is,
16 for those doing accounting, Boat Town hasn't done any
17 trainings on how they can properly run payroll,
18 calculate overtime?
19    MR. DEPONTE: Objection.
20    Hang on.
21    Objection. Are you asking during the time
22 that Mr. McNamara was employed, or are you asking
23 afterwards? Because afterwards is irrelevant.
24    MS. SCHEEF: I'm asking afterwards.
25    MR. DEPONTE: Then it's irrelevant and it's

136

1 not one of your topics.
2    Answer if you can, Ms. Harrell.
3    But, otherwise, I'm going to object to the
4 question.
5    MS. SCHEEF: Okay. Well, we do have
6 training and compliance as one of our topics, but --
7    MR. DEPONTE: Yeah, but that's not a
8 relevant time frame, though, and that's why I wanted to
9 discuss with you the topics. You've got to have the
10 relevant time frame. His employment ended in
11 September 2023. What's happened after that is
12 irrelevant.
13    MS. SCHEEF: Well, I tend to disagree, but,
14 obviously --
15    Q. (BY MS. SCHEEF) Have y'all done any trainings
16 on FLSA compliance?
17    A. Can you --
18    (Crosstalk.)
19    A. -- the question.
20    Q. I'll repeat the question.
21    Has Boat Town done any trainings for its
22 accounting staff on FLSA compliance?
23    A. Regarding -- Patti did train Tom.
24    Q. Do you know if she trained him on the correct
25 method of doing it?

137

1    MR. DEPONTE: Objection, form.
2    Q. (BY MS. SCHEEF) You can answer.
3    MR. DEPONTE: If you can.
4    A. Patti trained Tom. We weren't sitting there
5 while she was training him, but she did train him.
6    Q. (BY MS. SCHEEF) Okay. And then going to topic
7 five, how was it determined how much an employee was
8 going to make, from Mr. McNamara's time there?
9    A. How much -- how much he was going to make?
10    Q. Yes.
11    A. Initially, his -- first, was just a starting
12 salary, or per hour, and that was supposed to be for,
13 like, 60 to 90 days. It's just making sure he was still
14 an employee for that amount of time, and he was, so he
15 got the additional increase. And then the following
16 year, I believe he got another increase, and that was
17 just a cost of living.
18    Q. Okay.
19    (Crosstalk.)
20    Q. So a couple of questions on that.
21    He started at 18 a month, when -- you said
22 around 90 days.
23    When did he get the increase in pay?
24    A. I believe it was in April.
25    Q. Okay. So if you started on February 15th, not

138

1 good at math as you have already heard during this
2 deposition --
3    A. And I said 60 to 90 days. And that falls right
4 into that 60 days, and that is also right before our
5 busy season. We get started, we kind of can't worry
6 about paperwork once that gets started. We're gunning
7 and going after that.
8    Q. So if you increase his pay in April, and then
9 in May, that's when the accident with the guard gate
10 happens. Y'all didn't decrease his pay again after that
11 accident when the guard gate happened?
12    A. We did not.
13    Q. And, in fact, a year later, you increased his
14 pay?
15    A. A cost of living increase, correct.
16    Q. Okay. At no point did y'all dock his pay?
17    A. I'm sorry?
18    Q. At no point did y'all dock his pay?
19    A. We did not dock his pay.
20    Q. Have y'all ever docked an employee's pay?
21    A. I don't believe so, no.
22    Q. Okay. You would agree that's certainly within
23 Boat Town's power, if an employee isn't performing well,
24 they can dock the employee's pay?
25    A. I'm sorry?

139

1    Q. You would certainly agree that's within Boat
2 Town's power, if an employee's not doing well, you can
3 dock their pay?
4        MR. DEPONTE: Objection, form.
5        And that calls for a legal conclusion,
6 about docking pay. I'm not even sure what that really
7 means.
8        MS. SCHEEF: You can lower someone's pay
9 rate.
10        MR. DEPONTE: Okay.
11    Q. (BY MS. SCHEEF) You would agree that Boat
12 Town, if someone's not performing well, they can, as a
13 business, lower that person's rate of pay?
14    A. I would agree they could.
15        I do know the -- what Boat Town has tended
16 to do is absorb the cost and deal with the issue
17 separately.
18    Q. And how would they deal with the issue
19 separately?
20    A. To expect better of employees. Honestly,
21 people are generally embarrassed by mistakes they make,
22 enough that it's on their memory and they don't -- they
23 don't do it again.
24    Q. Okay. I think I've hit some of these topics
25 already.

140

1        Okay. I'm just going through my question,
2 making sure I'm not asking you redundant ones.
3        Do y'all have any policies about
4 off-the-clock work?
5    A. Policies regarding how they are paid on off the
6 clock?
7    Q. Yes.
8    A. They keep track of it themselves, like we
9 talked about just a bit ago, and bring that information
10 to the accounting department when -- back -- when we're
11 back and open.
12    Q. And so does the accounting department decide
13 whether or not to count that off-the-clock time, or is
14 it kind of a -- a -- scratch that.
15        Does the accounting department actually go
16 through and approve off-the-clock time?
17    A. If an employee says they work, they accept it.
18    Q. Okay. There's no kind of review process?
19    A. We haven't had a client -- or a client -- we
20 haven't had an employee lie.
21    Q. Okay. And then -- skipping over topic seven.
22        Now, the documentation that has been
23 provided, regarding Mr. McNamara's hours, those, you
24 know, hourly sheets that he discussed with Patti, do you
25 have any reason to believe that those aren't accurate?

141

1    A. I do not.
2    Q. Do you have any reason to believe that the
3 calculations that Mr. McNamara and Patti did are
4 inaccurate?
5    A. That they are not accurate?
6    Q. Yeah.
7    A. I believe they are accurate.
8    Q. Okay. And when y'all were calculating to pay
9 other people with the Department of Labor, did you use
10 similar documents?
11    A. We did.
12    Q. And do you know if y'all paid employees who
13 worked there in the past?
14    A. I do not. I do have -- I do have that
15 information, of all the employees that were paid, and I
16 can look through that and tell quickly.
17    Q. Okay. But you don't know for sure if y'all
18 reached back out to someone who worked there, who wasn't
19 a current employee when the Department of Labor came in,
20 but had worked there in the past?
21    A. I can find that out.
22    Q. Okay. And does anyone have access to modify
23 the time records after they've been put in?
24    A. The accounting department can make adjustments.
25    Q. But you have no reason to believe that it

142

1 happened?
2    A. No.
3    Q. Okay.
4    A. Any time it does happen, it's in the benefit of
5 the employee.
6    Q. Okay. And then I promise we're getting close
7 to done here.
8        So going into topic nine. Have you gone
9 over the documents that y'all provided us?
10    A. I've gone over the documents that I provided
11 you, you would have received last night or yesterday.
12    Q. Okay. Does everything have -- does all of that
13 have the totality of Mr. McNamara's employee file,
14 personnel file?
15    A. I do have access to his employee file, I'm not
16 sure -- I'm sure that you got all that information.
17    Q. And --
18        MR. DEPONTE: We have his personnel file,
19 if you don't already.
20        MS. SCHEEF: Okay. I was just
21 double-checking that we have the entirety of it.
22    Q. (BY MS. SCHEEF) And all employee records are
23 kept in that personnel file that y'all keep for seven
24 years?
25    A. Actually, we keep employee information in --

143

1 indefinite.
2        THE REPORTER: I'm sorry. I'm sorry, that
3 -- there was a computer ding and I did not hear your
4 full answer. Can you repeat, please.
5        THE WITNESS: Actually, we keep employee
6 information indefinite.
7        THE REPORTER: Indefinite. Thank you.
8    Q. (BY MS. SCHEEF) Okay. And then -- so do y'all
9 count payroll records as part of the personnel file?
10    A. Payroll. Actually, it's payroll that we keep
11 indefinite, I think. I believe that's what we keep.
12 Yes. There you go.
13    Q. And so are payroll records separate from the
14 personnel file?
15    A. They are.
16    Q. Okay. So you keep payroll records
17 indefinitely.
18        How long do you keep personnel files?
19    A. Seven years.
20    Q. Okay. And -- but they're separate --
21    A. They are separate.
22    Q. -- files?
23        Okay. Were you ever told not to delete any
24 emails or documents?
25    A. Any emails?

144

1    Q. Regarding this case.
2    A. Oh, regarding this case? No. I was not told
3 not to delete anything. Nothing has been deleted.
4    Q. Do you have any emails about this case?
5    A. I do.
6    Q. Do any of those emails not have an attorney on
7 them?
8    A. No. They all have an attorney on them.
9    Q. Okay. Do you have any text messages where you
10 discuss this case?
11    A. I don't.
12    Q. Okay.
13        THE REPORTER: I'm sorry. Did you say --
14 just making sure -- I don't? I do not?
15        THE WITNESS: I do not, yes. I do not.
16        THE REPORTER: Thank you. Thank you.
17        MS. SCHEEF: Very important distinction.
18 Thank you for catching that, Claudia.
19        THE REPORTER: Yes.
20        MS. SCHEEF: Okay. And then correct me if
21 I'm wrong, Mike, but I think that's all the questions
22 that you designated Bonnie for.
23        MR. DEPONTE: That's correct.
24    Q. (BY MS. SCHEEF) Okay. Bonnie, I'm going to do
25 the annoying thing that I did with Mr. Raven and just go

145

1 over and ask you, do you have anything more to add --
2        MS. SCHEEF: I'm assuming the running
3 objection is going to happen again, Mike?
4        MR. DEPONTE: Yes, please.
5    Q. (BY MS. SCHEEF) Okay. Anything to add on
6 topic four?
7    A. No.
8    Q. Anything to add on topic five?
9    A. No.
10    Q. Anything to add on topic six?
11    A. No.
12    Q. Anything to add on topic eight?
13    A. No.
14    Q. Anything to add on topic nine?
15    A. No.
16        MS. SCHEEF: Okay. I think that concludes
17 us.
18        Mike, we had discussed -- you know, we left
19 Kaden open yesterday and you didn't pass. Just so I can
20 get a chance to review these documents y'all produced
21 this morning, I -- I don't think I'll have additional
22 questioning, but can I leave the witness open for
23 questioning?
24        MR. DEPONTE: Yeah, of course.
25        MS. SCHEEF: Okay. Then not passing the

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

---

146

1 witness, but we'll end the examination for right now.
2        Appreciate you all's time and patience.
3        MR. DEPONTE:  That's fine.
4        MS. SCHEEF:  And go off the record.
5        THE REPORTER:  Okay.  And you would like to
6 read and sign for both, the whole thing, is that
7 correct, Michael?
8        MR. DEPONTE:  Correct.
9        THE REPORTER:  And would you need a copy
10 for yourself, sir?  Do you need a copy of the
11 transcript?
12        MR. DEPONTE:  Yes, please.
13        THE REPORTER:  And I would like to clarify
14 the confidentiality that you guys mentioned.
15        Do you want to -- how do you want the
16 transcript to appear?  Do you want me to -- well, do you
17 have an idea?
18        MR. DEPONTE:  Tanner, what do you want to
19 do for that?  I mean, really, it's just the corporate
20 numbers --
21        THE REPORTER:  Just -- I can just blank --
22 you know, leave --
23        MS. SCHEEF:  I mean, if you're fine with
24 the --
25        THE REPORTER:  Or mark the whole thing.

---

147

1 It's up to you.
2        MS. SCHEEF:  If you don't intend to show
3 this to anyone, if we want a Rule 11, or if there's --
4 you know, if we want it for the record.
5        MR. DEPONTE:  Well, let's -- we can leave
6 it in the transcript for now.
7        THE REPORTER:  Okay.
8        MR. DEPONTE:  And then we'll -- we'll
9 discuss how best to handle it after that.
10        THE REPORTER:  Or attorneys' eyes only?  Do
11 you want the whole transcript marked as attorneys' eyes
12 only, or --
13        MR. DEPONTE:  No.  I think that will cause
14 us an issue at trial.
15        THE REPORTER:  Okay.
16        MR. DEPONTE:  That'll make it more
17 complicated.
18        MS. SCHEEF:  Claudia, we just need an
19 online copy, or a digital copy, we don't need a physical
20 one.
21
22        (Deposition concluded at 1:22 p.m.)
23
24
25

---

148

1                CHANGES AND SIGNATURE
2 WITNESS NAME: ROBERT CLAYTON RAVEN  DATE: AUGUST 14, 2025
3 PAGE LINE    CHANGE            REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

---

149

1    I, ROBERT CLAYTON RAVEN, have read the foregoing
  deposition and hereby affix my signature that same is
2 true and correct, except as noted above.
3
4
                    _____
5                    ROBERT CLAYTON RAVEN
6
7 THE STATE OF _____)
8 COUNTY OF _____)
9
10    Before me, _____, on this day
11 personally appeared ROBERT CLAYTON RAVEN, known to me
12 (or proved to me under oath or through
13 _____) (description of identity
14 card or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18    Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21
22                    _____
                      NOTARY PUBLIC IN AND FOR
23                    THE STATE OF _____
                      COMMISSION EXPIRES: _____
24
25

---

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

---

**150**

```
1                    CHANGES AND SIGNATURE
2   WITNESS NAME: BONNIE HARRELL DATE: AUGUST 14, 2025
3   PAGE LINE    CHANGE            REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

---

**152**

```
1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2                  AUSTIN DIVISION
3   KADEN MCNAMARA on Behalf   )
    of Himself and Others      )
4   Similarly Situated,        )
                               )
5          Plaintiff,    ) CIVIL ACTION
                               )
6   VS.                 ) NO.: 1:24-CV-869-DII
                               )
7                              )
    BOAT TOWN, INC., CLAYTON   )
8   RAVEN, and CLAY RAVEN,     )
                               )
9          Defendants.  )
10
11          REPORTER'S CERTIFICATION
12  DEPOSITION OF ROBERT CLAYTON RAVEN and BONNIE HARRELL
13              AUGUST 14, 2025
14       I, Claudia White, Certified Shorthand Reporter in
15  and for the State of Texas, hereby certify to the
16  following:
17       That the witness, ROBERT CLAYTON RAVEN and BONNIE
18  HARRELL, was duly sworn by the officer and that the
19  transcript of the oral deposition is a true record of
20  the testimony given by the witness;
21       I further certify that pursuant to Federal Rules of
22  Civil Procedure, Rule 30(e)(1)(A) and (B) as well as
23  Rule 30 (e)(2) that the signature of the deponent:
24       _X_ was requested by the deponent and/or a party
25  before completion of the deposition and is to be
```

---

**151**

```
1        I, BONNIE HARRELL, have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted above.
3
4                _____
5                    BONNIE HARRELL
6
7   THE STATE OF _____)
8   COUNTY OF _____)
9
10      Before me, _____, on this day
11  personally appeared BONNIE HARRELL, known to me (or
12  proved to me under oath or through
13  _____) (description of identity
14  card or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18      Given under my hand and seal of office this
19  _____ day of _____, ____.
20
21
22
                    NOTARY PUBLIC IN AND FOR
23                  THE STATE OF _____
                    COMMISSION EXPIRES: _____
24
25
```

---

**153**

```
1   returned within 30 days from date of receipt of the
2   transcript.  If returned, the attached Changes and
3   Corrections and Signature pages contain any changes and
4   the reasons therefor;
5       ___ was not requested by the deponent and/or a
6   party before the completion of the deposition.
7       I further certify that I am neither counsel for,
8   related to, nor employed by any of the parties or
9   attorneys in the action in which this proceeding was
10  taken, and further that I am not financially or
11  otherwise interested in the outcome of the action.
12      Certified to by me this 25th day of August, 2025.
13
14
15
16
17      Claudia White, CSR No. 8242
18      Expiration Date:  5/31/2027
        The Legal Connection
        8656 West Highway 71
19      Building F, Suite 200
        Austin, TX 78735
20      CRCB Firm No. 656
        P: 512-892-5700  F: 512-892-5703
21
22
23
24
25
```