# Exhibit "A"

NO.: 1:24-CV-869-DII

KADEN MCNAMARA vs BOAT TOWN, INC., CLAYTON RAVEN, AND CLAY RAVEN

CORPORATE REPS FOR BOAT TOWN, INC.

AUGUST 14, 2025



WWW.TLC-TEXAS.COM | 855.327.7901

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

```
                                          2
 1  to the Federal Rules of Civil Procedure and the
 2  provisions stated on the record or attached hereto.
 3
 4
 5             A P P E A R A N C E S
                    (Via Zoom)
 6
 7  FOR THE PLAINTIFF:
 8     Ms. Tanner Scheef
       KAPLAN LAW FIRM, PLLC
 9     2901 Bee Cave Road
       Suite G
10     Austin, Texas 78746
       (512) 553-9390
11     tscheef@kaplanlawatx.com
12
    FOR THE DEFENDANTS BOAT TOWN, INC., CLAYTON RAVEN, and
13  CLAY RAVEN:
14     Mr. Michael J. DePonte
       JACKSON LEWIS
15     500 North Akard
       Suite 2500
16     Dallas, Texas 75201
       (214) 520-2400
17     michael.deponte@jacksonlewis.com
18
    ALSO PRESENT:
19
       Mr. Kaden McNamara
20     Mr. Gabriel Loya
       Mr. Ryan Estes
21
22
23
24
25
```

```
                                          3
 1              INDEX
                                     PAGE
 2  Appearances........................... 2
 3
 4
 5  ROBERT CLAYTON RAVEN
       EXAMINATION BY MS. SCHEEF....... 4
 6
    BONNIE HARRELL
 7     EXAMINATION BY MS. SCHEEF.......119
 8
    Signatures and Changes............... 148
 9  Reporter's Certificate............... 152
10              EXHIBITS
    Exhibit 1  Notice of Rule 30(b)(6) Deposition..... 10
11  Exhibit 2  Defendants' Answers.................... 26
    Exhibit 3  Employee handbook for Boat Town........ 94
12  Exhibit 4  Defendants' initial disclosures........ 89
13
            REQUESTED DOCUMENTS/INFORMATION
14
    NO.   DESCRIPTION                       PAGE
15
          NONE  .........................
16
17
18
19
20
21
22
23
24
25
```

```
                                          4
 1            THE REPORTER: I need you to raise your
 2  right hands to be sworn.
 3            (Oaths administered remotely.)
 4       ROBERT CLAYTON RAVEN and BONNIE HARRELL,
 5  having been first duly sworn, testified as follows:
 6              DIRECT EXAMINATION
 7            OF ROBERT CLAYTON RAVEN
 8  BY MS. SCHEEF:
 9       Q. Okay. So, Mr. Raven, I'm going to start with
10  you.
11            Good morning. Would you rather we call you
12  Mr. Raven, or Clayton, what do you prefer?
13       A. Mr. Raven is fine.
14       Q. Okay. Perfect.
15            Could you please state your full name for
16  the record.
17       A. Robert Clayton Raven.
18       Q. And what is your current address?
19       A. 310 Chaparral.
20       Q. Okay. And what is your current occupation and
21  job title?
22       A. I am a boat dealer. I'm really not big on
23  titles, but I guess my title would be president and CEO.
24       Q. And is that at Boat Town, Inc.?
25       A. Yes, it is.
```

```
                                          5
 1       Q. Okay. And how long have you been there?
 2       A. Fifty-one years.
 3       Q. Congratulations.
 4            What are your, I guess, current duties and
 5  responsibilities?
 6            I know that may be a lot, since you wear a
 7  lot of hats.
 8       A. There are a great deal. It's, you know, at the
 9  end of the day, I'm responsible for the company. I wear
10  the hats, but I got a lot of great people underneath me
11  that run the bulk of day-to-day operations. I'm sort of
12  keeper of culture. I try to touch every client, I talk
13  to our managers every day, oversee some boat ordering.
14  Just wear many hats.
15       Q. Yeah, I can -- I'll help you narrow it down a
16  little bit.
17            Do you, you know, hire and fire people?
18       A. That's typically done at the level below me.
19       Q. Do you supervise any of the other employees?
20       A. Yes. If we're hiring managers or somebody at
21  that level, yes, I am absolutely a part of that level of
22  hiring.
23       Q. Do you have some say in -- oh, apologies.
24  Sorry about that.
25       A. Nothing. Go ahead.
```

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

26

1  Q. Okay. Was that in preparation for today, or
2  was that a while back?
3  A. I couldn't tell you. I'm sure I've scanned
4  over it in the last 12 hours, but I've looked at it in
5  the past.
6  Q. Okay. Okay. So first topic is -- I just want
7  to discuss the facts and affirmative defenses asserted
8  in the defendants' answer. I'm not going to ask you for
9  any legal conclusions or anything like that, I just want
10 to talk about the facts that y'all are asserting in you
11 all's case, all right?
12 A. Fine.
13 Q. Okay. So when we pull up -- I'm going to pull
14 up what's marked as Exhibit 2.
15     (Exhibit 2 marked.)
16 Q. (BY MS. SCHEEF) And just give me a second.
17     So Exhibit 2, that I'm pulling up, is the
18 defendants' answer, so that's the answer that y'all made
19 in this case today.
20     Can you see that? And I can zoom in if you
21 need me to.
22 A. Is that, Plaintiffs are precluded from
23 recovering any amounts from defendants, where defendant
24 has paid plaintiffs and/or members of punitive class.
25 Will also --

27

1  Q. Well, I'm just --
2  A. -- include --
3  Q. -- I'm starting with right here. It says -- do
4  you see where it says: Defendants deny each and every,
5  all and singular, allegations contained in plaintiff's
6  original petition and demand strict proof thereof by a
7  preponderance of the evidence.
8      Do you see where it says that?
9  A. Yes.
10 Q. So Boat Town denied every single allegation in
11 Mr. McNamara's petition?
12     MR. DEPONTE: Objection.
13     Tanner, this is not one of the topics you
14 listed. You listed the affirmative defenses and
15 defenses of defendant, not the general denial pleadings
16 filed by defendant. If you want to ask questions,
17 actual questions, about the affirmative defenses, please
18 do so.
19     MS. SCHEEF: Well, the facts -- this
20 inherently has to do with the facts, you're denying all
21 of the facts in the petition.
22     MR. DEPONTE: It's called a general denial.
23 You're well aware of how that works in Texas.
24 Q. (BY MS. SCHEEF) Okay. Do you deny that Mr.
25 McNamara worked for you?

28

1  A. No.
2  Q. Do you deny that Mr. McNamara worked for you
3  from February of 2022 until September 15th, 2023?
4  A. No.
5  Q. What --
6  A. Let me -- let me rephrase this. He was
7  employed there.
8  Q. Okay. He was employed --
9  A. But I do -- yeah, he was employed there;
10 whether he actually worked is up for discussion.
11     But go ahead.
12 Q. Okay. Mr. Raven, was he employed by you?
13 A. Yes. He was employed.
14 Q. Okay. I just ask that you let me finish my
15 question.
16 A. I answered it, the one before.
17 Q. I just ask that you not interrupt me, because
18 it makes Ms. White's life harder when she's trying to
19 transcribe this, all right?
20 A. All right.
21 Q. Okay. My question simply was whether or not
22 you think he worked -- you employed him from February
23 of 2022 to September 15th, 2023?
24 A. Yes. He was --
25 Q. Okay.

29

1  A. -- employed there during those dates.
2  Q. Okay. Now, who at Boat Town was involved in
3  the creation of this answer?
4  A. Who factually produced the dates or who created
5  the answer?
6  Q. Who worked on the facts that are in here?
7      MR. DEPONTE: Sorry. Is there -- which
8  facts, Tanner? I -- I don't see which ones you're
9  referring to.
10     MS. SCHEEF: Let me --
11     MR. DEPONTE: I don't -- I don't understand
12 your question.
13 Q. (BY MS. SCHEEF) Did no -- did no one work with
14 the attorneys on creating this document?
15     MR. DEPONTE: Clayton, you can answer, if
16 you know.
17 A. I don't know.
18 Q. (BY MS. SCHEEF) You don't know who worked with
19 the attorneys on creating this document?
20 A. I'm not sure.
21 Q. Okay.
22 A. I don't know.
23 Q. Now, does Boat Town contend that there's any
24 time that Mr. McNamara worked, that he was doing such
25 small duties, that it shouldn't have been compensated?

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

30

1   A.  No.  Mr. McNamara was compensated for every
2 minute he was on the clock, or told us that he was on
3 the clock.
4   Q.  Okay.  But you're not alleging that there were
5 times that he should not have been paid?
6   A.  I didn't acknowledge that.  All I simply stated
7 is he spent a great deal of time sitting -- sitting in
8 offices, sitting in boats, sitting in trucks, doing
9 nothing, that he was repeatedly talked to, that he got
10 paid for.
11   Q.  Mr. Raven, that wasn't my question.
12       My question was, are you contending that,
13 under the law, there are times that he was paid for,
14 that he shouldn't have been paid for?
15   A.  Under the law?
16   Q.  Yes.
17   A.  I would have to ask Mr. McNamara to give me an
18 opinion on that.  But, no, we are not questioning --
19   Q.  Okay.
20   A.  -- that.
21   Q.  Is there any company policy as to what kind of
22 time is not payable at all?
23   A.  Let me see if I can get that for you.  Review
24 our handbook.
25   Q.  We can look at the handbook later, but I'm just

31

1 asking, you know, if you're waiting to bring a truck or
2 you're waiting to pick up a boat, is there a policy that
3 that wait time isn't compensable?
4   A.  No.
5   Q.  Okay.  And here -- I'm not going to ask you
6 specifically about the Portal-to-Portal Act, but it does
7 say that there's some activities that were preliminary
8 or post preliminary to their principal activities.
9       Are you alleging that there was time that
10 Mr. McNamara worked, before or after his main duties,
11 that he should not have been compensated for?
12       MR. DEPONTE:  We're withdrawing that
13 affirmative defense.
14       MS. SCHEEF:  Okay.
15   Q.  (BY MS. SCHEEF)  And then, finally -- let me
16 find it in here.
17       Okay.  So here, it says that all actions or
18 omission of defendants, if any, with regards to
19 plaintiff's employment and the method of payment of
20 plaintiffs, were in good faith and based on good cause,
21 and on reasonable grounds, for believing that the
22 defendant was complying with the FLSA.
23       Do you see where I said that -- or where it
24 says that?
25   A.  Let me see if I can figure out which --

32

1   Q.  And I can highlight it here.  It's on page 2 of
2 the defendants' answer to plaintiff's original petition.
3   A.  All I can say is, you know, we tried to pay
4 them right.
5   Q.  Who set up the method of the original form of
6 payment?
7   A.  Well, that would be accounting and us.
8       They're supposed to clock in and out on the
9 computer, but there were multiple dates that an employee
10 would work after hours on the lake, when the store would
11 be locked, and they would just simply come in and tell
12 service management, or accounting, and we would make the
13 adjustment, not question it, and pay them for the hours
14 they say they worked.
15   Q.  So just to go back to my question.  Who set up
16 that policy?
17   A.  That would be service management, and Patti, in
18 accounting.
19   Q.  Okay.
20   A.  And myself.
21   Q.  Before any of the stuff with Mr. McNamara, did
22 Boat Town ever consult with attorneys about how to
23 comply with the FLSA?
24   A.  Not that I'm aware of.
25   Q.  Did you ever look up any, you know, guidance on

33

1 how to properly pay employees according to the FLSA?
2   A.  We just tried to pay people right, ma'am, and
3 do what was fair.
4   Q.  I understand that, but that wasn't quite my
5 question.
6       What did you do in order to understand the
7 FLSA and follow the law?  Did you look up guidance, did
8 you look at the law?
9   A.  What did I personally do?
10   Q.  Or your staff.
11   A.  I cannot testify to what they did, but I'm not
12 aware that we looked up.
13   Q.  So -- and I'm asking you this as the corporate
14 representative.
15       Did anyone at Boat Town, as far as you
16 know, the accountants, yourself, anyone, look up how to
17 correctly do overtime before instituting the overtime
18 policy?
19   A.  I'll look into that and try to get you the
20 answer.
21   Q.  So you don't know?
22   A.  I don't know.
23       MR. DEPONTE:  Back to that question.  It is
24 outside of the scope of the topics, and you can read the
25 affirmative defense.  It is what it is.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

34

1  MS. SCHEEF: Good faith has to be based on
2 something, that's just what I'm trying to see, what it's
3 based on.
4  Q. (BY MS. SCHEEF) We'll get into this a little
5 bit more later.
6  Had -- did any other employee bring up
7 issues with the FLSA, before Mr. McNamara?
8  A. Not that I'm aware of.
9  Q. Had anyone, other than Mr. McNamara, brought up
10 overtime issues, in the history of Boat Town, as far as
11 you're aware?
12  A. Not that I'm aware of.
13  Q. Okay. Okay. Going to number two, the factual
14 basis for responses to interrogatories.
15  You know, my question is just going to be
16 pretty simple. Did you or anyone from Boat Town assist
17 the attorneys in creating the answers for the
18 interrogatories?
19  A. I'm sure Mike and I discussed it.
20  Q. Now, it's listed on the -- on some of your
21 answers, that Patti Shook was the person who provided
22 information.
23  Do you know if Patti provided information?
24  A. I'm sure she did.
25  Q. Okay. And what were Ms. Shook's title and

35

1 responsibilities?
2  A. She was the controller. She handled all
3 accounting responsibilities, payroll responsibilities,
4 at that time.
5  Q. Okay. Did anyone else, aside from Ms. Shook,
6 assist in preparing these responses?
7  A. Not that I'm aware of.
8  Q. Do you know what, if anything, Ms. Shook did,
9 to confirm that the answers provided, were accurate?
10  A. No.
11  Q. Okay. In regards to the documents y'all
12 produced, what steps did Boat Town take to search for
13 responsive documents?
14  A. Define a responsive document.
15  Q. A document that responds to the requests that
16 we made.
17  A. Is this regarding payroll records, employee
18 files?
19  Q. This is regarding all of the documents that we
20 requested to produce, including payroll documents,
21 employee files, relevant documents that Boat Town may
22 have in its own records.
23  MR. DEPONTE: Hey, I'm sorry, objection,
24 form.
25  Is there a specific document you're looking

36

1 for, Tanner?
2  Q. (BY MS. SCHEEF) All I'm asking is, what did
3 y'all do to search for relevant documents in this case.
4  MR. DEPONTE: You may answer, if you can,
5 Clayton.
6  A. It's from you all, or the Department of Labor,
7 or --
8  Q. (BY MS. SCHEEF) I'm asking about documents
9 that Boat Town has --
10  A. Yes.
11  Q. -- what did y'all do to search that you got all
12 of the relevant documents and not just some of them?
13  A. It's, Patti dug into it, provided the
14 Department of Labor with everything they needed and
15 wanted, they were totally satisfied, and we have
16 provided you with anything that we have.
17  Q. Okay. And you said Patti conducted the
18 document searches, right?
19  A. That is correct.
20  Q. Do you know where she looked for documents?
21  A. I was not physically there when she was looking
22 for them.
23  Q. Did you look over her work?
24  A. No.
25  Q. Has anyone checked to make sure she actually

37

1 gave everything?
2  A. I would have to look into that and get back to
3 you.
4  Q. Certainly you haven't looked to make sure she
5 actually gave everything, right?
6  A. No.
7  Q. Okay. You don't -- as far as you know, Clay
8 Raven, Karen Raven, you know, the new accounting staff,
9 they haven't double-checked to make sure all the
10 documents were given?
11  MR. DEPONTE: Objection.
12  You can answer, if you can, Clayton.
13  A. I don't know.
14  Q. (BY MS. SCHEEF) Okay. Are there any documents
15 that exist, that are relevant, that Boat Town has not
16 produced?
17  A. No.
18  Q. So as far as you know, everything's been given?
19  A. As far as I know.
20  Q. Were there any emails between Boat Town staff
21 about this case?
22  A. Not that I'm aware of.
23  Q. Any text messages between Boat Town ownership
24 and management about this case?
25  A. Not that I'm aware of.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

38

1  Q. You haven't texted Clay Raven about this case?
2  A. Not that I'm aware of.
3  Q. You haven't texted Karen Raven about this case?
4  A. No.
5  Q. You haven't texted or emailed any Boat Town
6  staff about this case?
7  A. No.
8  Q. As far as you know, no Boat Town email records
9  or phone records discussed this case at all?
10  A. As far as I know --
11  Q. Okay.
12  A. -- that's correct.
13  Q. Okay. Moving on here, to topic three.
14      I'm just trying to get an idea of what kind
15  of a structure is at Boat Town.
16      Now, you're president and CEO.
17      What role does Clay Raven play?
18  A. Clay Raven is the -- everything has been
19  transitioning over the years. If you go back, when I
20  got out of college, Boat Town had probably six
21  employees, was losing money. It's turned into a decent
22  little company now. As the boys have grown and matured,
23  Clay, over the last several years, has transitioned from
24  a sales position to now being the general manager of the
25  Austin store.

39

1  Q. Okay. And then what is Karen Raven's role?
2  A. She is vice president of the company.
3  Q. Is she also a co-owner?
4  A. No.
5  Q. Okay. And who else is -- is it just you at the
6  ownership level?
7  A. It's just me.
8  Q. And then what about the director level, is
9  there any directors?
10  A. It is -- we do not have a formal board of
11  directors. There's myself, the three Raven members,
12  they have the right to make any decision they feel they
13  can and want to make, and from there it drops to Bonnie
14  Harrell, director of operations. If no member of the
15  Raven family is available, Bonnie also has the sole
16  discretion to make any decision that she feels she needs
17  to make.
18  Q. Okay. And then what about managers, who are
19  the managers at Boat Town?
20  A. We have parts managers and service managers at
21  both stores. Cody Raven's the general manager at the
22  LBJ store, Clay's the GM at the Austin store, and then
23  Bonnie oversees all of them, with the help of the boys.
24  Q. Okay. And then I know we talked about these
25  questions as to you, but just go into a little bit more

40

1  detail, and I'll try and make these quick.
2      So you, yourself, Clayton Raven, Senior, do
3  you have the power to hire and fire employees at Boat
4  Town?
5  A. Do I have the power?
6  Q. Yes.
7  A. Yes.
8  Q. Okay. Do you have the power to supervise or
9  control employee work schedules and conditions of
10  employment?
11  A. I guess I would have that power.
12  Q. And do you have the power to determine the rate
13  or method of payment that workers at Boat Town receive?
14  A. I have the power, but most of that's done at a
15  lower level.
16  Q. And do you have the power to maintain employee
17  records or decide how they are maintained?
18  A. I'll say yes, I have that power.
19  Q. Okay. We're going to go through these
20  questions again for Clayton Raven, Junior.
21      Does he also have the power to hire and
22  fire employees?
23  A. To a certain extent.
24  Q. I remember you said earlier that the three
25  Ravens can make any and all decisions?

41

1  A. Yes.
2  Q. Does that include power to hire and fire?
3  A. Except me.
4  Q. Except you. Yeah, can't -- can't fire the
5  boss, but, other than that, you know, Clayton Junior and
6  Karen have the power to hire and fire?
7  A. Yes.
8  Q. Does Clayton Raven, Junior, have the power to
9  supervise or control employees' work schedules or
10  conditions of employment?
11  A. Yes.
12  Q. Does the same go for Karen Raven?
13  A. Yes.
14  Q. Does Clayton Junior have the power to determine
15  the rate or method of payment for employees at Boat
16  Town?
17  A. Before somebody's salaries or hourly wage has
18  stiffly changed, it typically comes to me. But, yes, he
19  has the ability to do that.
20  Q. Does the same go for Karen?
21  A. Yes.
22  Q. Okay. And then what about determining -- or
23  maintenance of employee records, do Clayton and Karen --
24  or Clayton Junior and Karen both have the ability to
25  either maintain employee records or decide how they're

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

42

1 maintained?
2    A. Well, it's all been done in the accounting
3 office.
4    Q. Do all three of y'all have access to those
5 records?
6    A. Yes.
7    Q. Okay. And you can decide, if you don't like
8 how they're being maintained, and change the way that
9 the records are maintained?
10    A. We have never done that.
11    Q. But you could if you wanted to?
12    A. We'd have to be able to find them, first.
13    Q. If you wanted to, if the three of y'all wanted
14 to, y'all could decide to change the way that employee
15 records are maintained, correct?
16    A. Correct.
17    Q. Okay. And then pulling this up.
18       So just getting more into the generalities
19 of Boat Town so I know a little bit more about it.
20       Can you describe, kind of, the primary
21 operations of Boat Town.
22    A. We're a full-service boat dealership. I guess
23 to put it in layman's terms, we're nothing more than a
24 car dealership that sells boats. We have new and used
25 sales. We have parts, service, finance. We take care

43

1 of boats, where car dealers take care of cars.
2    Q. Okay. And then how many locations do boat --
3 does Boat Town operate?
4    A. Two.
5    Q. And what is Boat Town's annual gross sales
6 volume?
7       THE WITNESS: Is this relevant, Mike?
8       MR. DEPONTE: It is, to an extent, but we
9 can mark this as confidential.
10       THE WITNESS: Okay.
11    A. It's currently 30 -- 30 million, give or take.
12    Q. (BY MS. SCHEEF) Okay. And nowadays,
13 approximately how many employees does Boat Town have?
14    A. You know, it varies seasonally. I would say we
15 run from 23 to 24 in the off season, per dealership, and
16 it may go to 27, 28-ish, but that number varies.
17    Q. So off season, versus, you know, your main
18 season, which, hazarding a guess, your main season is
19 summer?
20    A. Yes, spring and summer.
21    Q. All right. You're -- you have around three to
22 four less employees between winter and spring and
23 summer?
24    A. Per store, at least.
25    Q. Okay. And I'm going to skip over topic four,

44

1 because I think I'm talking to Bonnie about that, so
2 I'll skip over four, five, and six.
3       MS. SCHEEF: Let me know if I'm wrong about
4 that, Mike.
5       MR. DEPONTE: That's correct.
6       MS. SCHEEF: Okay.
7    Q. (BY MS. SCHEEF) Let's get into number seven,
8 Mr. Raven.
9       So when was Mr. McNamara hired by Boat
10 Town?
11    A. I believe it was February 15th of '22.
12    Q. And when was he -- when he was hired -- when he
13 was hired, what was his title?
14    A. He was boat delivery captain, but that title
15 comes with many hats.
16    Q. And what were the duties of a boat delivery
17 captain?
18    A. Boat delivery captains assist the sales team
19 with demos, driving to and from the lake, picking up
20 boats on the water, teaching clients to drive boats,
21 helping the service department, if they needed boats
22 picked up and brought in.
23       When there was none of that going on, it
24 was their responsibility to help keep the company trucks
25 maintained, clean, serviced regularly, you know, report

45

1 it if the tires were getting worn, brakes were getting
2 worn. So when the need arised, and it arose on short
3 notice very often, you know, that the vehicles needed to
4 perform the job, were ready. If there was an issue with
5 a trailer, we needed to get it pointed out so we could
6 get it into service and get it fixed.
7       They, you know, assisted family members
8 with personal errands, running and picking up things.
9       If they needed to run and pick up a part
10 from another dealership, from the parts department,
11 things like that.
12    Q. Were all of those listed on the job posting for
13 the boat delivery captain?
14    A. No.
15    Q. Okay. So, like, picking -- doing errands for
16 the family, that's not one of the official job duties?
17    A. It is one of the official job duties, and I
18 think we very seldom, if ever, post for these positions,
19 because employees normally have friends that want to
20 come in, clients normally have sons or daughters that
21 wish to come in. We have two family members right now
22 that have three sons, and we're on their third son right
23 now.
24       We do have a core philosophy at Boat Town,
25 it's when you come to work for our company, it's who do

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

46

1 you work for?  And they all say me, and I tell them
2 they're wrong.
3         When you come to work for Boat Town,
4 anybody I've ever hired, I have this core decision --
5 core conversation with them, when you come to work for
6 Boat Town, you work for Boat Town.  My two sons work for
7 Boat Town, my wife works for Boat Town, I work for Boat
8 Town, and it is a core philosophy.
9     Q.  I appreciate that.
10         But if there was a job posting -- but as
11 far -- as far as you know, Mr. McNamara found this job
12 through a job posting, right?
13     A.  No.  I do not know that.
14     Q.  How did Mr. McNamara find this job?
15     A.  I have no knowledge.
16     Q.  How did he apply?
17     A.  I have no knowledge.
18     Q.  Well, you know how he was hired, right?
19     A.  I'm not sure if my son hired him, the service
20 manager hired him.  I'm not sure who actually hired him.
21     Q.  Did y'all receive a job application from Mr.
22 McNamara?
23     A.  I have not seen one.  I'm not saying one
24 doesn't exist.
25     Q.  Okay.  Well, you're not sure if it doesn't

47

1 exist --
2     A.  That's correct.
3     Q.  -- you just haven't seen one?
4     A.  That's correct.
5     Q.  Okay.  So when he was hired, what was his
6 hourly rate of pay?
7     A.  I believe it was $18 an hour, but I would have
8 to go back and check that.
9     Q.  And when did that change?
10    A.  Let me see.
11        I do not have that information in front of
12 me.
13    Q.  Fine.
14        Do you know what it was changed to?
15    A.  I believe it was changed to $22 an hour.
16    Q.  Okay.  Who were his supervisors?
17    A.  At this time, they would have been Chuck Embree
18 and Clay Raven.
19    Q.  Okay.  What were their respective roles at Boat
20 Town?
21        We already talked about Clay, but what was
22 Chuck Embree's title?
23    A.  Chuck was service manager.
24    Q.  Okay.  And who was Geromi Trudeau?
25    A.  Geromi Trudeau was just a salesman.

48

1     Q.  Okay.  He wasn't in management?
2     A.  No.
3     Q.  And is he still employed with Boat Town?
4     A.  No.
5     Q.  Okay.  And what hours were the typical schedule
6 for a boat delivery captain?
7     A.  Our typical hours are, we work from 9:00 to
8 5:00 in the off season; i.e., October, November,
9 December, January, February, five days a week, and 9:00
10 to 2:00 in the off season.  And then we go from 9:00 to
11 6:00, four days a week, and then 9:00 to 5:00 on
12 Saturdays, during the full season.
13        But the sales team, along with the delivery
14 captains and the service team, once again, they all work
15 for Boat Town, we work for Boat Town's clients, many
16 times we work much longer hours in season.
17    Q.  On average, how long were people working in
18 that main season?
19    A.  I do not have an average number.
20    Q.  Do you know what Mr. McNamara's average weekly
21 hours were, more than 40 hours per week, during the busy
22 season?
23    A.  I do not have that information in front of me,
24 no.
25    Q.  Do you know how Mr. McNamara's hours were

49

1 tracked and recorded?
2     A.  Yes.
3     Q.  How?
4     A.  They were just tracked on a 40 hour -- every
5 week, the number of hours that he worked that week were
6 tracked and we paid biweekly.
7     Q.  How did you track them?  Did you have a system?
8     A.  Yes.  Once again, we've spoken about this
9 earlier.  Everybody is supposed to clock in and out on
10 Lightspeed, which is our computer system.
11    Q.  Okay.  Tell me a little bit about Lightspeed.
12    A.  Lightspeed is the industry standard.  It's
13 fully integrated to parts, service, accounting.
14 Employee walks in, they jump on a computer, they log in,
15 clock in.
16    Q.  I think I used that when I was a hostess, so I
17 have a little bit of a memory of that from a long time
18 ago.
19        Now, has that always been you all's system?
20    A.  Yes.
21    Q.  Okay.  Hasn't changed at all?
22    A.  No.
23    Q.  Going into the next issue, and I know you have
24 a lot of opinions on Mr. McNamara's work ethic, and a
25 lot of opinions on that.  I'm asking you about

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

50
1  specifically his record.
2       Did he ever receive any performance
3  evaluations?
4     A. Not that I'm aware of. I know he's had
5  multiple verbal evaluations from multiple people.
6     Q. Are there any records of these supposed verbal
7  conversations?
8     A. Not that I'm aware of.
9     Q. Was Mr. McNamara ever disciplined for anything
10 that happened during his tenure?
11    A. Not that I'm aware of.
12    Q. Mr. McNamara was never written up?
13    A. Not that I'm aware of.
14    Q. Never given a Performance Improvement Plan?
15    A. No.
16    Q. Never put on probation?
17    A. No.
18    Q. Never had his pay docked?
19    A. No.
20    Q. Never had his hours docked?
21    A. No.
22       MS. SCHEEF: Okay. I think I'm hitting a
23 good breaking point, and I need to grab more water.
24 Would y'all be cool with breaking until 11:15?
25       Is that all right with you, Mr. Raven?

51
1        THE WITNESS: Sounds good to me.
2        MS. SCHEEF: Okay. Be back at 11:15. Let
3  me let Claudia take us off the record.
4        THE REPORTER: Off the record at 11:08 a.m.
5        (Break taken from 11:08 a.m. to 11:15 a.m.)
6        THE REPORTER: Back on the record at
7  11:15 a.m.
8     Q. (BY MS. SCHEEF) Okay, Mr. Raven. Now, is
9  there anything that you would like to change about your
10 testimony that -- from before the break?
11    A. No.
12       MS. SCHEEF: Okay. And tell me if I'm
13 wrong, Mike, but I think our next section, relevant to
14 Mr. Raven, is topic 10?
15       MR. DEPONTE: I believe that is correct.
16 Let me just check. Yeah, that's 10.
17       MS. SCHEEF: Okay. Perfect.
18    Q. (BY MS. SCHEEF) Okay. So, Mr. Raven, Mr.
19 McNamara complained to Boat Town management about not
20 receiving proper overtime pay on June 6, 2023, right?
21    A. I'll take your word that that's the correct
22 date.
23    Q. Well, do you not know what the correct date is?
24    A. I do not have it in front of me, no.
25    Q. Did you review anything that had the dates?

52
1     A. I don't recall.
2        MR. DEPONTE: We'll stipulate that that's
3  the correct date.
4        MS. SCHEEF: Okay.
5     Q. (BY MS. SCHEEF) Mr. McNamara made this -- he
6  first brought this up to Geromi Trudeau, correct?
7        MR. DEPONTE: Objection.
8     A. I believe --
9        MR. DEPONTE: Go ahead, Clayton. You can
10 answer, if you can.
11    A. I believe so. My son is the one that called
12 me.
13    Q. (BY MS. SCHEEF) Okay. Do you have any records
14 of Mr. McNamara meeting with Patti Shook on June 6,
15 2023?
16    A. I do not have any records, no.
17    Q. You're aware that Mr. McNamara specifically
18 complained that he wasn't being paid for his time worked
19 over 40 hours in a week, correct?
20    A. Correct.
21    Q. And Mr. McNamara told management, Ms. Shook,
22 that at the time, Boat Town was illegally calculating
23 overtime on a two-week basis instead of weekly?
24    A. That is correct. That's what was brought to my
25 attention.

53
1     Q. Okay. And Boat Town's management knew that Mr.
2  McNamara was raising a complaint of a violation of
3  federal law, right?
4     A. As soon as we learned, that day that Mr.
5  McNamara brought this to our attention, and he came in
6  like he was bringing down the Capone crime family, you
7  know, Patti was crying. So she dug into it, immediately
8  called the Department of Labor, confirmed that she had
9  been paying it wrong. It was strictly by accident.
10       And as soon as it was brought to our
11 attention, we started working immediately to create --
12 you know, correct the problem. You know, we're
13 apologetic, we got the Department of Labor, we
14 immediately started digging back in. Since it was June,
15 our high season, we had to hire somebody else, you know,
16 to really dig in, in a short period of time, to run all
17 of the calculations the Department of Labor wanted. And
18 we corrected it immediately and provided DOL with
19 everything they requested.
20       Matter of fact, we already had it done
21 before they even showed up at the dealership, if memory
22 serves me correct.
23    Q. Well, I appreciate all that, but that wasn't
24 really my question.
25       My question is, Boat Town knew that Mr.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

Page 54

1  McNamara was claiming that Boat Town was violating
2  federal law?
3      A. We did not know it. We knew it when he brought
4  it to our attention. We did not question it when he
5  brought it to our attention, we immediately looked into
6  it.
7      Q. So that's a yes to my question, you know that
8  he was complaining that you violated federal law?
9      A. Yes. It was brought to my attention that he
10 was complaining that we were paying overtime
11 incorrectly.
12     Q. Okay. Now, Mr. McNamara met with Ms. Shook
13 multiple times?
14     A. I'll take your word for that.
15     Q. You're not aware of when Mr. McNamara met with
16 Ms. Shook?
17     A. Ma'am, I office out of Lake LBJ, 60 miles away,
18 so I do not see everything that goes on in that store.
19     Q. That wasn't exactly my question.
20        You were asked to review all of Boat Town's
21 records relevant to this case to prepare for today's
22 deposition, right?
23        MR. DEPONTE: I'm sorry, objection, form.
24        How is how many times Mr. McNamara met with
25 Ms. Shook one of the topics?

Page 55

1         MS. SCHEEF: We're specifically talking
2  about the protected -- any complaints he made. This is
3  specifically going to the facts of Mr. McNamara alleging
4  the violation of the law.
5         MR. DEPONTE: And there's no dispute that
6  he went to Ms. Shook and made a complaint.
7      Q. (BY MS. SCHEEF) Are there no records of how
8  many times Mr. McNamara met with Ms. Shook, Mr. Raven?
9         MR. DEPONTE: You can answer, if you can,
10 Clayton.
11     A. Not that I'm aware of. He could have gone in
12 there 27 times, he could have gone in there 2. I don't
13 know, I wasn't there.
14     Q. (BY MS. SCHEEF) Okay. Ms. -- Ms. Shook didn't
15 take any notes, as far as you know?
16     A. I don't know. She's not with me anymore. Her
17 daughter tried to commit suicide. She's got a lot going
18 on in her personal life. Maybe you can call her.
19     Q. We'll do that. But I'm asking you, according
20 to Boat Town's records, there are no records of when Mr.
21 McNamara met with Patti Shook?
22     A. I'm taking your word that it was June 6th.
23 We're not IBM, we're not Dell computer. When it was
24 brought to our attention, we have roughly 50 employees,
25 she went to the front of her lane, we dug into it

Page 56

1  immediately that day. So I don't think there was many
2  corporate meetings and board meetings. As soon as it
3  was brought to our attention, we immediately dug into
4  it, confirmed what he was saying was correct, and
5  started taking corrective action.
6      Q. Mr. Raven, my question is simply, were there
7  any records, even just personal notes or an email, that
8  said --
9      A. For the third time, I do not know.
10     Q. Okay. As far as you know, there's no records?
11     A. Fourth time --
12        MR. DEPONTE: Objection, form.
13     A. -- yes, that is correct.
14        MS. SCHEEF: Mike, he's not answering the
15 question.
16        MR. DEPONTE: Yeah, he did.
17     A. I just said yes.
18     Q. (BY MS. SCHEEF) Okay.
19     A. That is correct, for the fourth time.
20     Q. Okay. So it was true -- well, are you aware
21 that Ms. Shook said that Boat Town had been using the
22 2-week time calculation for over 20 years?
23        MR. DEPONTE: Objection, form.
24        You can answer.
25     A. I believe we've been using it ever since she'd

Page 57

1  been there, and probably before.
2      Q. (BY MS. SCHEEF) How long had Patti been there?
3      A. Roughly, 15 years. I don't have the exact
4  dates.
5      Q. So it's true, that had been the way y'all had
6  always done it, is that calculating by if you worked
7  over 80 hours in 2 weeks?
8      A. I don't know if Patti changed it that way when
9  she came on board. She was highly recommended. She was
10 a controller in the automotive world. But it would be,
11 my understanding, that we had been doing it at least
12 since Ms Shook had been there.
13     Q. Okay. Are you aware that at another meeting,
14 Ms. Shook told Mr. McNamara that this practice saved the
15 company money?
16        MR. DEPONTE: Objection, form.
17     A. Yeah. Somebody told me that. I immediately
18 confronted Patti; she denied the hell out of it.
19        I heard it once, confronted Patti, and
20 nobody else can confirm. And it's just flat ridiculous.
21 We would not do anything to short an employee.
22     Q. (BY MS. SCHEEF) Have you listened to the audio
23 recordings that we provided y'all in discovery?
24     A. No.
25     Q. So if something similar was said in those audio

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

**66**
1  question is.
2      Q. (BY MS. SCHEEF) How do you know Ms. Shook
3  contacted the Department of Labor?
4      A. She did not send me something in writing
5  that she conducted -- and so I do not know that she
6  conducted the Department of Labor -- or contacted them.
7      Q. Okay. Do you know who it was, the first person
8  at Boat Town, to have, I guess, a conversation with the
9  Department of Labor?
10     A. I don't know for a fact. If you want to run
11 down this same realm of questioning, it would probably
12 be Patti, but I don't know.
13     Q. Okay. Do you know when the Department of Labor
14 first contacted you?
15     A. I believe we contacted them first, but, no.
16     Q. Who at Boat Town was involved in the Department
17 of Labor investigations?
18     A. That would have been Patti, to the best of my
19 knowledge.
20     Q. Did anyone else speak with the Department of
21 Labor?
22     A. Not that I know of.
23     Q. You, yourself, never spoke with the Department
24 of Labor?
25     A. I did speak with them, yes.

**67**
1      Q. Okay. So you were one of the people who spoke
2  with the Department of Labor.
3          Anyone else?
4      A. I do not recall whether my son was there.
5  Debbie could have been there, another lady that helped
6  us, in accounting.
7      Q. Okay. And what was Debbie's role?
8      A. Debbie just helped us with storage, payables,
9  things of that nature.
10     Q. Okay. What was the scope of the Department of
11 Labor investigation, as far as you know?
12     A. Very limited. They came in, asked us for
13 documents, instructed us how it should have been done,
14 how far we needed to go back, to the best of my
15 recollection. Because I wanted to be there when they
16 got there, to understand what we were dealing with.
17         They were just very direct; here's what you
18 have been doing, here's what you should have been doing.
19 This is what we need, and here's what needs to be done
20 to correct it.
21     Q. Okay. Now, before the Department of Labor
22 investigation, to your knowledge, no other employee had
23 raised the issue of unpaid overtime to Boat Town?
24     A. No.
25     Q. He was the only one who raised the issue?

**68**
1      A. Yes.
2      Q. Even after the Department of Labor investigate
3  -- or the Department of Labor contacted you all, Mr.
4  McNamara was the only person who had brought up this
5  unpaid overtime issue?
6      A. I can't testify to that.
7      Q. As far as you know, no one else was reporting
8  that there was unpaid overtime?
9      A. As far as I know, that's correct.
10     Q. Okay. And you're here as the corporate
11 representative on behalf of the company, right?
12         MR. DEPONTE: Objection, form.
13         We've already established he's here as a
14 corporate representative.
15         MS. SCHEEF: Okay.
16     Q. (BY MS. SCHEEF) So as far as you know, Mr.
17 McNamara was the only person to have made a report to
18 the -- made a report of unpaid overtime?
19         MR. DEPONTE: Objection, form.
20         You can answer again, if you can, Mr.
21 Raven.
22     A. Yes.
23     Q. (BY MS. SCHEEF) Okay. Now, the Department of
24 Labor investigators came to Boat Town on September 8,
25 2023, right?

**69**
1      A. I can't testify to that date.
2      Q. Well, you were there, right?
3      A. I can't testify to the date, whether that's the
4  first day they were there and I -- or I was there the
5  first day.
6      Q. Did they come in multiple times?
7      A. I believe they did.
8      Q. Okay. Do you know the time --
9      A. I wouldn't say multiple -- no, I do not know
10 the exact times.
11     Q. Okay. If the investigators came on
12 September 8th and Mr. McNamara was fired on
13 September 15th, that's about an eight-day difference --
14 or seven days?
15         MR. DEPONTE: Okay. Thank you.
16     Q. (BY MS. SCHEEF) Right?
17     A. If those are the correct dates.
18     Q. So if the Department of Labor came in on
19 September 8th and terminated Mr. McNamara on
20 September 15th, that is a week?
21         MR. DEPONTE: I'm sorry, is the question if
22 that's a week, seven days is a week?
23         MS. SCHEEF: Yes.
24     Q. (BY MS. SCHEEF) Is seven days -- is seven days
25 a week?

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

78

1 personally apologized. And I found it amusing that
2 several of them apologized to us and said, don't worry
3 about it, we don't want the money.
4         And we said, take it, it's -- we're sorry
5 it happened.
6         And anybody that was due a check, we went
7 to, with the exception of Mr. McNamara, because he
8 wouldn't communicate, so his was dropped in the mail.
9    Q. Did you attempt to contact his attorneys?
10   A. No, I did not.
11   Q. Okay. Did you have every single person you
12 gave those checks to, sign a waiver?
13   A. Yes. We asked them to, and I believe all of
14 them did, without reservation.
15   Q. Okay. And that includes past employees?
16   A. I will have to double-check in the past
17 employees.
18   Q. Okay. Have there been any meetings with
19 employees regarding this case?
20   A. No.
21   Q. Have you instructed any employees regarding
22 this case?
23   A. No.
24   Q. Have any employees been instructed not to
25 discuss this case?

79

1    A. No.
2    Q. Are there any restrictions on employee
3 communications about wage and hour issues?
4         MR. DEPONTE: Objection, form.
5         I'm not sure where that is in the topics,
6 but if you want to find one for me, that would be great.
7         Otherwise, Mr. Raven, you can answer, if
8 you can.
9    A. It's -- when we employ people, we instruct them
10 that it's no -- nobody's business what they make and
11 it's not their business what anybody else makes.
12        But, no, we do not have ongoing discussions
13 about it.
14   Q. (BY MS. SCHEEF) Okay. After Mr. McNamara's
15 termination, did anyone attempt to contact him from Boat
16 Town?
17   A. Not that I'm aware of.
18   Q. Okay. Have -- has Boat Town interviewed any
19 witnesses for this case, other than the conversations
20 you have from your notes?
21        MR. DEPONTE: Objection, form.
22        Are you asking for attorney/client work
23 product, or are you asking about internally?
24        MS. SCHEEF: I'm talking about internal
25 communications.

80

1    A. No.
2    Q. (BY MS. SCHEEF) Okay. I think 18, we've
3 discussed already a little bit, and I'm sure we'll get
4 in more with Bonnie.
5         MS. SCHEEF: Why don't we take -- our next
6 topic is topic 19. How about we take a little break and
7 meet back at noon. Would that work for y'all?
8         Once we hit topic 19, I'm kind of rolling,
9 and I think we can get us done within the next hour or
10 so.
11        MR. DEPONTE: That will work.
12        MS. SCHEEF: Okay. Sounds good, y'all.
13        You want to take us off the record,
14 Claudia?
15        THE REPORTER: Yes.
16        Off the record at 11:52 a.m.
17        (Break taken from 11:52 a.m. to 12:00 p.m.)
18        THE REPORTER: Back on the record at
19 12:00 p.m.
20   Q. (BY MS. SCHEEF) Okay. Mr. Raven, anything you
21 would like to change, that you said before the break?
22   A. No.
23   Q. Okay. I'm going to get into, kind of, the --
24 the meat and potatoes here. So we're going to get up to
25 topic 19.

81

1         Now, you would agree that -- I mean, Boat
2 Town agrees that companies must not fire employees
3 because they reported FLSA violations?
4    A. Yes.
5    Q. While working at Boat Town in June of 2023, Mr.
6 McNamara reported FLSA violations to Boat Town, correct?
7    A. I know he did at some point.
8    Q. You would agree that Mr. McNamara reported FLSA
9 violations, right?
10   A. Yes.
11   Q. Mr. McNamara also reported these FLSA
12 violations to the Department of Labor?
13   A. I'll take your word for that.
14   Q. In September of 2023, Boat Town separated Mr.
15 McNamara's employment after nearly a year and a half of
16 working at Boat Town?
17   A. I know he was terminated -- what did you say,
18 what date?
19   Q. September 8 -- or September 15th is when he was
20 terminated.
21   A. I'll take your word for that.
22   Q. And like we discussed earlier, September 8th is
23 when the Department of Labor came in?
24   A. I believe we had been notified long before
25 that, by Mr. McNamara.

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

122

1  you've got, I've just got a physical copy, and then I
2  have the list of questions that you issued.
3  Q. Okay. And do you agree that if you start
4  reviewing something else, you'll just let me know what
5  it is?
6  A. I will.
7  Q. And you got your cell phone or tablet there
8  with you?
9  A. My cell phone is in the office, but it's shut
10 off and upside down.
11 Q. Perfect.
12     If that changes, will you agree to let me
13 know?
14 A. I will.
15 Q. And you already got that turned off, but I know
16 you're on your computer.
17     Will you just agree not to communicate with
18 anyone while you're on that commuter -- computer, while
19 I'm talking with you?
20 A. I will.
21 Q. Okay. And then -- now, you understand that
22 you're here as a designated corporate representative for
23 Boat Town, correct?
24 A. I do.
25 Q. And I know you have one in front of you, so

123

1  that notice of deposition with topics, you've had the
2  chance to review that?
3  A. I did.
4  Q. And you specifically are talking about topics
5  four, five, six, eight, and nine?
6  A. Correct.
7  Q. And you understand that you're -- you're
8  testifying on behalf of Boat Town, not in your
9  individual capacity as Bonnie?
10 A. I do.
11 Q. And what did you do to prepare for this
12 deposition?
13 A. I spoke with Tom Lang, which is our accountant
14 and comptroller.
15 Q. Okay. Did you review any documents to prepare
16 for this deposition?
17 A. The only things that I looked at were items
18 that you requested regarding hours worked and pay steps
19 for the client.
20 Q. Okay. And other than Mr. Lang, did you speak
21 with anyone else to prepare for today?
22 A. Hannah McRee.
23 Q. And that's the other person that we talked
24 about in accounting?
25 A. Correct.

124

1  Q. Okay. And I'm making sure I'm not asking you
2  redundant questions here.
3     Are you prepared to testify on behalf of
4  Boat Town for the topics that you have been designated
5  for?
6  A. I am.
7  Q. Okay. Let me scroll down to those topics,
8  then, and I can -- you know, you have that in front of
9  you, but I'll also screen share it to make it a little
10 bit easier for you as well.
11    So I'll go down to topic four and screen
12 share that, and just let me know when you can see it.
13 A. I can see it.
14 Q. (BY MS. SCHEEF) Okay. Perfect.
15    And so starting on topic four, your -- you
16 have a copy with you of the employee handbook for -- for
17 Boat Town?
18 A. I do.
19 Q. Do you know when that was written?
20 A. This particular version was written -- well,
21 it's -- they call it the 2022. I think it was in -- in
22 2021, is when it was implemented.
23 Q. Okay. And I'm just going to pull up that
24 handbook. I'm going to be on page 5, if you also want
25 to take a look on page 5, but I'll also screen share it.

125

1  A. Okay.
2  Q. Page 5 here talks about the hourly procedures
3  for Boat Town, right?
4  A. Correct.
5  Q. And this was the policy in place when Mr.
6  McNamara was employed?
7  A. It was, is.
8  Q. And here, it says, in the second paragraph, you
9  will be paid overtime if you work more than 40 hours
10 between Wednesday and Tuesday, right?
11 A. Correct.
12 Q. Is that kind of what y'all considered your work
13 week, is Wednesday to Tuesday?
14 A. That's how payroll falls, yes.
15 Q. Okay. And how were y'all doing payroll?
16    Was it being paid on -- we know a biweekly
17 basis, but was it on certain days of the week?
18 A. As to when it was figured or when they were
19 paid?
20 Q. When they were paid.
21 A. They were paid on Fridays.
22 Q. Okay. And when --
23 A. Or I guess they were Wednesdays, actually. The
24 hourly employees were paid on Wednesdays, so --
25 Q. Okay. So hourly employees paid on Wednesdays,

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

130

1  Q. Okay. Moving on.
2       So before Mr. McNamara made his report,
3  Boat Town was calculating overtime by if you worked over
4  80 hours in 2 weeks, rather than 40 hours in 1 week,
5  right?
6  A. I believe that's how Patti was calculating,
7  yes.
8  Q. And that can cause some problems, because you
9  could work 45 hours one week, and 35 the next week, and
10 have 80 hours?
11 A. When it was brought to the attention of the
12 owners and to Boat Town, realized that the error had
13 been made, and the corrections have been made since
14 then.
15 Q. But that -- that wasn't my -- really my
16 question.
17      My question was, the problem would be if
18 you worked 45 hours 1 week and 35 hours the next week,
19 you would have 80, and you wouldn't get paid overtime
20 for that 45 hours?
21 A. Understood. And that's why the correction was
22 made.
23 Q. Okay. And I know it seems like maybe we need
24 to have a conversation with Ms. Shook about this, but
25 what was the -- do you know the reasoning behind why

131

1  that was used as the calculation method?
2  A. You'd have to speak with Patti.
3  Q. Okay. And she never told y'all why she used
4  that as a calculation method?
5  A. I believe that was the form that they used at
6  her previous employer.
7  Q. And -- but now y'all are calculating it the
8  correct way?
9  A. Correct.
10 Q. Okay. And you made this change after Mr.
11 McNamara's report and after the Department of Labor came
12 in?
13 A. Correct.
14 Q. Okay. Have y'all changed, I guess, your
15 handbook in any way to reflect the change in the way you
16 calculate overtime?
17 A. The handbook actually says the correct way to
18 figure overtime.
19 Q. Okay. So it was just the system, that it was
20 calculating it wrong?
21 A. Correct.
22 Q. And we heard a little bit about it earlier, but
23 what was the system you used for hourly employees to
24 track time?
25 A. Lightspeed is the accounting software that we

132

1  use for them to clock in and out.
2  Q. Okay. And did Lightspeed just have the
3  settings set a certain way where it was done on a
4  biweekly basis?
5  A. It's actually figured each day.
6  Q. It's done each day?
7  A. Uh-huh, correct.
8  Q. And then --
9  A. It's hours each worked each day.
10 Q. And then did Ms. Shook manually go in and do
11 the two weeks?
12 A. The -- that information is manually put into
13 the third-party company. We use ADP.
14 Q. Okay. So it goes from the original one to ADP?
15 A. Correct.
16 Q. And you said y'all manually do that?
17 A. Correct.
18 Q. Okay. And is that the same process y'all
19 utilize now?
20 A. It is.
21 Q. Okay. And then payroll is just run through
22 ADP?
23 A. Correct.
24 Q. Okay. Was there automated calculations of the
25 time and a half or overtime done through ADP, or did

133

1  y'all do that yourself?
2  A. That's manually input.
3  Q. Okay. So it was someone, I'm guessing Patti at
4  the time, manually calculating time and a half for
5  people's -- well, hours worked over 80 hours a week, at
6  the time?
7  A. She doesn't manually -- they don't compute the
8  overtime, they input the hours, so --
9  Q. Okay. That makes sense.
10      And then -- so all hours were tracked
11 through that software we discussed while Mr. McNamara
12 was employed there?
13 A. Correct.
14 Q. And I know we discussed a little bit earlier,
15 where it says that there must be approval for overtime,
16 and obviously sometimes that doesn't happen, but if you
17 needed to request approval, how would you do it?
18 A. As far as overtime, the approval is probably
19 made, especially for your client's position, by the
20 person that sends him out to deliver the boat, pick up
21 the boat. They know he's going to be working overtime.
22 Q. Okay.
23 A. So that's preemptive, approving the overtime.
24 Q. And would that be for Mr. McNamara, Clay, and
25 Chuck?

CORPORATE REPS FOR BOAT TOWN, INC. 8-14-2025

**150**

```
 1              CHANGES AND SIGNATURE
 2   WITNESS NAME: BONNIE HARRELL DATE: AUGUST 14, 2025
 3   PAGE LINE      CHANGE           REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

**151**

```
 1       I, BONNIE HARRELL, have read the foregoing
     deposition and hereby affix my signature that same is
 2   true and correct, except as noted above.
 3
 4
                 _____
 5                       BONNIE HARRELL
 6
 7   THE STATE OF _____)
 8   COUNTY OF _____)
 9
10       Before me, _____, on this day
11   personally appeared BONNIE HARRELL, known to me (or
12   proved to me under oath or through
13   _____) (description of identity
14   card or other document) to be the person whose name is
15   subscribed to the foregoing instrument and acknowledged
16   to me that they executed the same for the purposes and
17   consideration therein expressed.
18       Given under my hand and seal of office this
19   _____ day of _____, _____.
20
21
22              _____
                NOTARY PUBLIC IN AND FOR
23              THE STATE OF _____
                COMMISSION EXPIRES: _____
24
25
```

**152**

```
 1          IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                     AUSTIN DIVISION
 3   KADEN MCNAMARA on Behalf   )
     of Himself and Others      )
 4   Similarly Situated,        )
                                )
 5            Plaintiff,        ) CIVIL ACTION
                                )
 6   VS.                        ) NO.: 1:24-CV-869-DII
                                )
 7                              )
     BOAT TOWN, INC., CLAYTON   )
 8   RAVEN, and CLAY RAVEN,     )
                                )
 9            Defendants.       )
10
11              REPORTER'S CERTIFICATION
12     DEPOSITION OF ROBERT CLAYTON RAVEN and BONNIE HARRELL
13                    AUGUST 14, 2025
14       I, Claudia White, Certified Shorthand Reporter in
15   and for the State of Texas, hereby certify to the
16   following:
17       That the witness, ROBERT CLAYTON RAVEN and BONNIE
18   HARRELL, was duly sworn by the officer and that the
19   transcript of the oral deposition is a true record of
20   the testimony given by the witness;
21       I further certify that pursuant to Federal Rules of
22   Civil Procedure, Rule 30(e)(1)(A) and (B) as well as
23   Rule 30 (e)(2) that the signature of the deponent:
24       _X_ was requested by the deponent and/or a party
25   before completion of the deposition and is to be
```

**153**

```
 1   returned within 30 days from date of receipt of the
 2   transcript.  If returned, the attached Changes and
 3   Corrections and Signature pages contain any changes and
 4   the reasons therefor;
 5       ___ was not requested by the deponent and/or a
 6   party before the completion of the deposition.
 7       I further certify that I am neither counsel for,
 8   related to, nor employed by any of the parties or
 9   attorneys in the action in which this proceeding was
10   taken, and further that I am not financially or
11   otherwise interested in the outcome of the action.
12       Certified to by me this 25th day of August, 2025.
13
14
15
16                    _____
17                    Claudia White, CSR No. 8242
                      Expiration Date: 5/31/2027
18                    The Legal Connection
                      8656 West Highway 71
19                    Building F, Suite 200
                      Austin, TX 78735
20                    CRCB Firm No. 656
                      P: 512-892-5700  F: 512-892-5703
21
22
23
24
25
```

THE LEGAL CONNECTION
WWW.TLC-TEXAS.COM - 855.327.7901