# Exhibit "B"

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3   KADEN MCNAMARA on Behalf    )
     of Himself and Others       )
 4   Similarly Situated,         )
                                 )
 5              Plaintiff,       )  CIVIL ACTION
                                 )
 6   VS.                         )  NO.: 1:24-CV-869-DAE
                                 )
 7   BOAT TOWN, INC., CLAYTON    )
     RAVEN, and CLAY RAVEN,      )
 8                               )
                Defendants.
 9

10       ----------------------------------

11           ORAL DEPOSITION OF KADEN MCNAMARA

12                    AUGUST 13, 2025

13                       VOLUME 1

14       ----------------------------------

15       ORAL DEPOSITION OF KADEN MCNAMARA, produced as a

16   witness at the instance of the DEFENDANTS, and duly

17   sworn, was taken in the above-styled and numbered cause

18   on August 13, 2025, from 9:28 a.m. to 12:07 p.m., before

19   Marta M. Johnson, CSR No. 10743, in and for the State of

20   Texas, reported by machine shorthand, at the law offices

21   of Jackson Lewis P.C., 93 Red River Street, Suite 1150,

22   Austin, Texas 78701, pursuant to the Federal Rules of

23   Civil Procedure and the provisions stated on the record

24   or attached hereto.

25
```

Page 2

```
 1                        APPEARANCES
 2   FOR THE PLAINTIFF KADEN MCNAMARA:
 3       MS. TANNER SCHEEF, ESQ.
         KAPLAN LAW FIRM, PLLC
 4       2901 Bee Cave Road
         Suite G
 5       Austin, Texas  78746
         Phone: (512) 814-8522
 6       Tscheef@kaplanlawatx.com
 7
     FOR THE DEFENDANTS BOAT TOWN, INC., CLAYTON RAVEN, and
 8   CLAY RAVEN:
 9       MR. MICHAEL J. DEPONTE, ESQ.
         JACKSON LEWIS P.C.
10       500 North Akard
         Suite 2500
11       Dallas, Texas  75201
         Phone: (214) 520-2400
12       Fax: (214) 520-2008
         Michael.deponte@jacksonlewis.com
13
14   ALSO PRESENT:
15       Bonnie Harrell
         Clayton Raven
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                           INDEX
 2
 3   KADEN MCNAMARA                                  PAGE
 4       Appearances                             2
 5       Examination By Mr. DePonte                 4
 6       Reporter's Certificate                    95
 7
 8                         EXHIBITS
 9   NO.       DESCRIPTION                          PAGE
10   Exhibit 1    Resume                            23
11   Exhibit 2    Resume                            25
12   Exhibit 3    Resume                            26
13   Exhibit 4    Resume                            28
14   Exhibit 5    Boat Town, Inc., Employee Handbook    51
15   Exhibit 6    Emails                            60
16   Exhibit 7    Boat Town Acknowledgement         61
17   Exhibit 8    Plaintiffs' Answers and Objections   86
                  to Defendants' First Set of
18                Interrogatories
19
20
21
22
23
24
25
```

Page 4

```
 1                     KADEN MCNAMARA,
 2   having been first duly sworn, testified as follows:
 3                       EXAMINATION
 4   BY MR. DEPONTE:
 5       Q.  All right.  Will you state your name for the
 6   record?
 7       A.  Kaden McNamara.
 8       Q.  All right.  Kaden, my name is Mike DePonte.
 9   I'm with Jackson Lewis.  You understand I represent the
10   defendants in this matter that you brought against Boat
11   Town?
12       A.  Yes.
13       Q.  Okay.  And this isn't a marathon.  If you need
14   to take a break, just let me know.
15       A.  Okay.
16       Q.  The only thing I ask is, if there's a question
17   on the table, if you would answer the question before we
18   take a break.
19       A.  Okay.
20       Q.  And you understand that your testimony today is
21   expected to be truthful and accurate as if you were in a
22   court of law testifying?
23       A.  Yes.
24       Q.  Okay.  And if you don't understand something
25   or -- something I ask you, will you ask me to clarify
```

Page 29

1  Q. Through whom? I'm sorry.
2  A. Work in Texas. It's a website.
3  Q. Is that a website you went to to -- or --
4  A. It's a website that you -- you are supposed to
5  sign up for when you receive unemployment.
6  Q. And when did they call you? Or when did they
7  reach out to you?
8  A. That's quite a while ago. Obviously, I -- I
9  assume before I started, but I don't know how long
10 before.
11 Q. Well, this indicates you're -- at least
12 Deposition Exhibit 3 indicates you worked for them from
13 May 2024 to August 2024. So would you agree with me
14 that it had to be before May 2024?
15 A. Correct.
16 Q. And if you were getting them through your
17 unemployment benefits, you would agree with me it had to
18 be after September 2023?
19 A. Correct.
20 Q. Okay. So we kind of have this six-month --
21 six-, seven-month window when I guess they reached out
22 to you?
23 A. If I recall correctly, I only had a few weeks
24 to prepare for that position, if that.
25 Q. And what kind of preparations did you do for

Page 30

1  that position?
2  A. Well, at first we thought it was going to be an
3  overnight position, so I started switching my schedule
4  for that.
5  Q. What were you switching your schedule from?
6  A. From waking up at 8:00 or 9:00 in the morning
7  and going to bed at 9:00 or 10:00 at night.
8  Q. So changing your sleep schedule?
9  A. Yes.
10 Q. And you indicate that your employment there
11 ended in August of 2024; correct?
12 A. Yes.
13 Q. Why did it end?
14 A. The contract was up. The job was completed.
15 Q. Did they have any other contracts?
16 A. That I don't know.
17 Q. Did you seek any other work with them?
18 A. Yes.
19 Q. But you weren't hired?
20 A. Correct.
21 Q. Do you know why?
22 A. I believe they don't -- they didn't need a boat
23 driver anymore. I think the rest of their stuff was on
24 land.
25 Q. And did you have any disciplinary issues with

Page 31

1  Lynx?
2  A. No.
3  Q. Who was your supervisor?
4  A. I don't recall his name at the moment.
5  Q. Do you remember who hired you?
6  A. Kelly.
7  Q. What is Kelly's last name?
8  A. That I don't know.
9  Q. And how much did you make at Lynx Contractors?
10 A. It was $2,000 a week.
11 Q. Was that -- was that wages or as an independent
12 contractor?
13 A. As an independent.
14 Q. So unless my math is wrong, you were making
15 about $104,000 a year with them during the four months
16 you worked there for them?
17 A. For a very short amount of time.
18 Q. Well, May through August of 2024; correct?
19 A. Correct. And it was the end of May to the
20 beginning of August.
21 Q. So basically three months?
22 A. I believe so.
23 Q. Do you recall how much a week you were making
24 at Boat Town?
25 A. That I don't remember.

Page 32

1  Q. Do you remember how many -- how much you were
2  paid per hour at Boat Town?
3  A. It was different throughout the entire thing.
4  I think I started at $18 and ended up at $24 an hour.
5  $22 an hour.
6  Q. So at 40 hours a week, $24 an hour, that's
7  about $960 a week; correct?
8  A. Yes. That sounds right.
9  Q. So you kind of doubled what you were making
10 working for Lynx than what you were making at Boat Town?
11 A. Yes. But it was a contract position and I
12 needed to deal with my own taxes.
13 Q. And then you -- you immediately got a job at
14 Icon as an associate test technician?
15 A. Yes.
16 Q. In August of 2024?
17 A. Pretty -- pretty close after that, yeah.
18 Q. How did you come across that job?
19 A. I got referred into that position by McKenna's
20 brother.
21 Q. And what did you do for Icon?
22 A. I was a test technician, so...
23 Q. What does a test technician do?
24 A. Basically I was working on their machines,
25 getting them ready for field, also testing new

Page 33

1  improvements, and I guess many other things, but that
2  was the main goal.
3     Q.  When you say "working on their machines," what
4  type of machines do they have?
5     A.  They -- they are 3-D printing machines for
6  homes, making homes out of concrete.
7     Q.  And how much did you make at Icon?
8     A.  $24 an hour, I believe.
9     Q.  And were you working 40 hours a week?
10    A.  I believe so.
11    Q.  Did you work more than 40 hours a week?
12    A.  I believe sometimes, yes.
13    Q.  So some overtime?
14    A.  Some overtime.
15    Q.  And your resume indicates that you worked there
16 from August of 2024 to March 2025?
17    A.  Yes.
18    Q.  Why did your employment there end?
19    A.  They did a company layoff of about 37 -- 33 to
20 37 percent of their workforce.
21    Q.  How large was their workforce?
22    A.  Large.  At least a couple hundred employees.
23    Q.  Before the layoff?
24    A.  Yes.  And that's as far as I know.  I wouldn't
25 know specifics.

Page 34

1     Q.  And do you know how it was that you were
2  selected for the layoff?
3     A.  I do not.
4     Q.  And so what did you do after Icon?
5     A.  We get into, I guess, current now.  I've been
6  looking for jobs consistently since then, reaching out
7  to anybody I could.
8     Q.  So did you file again for unemployment after
9  your work with Icon?
10    A.  I did.  I was denied the first time just
11 because of how much money I made in the last year.  That
12 was acceptable to them.  And then I filed again in July
13 and was accepted.
14    Q.  And how much in unemployment benefits do you
15 receive?
16    A.  Currently?
17    Q.  Yes, sir.
18    A.  None.
19    Q.  How much did you receive in July?
20    A.  None.  Currently it's not accepted yet.
21    Q.  Oh.  So you've refiled but you're still not
22 receiving benefits yet?
23    A.  Correct.
24    Q.  How much did you make in unemployment benefits
25 after your employment with Boat Town?

Page 35

1     A.  I would have to look back at the paperwork.
2     Q.  And aside from your Department of Labor
3  complaint that you identified in the petition, have you
4  filed any complaints with any other state or federal
5  commissions or entities?
6     A.  I don't believe so.
7     Q.  Did you -- after your employment with Boat
8  Town, did you apply for any positions that you did not
9  receive?
10    A.  Many.
11    Q.  Okay.  Then did you receive -- did you apply
12 for any positions after your employment with Boat Town
13 that you received but declined?
14    A.  Not that I recall at the moment.
15    Q.  So since September 2023, you haven't declined
16 any jobs?
17    A.  I believe there was -- there might have been
18 one that I declined due to liability.
19    Q.  I'm sorry.  I don't understand.
20        What do you mean "due to liability"?
21    A.  I believe, if I'm thinking about this
22 correctly, I think it was a -- another boat rental
23 place, but they wanted to hire me as an independent
24 contractor, which would mean that I needed my own
25 insurance.  And I wasn't comfortable with driving their

Page 36

1  boats under that risk.
2     Q.  How much were they willing to pay?
3     A.  Oh, that I don't remember.
4     Q.  And what was the name of the company?
5     A.  I would have to look back and see.
6     Q.  And so how soon after your employment with Boat
7  Town did you receive that offer?
8     A.  I believe that was more recent.  Like, within
9  the last six months.
10    Q.  Oh, I'm sorry.  I thought you said it was in
11 2023 that you declined it?
12    A.  No.  I did not say that.
13    Q.  And so what types of jobs did you look for
14 following your employment with Boat Town?
15    A.  Anything that I was qualified for.
16    Q.  And I'm sorry.  Let me take a step back.
17        When you say that this unknown boat rental
18 company wanted you to have your own insurance and hire
19 you as an independent contractor, was there an issue
20 with getting insurance as an independent contractor?
21    A.  I called around to see if I could, and I had
22 issues trying to find a company that would supply that.
23    Q.  Why did you have issues?
24    A.  I think it was a timing thing as well.  They
25 wanted me to start work almost immediately before I

Page 37

1 could take the time to find that kind of insurance.
2  Q. Did you talk to a broker about getting that
3 type of insurance?
4  A. A broker?
5  Q. Yeah.
6     Somebody who sells insurance?
7  A. Yes. I made a few calls.
8  Q. Not just insurance companies, but somebody who
9 specifically deals with insurance for independent
10 contractors or boats or those things?
11  A. I don't remember exactly who I talked to at
12 that point. This was a while ago.
13  Q. So you don't even know how much that would have
14 cost?
15  A. I don't.
16  Q. Did you go through any employment agencies for
17 work?
18  A. I did reach out to a few. One in North Austin.
19  Q. Did you get any placements through those
20 employment agencies?
21  A. I did not.
22  Q. And did you keep a list of the employers to
23 which you applied?
24  A. I'm keeping one currently. And I tried to make
25 one of my past applications from the data from Indeed

Page 38

1 and other sites.
2  Q. When did you try to make that?
3  A. I requested the information maybe a few weeks
4 ago. And I believe we sent it over last night.
5     MS. SCHEEF: Counselor, that's the
6 documents we produced yesterday.
7     MR. DEPONTE: Oh. All right. I'll have to
8 take a look at those.
9     MS. SCHEEF: Apologies for that.
10  Q. (BY MR. DEPONTE) All right. And did you limit
11 your search, your job search, at all by geography?
12  A. I did.
13  Q. Okay. What was the geography to which you
14 limited it?
15  A. I limited it to a -- a range where it would be
16 okay to drive. I believe it was -- it was 90 miles.
17  Q. So did you look for jobs in San Antonio?
18  A. I did.
19  Q. But you didn't look for jobs in Waco?
20  A. I don't know. I don't think so.
21  Q. Do you know how far Waco is from Austin?
22  A. I don't.
23  Q. Okay. If I told you it was a hundred miles,
24 would you agree with me that you didn't look in Waco?
25  A. Probably.

Page 39

1  Q. Okay. Did you limit your job search by wage?
2  A. Not really. I was open to work for basically
3 any pay.
4  Q. So aside from the two jobs that we've discussed
5 where you're making over a hundred thousand as a
6 contractor in one, and then the other one you were
7 making about $24 an hour in the other, you didn't -- you
8 couldn't find a job that even paid minimum wage?
9     MS. SCHEEF: Objection, form.
10     THE WITNESS: I -- I don't know if I agree
11 with that entire statement.
12  Q. (BY MR. DEPONTE) Okay. Well, did you apply
13 for any jobs that paid minimum wage?
14  A. Yes.
15  Q. And you didn't -- couldn't get any of them?
16  A. No.
17  Q. And is that in the record that you provided me
18 last night?
19  A. I believe so. I even applied to Home Depot and
20 Lowe's.
21  Q. Are there any jobs that you interviewed for
22 that you did not get?
23  A. Yes.
24  Q. Is that in that list that you provided?
25  A. I don't believe that, like, I marked which ones

Page 40

1 I went on interviews for. I think I've had less than 15
2 interviews over the past couple of years.
3  Q. So did you interview for the job at Icon?
4  A. I did.
5  Q. And did you interview for the job at Lynx?
6  A. Technically. I think it was a phone call and
7 interview.
8  Q. And so in the less than 15 that you -- that you
9 just described, did those include phone interviews?
10  A. Yes. Along with Zoom calls and in person. And
11 that's a rough guess. I -- I haven't totaled that
12 together.
13  Q. Was there any period of time after your
14 employment with Boat Town that you could not work?
15  A. No. I was able to work the entire time.
16  Q. So aside from these two jobs at Lynx and Icon,
17 did you have any other sources of income since your
18 employment with Boat Town?
19  A. I don't believe so.
20  Q. Do your parents support you?
21  A. Yes.
22  Q. They send you money?
23  A. Yes, to an extent.
24  Q. How much did they send you?
25  A. That I don't know. I know they helped with

Page 69

1   Q. When did you, or did you ever speak to anyone
2  from the Department of Labor?
3   A. I believe they reached out. I don't know the
4  specific date that they did. I know that they had also
5  told me when they had made contact with Boat Town, and I
6  believe that was in August.
7   Q. Did you have any emails with the Department of
8  Labor?
9   A. As far as I know, I -- I think we did talk over
10 email briefly, or they had sent something to me. I
11 don't remember exactly what was on there.
12  Q. And you said the Department of Labor came out
13 in August. Would that be August 2023?
14  A. The Department of Labor came to Boat Town on
15 the 7th of September, about eight days before my
16 termination.
17  Q. Do you know -- so you weren't, like, on any of
18 the correspondence between the Department of Labor and
19 Boat Town; correct?
20  A. Not that I know of.
21  Q. So you don't know what was discussed between
22 Boat Town and the Department of Labor?
23  A. Not -- no.
24  Q. So you said the Department of Labor came out on
25 September 7th. You were -- were you working that day?

Page 70

1   A. I was. Although, I didn't know who they were.
2  I think I saw them pull up, but then I had other duties
3  elsewhere and couldn't stay at the shop.
4   Q. So how long were you at the shop?
5   A. That I don't remember. I don't think it was
6  very long in the morning.
7   Q. Did you come back to the shop?
8   A. Near -- yes, after a few hours.
9   Q. Was -- I think you said a car or whatever
10 pulled up that you didn't recognize. Was that still
11 there when you got back?
12  A. It was not.
13  Q. Do you know if the Department of Labor came out
14 again after that September 7th?
15  A. I do not know.
16  Q. Do you know if the Department of Labor spoke to
17 any employees?
18  A. I heard rumors that they had done interviews.
19  Q. But you don't know?
20  A. I was not present.
21  Q. So you don't know?
22  A. I -- I -- correct. I -- I don't know. I only
23 heard it from Daniel and others.
24  Q. So when you allege in your petition that Boat
25 Town would not allow you to speak to the Department of

Page 71

1  Labor, you were only there for a short while in the
2  morning and then you were offsite. And when you came
3  back on site, the Department of Labor was gone; correct?
4   A. Correct.
5   Q. So how is it that Boat Town didn't allow you to
6  speak to the Department of Labor?
7   A. Where did I allege that?
8   Q. Well, let's see. And this is my copy, but take
9  a look at -- Paragraph 31 says "McNamara was not allowed
10 to be involved in these meetings when the Department of
11 Labor came out."
12  A. That's true.
13  Q. So how is it that Boat Town did not allow you
14 to meet with the Department of Labor?
15  A. I don't think it's not that they didn't allow
16 me, it's that I wasn't privy to the information.
17  Q. Well, it says "not allowed." I mean, that's
18 your allegation.
19  A. Can I see it again?
20  Q. Sure. That's your allegation in the lawsuit.
21 You're saying you were not allowed.
22  A. I -- I wasn't a part of the meetings. I
23 wasn't -- you know, I was -- I was busy doing other
24 things.
25  Q. But would you agree that there is a difference

Page 72

1  between doing your job and Boat Town affirmatively not
2  allowing you to talk to the Department of Labor?
3   A. Yes.
4   Q. Okay. And are you aware that Boat Town never
5  even knew why the Department of Labor came out?
6   A. I find that hard to believe.
7   Q. Why do you find that hard to believe?
8   A. Because of my allegation -- or my -- my
9  discussions with them about the issue.
10  Q. The discussions with them about the issue?
11  A. About -- about the overtime being paid
12 incorrectly.
13  Q. So you're saying them being your discussions
14 with the company about the overtime issue --
15  A. Yes.
16  Q. -- back in June; correct?
17  A. Yes.
18  Q. Do you know the reasons why the Department of
19 Labor does audits or visits employers?
20  A. Specifically?
21  Q. Yes.
22  A. No.
23  Q. Okay. And are you aware that the Department of
24 Labor, if they receive a complaint, does not tell the
25 employer why they are there?

Page 93

1  CHANGES AND SIGNATURE TO THE ORAL DEPOSITION OF
2           KADEN MCNAMARA
3           AUGUST 13, 2025
4  PAGE    LINE    CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 94

1       I, KADEN MCNAMARA, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5           _____
            KADEN MCNAMARA
6
7
8
9  THE STATE OF _____)
10 COUNTY OF _____)
11
12      Before me, _____, on
13 this day personally appeared KADEN MCNAMARA, known to me
14 (or proved to me under oath or through
15 _____) (description of identity
16 card or other document)) to be the person whose name is
17 subscribed to the foregoing instrument and acknowledged
18 to me that they executed the same for the purposes and
19 consideration therein expressed.
20      Given under my hand and seal of office this
21 _____ day of _____, _____.
22
23
24           _____
             NOTARY PUBLIC IN AND FOR
25           THE STATE OF _____
             COMMISSION EXPIRES: _____

Page 95

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION
3  KADEN MCNAMARA on Behalf   )
   of Himself and Others      )
4  Similarly Situated,        )
          Plaintiff,          )
5  VS.                        ) CIVIL ACTION
   BOAT TOWN, INC., CLAYTON   )
6  RAVEN, and CLAY RAVEN,     ) NO.: 1:24-CV-869-DAE
          Defendants.         )
7
             REPORTER'S CERTIFICATION
8         DEPOSITION OF KADEN MCNAMARA
                AUGUST 13, 2025
9      I, Marta M. Johnson, Certified Shorthand Reporter
10 No. 10743, in and for the State of Texas, hereby certify
11 to the following:
12      That the witness, KADEN MCNAMARA, was duly sworn by
13 the officer and that the transcript of the oral and
14 videotaped deposition is a true record of the testimony
15 given by the witness;
16      That the original deposition transcript was
17 delivered to _____,
18      That a copy of this certificate was served on all
19 parties and/or the witness shown herein on
20 _____.
21      That the amount of time used by each party at the
22 deposition is as follows:
23      MR. MICHAEL J. DEPONTE, ESQ. - 02 HOURS:05
   MINUTE(S)
24      MS. TANNER SCHEEF, ESQ. - 00 HOURS:00 MINUTE(S)
25      I further certify that pursuant to FRCP Rule

Page 96

1  30(f)(1) that the signature of the deponent:
2  _____ was requested by the deponent or a party
3  before the completion of the deposition and that the
4  signature is to be before any notary public and returned
5  within 30 days from date of receipt of the transcript.
6  If returned, the attached Changes and Signature Page
7  contains any changes and the reasons therefore.
8  _____ was not requested by the deponent or a
9  party before the completion of the deposition.
10      I further certify that I am neither counsel for,
11 related to, nor employed by any of the parties or
12 attorneys in the action in which this proceeding was
13 taken, and further that I am not financially or
14 otherwise interested in the outcome of the action.
15      Certified to by me this 29th day of August, 2025.
16
17      [signature]
18      _____
        Marta M. Johnson, Texas CSR 10743
19      Expiration Date: 10/31/26
        Deposition Resources, Inc.
20      Firm Registration No. CRF-409
        515 North Church Street
21      Palestine, Texas 75801
        efile@depositionresources.com
22      (800) 295-4109
23
24
25