# Exhibit "C"

1:24-cv-869-DII

KADEN McNAMARA vs BOAT TOWN, INC., CLAYTON RAVEN, et al

PATRICIA LYNN SHOOK

SEPTEMBER 17, 2025




WWW.TLC-TEXAS.COM | 855.327.7901

(Exhibit 1 marked.)
**Q. Do you -- can you see what I'm sharing?**
A. Yes.
**Q. Do you see where it says Defendant Boat Town, Inc.'s Objections and Answers to Plaintiff's First Set of Interrogatories?**
A. Yes.
**Q. Do you remember helping make these?**
A. I don't understand. Make them.
**Q. So here at Interrogatory 1, when it says, Please identify each person from whom information or documents were obtained to answer these interrogatories and respond to Plaintiff's First Request for Production to Defendant and who assisted in the preparing -- preparing the responses and objections to said discovery requests and identifying the interrogatory or requests for production each person helped answer.**
**And it says Patti Shook.**
A. Okay.
**Q. Do you see that?**
A. Yes, I see that.
**Q. So did you review these interrogatories and the answers that were given to --**
A. No, I -- no, I did not.
**Q. So if we received a verification of these**



**interrogatories with your signature, you didn't actually review these?**
A. Correct.
**Q. Okay. Were you asked at all about these questions and your memory whatsoever?**
A. No, not --
MR. DePONTE: Objection to the --
Wait, wait, Patti.
Objection to the extent you're seeking attorney-client communications. And I'll instruct the witness not to answer that question.
**Q. Did you review this document, Patti?**
A. Not really.
**Q. Okay. Moving on into kind of the questions regarding the nitty-gritty of overtime. And trust me, doing employment law, I know it is a confusing world.**
**So before you went to Boat Town, how long had you been doing kind of roles similar to the controller position at Boat Town?**
A. The same role is the question?
**Q. I guess roles of adjacent duties.**
A. Well, the thing is because I've been in the automotive and -- and dealership business for 40 years, but not always in a controller position.
**Q. In --**



A. I started in the boat and -- well, automotive business when I was 16.
**Q. I guess my question is, how many years have you been dealing with things like running payroll, doing overtime?**
A. Just at Boat Town.
**Q. Just at Boat Town. Okay.**
A. Yes, ma'am.
**Q. And when Mr. McNamara came to you, Boat Town had been calculating overtime at a 2-week basis?**
A. Can you -- can you re-question that? I mean, how were we paid biweekly?
**Q. Yes. So you were -- but you were calculating overtime based on whether or not someone was working over 80 hours every 2 weeks, right?**
A. That is correct.
**Q. How long had Boat Town been doing that?**
A. I have no idea.
**Q. Was that the --**
A. I know how long I did it. You know, from the time I started doing payroll. I have no idea of prior.
**Q. Did Jan have it that way?**
A. Yes.
**Q. Sorry, I think your audio might have gone out. Can you repeat your answer?**



A. I don't -- I don't -- I don't remember because I never checked her payroll.
**Q. Okay. How did you take over the system from her?**
A. She had a couple of spreadsheets, and she showed me how to pull the time sheets off the computer and showed me how her spreadsheets worked. And it was kind of you manually fill them in, and that was pretty much it. So I really -- she did train me, but not to massive extent I guess is a good way to put it.
**Q. Did she -- did you change her spreadsheets or her method in any way?**
A. No, not at all because I'm not a spreadsheet queen.
**Q. Neither am I, trust me. Had a class in undergrad where they wanted me to learn how to code and use Excel, and I was like, I'd rather not do this.**
A. Jan was -- Jan was very good at it.
**Q. I -- I guess going on to -- I guess I want some clarification on what the process was. I understand there was Lightspeed and then ADP. How did the process work from what -- what you remember?**
A. For payroll, to run payroll or process payroll?
**Q. To run payroll --**
A. Is that --

**Q. -- and calculate --**
A. -- is that the question.
**Q. Yes.**
A. Okay. In Lightspeed, I would print out all of the time clock sheets where they've clocked in and out. Lightspeed had a log-in and, you know, kept track of all their log-ins and outs. So I'd run those. And I would, yes, add up all their time. And then I -- of course there was flag sheets involved from the technicians. And once I put them into the spreadsheets, then I would log in to ADP and enter it all manually into ADP, and that -- that really is what processed it. I did all the additions and all that manually and entered it into Lightspeed -- I mean, into ADP. I'm sorry.
**Q. Okay. So where does the over 80 hours come in? Was that something you got from Lightspeed, from the spreadsheet or from ADP?**
A. I don't understand your question.
**Q. Sure. So --**
A. Where -- I mean, I don't understand what you're saying, where did the 80 hours come into play.
**Q. So where did you calculate overtime over 80 hours a week --**
A. On the --
**Q. -- or over 80 hours every 2 weeks?**



A. On their individual time sheet. In other words, it -- it would have a list of 2 weeks, total 2 weeks on the time sheet. And then at the bottom, it'd have a total hours for the 2 weeks. And if it said 81 hours, it was 80 regular and an hour overtime is how it was calculated.
**Q. Okay. And was Lightspeed, the Lightspeed spreadsheet, ADP process, that was in place with Jan?**
A. Yes.
**Q. Okay.**
A. Yes.
**Q. And then were you aware that calculating overtime on a 2-week basis was incorrect?**
A. I was not.
**Q. And when did you first learn that this was incorrect?**
A. When Mr. McNamara came to me and told me.
**Q. And we'll get into that a little bit, but did you ever, I guess, on your own look up guidance into how it was correctly done?**
A. No, not until after Mr. McNamara came to me. And then, yeah, WW Google search, you know. What are the FSLA whatever overtime rules in Texas.
**Q. It's the best --**
A. But not --



**Q. -- place to start off, I'll tell you that.**
A. Yeah. Not until then.
**Q. Okay. And then let me pull this up real quick. So you mentioned that you used the, I believe, Lightspeed, right?**
A. Yes, ma'am.
**Q. Do you know how long Boat Town had been using Lightspeed?**
A. Since I was there. I don't know prior to my arrival how long.
**Q. And did you just use Lightspeed for time tracking?**
A. No, Lightspeed was our accounting system.
**Q. Okay.**
A. ADP was just our payroll.
**Q. Okay. And can you explain to me how Lightspeed tracks time?**
A. Well, you go in the computer, you log in with your log-in, and you hit F whatever it is, 12, and it asks to you log in. You put in your time, you log in, and then you go about your business. And when you leave the end of the day, you go in and hit F12 again, and it clocks your time. And it saves it in the file, and you run a report on, okay. This 2-week period, I clocked in this many hours or whatever.



**Q. A lot simpler than having to do the physical card.**
A. Oh, I -- I've done those. I've added those up.
**Q. I did too, I did too.**
**So was there -- on Lightspeed, would it tell you how many hours someone worked a week?**
A. You could put it like that. It's just how you put it in the system. You would ask it, I want from this date to this date. Or you would say, you know, the one week or the two weeks. I just always pulled the two weeks since we were on a biweekly payroll.
**Q. Okay. So I'm going to pull up, I guess this won't really be an exhibit because it's a Web site, but I just have some questions on -- I'm pulling up Lightspeed's Web site on their labor and tracking and overtime settings. Do you see that?**
A. Yes.
**Q. Okay. And you see here it says, Set up overtime settings.**
A. Uh-huh.
**Q. Did you ever set up any overtime settings in Lightspeed?**
A. No, ma'am.
MR. DePONTE: Let me object to this line of questioning because there's no indication that this

is what was active at the time Boat Town was using Lightspeed. I assume this is not an archived page. This is a current page. So I don't know that this is really accurate. I mean, what -- Ms. Shook answered to the extent she can, but it's not necessarily a representation of what's in Lightspeed.

**Q. Okay. Well, here it does say, Set up Overtime Settings. Right, Ms. Shook?**

A. It says that, but I don't recall anything in my setup saying that, so...

**Q. Okay. I'm scrolling down a little bit here. Do you recall ever seeing a page like this on Lightspeed?**

A. No, ma'am.

**Q. Do you see where it says, Set your overtime and double time rules to enable us to populate your report correctly --**

A. Yes --

MR. DePONTE: Objection, form.

A. No, ma'am. I never saw that. I see that, but I never saw it.

**Q. Do you --**

A. In our setup.

**Q. Do you see here where it says, Please verify that your state's overtime and double time rules of the**



**US Department of Labor and enter any rules that apply for your business in the appropriate row below.**

A. I see that, yes.

MR. DePONTE: Can we agree to just a running objection to any questions related to this Web site?

MS. SCHEEF: Yeah, I'm fine with that.

MR. DePONTE: Thank you.

**Q. You see here it has kind of three options. One saying, Employees begin earning overtime after zero hours per week. Employees begin earning overtime after zero hours per day. Employees begin earning double time after zero hours per day.**

**Does that sound -- does that look correct from what you see on this screen?**

A. From what I see on the screen, yes, ma'am.

**Q. And there's no option here that says per every 2 weeks?**

A. No, ma'am.

**Q. Okay. But you don't recall ever going into the Lightspeed settings to see how --**

A. Never.

**Q. -- overtime?**

A. Never.

**Q. Okay.**



A. I didn't know that existed to be honest.

**Q. And so what would you download from or print from Lightspeed when you were doing payroll?**

A. It would be what's called a time card report.

**Q. And you would do that on a 2-week basis for each employee?**

A. That's correct.

**Q. -- that you had at the time?**

A. That's correct.

**Q. And those would be physically printed?**

A. Correct.

**Q. And then you would manually enter that into Excel?**

A. Correct.

**Q. And then would you upload the Excel to ADP or input the data manually into ADP?**

A. Manually input it.

**Q. And so you had to input each employee's individually?**

A. Correct.

**Q. Must have been very time consuming?**

A. Yes, ma'am.

**Q. And just double-checking this.**

**When you would enter it into ADP, and this is kind of my ignorance on how ADP works, would you put**



**in hours worked and overtime hours separately, and it would calculate the overtime?**

A. No, I would manually put in 80 hours and then the overtime over 80 into -- there's an overtime column.

**Q. Okay. And then --**

A. So I would separately put them in.

**Q. And then ADP would calculate the time and a half, right, I'm guessing?**

A. Correct. Based on what they were already put in the system at.

**Q. Okay. And do you know whose decision it was to do the 2-week basis for the overtime calculation?**

A. I don't recall. I don't know, honestly. Like I said, it was just passed over to me when Jan retired and, you know, kind of like monkey see monkey do.

**Q. You inherited it from them?**

A. Exactly and, you know, went with that.

**Q. Okay. And I guess getting into Mr. McNamara. Did you --**

A. Yes, ma'am.

**Q. -- you worked -- you worked with Mr. McNamara?**

A. I did.

**Q. How often would you interact with him?**

A. Hardly never.

**Q. Was he in a separate part of the shop, or were**

**you in a different location?**
A. Yes, he was.
**Q. And are you aware of what the duties are for a boat captain?**
A. No, I don't -- that's not my job to know that. That's Mr. Raven's.
**Q. Makes sense.**
**Are you aware, I guess, what -- was it part of the job duties for boat captains or other roles to assist members of the Raven family with their personal errands?**
MR. DePONTE: Objection, form.
A. I have no -- I have no idea.
**Q. Were you ever asked to do personal errands for the Ravens?**
A. No, ma'am.
**Q. If we heard from Mr. Raven that part of the boat captain's duties was to do personal errands for the Raven family, is that accurate from your experience?**
MR. DePONTE: Objection, form.
A. If -- I'm sorry. Can you rephrase that or ask it again?
**Q. Sure. If we heard from Mr. Raven, Sr. that --**
A. Yes.
**Q. -- part of the boat captain's duties was to**



**assist members of the family with their personal errands, was that accurate from your experience?**
MR. DePONTE: Objection, form.
You can answer if you can, Patti.
A. I have no idea because I don't -- I'm never aware of what they asked them to do. That's -- you know, I wasn't ever aware.
**Q. In your role --**
A. So --
**Q. -- go ahead.**
A. I can't answer that because I don't know.
**Q. And that's a perfectly fine answer. If you don't know, feel free to say it.**
A. Okay.
**Q. I always say that's -- that's the most common deposition answer. You hear it more than yes and no.**
**I guess my question is, you know, you have decades of experience. Was it normal for -- in your other companies for people to have to do personal errands for the owners of the company?**
MR. DePONTE: Objection, form.
A. Yes.
**Q. So you saw that in --**
A. Yes.
**Q. -- other employees doing personal errands?**



A. Yes, ma'am.
**Q. Okay. Do you know if doing those personal errands was counted towards someone's hours for working?**
A. I have -- I have no idea.
**Q. Okay. And so you're not sure if the Ravens allowed people to count those personal errands towards their working hours?**
A. That is correct.
**Q. Okay.**
A. I was not sure.
**Q. So I want to hop into your -- whenever Mr. McNamara came and first talked to you, that was around June 6, 2023, correct?**
A. I can't re -- I can't recall the dates.
**Q. That make sense. What I'm going to do is I'm going to pull up what we'll mark as Exhibit 2.**
(Exhibit 2 marked.)
A. And I don't have any stuff here to go off of and to look at, so...
**Q. And what I'm going to show you, I'll pull it up now, it is notes that Mr. McNamara was taking during these conversations. I just want to reference it for the dates.**
MR. DePONTE: Let me object because these have not been proven up. These are allegedly notes he



took during meetings.
MS. SCHEEF: I appreciate the objection. I think it's verging a little close towards instructing the witness, but --
MR. DePONTE: I --
MS. SCHEEF: -- I will note the objection.
**Q. Patti, I'm just asking you, does the date June 6, 2023 sound correct?**
A. I -- I have no idea, honest.
**Q. Do you remember at all when he came to complain?**
A. No, I don't recall.
**Q. Do you have any reason to dispute that this is accurate?**
A. No reason to dispute it. I just don't recall the date.
**Q. Okay. That makes sense. Well --**
A. And the time I don't -- I do know -- the only thing I can agree on on this that you're showing me is it was Geromi and me and Kaden. That's the only thing for sure I do know.
**Q. That's -- that's helpful for me. So Geromi was there as well. Geromi Trudeau, right?**
A. Correct.
**Q. And do you remember where this meeting would**

**have taken place?**
A. In Geromi's office.
**Q. And what was Geromi's role?**
A. You know, we really didn't like roles, but he was -- I would say he's a salesman, but sometimes he was over the captains, but --
**Q. And --**
A. -- he was the salesperson.
**Q. Do you remember Mr. McNamara raising the issue to you that overtime was being calculated improperly?**
A. Yes, I do.
**Q. And do you recall saying, This is how it has always been done.**
A. I don't recall that at all.
**Q. Do you recall saying, It saves the company money.**
A. No.
**Q. Okay. And whenever -- what was your reaction when Mr. McNamara came in?**
A. I was surprised. But, you know, I listened, and of course right away, I'm like, Okay. Well, I got to find out if I'm doing it wrong.
Like I said, I just -- well, assume. You should never assume, but I thought the 80 hours and then anything over 80 was correct. So I told him I would



check into it and, you know, let him know.
**Q. When he came to you, did he explain what he thought the correct method was?**
A. I don't recall. He might have. I don't recall.
**Q. Did he specifically mention the Fair Labor Standards Act or FSLA?**
A. I don't recall. Perhaps, but I don't recall.
**Q. Okay. And that day when you spoke with Mr. McNamara, did you bring it up to Mr. Raven?**
A. I don't think I did, no, not until I went and looked up. Like I said, I Googled, you know, overtime laws in Texas. I don't think I did, no, ma'am.
**Q. Do you recall speaking to Geromi and Kaden a second time that day a couple hours later?**
A. I don't recall.
**Q. Did you meet -- did you call Mr. McNamara back in after you did your research?**
A. I don't recall. I don't remember.
**Q. And that makes sense. I know it was several years ago, so I don't -- I probably wouldn't remember something that far back either. So no worries about that.**
**I guess, what do you do remember about those conversations with Geromi and Mr. McNamara?**



A. I just remember him bringing it up to me, and I -- like I said, I went and researched it, and I found out and realized yes, I was in fact figuring it wrong. And so that's when I think I went to Mr. Raven and told him, Look, you know, we've been doing this wrong. I need -- we need to fix this.
I did, too, at the time and part of my research, I called our ADP company. And I asked them, you know, how they figured overtime on a biweekly payroll. And I asked -- and I cannot remember the lady's name, but I asked her, I said, Do you figure, you know, anything over 80 hours was my question, or is it, you know, over 40?
She said, Well, I get paid biweekly, and that's how they pay me anything over 80.
So to me, you know, she said I was doing it right, but I did look it up, and I wasn't. So I didn't take her word for it.
**Q. Well, if ADP is doing it wrong, I don't know how any of us is doing it right.**
A. I mean, well, I didn't -- I didn't take her word for it. Like I said, I did do whatever Google search and stuff.
**Q. Okay. And then when Mr. McNamara came to you, did you understand that he was alleging that, you know,**



**potentially the overtime process was violating federal law?**
MR. DePONTE: Objection, form.
A. He did. He did.
**Q. And going over the notes of this conversation, do you recall talking about the process being difficult to fix and offering to give 2 hours -- overtime hours going forward to fix the issue?**
A. No.
**Q. Okay. And do you recall an option being, don't backpay it but fix it going forward? Do you recall --**
A. No. No.
**Q. Okay. Sharing just for a second.**
**So you said you kind of did your research, and you had been talking to Mr. McNamara. What was Clay Sr.'s reaction to you bringing up this issue?**
A. You know, I -- I really don't remember. I do remember bringing it up to him and telling him, you know, it was something that we needed to fix.
**Q. Did he have any knowledge about who had implemented this in the first place?**
A. No. Well, did I tell him that it was Mr. McNamara that came to me?
**Q. I guess --**
A. Is that the question?

**Q. So that's, what we hear there you believe to be Clay, Sr. talking to Mr. McNamara asking him how much he thinks he's owed?**
A. That's what it sounds like to me, yes, ma'am.
**Q. And he's specifically asking Mr. McNamara what he has calculated?**
A. That's what it sounds like.
**Q. And then at some point you try and say that you had calculated it, but he asks -- Mr. Raven says, I want to hear what he says.**
A. I didn't hear that, I'm sorry.
**Q. Okay. I'll go back a couple seconds.**
A. Yeah, I didn't hear that.
(Audio played)
**Q. You say -- Kaden says, Individual calculations like I assume that you did.**
**And then you say, Yeah, I did.**
**And then Mr. Raven says --**
A. Those are -- those are the calculations that I'd given him to go over.
**Q. And then Mr. Mc -- Mr. Raven says, I want to hear what he says.**
A. That's what it said on --
**Q. Okay.**
A. -- that recording.



**Q. And then going forward a little bit if I have my timestamps right. So we're at 1:23 in that audio clip.**
(Audio played.)
**Q. So I want to kind of talk about what we hear near the end of that. You mention that the other employees, that the payroll security issue. What did you mean by that?**
A. I don't have no idea. I don't recall. I have no idea what I meant. Unless I meant, you know, you don't need to be a part of what I'm going to figure or do for them. Maybe that's what I meant. I don't know.
**Q. And then Mr. Raven --**
A. Because his payroll -- his payroll's his, and his time's his, but he doesn't need to know how or what we're going to fix the others. Maybe that's what I meant.
**Q. Uh-huh.**
**Are you aware of the fact that employees do have the right to talk about wage issues with other employees?**
MR. DePONTE: Objection --
A. No. No, I wasn't aware. I'm not aware.
**Q. And do you hear, I guess, near the end of this clip, let's see.**



(Audio played.)
**Q. So Mr. Raven says something along the lines, It doesn't concern you legally or personally, Mr. McNamara.**
A. I heard that.
**Q. Was it your understanding that Mr. Raven was instructing Mr. McNamara not to talk to other employees about this issue?**
MR. DePONTE: Objection, form.
You can answer if you can.
A. Was that my understanding is the question?
**Q. Yes.**
A. That's what it sounded like.
**Q. Okay. So would Mr. McNamara have gotten in trouble if he had talked to other employees about this issue?**
MR. DePONTE: Objection, form.
A. I have no idea.
**Q. Okay. And then, so to your knowledge, Mr. McNamara made an internal complaint to Boat Town about not being paid properly for his overtime hours, right?**
A. Correct.
**Q. He specifically claimed that Boat Town's policies violated overtime law?**
A. I don't recall if that's how he said it, but...



**Q. The understanding is that he was saying that it violated the law?**
A. Correct.
**Q. Okay. And did you take any notes from your meetings with Mr. McNamara?**
A. No.
**Q. Were there any e-mails back and forth with anyone from Boat Town about the issue?**
A. With Boat Town, just probably with Clayton, Sr.
**Q. And so do you recall e-mailing with Clayton, Sr. about it?**
A. I -- I don't other than, you know, I probably talked to him in person. I don't recall e-mailing him about it.
**Q. Okay.**
A. I normally would call him on the phone. I don't, you know.
**Q. I understand. I'm a phone call person, too. My friends get very annoyed by it. They're like, You can text me. And I'm like, I want to call. So I understand.**
**I guess, are there any written records that you are aware of specifically regarding Mr. McNamara's complaint?**
A. Written complaints? The only written that

him -- Mr. McNamara and myself had was when I was sending him his numbers and trying to get him to approve and say yes, this is -- looks good to me. Those are the only e-mails back and forth he and I had.

**Q. Okay. Anyone else at Boat Town?**

A. No.

**Q. Okay.**

A. No.

**Q. And then --**

A. I feel it's a very private issue, and that's why it was just Mr. Raven and myself and...

**Q. But it did -- you know, it wasn't private because it applied to every single employee who was entitled to overtime, right?**

MR. DePONTE: Objection, form.

**Q. You can answer.**

A. Correct. But like I said, the whole situation I didn't feel needed to be publicized within the organization. It was just Mr. Raven and I and McNamara at that time.

**Q. Okay. I -- if you want to, this is a good break point if you would like to take a break, or we can keep pushing forward. Whatever you prefer here.**

A. I'm okay.

**Q. Let's keep pushing forward then.**



A. Let's go.

**Q. I appreciate it.**

MS. SCHEEF: And Mike, unless you or Jean need a break.

MR. DePONTE: No, let's push on.

MS. SCHEEF: Perfect.

**Q. Okay. I want to get into the Department of Labor. So were you aware that Mr. McNamara contacted the Department of Labor?**

A. No, I wasn't. I don't know who did.

**Q. Did you contact the Department of Labor?**

A. No, I did not.

**Q. Okay. So if we heard Mr. Raven say that you contacted the Department of Labor, that would be false?**

A. That's correct, he's -- I did not.

**Q. Okay.**

A. I contacted ADP.

**Q. Okay. And so you never contacted the Department of Labor reporting Boat Town?**

A. No, no.

**Q. Had anyone other than Mr. McNamara raised the overtime issue?**

A. No.

**Q. And so did the Department of Labor contact you first before showing up?**



A. Not me personally. But it was me, and I don't recall if it was Cody, Clayton and Clay on an e-mail. I was copied on an e-mail stating they wanted to do an investigation at that time. It's the first time I'd heard about it, knew about it or whatever.

**Q. Okay. So --**

A. And I don't recall when that was. It was an e-mail, though. And I assume, of course, as soon as I got that I got with Mr. Raven, and I was like, Hey, so they want to do this.

And I think if I'm not mistaken, I could be wrong, that's when we contacted our attorney --

**Q. Okay.**

A. -- or found an attorney.

**Q. So going back a little bit. Mr. McNamara makes a complaint. Department of Labor contacts y'all?**

A. Later.

**Q. Do you recall how much later?**

A. I don't. A month or two. I know I had already been in the process deep and heavy of recalculating everybody's overtime. And I had already paid Mr. McNamara his that he had signed off on and approved and signed that waiver. And I was already in the process of calculating all the other overtimes when we got the notice.



**Q. Okay. I guess my question is, if McNamara was the only one who had reported wage issues, and then the Department of Labor shows up, no one thought it was Mr. McNamara that reported y'all to the Department of Labor?**

MR. DePONTE: Objection, form.

You can answer if you can, Patti.

A. I didn't. I had no idea. If anybody else did, I didn't.

**Q. No one put two and two together and thought that it might have been Mr. McNamara given that he was the only one to raise the issue, and y'all told him not to talk to anyone about it?**

MR. DePONTE: Objection, form.

You can answer if you can, Patti.

A. Well, I have no idea, honestly.

**Q. Whenever you were dealing with the Department of Labor, you know, getting that e-mail from them, did Mr. Raven make any comments about Mr. McNamara?**

A. Not to my knowledge, no.

**Q. Did anyone bring up --**

A. Not -- not to me -- not to me. So if he did, I am not aware of it.

**Q. Okay. So you said it was an e-mail that you got from the Department of Labor that Boat Town got?**

A. Correct. Boat Town, and I was copied on it. I don't recall who else was, but yes, correct.
**Q. Okay. So that would be a part of Boat Town's e-mail records?**
A. Should be, yes, ma'am.
**Q. Okay. Don't know if we've necessarily received that, but I know that's -- you're no longer there, so that's why I'll let --**
A. Yeah.
**Q. -- stop right now.**
**So we heard from Mr. Raven that Boat Town hired someone to help comply with Department of Labor. Is that the attorney you were talking about?**
A. Yes, ma'am.
**Q. And I'm not going to ask you about, you know, the details and nitty-gritty of what you talked about with the attorney because that's not my business.**
A. No, yeah.
**Q. Was that -- I guess just timing-wise, was that before or after they showed up in person?**
A. Before.
**Q. Okay. And how many times did the Department of Labor come in person?**
A. Twice.
**Q. Okay.**



A. In person, yes.
**Q. And I'm guessing it was kind of a -- a lengthy correspondence beyond those, you know, two --**
A. In and out, yes. Yes, ma'am.
**Q. Okay. And you don't recall the exact dates of these visits?**
A. I don't.
**Q. Were you present at the meetings with the Department of Labor?**
A. I was.
**Q. Do you recall the name of the person at the Department of Labor you worked with?**
A. I don't recall. I know he was -- I know, don't take this bad, but I know he was Hispanic, but I don't remember his name.
**Q. Going back to those rogs just because I can't remember his last name off the top of my head. Let me pull it up. Does the name Michael Ramirez ring a bell?**
A. Correct, yes, that sounds -- Ramirez does. I don't know if it was Michael or whatever, but Ramirez sounds good.
**Q. And is he the only person with the Department of Labor that you worked with?**
A. Yes, ma'am.
**Q. And what did you discuss with the Department of Labor?**



A. He had e-mailed us, like, how far back and dates we had to go back to figure the overtime and everything to give them lists of who all it would entail, the employees, and gave us a date frame to gather the information for them.
**Q. And what was --**
A. And because it was 2 years, but not the same 2 years I thought it would be. I thought it was 2 years from whenever we first found out Mr. McNamara. So I had already -- like I said, I'd already gone back figuring it on 2 years because that was my -- you know, I was told 2 years was a good period. I don't remember who told me if you ask, but so I was already going back 2 years figuring it.
And so when they gave me the time frame that they wanted my records and to figure it from there, it was off a couple of months, you know, because wasn't a full -- it was a full 2 years, but it wasn't the same 2-year month I was pulling. So I -- you know, I went back to my spreadsheets and started figuring again. And then, you know, came up with my totals that I owed everyone, so.
And all of that, once I got it all together of course, yes, everything I did or -- or got



ready went through the attorney to the Department of Labor. I'd send it my attorney, and then he would forward it on to the Department of Labor.
**Q. Okay.**
A. And vice versa. They would send it to him and back to me.
**Q. Okay. And I'm sure it was a real pain to have to redo all those calculations, so...**
A. No, not really. Not really, no. Because, you know, ultimately in the end, I knew whatever the Department of Labor told me I needed to pay is what I was going to pay. I mean --
**Q. That's a good --**
A. -- it's...
**Q. And so did you go back only for current employees or for every single person --**
A. No.
**Q. -- who worked there?**
A. Ev -- every single person, I just put the time frame of who worked there. And I did it on both computers. I -- well, I say computers. ADP and Lightspeed, I pulled both reports. And if they were in that time frame an hourly employee, they got issued whatever, or they were figured.
**Q. Okay. Perfect. That kind of --**

this, oh, okay. So I did another check, separate check for the difference and paid them what the DOL told me I owed them.
**Q. Okay. Did you ever at any point pay them -- you know, you have your unpaid overtime amount. Did you ever pay them double that unpaid overtime amount?**
A. I don't understand the question. I guess I'm not -- I mean.
**Q. It's getting into potential, you know, it's a -- it's a -- not a legal question, but it's about a legal concept. Was -- did they ever receive not only the unpaid overtime, but double that unpaid overtime, or was it just --**
A. They re --
**Q. -- overtime?**
A. They received what the DOL told me to pay them.
**Q. And was that the unpaid --**
A. I don't know how -- I have no idea how they calculate it.
**Q. Okay.**
A. But I did get a calculation worksheet from them, and that's what I went by.
**Q. Okay. So you got a calculation worksheet from the DOL?**
A. Yes, ma'am.



**Q. Okay. And then did y'all make the employee or the people you sent the checks to sign waivers?**
A. Yes, ma'am. Well, I assume they did because I didn't hand them out, Clayton and Clay did. And they gave me their waivers. So I assume that's what happened.
**Q. Did you get one from every single person?**
A. Yes.
**Q. Even the past employees?**
A. I don't recall, honestly, to be honest because I don't recall if there were a lot of past employees that qualified. I don't recall.
**Q. That makes sense.**
**Okay. So this is the date I have. If it's accurate, let me know, but I have that the Department of Labor visited on September 8th, 2023. Is that around accurate from what you remember?**
A. Around that I remember.
**Q. And were you aware that Mr. McNamara was terminated on September 15th, 2023?**
A. I was not aware at the time. I was out on vacation. And when I got back from vacation, they told me. And honestly, you know, like I said, I didn't know that was even going to happen. I'm not usually thought about or considered in hiring or firing, so. And nine



times out of ten, I never would find out if anyone was let go until I got ready to do a payroll. And then they're like, Oh, they're not here no more.
I'm like, Oh, okay.
**Q. That makes sense. You answered some of my other questions in that answer. So that's helpful.**
**I guess, you know, September 8th is when the Department of Labor comes in, and he's terminated September 15th. That's just a week difference?**
A. That's true.
**Q. So Mr. McNamara was terminated a week after the Department of Labor came into Boat Town?**
A. If that's the correct dates, that's right.
**Q. Okay.**
A. To my -- you know, like I said, I don't know when he was terminated. I can only go off of what I was told.
**Q. Okay.**
A. Because I wasn't there.
**Q. Why were you told he was terminated?**
A. Because I'm doing payroll? Oh --
**Q. Oh, no I mean, like, what was the reason given for his termination. Sorry.**
A. I was -- I wasn't given.
**Q. They didn't tell you it was a layoff or for cause?**



A. No, ma'am.
**Q. Had you ever heard of any performance concerns with Mr. McNamara?**
A. Not to my knowledge. Not performance, no, ma'am. They don't come to me normally anyway about that.
**Q. It's outside of your -- your scope of your job. You don't have to deal with that.**
A. Thank goodness.
**Q. I -- I -- I agree with that, certainly.**
**So who told you about his termination?**
A. Clay.
**Q. And that's Clay, Jr.?**
A. Jr., Jr., yes.
**Q. Okay. And for -- this is for Tanner personally and making this case a little bit easier for everyone. Clay is Jr., Clayton is Sr.?**
A. That's correct, for me anyway. That's how I -- yeah. Yes, ma'am.
**Q. Perfect.**
**I guess, do you know if anyone was terminated alongside Mr. McNamara?**
A. The only one I'm aware of at the same time was Dylan Shafer (phonetic).

**let me know, but that concludes my questioning.**
MS. SCHEEF: And I pass the witness.
THE WITNESS: Will do. Thank you so much.
MR. DePONTE: Thanks, Patti. I'll --
THE WITNESS: It was a new experience.
MR. DePONTE: I'll reserve my questions for the time of trial.
That's it. You're good to go.
THE REPORTER: Okay. Does the witness want to read and sign?
MR. DePONTE: Yes.
THE REPORTER: Okay. Send it to you, Mr. DePonte?
MR. DePONTE: Please.
THE REPORTER: Okay. And would you like to purchase a copy as well?
MR. DePONTE: Yes, please.
THE REPORTER: Okay. Thank you.
We're off the record at 11:35 a.m.
(Deposition concluded at 11:35 a.m.)



CHANGES AND SIGNATURE

WITNESS: PATRICIA LYNN SHOOK DATE: SEPTEMBER 17, 2025

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE LINE CHANGE REASON CODE

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________



I, PATRICIA LYNN SHOOK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_________________________
PATRICIA LYNN SHOOK

THE STATE OF ______________)
COUNTY OF _________________)

Before me, ___________________________, on this day personally appeared PATRICIA LYNN SHOOK, known to me or proved to me on the oath of ________________ or through _________________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _________________, _______.

_________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ____________

My Commission Expires: _________



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

KADEN McNAMARA on Behalf of Himself and Others Similarly Situated,
Plaintiff,
vs. CASE NO. 1:24-cv-869-DII
BOAT TOWN, INC., CLAYTON RAVEN and CLAY RAVEN,
Defendants.

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF PATRICIA LYNN SHOOK
SEPTEMBER 17, 2025

I, Jean Thomas Fraunhofer, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PATRICIA LYNN SHOOK, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Pages contain any changes and the reasons therefor;