# Exhibit "D"

1:24-cv-869-DII

KADEN McNAMARA, et al vs BOAT TOWN, INC., CLAYTON RAVEN, et al

CLAYTON RAVEN, JR.

SEPTEMBER 17, 2025



THE LEGAL CONNECTION

WWW.TLC-TEXAS.COM | 855.327.7901

14
1  accident in 2022, correct?
2     A.  Correct.
3     Q.  But it did fire him for it, in part, a year and
4  a half later, correct?
5     A.  Yeah, you want to say that.
6     Q.  What changed in that year and a half to cause
7  Boat Town to fire him for this incident from that long
8  ago in September of 2023?
9     A.  Like I said, it was one of the several factors.
10    Q.  But --
11    A.  His work ethic any -- anyone here will testify,
12 the last several months he was here.  And I even told
13 him, kind of people behind the counter told him.  But
14 when you're sitting on your phone where customers can
15 see you in boats in a showroom and behind me, he was
16 either on his phone.  Several instances that I was told
17 about, he was sitting in a company truck with the truck
18 running playing on his phone outside in a storage lot
19 riding skateboards around the lot.  That's what did
20 this.  So I don't really know.  Y'all saying that it was
21 the accident, yeah.  And anyhow.
22    Q.  Instead of firing him, within a few weeks after
23 the boat accident, Boat Town hired Kaden as a permanent
24 full-time employee, correct?
25    A.  No, he was already a employee.  I guess he --

15
1  you know, I don't know what I mean by that.
2     Q.  Well, you approved of him remaining a full-time
3  employee after the accident?
4     A.  Yeah, I mean, to me.  To my knowledge, he was
5  already an employee again.
6     Q.  And Boat Town gave him multiple raises after
7  the accident as well, correct?
8     A.  I know of at least one --
9     Q.  And you approved of the one raise you knew
10 about, correct?
11    A.  Correct.  I needed people at work.  We were
12 busy in 2020, 2021 and 2022.
13    Q.  Okay.  Is there any policy at Boat Town against
14 boat captains also having real estate licenses?
15    A.  No.
16    Q.  Okay.  And did you --
17    A.  Not that I know of.  But no.
18    Q.  Did you know whether Kaden had a real estate
19 license?
20    A.  No, I never really had many personal
21 conversations with him.
22    Q.  Okay.
23    A.  As long as it didn't interfere with your job
24 and, you know, you doing your job.  I mean, we have
25 several -- several employees here that have things they

16
1  do on the side.
2     Q.  You mentioned the phone, the cell phone and the
3  skateboard.  When did whoever it was at Boat Town, you
4  or others, notice that he was on the phone or
5  skateboard?
6     A.  Are you talking, like, a timeline?  It was all
7  the time.  He was sitting behind the counter with his
8  feet up with a cell phone or, you know, running his
9  skateboard around the service lot.  I mean, that's --
10 that happened all the time for a while.
11    Q.  All the time meaning from 2022 forward?
12    A.  This was years ago, yes.  I'll tell you the
13 last -- last several months, he was especially bad.  I
14 mean, probably the last 6 months to a year at least.
15    Q.  No -- at no point did he get any kind of
16 written discipline, write-up, performance improvement
17 plan related to that or any other issue, correct?
18    A.  I don't know if there was any formal write-ups.
19 We've never been a company with -- you know, we probably
20 should be a little more structured in that.  But I know
21 that he was talked to several times.  I had talked to
22 him.  I know Clayton had even, you know, probably walked
23 by and said hey, you know.  But I know he'd been talked
24 to several times at least by Colton and members of our
25 service staff behind the service counter.

17
1     Q.  Okay.  Let's talk about overtime.  Boat Town
2  had a policy in their handbook that they pay overtime to
3  hourly employees, correct?
4     A.  I don't -- I don't know.
5     Q.  Okay.
6     A.  But I know that we -- we do pay overtime.
7     Q.  Okay.  And -- and you know now -- you know
8  today that -- well, let me -- strike that.
9         Did you understand in 2022 that Boat Town
10 was required to pay overtime for hours worked more
11 than 40 in any single workweek?
12    A.  No, I don't think anyone here, as y'all know,
13 was aware of that, or that's the way we would have been
14 doing it.  And I have never been -- since I started at
15 Boat Town, I've always been on salary with a commission
16 driver because I've been in sales.  So, you know, I've
17 never been paid since I was here full-time on hourly.
18 But no one knew that that was the way it was supposed to
19 have been done to my knowledge.
20    Q.  No one knew that you had to pay overtime week
21 by week; is that right?  As opposed to pay period by pay
22 period?
23    A.  Correct.  I mean, as you know, we are paying on
24 an 80-hour, you know, biweekly pay period, I guess.
25    Q.  Let's talk about the overtime issue.  You knew

18

1 that Kaden had reported this issue to the company as
2 early as June 6, 2023 correct?
3   A.  Don't know the timeline, but I know that Kaden
4 went to Patti. And that's when I heard about it.
5   Q.  Patti at the time was the controller for the
6 company?
7   A.  Correct.
8   Q.  She was in management?
9   A.  Yes, she handled the payroll.
10  Q.  And she told you what Kaden had reported?
11  A.  Correct.
12  Q.  You knew that Kaden had asked that the -- the
13 unpaid overtime be paid back?
14  A.  Yes.
15  Q.  And Kaden made an informal, internal complaint
16 to Boat Town about not being paid properly for overtime
17 hours?
18  A.  I guess. I just know he brought up to Patti,
19 and that's when we learned about it, and we fixed it as
20 soon as we could.
21  Q.  Okay. Kaden claimed that Boat Town's practices
22 violated the Fair Labor Standards Act or the overtime
23 law requirements, correct?
24  A.  I -- I don't know what, you know, the --
25 whatever you just said, the fair labor act, overtime,

19

1 any of that, what that even entails. But yes, I know
2 that we were in the wrong, and we, you know, fixed it to
3 a biweekly. You know, two 40-hour weeks to calculate
4 overtime.
5   Q.  Okay. But Kaden was the one who first claimed
6 that Boat Town's policies violated the overtime law,
7 correct?
8   A.  Yes, he's the one that brought it up to Patti.
9   Q.  And initially Boat Town did not agree and pay
10 him back, correct?
11  A.  No, we were always cooperative and always going
12 to pay him back once we realized we were doing overtime
13 wrong.
14  Q.  Once Patti raised this to you, did you become
15 the point person for handling this issue?
16  A.  I've had so little involvement with this case.
17 But, I mean, I was in the know. But no, I mean, I had
18 very little involvement. Patti did all the
19 calculations. And, you know, was -- I know we went back
20 2 years which is what, you know, was recommended, and we
21 paid everyone what they were due.
22  Q.  Wasn't there a 3-week delay between when Kaden
23 raised this issue in early June and when Boat Town paid
24 him back his overtime?
25  A.  I don't know what the time lapse was in getting

20

1 checks issued out. I mean, that was a lot of -- a lot
2 of numbers to crunch.
3   Q.  You do agree that Boat Town paid Kaden his
4 unpaid overtime that was owed in June. That the payment
5 was made in June, correct?
6   A.  I don't know when the payment was made. It
7 seems like if I had to go back that long ago, it was,
8 you know, within -- for sure within a couple weeks.
9   Q.  Okay. And so we agree, Boat Town paid Kaden
10 within a couple weeks his unpaid overtime, correct?
11  A.  Yes, I would say so.
12  Q.  Now, there were other employees who were paid
13 the same way as Kaden, correct?
14  A.  Yes.
15  Q.  But Boat Town did not pay them back their
16 overtime at the same time, correct?
17  A.  It was if not the same time, within a very
18 short period of time after. I mean, again, you have to
19 think about going back. Patti was having to do all
20 that, you know, manually and calculate all the numbers.
21  Q.  Well, that was my question --
22  A.  That stuff.
23  Q.  -- why -- why -- what's the reason for the
24 delay between when Kaden was paid back and the other
25 employees that were paid back were paid back?

21

1   A.  Have you ever tried to crunch that many
2 numbers? I mean, Patti was working around the clock, I
3 know for days, weeks to try to go ahead and get all that
4 taken care of. And I don't even know what the delay
5 was. But I know that I was, you know, tasked with
6 helping pass out checks because I passed out -- for a
7 long time, I passed out all of our, you know, payroll
8 checks before we went to direct deposit. But there was
9 a lot of numbers to crunch to go ahead and get that
10 calculated right would be my only guess.
11  Q.  Did Patti seem frustrated with the repayment
12 request from Kaden?
13  A.  No. I mean, I think she was, if anything, more
14 frustrated with herself that, you know, we, you know,
15 had that mistake. I mean, it was an honest mistake no
16 one knew about --
17  Q.  Did Patti --
18  A.  -- I don't think there was any frustration with
19 Kaden.
20  Q.  Did Patti speak with you in early June and ask
21 you to put the hours together for what Kaden might be
22 owed?
23  A.  No, Patti, I don't think, ever -- I mean,
24 because I have nothing to do with payroll or -- or, you
25 know, personnel clocking in and out. Patti handled all

**Page 62**

1   A.  I'm going to go ahead and retract that.  Not
2   that I know of because that was not really my
3   department.  I don't know if, you know, anyone in
4   service ever sat down with anyone because, you know, we
5   do have a service manager, but not that I ever
6   performed, so...
7   Q.  Back -- back in September of 2023, who did
8   Kaden as a boat captain report through?  Like, what was
9   his structure?
10  A.  I don't remember if Chuck was our service
11  manager, or if Colt was our service manager yet at the
12  time.  It was somewhere right in that -- that time frame
13  when that transition was made.  But typically our
14  captains report through our service manager.
15  Q.  So Kaden would report through either Chuck or
16  Colton.  And who do they report to?
17  A.  Chuck or Colton, again, I was, you know, not a
18  GM, so to speak, at the time, I don't believe.  It was,
19  again, years ago but, you know, I was essentially head
20  of the Austin store.  Either myself or Bonnie if I'm not
21  there.
22  Q.  Okay.  Would Kaden also get instructions from
23  Ge -- Geromi?  I think I'm saying that right.
24  A.  Different, tough one to pronounce, Geromi.
25  Q.  Oh.

**Page 63**

1   A.  So Geromi, though.  But yes, Geromi was a
2   veteran sales guy.  He had been with us for a long time,
3   and he was usually our number one performer right there
4   with me.  So he -- you know, our captains would work
5   between sales and service.  They -- they were mostly
6   service folks, but they would help with demos and things
7   like that as well.  And Geromi, lack of better words, he
8   always, you know, kind of, I don't know, he acted like a
9   manager even though he wasn't.  So yes, he would go
10  ahead and ask our captains to do things, help with
11  pickups, deliveries.
12  Q.  Okay.  For 2022 through 2025, Boat Town's
13  annual gross sales exceeded half a million dollars in
14  each of those years, correct?
15  A.  Half a million?
16  Q.  Yeah.
17  A.  Yes.
18  Q.  And Boat Town handles goods that move around
19  state to state like the boats and trailers?
20  A.  Not really state to state, no, but we do sell
21  used boats out of state.
22  Q.  Okay.
23  A.  Boats we -- we, you know, really try to sell
24  locally into our territory.
25  Q.  Well, I mean, the boats are coming -- coming

**Page 64**

1   from other --
2   A.  Yes, they're -- they're man -- manufactured in
3   other states, yes, sir.
4   Q.  And -- and Boat Town purchases inventory and
5   supplies from out of state vendors that get shipped in
6   as well?
7   A.  Correct.
8   Q.  Okay.
9       MR. KAPLAN:  Okay.  Let's take a break.
10      THE REPORTER:  We're off the record at
11  3:30 p.m.
12      (Recess from 3:30 p.m. to 3:35 p.m.)
13      THE REPORTER:  We're back on the record at
14  3:35 p.m.
15  Q   (BY MR. KAPLAN) Just a few more questions.
16  Have you spoken to your father, the owner of Boat Town,
17  about this lawsuit?
18  A.  Yeah.
19  Q.  Is your impression that he is unhappy that
20  Kaden filed this lawsuit?
21  A.  Is anyone ever happy that there's a lawsuit
22  being filed against them?
23  Q.  Okay.  Did you ever talk to your father about
24  the Department of Labor's visit when it happened?
25  A.  Not really, no.

**Page 65**

1   Q.  Did you get the impression that he was unhappy
2   that the Department of Labor visited?
3   A.  Answer your question the same way.  Is anyone
4   ever happy?  It's like saying are you happy the IRS, you
5   know, is doing something.  No, we realized we made a
6   mistake or that there was a mistake.  I wouldn't say we
7   were making a mistake because we were unaware that it
8   was being made.  But we were, you know, trying to get it
9   taken care of and, you know, hoping that was the end of
10  it.  Get everyone paid and be done.
11  Q.  Kaden was the only one who reported the
12  overtime issue ultimately at any point in time in the
13  company, right?
14  A.  He was the only one.  He came to Patti.  And
15  yes, no one ever brought it to our attention.  Are you
16  asking if someone prior to that ever mentioned that we
17  were doing it wrong?
18  Q.  I think that answers the question.
19      And then shortly after Kaden raised this
20  issue, the Department of Labor shows up at the company,
21  right?
22  A.  Correct.
23  Q.  And then in this case, you are asking the jury
24  to believe that you didn't -- that you did not assume
25  that Kaden called the Department of Labor, correct?

70
1  out --
2     A. And I didn't realize the profanity would come
3  back up, but yes, they did. When, you know, Daniel was
4  leaving, and Daniel liked working with Kaden, you know,
5  so yes, they -- they could be productive.
6     Q. Okay. And -- and by that you mean they got
7  things -- they got tasks done that they needed to get
8  done quickly?
9     A. Correct.
10    Q. Okay.
11       MR. KAPLAN: Okay. I'll pass the witness.
12       MR. DePONTE: We'll reserve our questions
13 for the time of trial.
14       THE REPORTER: Mr. DePonte, do you want to
15 purchase a copy of this deposition as well?
16       MR. DePONTE: Yes, please.
17       THE REPORTER: Okay.
18       MR. DePONTE: And we'll read and sign.
19       THE REPORTER: Okay. We're off the record
20 at 3:43 p.m.
21       (Deposition concluded at 3:43 p.m.)
22
23
24
25

72
1     I, CLAYTON RAVEN, JR., have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5                     _____
6                            CLAYTON RAVEN, JR.
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10    Before me, _____, on this day
11 personally appeared CLAYTON RAVEN, JR., known to me or
12 proved to me on the oath of _____ or through
13 _____ (description of identity card
14 or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that he/she executed the same for the purpose and
17 consideration therein expressed.
18    Given under my hand and seal of office on this _____
19 day of _____, _____.
20                     _____
21                     NOTARY PUBLIC IN AND FOR
22                     THE STATE OF _____
23 My Commission Expires: _____
24
25

71
1             CHANGES AND SIGNATURE
2  WITNESS: CLAYTON RAVEN, JR.  DATE: SEPTEMBER 17, 2025
3  Reason Codes: (1) to clarify the record; (2) to conform
   to the facts; (3) to correct a transcription error; (4)
4  other (please explain).
5  PAGE  LINE   CHANGE                        REASON CODE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

73
1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                    AUSTIN DIVISION
3  KADEN McNAMARA on Behalf of  )
   Himself and Others Similarly )
4  Situated,                    )
                                )
5         Plaintiff,            )
                                )
6  vs.                          ) CASE NO. 1:24-cv-869-DII
                                )
7  BOAT TOWN, INC., CLAYTON     )
   RAVEN and CLAY RAVEN,        )
8                               )
         Defendants.            )
9
10              REPORTER'S CERTIFICATE
11        ORAL DEPOSITION OF CLAYTON RAVEN, JR.
12                 SEPTEMBER 17, 2025
13    I, Jean Thomas Fraunhofer, Certified Shorthand
14 Reporter in and for the State of Texas, hereby certify
15 to the following:
16    That the witness, CLAYTON RAVEN, JR., was duly sworn
17 and that the transcript of the deposition is a true
18 record of the testimony given by the witness;
19    I further certify that pursuant to FRCP Rule
20 30(f)(1) that the signature of the deponent was
21 requested by the deponent or a party before the
22 completion of the deposition and is to be returned
23 within 30 days from date of receipt of the transcript.
24 If returned, the attached Changes and Signature Pages
25 contain any changes and the reasons therefor;